UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

RD-6665

DANIEL WIRSHUP,

                  Plaintiff,

-against-

SUFFOLK COUNTY POLICE DEPARTMENT; THOMAS J. SPOTA; SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE; ASSISTANT DISTRICT ATTORNEYS JANE AND JOHN DOES "1"-"5," KEVIN WARD, JOHN SCOTT PRUDENTI, and CHRISTOPHER NICCOLINO; DETECTIVES/POLICE OFFICERS TOM ICAPELLI, ROBERT AMATO, RAYMOND FELICE and JOHN AND JANE DOES "1"-"5," and THE COUNTY OF SUFFOLK,

                  Defendants.

**DEFENDANT COUNTY OF SUFFOLK'S STATEMENT PURSUANT TO RULE 56**

**CV05-4086 (ERK)(ARL)**

1. On March of 2003 Stephen Milvid (hereinafter "Milvid"), a president and co-owner of Debut Concrete and Debut Construction, Inc. (hereinafter "Debut") , was indicted for *inter alia* Grand Larceny in the 2nd degree, Falsifying Business Records in the 1st degree, Offering a False Instrument for Filing in the 1st degree, in connection with contract work with the Town of Brookhaven, as a result of a special Grand Jury investigation that commenced in October of 2002. (See Exhibit 1).

2. One Patricia Strebel (hereinafter "Strebel"), the then Highway Department Supervisor for the Town of Brookhaven, at that time of the Milvid indictment, was considered an unindicted co-conspirator by virtue of her position and her approval of the

1

work that was the subject of the Milvid indictment (see Exhibit 2, Felice Deposition, page 15 and Exhibit 3, Prudenti Depositiion, page 17, Exhibit 5, page 17, line 16-page 19, line 16)

3. During this investigation Detective Raymond Felice and Detective Charlie Bartels had obtained information that prompted them to investigate Milvid and Debut further with respect to other municipal contracts it had obtained. (See Exhibit 2: Felice Deposition, page 30, lines 19-25; see also Exhibit 3: Prudenti Deposition, page 14, lines15 to page 17, line 21; see also Exhibit 4: Amato Deposition, page 45, line 3 - page 46, line 24).

4. During the wider investigation, and as a result of a search warrant at Milvid's offices, various items were seized indicating among other things a close relationship between Daniel Wirshup (hereinafter "Wirshup") – the Superintendent of Public Works in and for the Municipal Village of Patchogue – and Milvid. Among items seized was a rolodex that contained many business and personal telephone numbers of Wirshup. Also, documents revealed Wirshup's son was employed by Debut Concrete. (See Exhibit 2: page 22, line 22 - page 23, line 13; Exhibit 5: Nicolino Deposition, page 25, lines 14-25; see also Exhibit 6: Wirshup Deposition, page 20, lines 20-21).

5. As the investigation continued, Detectives reviewed the billing practices of the Village of Patchogue with respect to work Debut was doing in the Village. A pattern of over billing, and employee underpayment, similar to that uncovered in the Town of

Brookhaven, was also occurring in the Village of Patchogue. The vouchers under review in the Village of Patchogue were all signed by Wirshup. (See Exhibit 5, page 26, lines 9-15; see also Exhibit 3, page 18, lines 3-15).

6. After uncovering what appeared to be favorable treatment enjoyed by Milvid in the Village of Patchogue, Wirshup became a prominent suspect in the ongoing investigation. (See Exhibit 5, page 24, line 12 – page 26, line 23).

7. In furtherance of the investigation a complaint from a civilian was discovered indicating that a Village of Patchogue homeowner had been coerced by Wirshup to use Debut Concrete to repair the sidewalk in front of his house. (See Exhibit 4, page 46, lines 20-24).

