Page 1

```
 1                                                  1
 2   UNITED STATES DISTRICT COURT
 3   EASTERN DISTRICT OF NEW YORK
 4   -----------------------X
 5   DANIEL WIRSHUP,
 6                 Plaintiff,
 7        -against-
 8   SUFFOLK COUNTY POLICE DEPARTMENT,
     SUFFOLK COUNTY DISTRICT ATTORNEY,
 9   THOMAS J. SPOTA; SUFFOLK COUNTY
     DISTRICT ATTORNEY'S OFFICE, ASSISTANT
10   DISTRICT ATTORNEYS JANE and JOHN DOE
     "I" - "S;" ASSISTANT DISTRICT ATTORNEYS
11   KEVIN WARD, JOHN SCOTT PRUDENTI, and
     CHRISTOPHER NICOLINO; DETECTIVES/POLICE
12   OFFICERS TOM IACOPELLI, ROBERT AMATO,
     and RAYMOND FELICE, DETECTIVES/POLICE
13   OFFICERS JOHN and JANE DOE "I" - "S,"
     and THE COUNTY OF SUFFOLK,
14
                  Defendants.
15
     -----------------------X
16
            666 Old Country Road
17          Garden City, New York
18          May 31, 2007
            2:05 p.m.
19
20       EXAMINATION BEFORE TRIAL of RAYMOND
21   FELICE, one of the Defendants in the above-
22   entitled action, held at the above time and
23   place, taken before Holly Daloia, a shorthand
24   reporter and Notary Public of the State of
25   New York.
```

Page 2



```
 1                                2
 2   A P P E A R A N C E S:
 3
 4   LAW OFFICE OF BRUCE BARKET
        Attorneys for Plaintiff
 5      666 Old Country Road
        Suite 600
 6      Garden City, New York 11530
     BY: BRUCE BARKET, ESQ.
 7
 8
 9
     SUFFOLK COUNTY ATTORNEY'S OFFICE
10      Attorneys for Defendants
        H. Lee Dennison Building
11      100 Veterans Highway
        Hauppauge, New York 11788
12   BY: RICHARD DUNNE, ESQ.
13
14
15   ALSO PRESENT:
16   Daniel Wirshup
17   Tom Iacopelli
18   Robert Amato
19
20
21
22
23
24
25
```

Page 3

```
 1                     3
 2
 3        S T I P U L A T I O N S
 4
 5       IT IS HEREBY STIPULATED AND AGREED
 6   by and between the attorneys for the
 7   respective parties herein, that filing,
 8   sealing and certification be and the
 9   same are hereby waived.
10
11       IT IS FURTHER STIPULATED AND AGREED
12   that all objections, except as to the
13   form of the question shall be reserved
14   to the time of the trial.
15
16       IT IS FURTHER STIPULATED AND AGREED
17   that the within deposition may be signed
18   and sworn to before any officer authorized
19   to administer an oath, with the same force
20   and effect as if signed and sworn to before
21   the Court and that a copy of this
22   examination shall be furnished without
23   charge to the attorney representing the
24   witness testifying herein.
25
```

Page 4

```
 1                         4
 2            (Notice was marked as
 3        Plaintiff's Exhibit 4 for
 4        identification, as of this
 5        date.)
 6   R A Y M O N D   F E L I C E,
 7        the witness herein, having first
 8        been duly sworn by a Notary Public
 9        of the State of New York, was
10        examined and testified as follows:
11   EXAMINATION BY
12   MR. BARKET:
13        Q.   Please state your name for the
14   record.
15        A.   Raymond Felice.
16        Q.   Do you recognize what I marked as
17   Plaintiff's Exhibit 4?
18        A.   Do I recognize it?
19        Q.   Have you ever seen it before?
20        A.   No.
21        Q.   Were you asked to bring anything to
22   the deposition today?
23        A.   No.
24        Q.   How did you find out the deposition
25   was today and where to go?
```