8. Similarly, other homeowners reported that they were bullied or otherwise pressured by Wirshup to utilize Debut Concrete to perform "required" repairs on their property and that if another contractor was used the work would be ripped up at the owner's expense if the work did not conform to code. (See Exhibit 2, page 27, line 10-17; Exhibit 4, page 68, line 20 – page 72, line 11 and Exhibit 12.).

9. During the investigation Detective Felice, with the assistance of an engineering firm, conducted random measuring of various sidewalk curbs, flat work and parking lots completed by Debut Concrete in the Village of Patchogue, to determine if the work conformed to the Village code. (See Exhibit 2, page 10, line 10 – page 11, line 4; page

17, line 15 – page 18, line 14 ; see also Exhibit 7: Iacopelli Deposition, page 14, lines 4-9 and Exhibit 12).

10.     The aforementioned inspections revealed a number of deficiencies in work that was purportedly inspected and approved, indicating compliance with the Village code, and signed off on by Wirshup, pursuant to his official duties.  Wirshup himself admitted that the subject work was not in compliance with the code and that he signed the vouchers which would imply code compliance.  He also stated he "would like to think that he did the inspections".  (See Exhibit 2, page 18, line 2 – page 19, line 13; page 31, line 24 – page 32, line 14; page 32, lines 12-14; Exhibit 6, pages 46-62; Exhibit 4, page 76, line 4 – page 77, line 21, and Exhibit 8: On-site Photographs).

11.     Further investigation revealed a number of vouchers paid by the Village of Patchogue to Debut Concrete for work that was never performed but nevertheless approved by Wirshup. (See Exhibit 2, page 18, lines 2-14; Exhibit 4 page 89, lines 3-11).

12.     The result of the physical investigation and the comparison to the work purportedly done on the vouchers signed by Wirshup, led to the conclusion that the "obvious" omissions were not simple human error, sloppiness or laziness on the part of Mr. Wirshup but indicative of purposeful behavior. (Exhibit 7, page 29, line 4 - page 34, line 17; see also Exhibit 4, page 198, line 18 - page 199, line 25).

13. An investigation into Wirshup's personal finances was conducted and it indicated that he maintained a modest lifestyle and otherwise did not live beyond his means as a Superintendent of Public Works suggesting that there were no outward payments to Wirshup from Debut. (See Exhibit 4, page 86, line 11 – page 91, line 23).

14. Absent obvious financial gain, investigators theorized that Wirshup was likely acting at the behest of others and that he himself was a "low man" in a deliberate course of conduct that favored Debut and defrauded the Village of Patchogue. (See Exhibit 7, page 28, line 7 - page 29, line 11; page 46, lines 6-11).

15. The investigation revealed that Milvid had been a substantial political contributor to the Village's Mayor Steven Keegan and that Mr. Keegan had appointed Wirshup to his job despite not being qualified for the position pursuant to Civil Service Law. Wirshup's appointment, in effect, bypassed the Civil Service process. The conclusion of the investigators was that Wirshup was beholden to Keegan as a result (Exhibit 7,page 30, line 25 – page 36, line 23, and page 41, line 11 – page 43, line 22; see also Exhibit 4, page 73, line 13 – page 76, line 3; Exhibit 6, page 20, line 18 - page 22, line 6).

16. Believing that Wirshup was signing vouchers on substandard work performed by Debut at the direction of others in the Village, a decision was made to attempt to have Wirshup cooperate with the ongoing investigation. (See Exhibit 3, page 27, lines 3 – page 28, line 17).

17.     Mr. Wirshup was contacted via his attorney Mr. Patrick O'Connell and in late October of 2002 a meeting at the District Attorney's office was held. (See Exhibit 3, page 19, line 2 - page 22, line14 and page 29, lines 17-25; see also Exhibit 2, page 13, line 2 – page 14, line 3 and Exhibit 6, page 77, line 3 – page 85, line 7).