Page 5

Raymond Felice 5

A. I was advised by the County Attorney's office.
Q. You were invited?
A. Advised.
Q. Have you ever been deposed before?
A. No.
Q. I'm going to ask a series of questions. If a question is not clear to you, just say that and I would try to rephrase it. If you don't indicate that, we are all going to assume the answers you gave are responsive to the questions, okay?
A. Yes.
Q. Have you ever testified in court?
A. Yes, I have.
Q. How many times?
A. Numerous.
Q. Have you ever been a party to a lawsuit?
A. No.
Q. Have you ever been sued or sued anyone?
A. No.
Q. Did you review any documents or

Page 6

Raymond Felice 6

materials concerning this case prior to coming here for the deposition?
A. I looked at the synopsis of the IAD file.
Q. When did you do that?
A. In my office this morning.
Q. Are you currently employed?
A. Yes.
Q. What do you do?
A. I'm a police detective.
Q. Who do you work for?
A. Suffolk County Police Department.
Q. How long have you been so employed?
A. I just started 37 years.
Q. What is your current assignment?
A. I'm assigned to the Labor Law Unit of the Suffolk District Attorney's Office.
Q. How long have you been in that unit?
A. Roughly six years.
Q. What are your responsibilities within that unit?
A. Enforce the New York State Labor Law 220, prevailing wage violations.

Page 7

Raymond Felice 7

Q. Do you know Detective Amato?
A. Yes, I do.
Q. How do you know him?
A. He works in the DA's office.
Q. The gentleman sitting next to me?
A. Him, right there (indicating).
Q. How about Detective Iacopelli?
A. Yes.
Q. How do you know him?
A. He also works in the DA's office.
Q. Have you ever worked on a case with them?
A. The Debut Concrete case.
Q. How was it that you were involved in the case?
A. I started the case with my partner and several other detectives, investigators, dating back in 2002. Looking at all the billing of concrete flat work done by Debut Concrete in the Town of Brookhaven.
Q. I'm curious, how is that related to the Labor Law Unit?
A. He also had his day workers -- he wasn't paying them prevailing wage for day

Page 8

Raymond Felice 8

work.
Q. Did you have any employment before the Suffolk County Police Department?
A. Yes.
Q. What was that?
A. I worked as a police officer, seasonal police officer in the Village of Ocean Beach. I drove a truck before that. I worked in Grumman Aircraft.
Q. What is your educational background?
A. I have a GED.
Q. Do you have any training in college at all?
A. Years ago. We took some college courses through the police department, college credits.
Q. Do you have any training other than as a police officer, any other profession?
A. I'm a plumber.
Q. Certified -- is there such a thing?
A. Licensed. I'm not licensed anymore.
Q. Any training or work or experience

Page 9

Raymond Felice 9

Q. in construction or concrete?
A. I poured some concrete, construction. I've grown up in the construction trade, yes.
Q. You say you poured some concrete. In what capacity?
A. Building renovations and stuff.
Q. Is that a part-time job you had while a police officer?
A. No, as a young boy.
Q. I don't mean to embarrass you, I'm sure I wont, but how long ago was that?
A. Fifty years ago, forty-five years ago.
Q. The construction, what kind of construction work?
A. My uncles were builders. My father was a plumber.
Q. Going back forty years ago?
A. Young boy, yes.
Q. I kind of asked the question, do you have any expertise in this, other than the work --
A. Practical training.

Page 10

Raymond Felice 10

Q. Yes. Other than the work -- do you have any formal training in concrete or construction?
A. No.
Q. Do you hold yourself out as an expert in any field other than as a law enforcement officer?
A. No.
Q. Are you familiar with the investigation involving Daniel Wirshup?
A. Yes.
Q. Were any experts used in connection with the investigation involving Mr. Wirshup?
A. I believe the Village of Patchogue when measuring the curbing and flat work done in the Village, the Village of Patchogue hired an engineering firm.
Q. Who was the firm?
A. They were from Blue Point.
Q. We'll leave a blank. You can fill it in later.
(INSERT):
Q. Did you utilize those experts in the course of your investigation?