18.     At the aforementioned meetings, Wirshup, through his attorney Mr. O'Connell, was offered an opportunity to come forward and to assist with investigation. Mr. O'Connell indicated he wished to know the information that led to the interest in Wirshup before his client would answer questions. The District Attorney declined to offer any information until Wirshup indicated to them who decided to approve substandard work to the benefit of Debut. The meeting abruptly terminated when neither side changed their demands. (See Exhibit 2, page 13, line 2 – page 14, line 21; Exhibit 3, page 23, line 24 – page 28, line 28; Exhibit 5, page 29, line 12 – page 34, line 16 and Exhibit 6, page 77, line 3 to page 85, line 7).

19.     At the conclusion of the aforementioned meeting, Assistant District Attorney Christopher Nicolino discussed with Mr. O'Connell that he had a conflict of interest in his representation of Wirshup by virtue of his representation of Brookhaven Town Highway Superintendent Strebel (who was simultaneously being investigated for a similar course of conduct between Debut and the Town of Brookhaven) and urged Mr. O'Connell to withdraw from the Wirshup case. At the time of this meeting, the investigation had established that Mr. O'Connell had a close personal relationship with Village Mayor Keegan and that he had been appointed by Mr. Keegan to act as a Village

Justice. This was not discussed with Mr. O'Connell because of the possibility that Keegan could be a potential target and could have been the individual instructing Wirshup to give favorable treatment to Debut. (See Exhibit 4, page 73, line 13 – page 76, line 3; Exhibit 5, page 12, line 13 – page 15, line 23; Exhibit 6, page 20, line 18 – page 22, line 6 and page 93, lines 2-16; Exhibit 7, page 30, line 25 – page 36, line 23).

20. On the day of the aforementioned meeting, Mr. Wirshup had not been arrested or indicted. (See Exhibit 3, page 28, lines 4-17; and Exhibit 9: Superseding Grand Jury Indictment).

21. Since Mr. O'Connell continued to represent both Wirshup and Strebel, and the relationship with Mayor Keegan created apprehension in revealing the facts of the investigation to Mr. O'Connell for fear that Keegan would learn that he was a potential target, no further attempts were made to have Wirshup cooperate. (See Exhibit 5, page 9, line 23 – page 13, line 18).

22. On February 6, 2003 Detective Investigators Amato and Iacopelli, (herein after "Amato" and "Iacopelli" respectively) while en-route to their respective investigative duties in the Village of Patchogue, made a routine stop at a 7-Eleven store in Patchogue for coffee and to discuss and coordinate their respective assignments in the Village of Patchogue for the upcoming day and inadvertently ran into Wirshup. (See Exhibit 7, page 20, line 19 - page 21, line 24; see also Exhibit 4, page 114, line 22 – page 117, line 23).

23.     Iacopelli, while in-line to pay for coffee at that 7-Eleven store, noticed Mr. Wirshup in front of him.  Mr. Wirshup appeared to be having some problem with his credit card purchase at which point Iacopelli initiated conversation. After a brief introduction and identification Iacopelli asked Mr. Wirshup if he would like to speak with him and his partner Amato who at that time was waiting outside in his unmarked vehicle.  Wirshup agreed and they got inside the unmarked vehicle for a conversation. This conversation was not taped.  (Exhibit 7, page 23, lines 2 – page 24, line 17; see also Exhibit 4, page 138, line 6 – page 140, line 15; see also Exhibit 6, page 88, line 20 – page 90, line 22; Exhibit 2, page 33, line 6 – page 34, line 9).

24.     During a brief conversation in the car, Amato and Iacopelli, in an attempt to "cultivate" Wirshup as an informant indicated to him he may have engaged in criminal activity but they wished to have him cooperate.  It was explained that if Wirshup chose to cooperate he would have to be represented by an attorney but that that attorney could not be Mr. O'Connell because he had a conflict and might not act in his best interest. (See Exhibit 6, page 90, line 23 – page 92, line 3; see also Exhibit 4, page 144, line 20 – page 146, line 11, page 168, line 9 – page 169, line 7; see also Exhibit 7, page 24, line 18 – page 26, line 10).