Page 11

Raymond Felice 11

A. We accompanied them measuring sidewalks, flat work, parking lots. Stuff like that, yes.
Q. Did you have attorneys that analyzed the Village code?
A. Did I have an attorney?
Q. Not you, personally. Did you utilize an attorney to analyze the Village code during the course of your investigation?
A. I don't know if anybody analyzed it. I think they looked at it.
Q. Who is "they?"
A. The attorneys in the office.
Q. District attorneys?
A. Yes.
Q. Who would they be?
A. Could have been Kevin Ward, John Prudenti, Chris Nicolino.
Q. What was the professional relationship between yourself and the people from Suffolk County District Attorney Squad, Amato and Iacopelli?
A. My relationship?
Q. Yes, in the course of this

Page 12

Raymond Felice 12

investigation. Was there a structure set up?
A. Not really.
Q. Was it your case and you asked them what to do? Was it their case and they asked you what to do?
A. No, it was basically a case that came into the office and myself and Detective Bartel, Detective Investigator Weber, Detective Investigator Pataglia, Amato, Iacopelli, we all worked on it.
Q. Did you ever have a conversation with Mr. Wirshup?
A. Yes, I think in September of 2002.
Q. Where did the conversation take place?
A. Village Hall, Patchogue.
Q. What was the nature of the conversation?
A. I was subpoenaing records from the Village. I also subpoenaed records from Mr. Wirshup. John Lund was a foreman, I believe, and Billy Felice, an assistant foreman.
Q. Was the conversation limited to

Page 13

1    Raymond Felice    13
2  years of subpoena records, things like that?
3      A.  Yes, basically.
4      Q.  Did you ever talk to him at the
5  district attorney's office or the police
6  department?
7      A.  Yes.  He came in with his attorney,
8  Mr. O'Connell.  That might have been in
9  October 2002.
10     Q.  You were present for that meeting?
11     A.  Outside having a cigarette.
12 Mr. Wirshup came in with his attorney.  I met
13 Mr. Wirshup.  I did have a conversation.  His
14 step-sister was married to my sister-in-law's
15 brother and there was a wedding in our
16 family.  I asked him if he had seen the boy
17 that came up from Florida, whatever, his
18 nephew.
19     Q.  Did you participate at all in the
20 meeting he had with the district attorney --
21     A.  I sat in on that meeting, yes.
22     Q.  Who else was present?
23     A.  I believe Mr. Prudenti.  Possibly
24 Mr. Nicolino, Detective Bartel, myself.  I
25 believe, Mr. O'Connell, Mr. Wirshup.

Page 14

1    Raymond Felice    14
2      Q.  How long did the meeting last?
3      A.  A half hour.
4      Q.  What was discussed?
5      A.  Mr. Prudenti asked Mr. Wirshup if
6  he would want to assist us in the
7  investigation, if he knew certain things
8  about certain people.  And Mr. Wirshup said
9  no, he had no knowledge of anything and that
10 was it.
11     Q.  Were you aware that meetings were
12 being set up prior to attending it?
13     A.  I might have been told that day.
14     Q.  Do you know who Mr. Wirshup was in
15 connection with the investigation?
16     A.  Yes.  I met him at the Village
17 Hall.
18     Q.  Do you know the role he played in
19 the investigation?
20     A.  He was the superintendent of DPW in
21 the Village.
22     Q.  Was there any discussion prior to
23 the meeting about the propriety of
24 Mr. O'Connell representing Mr. Wirshup?
25     A.  Not to my recollection, no.

Page 15

1    Raymond Felice    15
2      Q.  Was there any discussion among law
3  enforcement officers after the meeting of the
4  propriety of Mr. O'Connell representing
5  Mr. Wirshup?
6      A.  Not to my knowledge, no.
7      Q.  Did you ever participate in or hear
8  a conversation about whether or not
9  Mr. O'Connell had some kind of conflict and
10 shouldn't be representing Mr. Wirshup?
11     A.  Later on in the investigation, I
12 heard some rumbling about it.
13     Q.  When you say you heard some
14 rumbling --
15     A.  There might have been a conflict
16 because Mr. O'Connell represented
17 Mrs. Strebble (phonetic), Superintendent of
18 Highways in Brookhaven.  We had already
19 arrested Mr. Melvid, who was vice president
20 of Debut Concrete.  He was represented --
21 Mr. O'Connell represented Mrs. Strebble and
22 we continued our investigation and found
23 shortages in work done in the Village of
24 Patchogue as well.  There was some talk about
25 there might be a conflict.