25.     Mr. Wirshup expressed interest to Amato and Iacopelli in cooperating and inquired as to other attorneys available.  Amato and Iacopelli informed him that no specific attorney could be recommended and he would have to find one on his own. Amato informed Mr. Wirshup that a criminal investigation in the Village of Patchogue

8

was ongoing and gave him his business card with a number to contact Amato if and when Wirshup decided to cooperate. No other discussions were held and Wirshup made no inculpatory statements nor was he asked to give an inculpatory statement. (See Exhibit 4, page 146, line 9 – page 148, line 11; page 168, line 9 – page 169, line 25 and Exhibit 6, page 91, lines 5-13).

26. After the initial contact at the 7-11 on February 6, 2003, Wirshup relayed the information about this contact with Amato and Iacopelli to Mr. O'Connell and they subsequently decided to contact the Investigators and to in fact tape his contact with them. See Exhibit 6, page 105, line 9 – page 108, line 11.

27. After this contact with Wirshup, the assigned District Attorney's were advised that Wirshup may decide to cooperate in the investigation. (See Exhibit 4, page 158, line 6 – page 159, line 21; Exhibit 5, page 20, lines 6-17; and Exhibit 7, page 68, line 7 – page 69, line 18).

28. On February 10, 2003 Wirshup contacted Amato by phoning him. During the conversation Wirshup again expressed an interest in cooperating with the investigation. Amato again told him that any cooperation would be impossible unless another attorney was retained and suggested that "other" people in the Village should be dealing with the problems in Patchogue that the investigation had uncovered. This conversation was taped by Wirshup. (See Exhibit 4, page 151, lines 4 - page 166, line 3; also Exhibit 6, page 108, line 22 – page 109, line 20; and Exhibit 10 tape transcript for 2/10/05).

29. On February 24, 2003 Wirshup placed two phone calls to Amato and Iacopelli. Both of these conversations were also taped by Wirshup. (See Exhibit 10, tape transcripts for 2/24/03).

30. During the first conversation, Amato again encouraged Wirshup to cooperate by suggesting he may have problems relating to their investigation and reiterated that he should obtain another attorney. Wirshup responded by suggesting a Paul Gianelli as his counsel in place of Mr. O'Connell. Amato indicated that this would be fine but that he would have to check with the Assistant District Attorney's. (See Exhibit 6, page 109, line 21 – page 113, line 25; Exhibit 4, page 188, line 23 – page 189, line 5; and tape transcript for 2/24/03).

31. When the District Attorney's office learned of Wirshup's desire to retain Mr. Gianelli they instructed the investigators that Mr. Gianelli would also have a conflict of interest problem because he represented Milvid, who at the time, was on the verge of being indicted in the original Brookhaven investigation and was the same contractor that had dealt with Wirshup in the Village of Patchogue. Amato was unaware of this when he indicated to Wirshup that Mr. Gianelli would be fine. (See Exhibit 3, page 36, line 19 – page 37, line 14; Exhibit 4, page 191, line 10 – page 192, line 6; Exhibit 6, page 114, lines 2-24; and tape transcript for 2/24/03).

32. On February 24, 2003 at approximately 5:28 p.m. a second conversation occurred between Wirshup and Iacopelli. This conversation was also taped by Wirshup. (See Exhibit 6, page 114, lines 2-6 and tape transcript for 2/24/03).

33. During this second conversation on February 24, 2003 Iacopelli told Wirshup that after consulting with prosecutors, they were informed that Mr. Gianelli could not represent him since Mr. Gianelli had a similar conflict of interest issue along with Mr. O'Connell. Iacopelli did not recommend a specific attorney, but indicated that neither Mr. O'Connell nor Mr. Gianelli could be utilized. Iacopelli also reiterated that Wirshup may have a problem with respect to the subject investigation and that he (Iacopelli) felt it could be worked out. (See Exhibit 6, page 114, line 6 – page 115, line 2; and Exhibit 10 tape transcript for 2/24/03).