Page 16

1    Raymond Felice    16
2      Q.  Among who?
3      A.  The conversation?
4      Q.  Yes, who was the conversation with?
5      A.  Possibly the ADAs in the office.
6      Q.  Was this the meeting that you
7  attended with Mr. O'Connell and Mr. Wirshup,
8  was this conflict brought to Mr. O'Connell's
9  attention?
10     A.  I answered that before.  I don't
11 believe so.
12     Q.  When you all sat down, whenever it
13 was, I guess Fall '02 -- October?
14     A.  October.
15     Q.  Did anyone from the district
16 attorney's office say to Mr. O'Connell, "You
17 can't represent him.  We have a problem with
18 you representing him because we think you
19 have a conflict?"
20     A.  Not while I was present.  I didn't
21 hear it.
22     Q.  What role did you play in the
23 investigation with respect to Mr. Wirshup?
24     A.  I carried over -- we had looked at
25 Brookhaven Town and the shortages in

Page 17

Raymond Felice 17

Brookhaven Town as far as curb conducted by Debut Concrete. I had seen Debut's equipment in Patchogue the year before, the Summer before. So I had an idea that they had done work and I talked to other contractors and people in the trade. He was very active, Debut Concrete. He had done a lot of work in the town. He had done a lot of work at the schools and had also done some work in Patchogue. Patchogue was in the location of Brookhaven Town and I wanted to see if he also shorted the Village of Patchogue as far as overcharging or not doing the work.

Q. Did you examine any of the sites that were repaired by Melvid?

A. Yes.

Q. In Patchogue?

A. Yes.

Q. Did you examine any of the sites that Mr. Wirshup certified or approved?

A. Yes.

Q. How many?

A. Numerous, again. Hundreds of feet of curbing and sidewalk.

Page 18

Raymond Felice 18

Q. Did you form a belief that Mr. Wirshup was involved in criminal activity?

A. Once we started measuring the flat work and curbing, there was some question about that, yes, because he was signing off on the PO, the purchase orders, and one instance, I think, this one curbing job that was done, Rose Avenue, to the best of my recollection -- it was not -- it was the Rose Avenue job and Woodworks Lane. There was 104 foot of curbing that didn't exist that was signed off on.

Q. You heard the conversation or questioning I did this morning with Mr. Iacopelli.

The difference between, perhaps, Mr. Wirshup being a bad employee and a criminal, you heard those questions?

A. Yes.

Q. What evidence can you point to that Mr. Wirshup was involved in criminal activity as opposed to just being sloppy or negligent or lazy or something like that?

Page 19

Raymond Felice 19

A. Once again, one particular instance, I believe, 104 feet curbing that didn't exist that was charged to a job that he signed off on.

We seized Debut's records with a search warrant prior to Melvid's arrest. We brought up, I believe, his QuickBooks and we also had his employment log. In the Summer of 2002, I believe, it was my partner going through the books, noticed Brian Wirshup was employed by Debut Concrete. We later found out that that was Mr. Wirshup's son.

Q. How does that answer my question? I don't follow the connection.

A. If you're looking for some type of reimbursement, the son was being paid. I believe, he made over $3,000 that Summer. When we spoke to some of the people because, I believe, he had -- there was possibly one or two days that he worked in Patchogue Village and nobody had ever seen him there. It was an assumption on our part that maybe this was some type of reward.

Q. When you say you spoke to people,

Page 20

Raymond Felice 20

who did you speak to?

A. Other employees of the Village on the Highway Department. We asked if they knew Mr. Wirshup's son. They said yes. We asked, "Did you see him work" --

Q. Who are these people you spoke with?

A. I believe one was John Lund. The other was William Felice.

Q. Anyone else?

A. There may have been. I don't recall.

Q. How many days did Mr. Wirshup's son work in Patchogue, according to the records?

A. I thought there were several days that he appeared on the records.

Q. Several being?

A. Maybe two or three days.

Q. Mr. Lund and Mr. Felice, what did they do that that would have necessarily seen --

A. The DPW workers, they were in the Village of Patchogue at the time and, I believe, they seemed to be working there. It