34. On March 7, 2003 a final meeting occurred at the 7-Eleven in Patchogue between Wirshup, Amato and Iacopelli. This conversation was also taped by Wirshup. During this meeting Wirshup was informed that neither Mr. Gianelli or Mr. O'Connell would be acceptable if he wanted to cooperate. Wirshup was also told about the current investigation in general terms and why it would be to his benefit to cooperate. This included telling Wirshup they believe he did what he did because he was following orders. Wirshup was also told that if he decided to "come in" with another attorney, the D.A.'s would have to be informed because there's a process they would then have to go through. At no point during this meeting was Wirshup asked any inculpatory statements or to provide information of any kind. (See Exhibit 6, page 120, line 2 – page 133, line 8;

11

Exhibit 5, page 7, line 23 – page 12, line 15; Exhibit 3, page 41, line 22- page 42, line 11; and Exhibit 10, tape transcripts for 3/7/03).

35. The March 7, 2003 meeting was the last contact that investigators had with Wirshup during the investigative phase of the case. Because Wirshup never contacted the District Attorney's Office with an un-conflicted attorney, a "shadow counsel" process was never undertaken. Had Mr. Wirshup appeared with an un-conflicted attorney, the District Attorney would have directed that the matter be brought before the empanelling judge of the special grand jury conducting the subject investigation. (See Exhibit 5, page 9, line 23 – page 12, line 15; Exhibit 3, page 41, line 22 – page 42, line 11; and Exhibit 13)

36. On May 28, 2003 a Superseding Indictment was handed up charging Patricia Strebel, Steven Milvid, Debut Concrete, Rlorinda Ferriera and Daniel Wirshup with various counts covering the defendants interactions in the Town of Brookhaven and the Village of Patchogue. (See Exhibit 9).

37. On December 28, 2006 during Wirshup's deposition the following questions were asked and the following answers were given:

Q: I'm talking the broad stroke. Do you ever go in to talk to them [referring to the D.A.'s office] about your relationship, with Mayor Keegan or anybody else downtown, with Mr. Milvid or any other contractor?
A: No.
Q: In your estimation, why does that not happen? Do you make a decision, conscious decision, not to go and talk to them?
A: No.

Q: You don't make a conscious decision?
A: To go over to the D.A.'s office and talk to them?
Q: You never go and talk to them?
A: No.
Q: In fact, after March 7, 2003, there is no longer any contact between you and either the detectives or the District Attorney's office; correct?
A: That was the last contact I had with the investigators; correct.
Q: So, you don't take steps to go in to cooperate with them. You make the decisions not to?
A: That's a question that you should probably ask my attorney.
MR. BARKET: Meaning, Mr. O'Connell?
THE WITNESS: Mr. O'Connell, right.
(See Exhibit 6, page 126, line 16 - page 127, line 17).

38. On May 28, 2003 the Grand Jury returned a verdict "not guilty" for Daniel Wirshup and "guilty" verdicts for defendants Patricia Strebel, Steven Milvid, and Debut Concrete on various counts. (See Exhibit 11: Grand Jury Superseding Indictment; and Exhibit 14, Honorable Gary Weber decisions after trial).

Dated: Hauppauge, New York
October 31, 2007

Yours, etc.

CHRISTINE MALAFI
SUFFOLK COUNTY ATTORNEY
Attorney for Defendants
County of Suffolk, Ward, Prudenti
Niccolino, Iacopelli, Amato & Felice
H. Lee Dennison Building
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York 11788

By: _____
Richard T. Dunne/RD-6665
Assistant County Attorney

To:
Bruce A. Barkett, Esq.
Attorney for Plaintiff
Law Offices of Bruce A. Barkett, P.C.
666 Old Country Road, Suite 600
Garden City, NY 11530