Page 21

1  Raymond Felice  21
2  was a fairly large project on South Ocean
3  Avenue.
4      Q.  So they were at the same work site
5  where Mr. Wirshup's son was?
6      A.  They passed by. I don't know if
7  they were working there constantly but the
8  Village is only a couple of square miles.
9      Q.  Let me see if we can't narrow it
10 down just a little bit. Let me ask the
11 question a little bit broader.
12         Why is it that you think Lund or
13 Felice would have necessarily seen
14 Mr. Wirshup's son?
15     A.  Because they were privy to the work
16 that was going on. I believe they were at
17 that site quite often.
18     Q.  Assuming Summer is 120 days long
19 and he is there for two or three of those
20 days at a work site and it's not a work site
21 where Lund and Felice were assigned or were
22 working themselves --
23     A.  I don't know --
24         MR. DUNNE: Object to the
25     form of the question.

Page 22

1  Raymond Felice  22
2         Answer it as best you can.
3      A.  I don't know if they were assigned
4  to that particular project on a daily basis.
5      Q.  But they might have stopped by?
6      A.  They drove by. Maybe they assisted
7  them. I don't know.
8      Q.  In other words, what would be their
9  basis for saying -- obviously they could say,
10 "We never saw him."
11     A.  I believe at that time, I believe,
12 my partner, Detective Bartel, asked them if
13 they knew Mr. Wirshup's son and they said
14 yes. My partner asked did they ever see him
15 on a job in the Village of Patchogue. They
16 said no.
17     Q.  It's certainly not unusual if they
18 were not assigned to the site --
19        MR. DUNNE: Objection.
20        That's a statement, not a
21     question.
22     Q.  Were they assigned to sites where
23 Mr. Wirshup's son was -- the records
24 indicated he was working?
25     A.  I don't know if they were assigned

Page 23

1  Raymond Felice  23
2  there. I wasn't assigned to that particular
3  project on a daily basis or eight hours on a
4  daily basis, no.
5      Q.  Did you ever interview any
6  employees that worked with the same company
7  that Mr. Wirshup's son worked at?
8      A.  Yes.
9      Q.  Who did you speak to?
10     A.  Lucio, I think it's Gonzalez.
11     Q.  Did you confirm Mr. Wirshup's son
12 was actually employed and performed work for
13 Melvid Company?
14     A.  I don't think Mr. Gonzalez worked
15 with his son, or don't recall.
16     Q.  The records you looked at with
17 Mr. Wirshup's son -- his first name is Brian?
18     A.  Right.
19     Q.  Where Brian Wirshup was assigned,
20 were other people assigned to the same job?
21     A.  Yes. I would have to look through.
22     Q.  Did you go and interview those
23 people?
24     A.  They weren't all cooperative with
25 us.

Page 24

1  Raymond Felice  24
2      Q.  Did you speak with anyone who
3  worked at those jobs who told you either
4  Mr. Wirshup's son did, in fact, perform the
5  work that the records indicate or wasn't
6  there when --
7      A.  No, they weren't cooperative.
8      Q.  You didn't make a determination of
9  that either way?
10     A.  No.
11     Q.  What you said was an assumption of
12 the two or three days he was in Patchogue.
13 That assumption is based on what Lund and
14 Felice told you?
15     A.  It was based upon, I believe, his
16 workbooks and my partner questioned them and
17 they said they had never seen him work in
18 Patchogue.
19     Q.  Other than the two or three days he
20 supposedly worked in Patchogue, are there any
21 other dates he was working in Patchogue?
22     A.  Not to my knowledge.
23     Q.  The $3,000, was that compensation
24 for those two or three days?
25     A.  Over the course.

Page 25

Raymond Felice 25

2  Q. Over course of the Summer
3  employment?
4  A. Yes.
5  Q. How old was Brian at the time?
6  A. Maybe a teenager or late teenager
7  at that time.
8  Q. Remind you of anybody?
9     Was he assigned to other jobs?
10 A. I believe so.
11 Q. Did you go out to those other jobs
12 to see if he was working at those places?
13 A. That was the year before the work
14 had been complete.
15 Q. Did you go out and talk to the
16 people there to see if Brian had worked
17 there?
18 A. The workers weren't cooperative.
19 Q. Let me swing back to where I
20 started.
21    The indication that Brian -- was I
22 wrong to infer that you were implying that
23 Brian had a no-show job in exchange for his
24 father doing things for Melvid?
25 A. No. All I said is nobody had seen

Page 26

Raymond Felice 26

2  him in the Village of Patchogue when my
3  partner asked if they had seen him on the
4  job.
5  Q. That would have been two or three
6  days?
7  A. To the best my recollection.
8  Q. Getting back to the first question
9  I asked, which is evidence of Mr. Wirshup's
10 criminal intent, is what, if anything, other
11 than his son working for Melvid the year
12 before?
13 A. I never really spoke to Mr. Wirshup
14 about it, so I wouldn't know what his intent
15 is.
16 Q. Not Brian, but evidence of
17 Mr. Wirshup's criminal intent, Daniel.
18 A. I never spoke to Daniel Wirshup
19 about his criminal intent.
20 Q. Right. But you can prove criminal
21 intent through -- as a police officer, do you
22 have evidence of his intent, cash that he
23 received from Melvid, do you have statements
24 made by him to other people that he had a
25 scam going, do you have --

Page 27

Raymond Felice 27

2  A. No.
3     MR. DUNNE: At which time?
4     MR. BARKET: Ever.
5  Q. As we sit her now, do you have any
6  evidence of criminal intent?
7  A. His intent, no.
8  Q. Did you testify in the Grand Jury?
9  A. No.
10 Q. Do you have any evidence of a
11 motive for Mr. Wirshup to having him
12 participated in this criminal conspiracy?
13 A. We have, I believe, other
14 investigators took statements that he was
15 very highLY pressure, as far as selling Debut
16 Concrete to work that was condemned in the
17 Village, homeowners, other than that, no.
18 Q. Do you have any indication why he
19 would have done this?
20 A. I could think of ten reasons why.
21 You're asking for intent or motive?
22 Q. Or proof.
23 A. Or proof, I don't have any at this
24 point.
25 Q. When did Mayor Keegan -- when was

Page 28

Raymond Felice 28

2  he in office, do you remember?
3  A. I guess late '90s, early 2000. I
4  don't know the exact times when he was there.
5  Q. Who was the mayor in 2001, 2002,
6  Patchogue?
7  A. I don't know if it was Keegan or
8  Ihne, I-H-N-E, at that point.
9  Q. Did you have any conversations with
10 Mr. Amato and Mr. Iacopelli about them
11 speaking to Mr. Wirshup about Mr. O'Connell
12 representing him?
13 A. Later on in the investigation I
14 heard that they spoke to Mr. Wirshup.
15 Q. As part of your -- were you given
16 any training as a police officer concerning
17 when you can talk to a suspect and when you
18 couldn't?
19 A. Over the years, yes.
20 Q. Is there a manual in Suffolk about
21 that?
22 A. I'm sure it's in the rules of
23 procedures in one of the publications.
24 Q. Are you related to Mr. Felice?
25 A. Yes.

Page 29

Raymond Felice 29

Q. What is your relationship with William Felice?

A. His relationship to me?

Q. Either/or.

A. He is my second cousin's son. You do -- what is it second cousin once removed?

Q. If you were Mayor of New York you could marry him.

What's his position now? Does he still work in the Village of Patchogue?

A. Yes, I think he is still working there.

Q. What does he do?

A. I think he was an assistant foreman. I guess that's what he still does.

Q. Who took over Mr. Wirshup's job when he left?

A. I don't know if they replaced him or just left Lund who was the foreman under Mr. Wirshup. I guess he is running it.

Q. Is there anybody else in the Village of Patchogue that's related to you that works for the Town?

A. I think there is a boy that works

Page 30

Raymond Felice 30

on a garbage truck. It might be Vinny Felice. Richard Felice works in the garage as a mechanic.

Q. How about the Village clerk?

A. Now or then?

Q. Then.

A. Richard Colacola (phonetic), his mother was Felice. I think a cousin, second cousin to my father.

Q. Was there any discussion about whether or not you should be conducting an investigation into Patchogue, given your family's numerous ties to the Village?

A. I had mentioned that I had relatives that worked in the Village of Patchogue and they didn't seem to be the target of the investigation. They said no.

Basically, my investigation started in the Town of Brookhaven. They only carried it over into the Village because I was familiar with what was done to the Town of Brookhaven. We looked at Debut's work in the Village of Patchogue and it was the same type of method.

Page 31

Raymond Felice 31

Q. Is there a relative of yours by the name of Sal or Salvatore Felice?

A. Yes.

Q. Was he involved in politics at all?

A. He was a Village trustee or an appointed trustee. That would be William's brother.

Q. Had he ever run for office?

A. I think he did, yes.

Q. For mayor?

A. I don't know, mayor or trustee. He might have ran for school board too.

Q. He is your second cousin's son, as well?

A. Yes. He is William's brother.

MR. BARKET: Other than the documents, we'll stop here.

MR. DUNNE: I just have a few questions to clarify the record.

EXAMINATION BY
MR. DUNNE:

Q. Detective, can you indicate how it was that you came into the Town of Patchogue?

Page 32

Raymond Felice 32

A. Like I said before, I had seen them working in the Summer of 2001 with some Debut equipment. I told the boss in the office that if they were going to continue, we would look at them again. They did work down there. When the investigation came up in the Town of Brookhaven of the shortages in the Town of Brookhaven, at that point I said, let's go down and look in the Village of Patchogue.

We found shortages, we found numerous monolithic pours and curbing, sidewalks. Shortages in curbs and sidewalks.

Q. What was your primary responsibility with respect to what was established as a larger investigation?

A. Just to go down to the Village and determine if it was work done and subpoenaed some POs, work orders, and when we compared it to measuring, the work didn't exist.

Q. Was there a, quote, "Patchogue team?"

A. Yes, to do the whole Patchogue investigation and everything else, Amato and

Iacopelli.

Q. Your responsibility was in Brookhaven, primarily?

A. Primarily, yes.

Q. One thing we didn't ask. Assuming February 6, '03 is the correct date, were you scheduled to meet with Detectives Iacopelli and Amato?

A. Yes.

Q. At any point in time, did you make any phone calls to them?

A. Yes, I did.

Q. Can you just explain the circumstances of the phone call?

A. We were to meet that late morning at the Village Hall in Patchogue to try to stay away -- I tried to stay away from the Department of Public Works and have the crew come to the Village Hall. When I got there, they weren't there. I may have left a couple of minutes before. I waited awhile and I called them. By that time I had headed back up to see if they went to the other location, the Department of Public Works. I didn't see

a car in the lot. I called and they said they were at 7-Eleven and that they had bumped into Mr. Wirshup.

Q. At that point that day or any time prior, did you or Detective Iacopelli or Detective Amato decide you were going to take a run at Mr. Wirshup?

A. No, not at all.

Q. Was there any discussion about attempting to look for Mr. Wirshup at DPW?

A. No.

MR. DUNNE: That's it.

MR. BARKET: What does "take a run" mean?

(Continued on next page to accommodate jurat.)

THE WITNESS: If you're going out to question somebody, you look at his place of employment, his home, take a run to see if he wants to talk to you.

-o0o-

(Whereupon, the examination of Raymond Felice was concluded at 2:40 p.m.)

RAYMOND FELICE

Subscribed and sworn to
before me this day
of , 2007.

NOTARY PUBLIC

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Raymond Felice | Mr. Barket | 4 |
| | Mr. Dunne | 31 |

EXHIBITS

| PLAINTIFF'S | | PAGE |
|---|---|---|
| 4 | Notice | 4 |

INSERTS

| DESCRIPTION | PAGE |
|---|---|
| Name of engineering firm | 10 |

Page 37

                                37

         CERTIFICATE

     I, HOLLY DALOIA, a Notary Public
within and for the State of New York, do
hereby certify:
     That the witness(es) whose testimony
is hereinbefore set forth was duly sworn by
me, and the foregoing transcript is a true
record of the testimony given by such
witness(es).
     I further certify that I am not
related to any of the parties to this action
by blood or marriage, and that I am in no way
interested in the outcome of this matter.



         HOLLY DALOIA