COPY                                                    1

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF SUFFOLK

- - - - - - - - - - - - - - - - - - - -

DANIEL WORSHIP,

                              Plaintiff,

          -against-

SUFFOLK COUNTY POLICE DEPARTMENT; THOMAS J.
SPOTA; SUFFOLK COUNTY DISTRICT ATTORNEY'S
OFFICE; ASSISTANT DISTRICT ATTORNEYS JANE
AND JOHN DOES "1"-"5," KEVIN WARD, JOHN
SCOTT PRUDENTI and CHRISTOPHER NICOLINO;
DETECTIVES/POLICE OFFICERS TOM ICAPELLI,
ROBERT AMATO, RAYMOND FELICE and JOHN
AND JANE DOES "1"-"5," and THE COUNTY OF
SUFFOLK,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - x

                         100 Veterans
                         Memorial Highway
                         Hauppauge, New York

                         June 5, 2007
                         10:45 a.m.

          **EXAMINATION BEFORE TRIAL** of **JOHN SCOTT**

**PRUDENTI**, one of the Defendants in the above-

entitled action, held at the above time and

place, pursuant to Notice, taken before

Eileen Savino, a shorthand reporter and

Notary Public of the State of New York.

**ON TIME COURT REPORTING**
**516-535-3939**

RECEIVED
JUN 2 2 2007
BRUCE A. BARKET

A P P E A R A N C E S:

BRUCE A. BARKET, P.C.
        Attorneys for Plaintiff
        666 Old Country Road
        Garden City, New York   11530
BY:  BRUCE A. BARKET, ESQ.


SUFFOLK COUNTY DEPARTMENT OF LAW
        Attorneys for Defendants
        H. Lee Dennison Building
        6th floor
        100 Veterans Memorial Highway
        P.O. Box 6100
        Hauppauge, New York   11788
BY:  RICHARD T. DUNNE, ESQ.
        Assistant County Attorney


ALSO PRESENT:

    Christopher A. Nicolino

    Daniel Worship

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties:

That all rights provided by the CPLR, including the right to object to all questions except as to form, or to move to strike any testimony at this deposition, are reserved for trial; and that failure to object to any question, or to move to strike any testimony at this deposition shall not be a bar or waiver of the right to make such objection or motion at the trial of this action.

That this deposition may be sworn to by the witness before any notary public; and the failure to do so, or to return the original transcript to counsel for the party on whose behalf it was taken, shall not be deemed a waiver of the rights provided by CPLR Rule 3116, and shall be so controlled.

That the filing and certification of this examination are waived.

That a copy of this examination shall be furnished without charge to the attorney representing the witness testifying herein.

J O H N    S C O T T    P R U D E N T I,

the witness herein, having first

been duly sworn by a Notary Public

of the State of New York, was

examined and testified as follows:

EXAMINATION BY

MR. BARKET:

    Q.    Please state your name for the record.

    A.    John Scott Prudenti.

    Q.    Please state your address for the record.

    A.    33 Evergreen Avenue, East Moriches, New York  11940.

    Q.    Good morning.

    A.    Good morning.

    Q.    Have you ever been deposed before?

    A.    Once, I believe.

    Q.    What was the context?

    A.    It was a matter involving an inquiry into a food sickness.

    Q.    Were you the plaintiff?

    A.    Defendant.

    Q.    Let me skip over that for the time

being.

        I'm going to be asking a series of questions.  You know that.  If I'm not clear, just say that, and I'll try to rephrase.

    A.   Certainly.

    Q.   If you answer the question, we will all assume that you understood the question.

    A.   Very well.

    Q.   You're an attorney?

    A.   Yes.

    Q.   How long have you been practicing?

    A.   Since 1986.

    Q.   Where did you graduate from law school?

    A.   Touro.

    Q.   What year?

    A.   1985.

    Q.   Did you work between 1985 and 1986?

    A.   At a restaurant.

    Q.   Where did you go to college?

    A.   Oneonta.

    Q.   What did you get your degree in?

    A.   Bachelor of Arts.

    Q.   In what subject?

A.    History and a political science

minor.

Q.    Other than working for the Suffolk

County District Attorney's Office, have you

had any other legal employment?

A.    Off and on doing work for my

father's firm, basically awaiting admission

to the Bar during the Summer of -- during the

period of 1985 to 1986.

Q.    You were a defendant in a civil

lawsuit?

A.    I don't know if it got that far.

There was inquiry made with respect to a

person claiming that they had a food-bourne

illness from a number of restaurants, one of

which was owned by my family.

Q.    When was that?  Do you recall?

A.    I don't recall.

Q.    Other than that, have you ever been

a plaintiff or a defendant in a civil

lawsuit?

A.    Not that I'm aware of.

Q.    I take it you have never been

charged with any type of crime?

          A.    In 1980, I was arrested for driving
while intoxicated, subsequently pled to
impaired.

                    MR. DUNNE:  Note my

                    objection to the question, but

                    under the federal rules, he is

                    permitted to answer that, and the

                    answer is there.

                    MR. BARKETT:  Why would you

                    object then?  It's already on the

                    record as asked.

                    MR. DUNNE:  Well, you are

                    permitted, but that doesn't mean

                    that several years down the road --

                    I mean, that's what the federal

                    stips mean.

          Q.    Other than that, no other criminal
charges?

          A.    No.

          Q.    The context of your employment as
an assistant district attorney, have there
ever been allegations of profitory misconduct
directed at you?

          A.    I'm not aware of any.

Q.    Have you ever been the subject of a
complaint to the grievance committee?

A.    None that I'm aware of.

Q.    Just to follow up on the
misconduct --

                    MR. DUNNE:  Misconduct

                    question?

                    MR. BARKET:  Right, the

                    misconduct question.

Q.    Obviously, you've obtained a number
of convictions over the years; is that right?

A.    I would think so.

Q.    Well, you don't have to think so.
We know that to be true.  Yes?

A.    Yes.

Q.    Sometimes individuals file what we
refer to as post-judgment motions.

        Do you know what those are, in
general?

A.    Yes.

Q.    440s?

A.    440 motions.

Q.    Some of the 440s may or may not
include allegations that the trial prosecutor

engaged in misconduct.

Are you familiar with that as a
concept or an argument?

A.    I've heard that used as an
argument.

Q.    Has anyone ever filed a 440 or
post-judgment motions alleging that you
engaged in some misconduct during the trial?

MR. DUNNE:  Again, I note my
objection, but go ahead, John, and
answer that as best you can.

A.    All of our 440 motions are answered
by our appeals.  I don't have the occasion to
do the appeals.  Whatever extent that our
input is necessary to help them, we provide
that.  There may or may not be, but none that
I'm aware of.

Q.    There was no instance where you
were aware of an individual complaining that
you failed to disclose exculpatory material
or other discoverable material?

A.    Again, none that I'm aware of.

Q.    Starting with your current
position, I want to work backwards to where

1  you worked in the District Attorney's Office.

2        Where are you currently working?

3      A.     I'm a Deputy Bureau Chief for the

4  Major Crime Bureau.

5        MR. BARKET:  Off the record

6        for a second.

7        MR. DUNNE:  Sure.

8        (Whereupon, a discussion was

9        held off the record.)

10      Q.     How long have you had that

11  position?

12      A.     Since December of -- I want to say

13  December '05.

14      Q.     So that would make it about a year

15  and a half?

16      A.     That's about right.

17      Q.     Before that?

18      A.     Homicide.

19      Q.     For how long?

20      A.     Since June '04 -- May or June '04,

21  around that time period.

22      Q.     Before you were working in

23  Homicide?

24      A.     Economic Crimes.

         Q.    The dates for that?

         A.    Probably for about a year and a

half, two years.  So if we're working

backwards, then --

         Q.    June '02?

         A.    Yeah, probably August, maybe August

'02 to June '04, sounds about right.

         Q.    Prior to working at Economic Crimes

Bureau?

         A.    Rackets, what was then called the

Rackets Bureau, which is now Rackets

Investigations.

         Q.    The Rackets Bureau, is that aimed

at organized crime?

         A.    Yeah.  I guess one of the areas

would be organized crime.

         Q.    Have you ever been cross-designated

to work with a federal law enforcement

agency?

         A.    No.

         Q.    Have you ever worked with federal

law enforcement officers in connection with

responsibilities as an assistant district

attorney?

1

2      A.     I'm sure during the course of my

3    tenure involving different investigations, I

4    have had occasions to work with them, but I'm

5    not recalling any specific joint

6    investigations where both of us were working

7    on the same thing.  We probably assisted each

8    other.

9      Q.     How long did you work in the

10   Rackets Bureau?

11     A.     Probably, I would say -- where are

12   we at there, '02?

13     Q.     Yes.

14     A.     Either '89 or '90, to '02.

15                    MR. DUNNE:  1990.

16     Q.     Prior to that?

17     A.     That would be the Major Crimes

18   Bureau.

19     Q.     How long were you in that bureau?

20     A.     Approximately seven or eight years.

21     Q.     That brings us back to 1992.

22     A.     That would have been the Family

23   Crimes Bureau.

24     Q.     How long were you there?

25     A.     Approximately two years.

1

2      Q.   Where did you start in the office,

3   in the District Court?

4      A.   I started in the District Court in

5   1986.

6      Q.   How long were you in the District

7   Court Bureau?

8      A.   Approximately a year.

9      Q.   Where did you go from District

10   Court?

11      A.   East end, which was either an

12   extension or subdivision of the District

13   Court Bureau, but it was -- I don't remember.

14      Q.   How long were you at the east end?

15      A.   Approximately a year.

16      Q.   Where did you go after that?

17      A.   Felony screening, Grand Jury -- I

18   believe it was combined.

19                MR. DUNNE:  It was combined.

20      Q.   Richard Dunne is your lawyer in

21   this particular case, right?  He is

22   representing you as part of the Suffolk

23   County Attorney's Office?

24      A.   Yes.

25      Q.   Did you two know each other when

you were in the District Attorney's Office?

    A.    Yes.  I believe we started at or about the same time.

            MR. DUNNE:  No, the same day or --

            MR. BARKET:  Well, his recollection controls.

    Q.    Let me direct your attention, if I can, to the investigation concerning Daniel Worship.  Do you recall that?

    A.    Yes.

    Q.    What was your role in that investigation?

    A.    To the best of my recollection, my role was I was brought in at some point after the initial arrest and initial indictment of Stephen Milvid who was a contractor doing business with the Town of Brookhaven.  After that initial investigation, we were looking in other areas where Milvid had, in fact, done work.  One of those areas was the Municipal Village of Patchogue.

    Q.    You were assigned to work on the investigation and look at other areas where

1  Mr. Milvid had poured concrete or done

2  construction work?

3      A.    Correct.

4      Q.    What were your assigned duties?

5  What were you supposed to be doing?

6      A.    We were looking at other areas

7  where his construction projects were, in

8  fact, taking place to see if there was any

9  commonality as to the way that he was, in

10 fact, doing his business or performing his

11 work.

12     Q.    Who was your supervisor?

13     A.    Ed Heilig.

14     Q.    Mr. Nicolino who is here today, was

15 he working on that case as well?

16     A.    He was working, but in a different

17 capacity.  We had kind of split this up.  I

18 kind of came in after the Brookhaven thing

19 had started, and we were looking at different

20 targets in the Town of Brookhaven.

21     Q.    Did there come a point in time

22 where you met with or came across the name

23 Daniel Worship?

24     A.    Yes.

Q.    When was that?

A.    The first time that I came across
the name of Daniel Worship, I was informed by
Mr. Nicolino that after a search warrant or
something to do with a warrant with respect
to Mr. Milvid's office was analyzed, and his
name came up either on a rolodex or there was
some other way that there was contact there,
and then I later learned that he did, in
fact, have a position with the Village of
Patchogue related to Mr. Milvad's working in
Patchogue.

Q.    By the way, did you ever receive a
Notice of Deposition to come to the
deposition today?

A.    I don't believe I did.

          MR. DUNNE:  I got it.

Q.    Did you bring any documents with
you today?

A.    Actually, I brought the -- it ended
up being four copies, the verdict sheet that
was done by Judge Weber with the results of
the criminal case.

Q.    You mean his written decision

2   issuing a verdict?

3        A.    Yes.

4        Q.    Any notes or reports or any other

5   documents?

6        A.    No.

7        Q.    Were you asked to bring any?

8        A.    No.

9        Q.    After coming across Mr. Worship's

10   name, did you make a decision as to whether

11   or not you wanted to speak to him or believed

12   he was either a witness or a target of the

13   investigation?

14        A.    Based upon what we knew at the time

15   through the Strebel Milvid connection, we

16   believed that there could be areas where

17   there could be some commonality with

18   Mr. Worship and Mr. Worship's involvement

19   with Milvid and others that Milvid was, in

20   fact, involved with, involving both Patchogue

21   and the Town of Brookhaven.

22        Q.    So you thought that Mr. Worship was

23   potentially a witness or potentially a

24   target?

25        A.    A target with respect to

substandard work being done, if he would have
had knowledge of that, and I believe through
his position that he would have been the
person charged with that task and, again, it
seems to have been some patterns repeating
themselves through very similar patterns that
were, in fact, done in Brookhaven, including
but not limited to what they call monolithic
pour, substandard curb work, work that was
being measured incorrectly, and I think in
both instances, we learned that the necessary
records were not being kept and maintained
with respect to Mr. Milvid's failure to pay
minimum wage to his employees.

    Q.    Did you make a decision that you
wanted to speak with Mr. Worship?

    A.    A decision was made that
Mr. Worship would be the person to speak to.

    Q.    Who made that decision?

    A.    I believe I spoke to Mr. Nicolino,
myself, and I would have talked to Ed Heilig,
and I think a decision was made at some
point; something to the effect of let's see
if he wants to come in and talk to us.

Q.     Did you discuss how you arrange to

speak with Mr. Worship?

A.     I believe Mr. Nicolino had called

Mr. O'Connell on some occasions and not

getting a call back.  I then called Pat

O'Connell.  He called me back, and a meeting

was subsequently set up.

Q.     How did you know to contact

Mr. O'Connell?

A.     I believe that I had that

information from someone.  I don't know if I

got it from either Mr. Nicolino, but I do

know that a couple of calls were made to Pat

that were unreturned, and then I know that I

had called.

Q.     Let me back up a bit.

I guess at some point in time, your

office learned that Mr. Worship had retained

an attorney for this matter?

A.     I guess I'm making the assumption

because I'm calling him, but yeah, we would

have had to have learned that.

Q.     Do you know who first contacted

Mr. Worship and learned that he was

represented by counsel?

    A.    That I don't know.  I just -- my recollection is that there were several phone calls that were left unreturned and that I, in fact, called back and said, "Hey, does your guy want to come in or not?"

    Q.    What did you say to him?

    A.    I said, "Does your guy want to come in or not?"

    Q.    Why didn't you call Mr. Worship directly when Mr. O'Connell didn't return the calls?

    A.    Because we called, you know, and for whatever reason, we were either led to believe, or I was told that O'Connell was his attorney.

    Q.    The fact that Mr. Worship had retained an attorney for the matter, did that have any impact or effect on your decision to contact him directly?

    A.    I'm not following you.

    Q.    Well, if Mr. Worship was not represented by counsel, I take it that you would've contacted Mr. Worship directly; is

that right?

     A.     That's correct.

     Q.     Did you think that it was a choice
as to whether or not you could call
Mr. Worship directly when he was represented
by counsel?

     A.     No.  I guess we received or -- I'm
not guessing.  We would have been aware at
that point because we were, in fact, calling
O'Connell.

     Q.     How many meetings did Mr. Worship
and Mr. O'Connell attend at your office?

     A.     I'm only aware of one, in which I
was present.

     Q.     Who else was present for that
meeting?

     A.     I believe that meeting took place
in a downstairs conference room.  It was
myself, Mr. O'Connell, Mr. Worship, and I
think Mr. Nicolino, and perhaps one or two of
our investigators.  I'm sure that there would
have been an investigator present.

          My recollection of that day is that
we spent more time out on the front porch

smoking a cigarette than the meeting lasted

because the meeting lasted five minutes, if

that.

Q.    Do you have any record of the

meeting?

A.    No.

Q.    Did you make any notes?

A.    No, i did not.

Q.    Did you record that the meeting

took place anywhere?

A.    I just have a recollection that the

meeting took place in the first floor

conference room of our office in Hauppauge.

Q.    In lengthy investigations, did you

have a method to keep track of the

investigation?

A.    We would have meetings that --

Q.    I'm sorry.  I don't think the

question was very clear.  Let me come back

and walk through a few other things.

Typically, in the State District

Attorney's Office, you would get cases after

the crime has occurred, right?

A.    That is correct.

        Q.    However, in some of the specialized
bureaus, you actually go out and supervise
the investigations and do the investigations,
after the crime has occurred, obviously, but
before an arrest is made; is that fair?

        A.    That would be correct.

        Q.    Some of those investigations in.
Economic Crimes and Organized Crimes or
Rackets can be quite lengthy; is that right?

        A.    That is correct.

        Q.    And they can be quite complicated
in terms of number of witnesses or legal
issues and so forth?

        A.    That's also correct.

        Q.    Did you keep a folder or a
notebook, or did you have a method to keep
track of in written form the stages of the
investigations?

        A.    No, I did not.

        Q.    Did you have any calendar that you
would use?

        A.    The -- no.

        Q.    At the meeting with Mr. O'Connell
and Mr. Worship, what was discussed?

A.    I think, in general terms, whether or not he wanted to cooperate with this investigation, that it was quite possible that he, himself, could have liabilities as a result of the activities which we were learning about.  We had already -- I believe up until this point, we had already established Milvid's practices within the Town of Brookhaven, and initial reports were coming back that a lot of the same things were being observed in Patchogue but obviously on a smaller scale but, again, a very similar type of (a) substandard work, (b) not paying for minimum wage, (c) monolithic pours, and also short pouring and systematical billing.

Q.    All this was discussed at this meeting?

A.    No, this was --

Q.    Let me go back then and ask the question again.

What was discussed at the meeting?

A.    Whether or not he wished to avail himself of cooperating with our office, and I

believe the question came from Mr. O'Connell
as to, "Okay. What have you got?" I believe
it was myself that responded, "This is not
the way it works. You're going to have to
talk to your client. You know, what our
investigation is. You know where this has
been going."

I think it was quite public with
respect to Milvid. Every fact of his arrest
in September was like a shock wave that had
gone through the political word, and I
believe quite a few people were aware of this
particular arrest. I believe his equipment
was, in fact, seized and taken into impound
which was the subject of a lot of discussion,
and he may or may not have been informed
that, "Okay, listen. We know that Milvid's
working in your town." I think it was more
along the lines of, "Do you want -- this is
your chance. Do you want to cooperate with
us?"

And, again, it was basically,
"Okay. What do you have on him? Can you
tell us? We're not going to play our part

out for you.  You have to decide.  Do you
want to come forward or not?"

I believe that's when Mr. O'Connell
said that they weren't interested, and the
meeting took place pretty much as long as my
explanation of this answer to you.

Q.    So he said he wasn't interested in
cooperating and that was the end of it?

A.    Pretty much.

Q.    He said that in front of
Mr. Worship?

A.    Yes.

Q.    Did Mr. Worship say anything during
the meeting?

A.    I don't recall Mr. Worship saying
anything at the meeting.

Q.    Let me go over this so that a lay
person reading this will understand what
you're saying, and so that I make sure that
my understanding is correct.

When you say "cooperate," do you
mean in a typical sense of a witness who
might be a witness to a crime on the street
would come in and testify and cooperate?

2          A.    No.

3          Q.    Or did you mean cooperate in the

4     sense that in exchange for offering

5     testimony, you may be more lenient in any

6     prosecution of Mr. Worship?

7          A.    That is correct.

8          Q.    I take it that you have dealt with

9     individuals who have cooperated in that sense

10    in the past; is that right?

11         A.    That is correct.

12         Q.    Is that a regular part of your

13    responsibilities as a prosecutor?

14         A.    Yes, it is.

15         Q.    To frequently make, for lack of a

16    better phrase, deals with people who have

17    committed crimes to get other people who have

18    committed crimes?

19         A.    That is correct.

20         Q.    Reduce their sentences, reduce the

21    criminal charges that they have to plead

22    guilty to, yes?

23         A.    If the situation warrants it, yes.

24         Q.    In exchange for what you would

25    require would be, in your view, truthful

testimony against other individuals?

    A.    That is correct.

    Q.    At this point in time, Mr. Worship had not been arrested, had he?

    A.    No, he had not.

    Q.    Had be been indicted?

    A.    No, he had not.

    Q.    The status of the investigation as to Mr. Worship was still in its investigative phase; is that right?

    A.    As it was with everybody with respect to this, with the exception of Mr. Milvid.  Mr. Milvid remained the only person that was, with respect to this initial investigation, was the only one that was placed summarily under arrest.

    Q.    Now, in this capacity, working in the investigative phase, is there a hierarchy who has control of the investigation, the prosecutors that work in the District Attorney's Office or the police detectives that work in the District Attorney's Office?

    A.    I'm not following you.

    Q.    Well, you're familiar with

Detective Amato?

    A.    Yes, I am.

    Q.    What about Detective Icapelli?

    A.    Yes, I am.

    Q.    Detective Felice?

    A.    Yes.

    Q.    They were employees of Tom Spota; is that right?

    A.    Yes, they were.

    Q.    As are and as were you at the time?

    A.    Yes, that's correct.

          MR. DUNNE:  Off the record.

          MR. BARKET:  Sure.

          (Whereupon, a discussion was

          held off the record.)

    Q.    By the way, when did this meeting take place?  What was the date of meeting?

    A.    I'm giving you an approximate time period here, but my recollection would some time of mid to late October, early November. I remember Fall.

    Q.    Fall of what year?

    A.    I would be fairly comfortable saying Fall of '02.

Q.    Getting back to my question, if
there were disagreements as to what should
the next step in the investigation be, who
would have the authority to make that
decision, the prosecutors or the detectives?

A.    The detectives would report their
findings.  Their findings would be discussed
by us and depending on what part of the
investigation the detectives were involved
in, that would result in the information
going to whoever would be responsible for
that part of the investigation.  My part of
this investigation at this point in time was
the overall Brookhaven investigation with
respect to matters of Milvid with other areas
that he would have been doing work in.

Q.    Who was in charge, the prosecutors
or the police?

A.    They would again give us the
information, and we would then look to see
what we could do with this information, and
based on the information provided to us, we
would decide to issue other subpoenas, look
at other records, and then they would go out,

and if there were other leads, they would go
out and chase those leads.

Q.   The detectives ultimately have to
follow the direction of the prosecutors; is
that right?

A.   To a certain extent, yeah.

Q.   Was there an ongoing grand jury
investigation into Mr. Worship's activities
at the time of this meeting?

A.   At this time, there had been, yes.
There had been some grand jury investigation
as to -- I think certain matters were
subpoenaed, that I became aware of, and some
similar, again, construction companies were
coming up that we were familiar with, both in
Brookhaven and Patchogue.

Q.   Ultimately, Mr. Worship was
indicted by the grand jury; is that correct?

A.   That is correct.

Q.   Who presented the case to the grand
jury?

A.   The case was presented by myself
and Mr. Nicolino.

Q.   When did that grand jury

presentation begin?

    A.    I'm unsure of the exact date.  I do know that this was not a regular grand jury. So I do know that this did not take place in a typical term.  It was presented to a special grand jury.  To the best of my recollection, I would say that the initial part of the grand jury was started in March, possibly April of '03.  I'm comfortable with saying the Spring of '03.  It would have been the initial part of the investigation, Spring or it could have been early Summer, but it was --

    Q.   We won't hold you to a particular month.

    When did the grand jury hand up this indictment against Mr. Worship?

    A.    I'm not sure of the hand up, but I want to say the latter part of Spring of '03.

    Q.    So a few months after it started?

    A.    Yeah.  It was a lengthy grand jury investigation.

    Q.    But it was from the Spring of '03. It wasn't to the Spring of '04, was it?

A.    There was a lot of information that was subpoenaed, both with respect to him, more so with Milvid, more so with the Village of Patchogue.

Q.    I'm just concerned with the timing at this point.  You said it started in the Spring of '03, March or April, and you said it ended with the hand up late Spring or early Summer of '03?

A.    Correct.

Q.    So it all would have taken place within the confines of three or four months; is that fair?

A.    But you're leaving out the subpoena part.  There were records that were subpoenaed months in advance.

Q.    By the same grand jury?

A.    By way of the grand jury subpoenas.

Q.    By the same grand jury?

A.    I'm not sure if this grand jury -- I'm not sure of the term of this particular grand jury.  I know this grand jury was a special, but I don't know --

Q.    When it was in term?

A.   What the term was is what I'm
trying to tell you.

Q.   Did there come a point in time
where you became concerned with Mr. O'Connell
representing Mr. Worship?  If you became
aware of -- just the timing.  Did you become
concerned at some point in time?

A.   There became a concern when it
appeared that Pat Strebel, Patricia Strebel,
the highway superintendent, was also now
implicated through the access of records
seized and analyzed and certain other records
looked at that it appeared that Patricia
Strebel also would be a potential target, and
we were notified that Pat O'Connell would be
representing her as well.

Q.   When did that occur?

A.   That would have occurred some
time -- I know that I learned about that at
some point in December of '02.  I would have
had to have learned that.

Q.   Who was the supervising judge of
the grand jury that was issuing the subpoenas
at that time?

A.    I don't recall.

Q.    There was a supervising judge; is that right?

A.    There was a supervising judge.

Q.    So that if there were legal issues that arose during the course of the investigation, you could go to the judge for rules; is that right?

A.    That's true.

Q.    Did you ever utilize that?

A.    No, I did not.

Q.    Once you were aware of Mr. O'Connell's possible representation of Ms. Strebel, what did you do?

A.    I believe at some point I had a chance conversation with his partner and indicated to him, "I think this is going to be coming up, and you guys are going to be representing two of these. I think you're going to have a conflict sooner or later down the line." He didn't think so.

Q.    Are we aware of a meeting that took place between Mr. Worship, Mr. Icapelli, and Mr. Amato at a 7-Eleven?

A.    I became aware of it.

Q.    When did you become aware of it?

A.    I believe I became aware of that meeting after I had listened or was informed about a tape that was made by Mr. Worship.

Q.    So that would have been during the trail or well after the indictment?

A.    I don't know if it was well after the indictment. It actually might have been before the indictment but after the presentation that Mr. Tineri brought some concerns to the District Attorney himself, and we became aware of --

Q.    Were you aware that Detective Amato and Detective Icapelli were talking to Mr. Worship without consulting Mr. O'Connell?

A.    No, I was not.

Q.    Until the tapes were brought to your attention, did you ever become aware of it?

A.    At some point, I think I became aware of a conversation where it was felt that he might be looking for another lawyer, and he may want to cooperate, but he wanted

to cooperate with Gianelli, and I think at

that point, it was -- I know I became aware

of it because Gianelli represents the other

co-defendant.  So he would not be allowed to

cooperate in respect to that as well because

we thought that there would be conflicts,

some obvious conflicts.

    Q.   Who brought the possibility that

Mr. Worship would hire Mr. Gianelli to your

attention?

    A.   That would have been -- I believe

that would have been one of the detectives.

I just recall that coming to my attention.

    Q.   When the meeting left, with you and

Mr. O'Connell and Mr. Worship, and you said

it was extremely brief, was there any

ambiguity as to whether or not Mr. Worship

was going to cooperate?

    A.   I don't think there was any

ambiguity.

    Q.   I mean, you were told, as I gather

from what you said, unequivocally that he was

not interested in that and that was the end

of it; is that right?

A.    That's correct.

          MR. DUNNE:  Are you asking

     on the day of the meeting?

          MR. BARKET:  Right.  On the

     day of the meeting.

Q.    You're aware of the rules of
professional responsibility and ethics and
that you're not permitted to have contact
with a person that is represented by counsel;
is that right?

A.    That's correct.

Q.    It's actually part of a code of
professional responsibility.

A.    That's correct.

Q.    Once you met with Mr. O'Connell and
Mr. Worship, you recognized that you were not
free to speak to Mr. Worship about the
subject matter that Mr. O'Connell was
representing him for without Mr. O'Connell's
permission; is that right?

A.    Yeah, and I had no further
conversations with Mr. Worship.

Q.    You recognize that you were not
free to direct others to go and speak to

Mr. Worship without Mr. O'Connell's

permission; is that right?

     A.    And I did not direct others to

speak to him.

     Q.    In other words, if Detective Amato

had said to you, "Hey, I want to go speak to

Mr. Worship," you would have told him, "No,

that's not permitted?"

               MR. DUNNE:  Objection to the

               speculative nature of the question,

               but you can answer that as best you

               can.

     A.    I would have told him not to speak

to Mr. Worship.

     Q.    Without Mr. O'Connell's permission?

     A.    I would told him not to speak to

Mr. Worship.

     Q.    Did Detective Amato or Detective

Icapelli ever come to you and indicate that

they wanted to speak to Mr. Worship and try

talking him into cooperating, despite his

initial position?

     A.    I think at some point in time, it

was discussed that maybe this guy wants to

come in, and I said that, well, you know, he

can't come in with the attorneys that are

already involved in this.  We were aware of

other avenues that were continuing in this

investigation, and I believe we saw potential

conflicts.

    Q.    When you say you were told that he

might want to come in, who told you that?

    A.    Possibly one of --

    Q.    Icapelli or Amato?

    A.    It would've been one of those two

individuals.

    Q.    You said that he can't come in with

the lawyers that had been discussed.  Did

that include Mr. O'Connell?

    A.    It certainly would have included

Mr. O'Connell, and it would have included

Mr. Gianelli.

    Q.    So that if Mr. O'Connell had called

you up and said, "You know what?  My client

changed his mind.  He wants to cooperate."

You would've said to him that he's got to get

a new lawyer?

    A.    We would have allowed to him to

cooperate, but he would have had to switch

lawyers, and we would have pointed out to

Mr. O'Connell that without disclosing who the

particular conflicts are, for obvious

reasons, these weren't people that were

already arrested and --

Q.     Did you ever --

A.     Let me finish my answer.

Q.     I'm sorry.

A.     These were not people who were

already arrested.  We didn't want to be in a

situation where it could be that

Mr. O'Connell and I were talking about, you

know, Mr. Barket, we know that you're

friendly with him or that you know him.  He's

next.

Q.     Let's not use me in that particular

context, but continue.

A.     We didn't want to have that

situation arise.

Q.     Did you ever move to have

Mr. O'Connell disqualified from representing

Mr. Worship?

A.     No.

Q.    Are you familiar with the method to do that?

A.    Yes, I am.

Q.    So if you believed that an attorney in a criminal case had an unwaivable conflict of interest, you know that there is a procedure to have that attorney disqualified?

A.    That would have been up to Mr. Worship, in fact, if he wished to avail himself of cooperation, my belief.

Q.    Were you aware that between December '02 and February '03 that Mr. Worship had several phone conversations with Detective Amato and/or Detective Icapelli?

A.    I wasn't aware of it at the time. I became aware of it.

Q.    After you became aware of that, were there any disciplinary proceedings or conversations had with Icapelli and Amato about the propriety of speaking to a represented individual.

                    MR. DUNNE:  I'm going to
                    object to the form of that, but you

1

2          can try to answer that as best you

3          can.

4     A.     You're talking about the talk

5   thing?

6     Q.     In other words, stop doing what

7   they had been doing?

8                    MR. DUNNE:  No.  Objection.

9                    That is a complete

10                   mischaracterization of the answer

11                   that was just given.

12                   Don't answer that question.

13    Q.     They were told to stop talking to

14   him?

15    A.     Yes.  The decision was made to stop

16   talking to them.

17    Q.     Who made that decision?

18    A.     I believe that was discussed

19   between myself and Ed Heilig.

20    Q.     Was Mr. Spota aware of this?

21    A.     I think Mr. Spota became aware of

22   the conversations because Mr. O'Connell's

23   partner had brought tapes of those

24   conversations to Mr. Spota himself, not to

25   myself, not to Mr. Heilig.  In fact, that's

1   how I learned of those subsequent

2

3   conversations.

4       Q.    When were these tapes brought to

5   Mr. Spota, that you are aware of?

6       A.    I'm not sure of the time frame of

7   that, but I do know that they were --

8       Q.    Can you give me a year?

9       A.    It would have been some time, I

10  guess, probably -- I'm comfortable saying

11  Spring, maybe April '03.

12      Q.    Are you aware of any training that

13  the individuals who joined the District

14  Attorney's Office as detectives or

15  investigators are given before they are

16  permitted to work?

17      A.    No.

18      Q.    Is there a manual for procedures

19  for the detectives or investigators that work

20  for the District Attorney's Office?

21      A.    I'm not aware of detective or

22  investigators' procedures.

23      Q.    Are you aware of a manual that

24  exists for the District Attorney's Office for

25  those who are working as detectives or

investigators for the office?

    A.    Again, with respect to detectives

and detective investigators, I'm not aware of

any manual or standard of operation or

operation of code.

             MR. BARKET:  Subject to the

             resolution of the paperwork problem

             that we have, you can go back to

             your regular duties.

             THE WITNESS:  Thank you.

                    -o0o-

             (Whereupon, the examination

             of John Scott Prudenti was

             concluded at 11:30 a.m.)

            _____

            JOHN SCOTT PRUDENTI

Subscribed and sworn to
before me this _____ day
of _____, 2007.

_____

NOTARY PUBLIC

46

I N D E X

WITNESS                EXAMINATION BY            PAGE

John Scott Prudenti

                       Mr. Barket                 4

ON TIME COURT REPORTING
516-535-3939

## A

about 10:15,17 11:3,8
  14:4 24:7 29:4 34:20
  36:6 38:18 41:14
  42:22 43:4
above 1:20,21
access 34:12
across 15:23 16:3 17:9
action 1:21 3:13 47:14
activities 24:6 31:9
actually 16:21 23:3
  36:10 38:13
address 4:12
admission 6:8
advance 33:17
after 13:16 14:16,19
  15:19 16:5 17:9
  22:23 23:5 32:21
  36:5,8,9,11 42:19
again 9:10,23 18:5
  24:13,22 25:23 30:20
  31:15 45:3
against 1:7 28:2 32:18
agency 11:20
AGREED 3:2
ahead 9:11
aimed 11:14
allegations 7:23 8:25
alleging 9:8
allowed 37:5 40:25
along 25:20
already 7:11 24:7,8
  40:4 41:7,12
Amato 1:11 29:2 35:25
  36:15 39:6,19 40:11
  42:15,21
ambiguity 37:18,21
analyzed 16:7 34:13
and/or 42:15
another 36:24
answer 5:7 7:8,9 9:12
  26:7 39:12 41:9 43:2
  43:10,12
answered 9:13
anyone 9:7
anything 26:14,17
anywhere 22:11
appeals 9:14,15
appeared 34:10,14
approximate 29:19
Approximately 12:20
  12:25 13:8,15
April 32:10 33:8 44:11
areas 11:16 14:21,22
  14:25 15:7 17:16
  30:16
argument 9:4,6
arise 41:21
arose 35:7
around 10:22
arrange 19:2
arrest 14:17 23:6 25:10
  25:14 28:17
arrested 7:2 28:5 41:7
  41:12
Arts 5:24
asked 7:12 17:7
asking 5:3 38:3
assigned 14:24 15:5
assistant 1:9 2:13 7:22
  11:24
assisted 12:7
assume 5:8
assumption 19:21
attend 21:13
attention 14:9 36:20
  37:11,14
attorney 2:13 3:24 5:10
  7:22 11:25 19:20
  20:17,19 36:13 42:5
  42:8
attorneys 1:9 2:4,9 3:3
  40:3
Attorney's 1:8 6:5 10:2
  13:23 14:2 22:23
  28:22,23 44:14,20,24
August 11:7,7
authority 30:5
avail 24:24 42:10
Avenue 4:14
avenues 40:5
awaiting 6:8
aware 6:23 7:25 8:4
  9:18,20,23 21:9,14
  25:13 31:14 34:7
  35:13,23 36:2,3,4,14
  36:15,20,23 37:3
  38:7 40:4 42:12,17
  42:18,19 43:20,21
  44:5,12,21,23 45:4
a.m 1:17 45:15

## B

b 24:15
Bachelor 5:24
back 12:21 19:6,7,17
  20:6 22:20 24:11,21
  30:2 45:9
backwards 9:25 11:5
bar 3:11 6:9
Barket 2:4,6 4:8 8:9
  10:6 14:7 29:14 38:5
  41:15 45:7 46:7
BARKETT 7:10
based 17:14 30:23
basically 6:8 25:23
became 31:14 34:5,6,9
  36:2,4,14,22 37:3
  42:18,19 43:21
become 34:7 36:3,20
before 1:19,22 3:15
  4:18 10:18,23 23:6
  36:11 44:15 45:21
begin 32:2
behalf 3:18
being 5:2 16:22 18:2,11
  18:13 24:12
belief 42:11
believe 4:19 13:18 14:3
  16:17 18:3,21 19:4
  19:11 20:16 21:18
  24:7 25:2,3,13,14
  26:4 35:16 36:4
  37:12 40:6 43:18
believed 17:11,16 42:5
best 9:12 14:15 32:7
  39:12 43:2
better 27:16
between 3:3 5:19 35:24
  42:12 43:19
billing 24:17
bit 19:17
blood 47:5
both 12:6 17:20 18:12
  31:16 33:3
Box 2:11
brief 37:17
bring 16:19 17:7
brings 12:21
Brookhaven 14:19
  15:19,21 17:21 18:8
  24:10 30:15 31:17
brought 14:16 16:21
  36:12,19 37:9 43:23
  44:4
BRUCE 2:4,6
Building 8:3
bureau 10:4,5 11:10,12
  11:14 12:10,18,19,23
  13:7,13
bureaus 23:3
business 14:19 15:11

## C

c 2:2 4:2 24:15 47:3,3
calendar 23:21
call 18:9 19:6 20:11
  21:5
called 11:11 19:4,6,7
  19:16 20:6,14 40:20
calling 19:22 21:10
calls 19:14 20:5,13
came 15:19,23 16:3,8
  25:2
capacity 15:18 28:18
case 13:21 15:16 16:24
  31:21,23 42:6
cases 22:23
certain 31:7,13 34:13
certainly 5:6 40:17
certification 3:21
certify 47:7,13
chance 25:21 35:17
changed 40:22
charge 3:24 30:18
charged 6:25 18:5
charges 7:19 27:21
chase 31:3
Chief 10:4
choice 21:4
Christopher 1:10 2:17
cigarette 22:2
City 2:5
civil 6:11,21
claiming 6:15
clear 5:4 22:20
client 25:6 40:21
code 38:13 45:6
college 5:21
combined 13:18,19
come 15:22 16:15
  18:25 20:7,9 22:20
  26:3,25 34:4 39:20
  40:2,3,9,14
comfortable 29:24
  32:10 44:10
coming 17:9 24:11
  31:16 35:19 37:14
committed 27:17,18
committee 8:3
commonality 15:10
  17:17
companies 31:15
complaining 9:20
complaint 8:3
complete 43:9
complicated 23:12
concept 9:4
concern 34:9
concerned 33:6 34:5,8
concerning 14:10
concerns 36:13
concluded 45:15
concrete 15:2
conference 21:19 22:14
confines 33:13
conflict 35:21 42:6
conflicts 37:7,8 40:7
  41:5
connection 11:23 17:15
construction 15:3,8
  31:15
consulting 36:17
contact 16:9 19:9 20:21
  38:9
contacted 19:24 20:25
context 4:20 7:21 41:19
continue 41:19
continuing 40:5
contractor 14:18
control 28:20
controlled 3:20
controls 14:8
conversation 35:17
  36:23
conversations 38:23
  42:14,21 43:22,24
  44:3
convictions 8:12
cooperate 24:3 25:21
  26:22,25 27:3 36:25
  37:2,6,19 40:22 41:2
cooperated 27:9
cooperating 24:25 26:9
  39:22
cooperation 42:11
copies 16:22
copy 3:23
correct 15:4 21:3 22:25
  23:7,11,15 26:21
  27:7,11,19 28:3
  29:12 31:19,20 33:11
  38:2,12,15
counsel 3:17 20:2,24
  21:7 38:10
Country 2:5
County 1:3,8,8,11 2:9
  2:13 6:5 13:23
couple 19:14
course 12:2 35:7
Court 1:2 13:3,4,7,10
  13:13
co-defendant 37:5
CPLR 3:5,20
crime 6:25 10:5 11:15
  11:17 22:24 23:5
  26:24
crimes 10:25 11:9
  12:17,23 23:9,9
  27:17,18
criminal 7:18 16:24
  27:21 42:6
cross-designated 11:18
curb 18:10
current 9:24
currently 10:3

## D

D 4:2 46:3
Daniel 1:5 2:18 14:10

15:24 16:4
date 29:18 32:3
dates 11:2
day 14:5 21:24 38:4,6
45:21
deals 27:16
dealt 27:8
December 10:13,14
34:21 42:13
decide 26:2 30:24
decision 16:25 17:10
18:16,18,20,23 20:20
30:6 43:15,17
deemed 3:19
defendant 4:24 6:11,21
Defendants 1:13,20 2:9
degree 5:23
Dennison 2:10
DEPARTMENT 1:8
2:9
depending 30:9
deposed 4:18
deposition 3:8,11,14
16:15,16
Deputy 10:4
despite 39:22
detective 29:2,4,6
36:15,16 39:6,19,19
42:15,15 44:21 45:4
detectives 28:22 30:6,7
30:10 31:4 37:13
44:14,19,25 45:3
DETECTIVES/POL...
1:10
different 12:3 15:17,20
direct 14:9 38:25 39:4
directed 7:24
direction 31:5
directly 20:12,21,25
21:6
disagreements 30:3
disciplinary 42:20
disclose 9:21
disclosing 41:4
discoverable 9:22
discuss 19:2
discussed 23:25 24:18
24:23 30:8 39:25
40:15 43:18
discussion 10:9 25:16
29:15
disqualified 41:23 42:8
district 1:8,9 6:5 7:22
10:2 11:24 13:3,4,6,9
13:12 14:2 22:22
28:21,23 36:13 44:13
44:20,24
documents 16:19 17:5

**E**

doing 6:7 14:18 15:6,11
30:17 43:6,7
done 14:22 15:2 16:23
18:2,8
down 7:15 35:21
downstairs 21:19
driving 7:2
duly 4:4 47:9
Dunne 2:12 7:5,13 8:7
9:10 10:8 12:15
13:19,20 14:5 16:18
29:13 38:3 39:10
42:24 43:8
during 6:9,9 9:9 12:2
26:14 35:7 36:7
duties 15:5 45:10

**E**

E 2:2,2 4:2 46:3 47:3,3
each 12:7 13:25
early 29:21 32:13
33:10
east 4:14 13:11,14
Economic 10:25 11:9
23:9
Ed 15:14 18:22 43:19
effect 18:24 20:20
eight 12:20
Eileen 1:23 47:5,20
either 12:14 13:11 16:8
17:12 19:13 20:15
employees 18:15 29:8
employment 6:6 7:21
end 13:11,14 26:9
37:24
ended 16:21 33:9
enforcement 11:19,23
engaged 9:2,9
entitled 1:21
equipment 25:14
ESQ 2:6,12
established 24:9
ethics 38:8
ever 4:18 6:20 7:23 8:2
9:7 11:18,22 16:14
35:11 36:20 39:20
41:8,22
Evergreen 4:14
Every 25:10
everybody 28:12
exact 32:3
examination 1:19 3:22
3:23 4:7 45:13 46:5
examined 4:6
except 3:7
exception 28:13
exchange 27:4,24
exculpatory 9:21

exists 44:24
explanation 26:7
extension 13:12
extent 9:15 31:7
extremely 37:17

**F**

F 47:3
fact 14:21 15:9,11
16:11 17:20 18:8
20:6,18 21:10 25:10
25:15 42:10 43:25
failed 9:21
failure 3:9,16 18:14
fair 23:6 33:14
fairly 29:24
Fall 29:22,23,25
familiar 9:3 28:25
31:16 42:2
family 6:17 12:22
far 6:13
father's 6:8
February 42:13
federal 7:7,16 11:19,22
Felice 1:11 29:6
Felony 13:17
felt 36:23
few 22:21 25:13 32:21
file 8:17
filed 9:7
filing 3:21
findings 30:8,8
finish 41:9
firm 6:8
first 4:3 16:3 19:24
22:13
five 22:3
floor 2:10 22:13
folder 23:16
follow 8:5 31:5
following 20:22 28:24
follows 4:6
food 4:22
food-bourne 6:15
foregoing 47:10
form 3:7 23:18 42:25
forth 23:14 47:9
forward 26:3
four 16:22 33:13
frame 44:6
free 38:18,25
frequently 27:15
friendly 41:16
from 5:14 6:16 13:9
19:12,13 25:2 32:24
37:23 41:23
front 21:25 26:11
furnished 3:24

further 38:22 47:13

**G**

Garden 2:5
gather 37:22
general 8:20 24:2
getting 19:6 30:2
Gianelli 37:2,4,10
40:19
give 30:20 44:8
given 43:11 44:15
47:11
giving 29:19
go 5:21 9:11 13:9,16
23:3 24:21 26:18
30:25 31:2 35:8
38:25 39:7 45:9
going 5:3 25:5,8,25
30:12 35:18,19,21
37:19 42:24
gone 25:12
Good 4:16,17
graduate 5:14
grand 13:17 31:8,12,19
31:21,25 32:4,7,9,17
32:22 33:18,19,20,21
33:23,23 34:24
grievance 8:3
guess 11:16 19:18,21
21:8 44:10
guessing 21:9
guilty 27:22
guy 20:7,9 39:25
guys 35:19

**H**

H 2:10 4:2
half 10:16 11:4
hand 32:17,19 33:9
Hauppauge 1:16 2:12
22:14
having 4:3
heard 9:5
Heilig 15:14 18:22
43:19,25
held 1:21 10:10 29:16
help 9:16
her 34:17
hereinbefore 47:9
Hey 20:6 39:7
hierarchy 28:19
highway 1:15 2:11
34:11
him 17:11 19:22 20:8
20:21 25:24 33:3
35:18 38:20 39:5,8
39:14,17,22 40:23,25
41:16,16 43:14

himself 24:5,25 36:13
42:11 43:24
hire 37:10
History 6:2
hold 32:15
Homicide 10:19,24

**I**

Icapelli 1:10 29:4
35:24 36:16 39:20
40:11 42:16,21
illness 6:16
impact 20:20
impaired 7:4
implicated 34:12
impound 25:15
include 8:25 40:16
included 40:17,18
including 3:6 18:8
incorrectly 18:11
indicate 39:20
indicated 35:18
indicted 28:7 31:19
indictment 14:17 32:18
36:8,10,11
individual 9:20 42:23
individuals 8:17 27:9
28:2 40:13 44:13
information 19:12
30:11,21,22,23 33:2
informed 16:4 25:17
36:5
initial 14:17,17,20
24:10 28:15 32:8,12
39:23
input 9:16
inquiry 4:22 6:14
instance 9:19
instances 18:12
interest 42:7
interested 26:5,8 37:24
47:16
intoxicated 7:3
investigation 14:10,14
14:20,25 17:13 22:17
24:4 25:7 28:9,16,20
30:4,10,13,14,15
31:9,12 32:12,23
35:8 40:6
investigations 11:13
12:3,6 22:15 23:4,4,8
23:19
investigative 28:10,19
investigator 21:23
investigators 21:22
44:15,19,22 45:2,4
involved 17:20 30:10
40:4

involvement 17:18
involving 4:21 12:3
  17:20
issue 30:24
issues 23:14 35:6
issuing 17:2 34:24

**J**

J 1:8 4:2
JANE 1:9,11
John 1:9,9,11,19 4:11
  5:1 6:1 7:1 8:1 9:1,11
  10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1
  30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1
  45:14,19 46:6
joined 44:13
joint 12:5
judge 16:23 34:23 35:3
  35:5,8
June 1:17 10:21,21
  11:6,8
jury 13:17 31:8,12,19
  31:22,25 32:4,7,9,17
  32:22 33:18,19,20,21
  33:23,23 34:24
just 5:5 8:5 20:3 22:12
  33:6 34:7 37:14
  43:11

**K**

keep 22:16 23:16,17
kept 18:13
KEVIN 1:9
kind 15:18,19
knew 17:14
know 5:4 6:13 8:15,19
  13:25 19:9,12,14,15
  19:24 20:3,14 25:6,7
  25:18 32:4,5 33:23
  33:24 34:20 36:9
  37:3 40:2,21 41:15
  41:15,16 42:7 44:7
knowledge 18:3

**L**

lack 27:15
lasted 22:2,3
late 29:21 33:9
later 16:10 35:21
latter 32:20
law 2:9 5:14 11:19,23

lawsuit 6:12,22
lawyer 13:20 36:24
  40:24
lawyers 40:15 41:3
lay 26:18
leads 31:2,3
learned 16:10 18:12
  19:19,23,25 34:20,22
  44:2
learning 24:7
leaving 33:15
led 20:15
Lee 2:10
left 20:5 37:15
legal 6:6 23:13 35:6
lengthy 22:15 23:10
  32:22
lenient 27:5
Let 4:25 14:9 19:17
  22:20 24:21 26:18
  41:9
let's 18:24 41:18
liabilities 24:5
like 25:11
limited 18:9
line 35:22
lines 25:20
listen 25:18
listened 36:5
long 5:12 10:11,20 12:9
  12:19,24 13:6,14
  14:9
look 14:25 30:21,24
looked 34:14
looking 14:20 15:7,20
  36:24
lot 24:11 25:16 33:2

**M**

made 6:14 18:18,20,23
  19:14 23:6 36:6
  43:15,17
maintained 18:13
Major 10:5 12:17
make 3:12 10:15 17:10
  18:16 22:8 26:20
  27:15 30:5
making 19:21
manual 44:18,23 45:5
many 21:12
March 32:9 33:8
marriage 47:15
material 9:21,22
matter 4:21 19:20
  20:19 38:19 47:16
matters 30:16 31:13
may 3:14 8:24,24 9:17
  9:17 10:21 25:17,17

27:5 36:25
maybe 11:7 39:25
  44:11
mean 7:14,16,17 16:25
  26:23 27:3 37:22
measured 18:11
meeting 19:7 21:17,18
  22:2,3,6,10,13 23:24
  24:19,23 26:6,15,17
  29:17,18 31:10 35:23
  36:5 37:15 38:4,6
meetings 21:12 22:18
Memorial 1:15 2:11
met 15:23 38:16
method 22:16 23:17
  42:2
mid 29:21
might 26:24 36:10,24
  40:9
Milvad's 16:12
Milvid 14:18,21 15:2
  17:15,19,19 25:10
  28:14,14 30:16 33:4
Milvid's 16:7 18:14
  24:9 25:18
mind 40:22
minimum 18:15 24:15
minor 6:3
minutes 22:3
mischaracterization
  43:10
misconduct 7:23 8:6,7
  8:10 9:2,9
monolithic 18:9 24:16
month 32:16
months 32:21 33:13,17
more 21:25 25:19 27:5
  33:4,4
Moriches 4:14
morning 4:16,17
motion 3:13
motions 8:18,23 9:8,13
move 3:7,10 41:22
much 26:6,10
Municipal 14:23
myself 18:22 21:20
  25:4 31:23 43:19,25

**N**

N 2:2 4:2,2 46:3
name 4:9 15:23 16:4,8
  17:10
nature 39:11
necessary 9:16 18:12
never 6:24
new 1:2,16,24 2:5,12
  4:5,15 40:24 47:6
next 30:4 41:17

Nicolino 1:10 2:17
  15:15 16:5 18:21
  19:4,13 21:21 31:24
none 8:4 9:17,23
notary 1:24 3:15 4:4
  45:25 47:5
note 7:5 9:10
notebook 23:17
notes 17:4 22:8
Notice 1:22 16:15
notified 34:16
November 29:21
number 6:16 8:11
  23:13

**O**

O 4:2,2
object 3:6,9 7:11 42:25
objection 3:12 7:6 9:11
  39:10 43:8
observed 24:12
obtained 8:11
obvious 37:8 41:5
obviously 8:11 23:5
  24:13
occasion 9:14
occasions 12:4 19:5
occur 34:18
occurred 22:24 23:5
  34:19
October 29:21
off 6:7 10:6,10 29:13
  29:16
offering 27:4
office 1:9 6:5 10:2 13:2
  13:23 14:2 16:7
  19:19 21:13 22:14,23
  24:25 28:22,23 44:14
  44:20,24 45:2
officers 1:10 11:23
Okay 25:3,18,24
Old 2:5
Once 4:19 35:13 38:16
one 1:20 6:16 11:16
  14:22 21:14,21 28:16
  37:13 40:10,12
Oneonta 5:22
ongoing 31:8
only 21:14 28:14,16
operation 45:5,6
organized 11:15,17
  23:9
original 3:17
other 6:4,6,20 7:18,18
  9:22 12:8 13:25
  14:21,25 15:7 16:9
  17:4 22:21 27:17
  28:2 30:16,24,25

31:2 34:13 37:4 39:6
  40:5 43:6
others 17:19 38:25
  39:4
out 21:25 23:3 26:2
  30:25 31:3 33:15
  41:3
outcome 47:16
over 4:25 8:12 26:18
overall 30:15
owned 6:17
O'Connell 19:5,7,10
  20:12,16 21:11,13,20
  23:24 25:2 26:4 34:5
  34:16 36:17 37:16
  38:16,19 40:16,18,20
  41:4,14,23
O'Connell's 35:14
  38:20 39:2,16 43:22
o0o 45:12

**P**

P 2:2,2 4:2
PAGE 46:5
paperwork 45:8
part 13:22 25:25 27:12
  30:9,13,13 32:9,12
  32:20 33:16 38:13
particular 13:21 25:14
  32:15 33:22 41:5,18
parties 3:4 47:14
partner 35:17 43:23
party 3:17
past 27:10
Pat 19:6,14 34:10,16
Patchogue 14:23 16:12
  16:13 17:20 24:12
  31:17 33:5
Patricia 34:10,14
patterns 18:6,7
pay 18:14
paying 24:15
people 25:13 27:16,17
  41:6,11
performing 15:11
perhaps 21:21
period 6:10 10:22
  29:20
permission 38:21 39:3
  39:16
permitted 7:8,14 38:9
  39:9 44:16
person 6:15 18:5,19
  26:19 28:15 38:10
phase 28:11,19
phone 20:4 42:14
phrase 27:16
place 1:22 15:9 21:18

22:11,13 26:6 29:18
32:5 33:12 35:24
placed 28:17
plaintiff 1:6 2:4 4:23
6:21
play 25:25
plead 27:21
Please 4:9,12
pled 7:3
point 14:16 15:22
18:24 19:18 21:10
24:8 28:4 30:14 33:7
34:4,8,21 35:16
36:22 37:3 39:24
pointed 41:3
police 1:8 28:22 30:19
political 6:2 25:12
porch 21:25
position 9:25 10:12
16:11 18:4 39:23
possibility 37:9
possible 24:4 35:14
possibly 32:10 40:10
post-judgment 8:18 9:8
potential 34:15 40:6
potentially 17:23,23
pour 18:10
poured 15:2
pouring 24:16
pours 24:16
practices 24:9
practicing 5:12
present 2:16 21:15,16
21:23
presentation 32:2
36:12
presented 31:21,23
32:6
pretty 26:6,10
Prior 11:9 12:16
probably 11:3,7 12:7
12:11 44:10
problem 45:8
procedure 42:8
procedures 44:18,22
proceedings 42:20
professional 38:8,14
profitory 7:23
projects 15:8
propriety 42:22
prosecution 27:6
prosecutor 8:25 27:13
prosecutors 28:21 30:6
30:18 31:5
provide 9:16
provided 3:5,19 30:23
Prudenti 1:10,20 4:11
5:1 6:1 7:1 8:1 9:1

10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
45:14,19 46:6
public 1:24 3:15 4:4
25:9 45:25 47:5
pursuant 1:22
P.C 2:4
P.O 2:11

Q
question 3:10 5:7,8 7:6
8:8,10 22:20 24:22
25:2 30:2 39:11
43:12
questions 3:6 5:4
quite 23:10,12 24:4
25:9,13

R
R 2:2 4:2 47:3
Rackets 11:11,12,12,14
12:10 23:10
RAYMOND 1:11
reading 26:19
reason 20:15
reasons 41:6
recall 6:18,19 14:11
26:16 35:2 37:14
recalling 12:5
receive 16:14
received 21:8
recognize 38:24
recognized 38:17
recollection 14:8,15
20:4 21:24 22:12
29:20 32:8
record 4:10,13 7:12
10:6,10 22:5,10
29:13,16 47:11
records 18:13 30:25
33:16 34:12,13
reduce 27:20,20
refer 8:18
regular 27:12 32:4
45:10
related 16:12 47:14
remained 28:14
remember 13:13 29:22
repeating 18:6
rephrase 5:5
report 30:7

reporter 1:23
reports 17:4 24:10
representation 35:14
represented 20:2,24
21:6 38:10 42:23
representing 3:25
13:22 34:6,17 35:20
38:20 41:23
represents 37:4
require 27:25
reserved 3:8
resolution 45:8
respect 6:14 16:6 17:25
18:14 25:10 28:13,15
30:16 33:3 37:6 45:3
respective 3:3
responded 25:4
responsibilities 11:24
27:13
responsibility 38:8,14
responsible 30:12
restaurant 5:20
restaurants 6:16
result 24:6 30:11
results 16:23
retained 19:19 20:19
return 3:16 20:12
Richard 2:12 13:20
right 3:6,12 8:9,12
10:17 11:8 13:21
21:2 22:24 23:10
27:10 28:11 29:9
31:6 35:4,9 37:25
38:5,11,21 39:3
rights 3:5,19
road 2:5 7:15
ROBERT 1:11
role 14:13,16
rolodex 16:8
room 21:19 22:14
Rule 3:20
rules 7:7 35:9 38:7

S
S 2:2 4:2
same 12:7 14:4,5 24:11
33:18,20
Savino 1:23 47:5,20
saw 40:6
saying 26:16,20 29:25
32:11 44:10
scale 24:13
school 5:15
science 6:2
Scott 1:10,19 4:11 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1

19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1,14,19
46:6
screening 13:17
search 16:5
second 10:7
see 15:9 18:24 30:21
30:4
seems 18:6
seized 25:15 34:13
sense 26:23 27:4,9
sentences 27:20
September 25:11
series 5:3
set 19:8 47:9
seven 12:20
several 7:15 20:4 42:14
sheet 16:22
shock 25:11
short 24:16
shorthand 1:23
sickness 4:22
similar 18:7 24:14
31:15
Since 5:13 10:13,21
situation 27:23 41:13
41:21
skip 4:25
smaller 24:13
smoking 22:2
some 8:24 9:9 14:16
16:9 17:17 18:6,23
19:5,18 23:2,8 29:20
31:12,14 34:8,19,21
35:16 36:12,22 37:8
39:24 44:9
someone 19:12
something 16:6 18:24
Sometimes 8:17
sooner 35:21
sorry 22:19 41:10
sounds 11:8
speak 17:11 18:17,19
19:3 38:18,25 39:5,7
39:14,17,21
speaking 42:22
special 32:7 33:24
specialized 23:2
specific 12:5
speculative 39:11
spent 21:25
split 15:18
spoke 18:21
Spota 1:8 29:8 43:20

19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1,14,19
46:6
screening 13:17
search 16:5
second 10:7
see 15:9 18:24 30:21
30:4
seems 18:6
seized 25:15 34:13
sense 26:23 27:4,9
sentences 27:20
September 25:11
series 5:3
set 19:8 47:9
seven 12:20
several 7:15 20:4 42:14
sheet 16:22
shock 25:11
short 24:16
shorthand 1:23
sickness 4:22
similar 18:7 24:14
31:15
Since 5:13 10:13,21
situation 27:23 41:13
41:21
skip 4:25
smaller 24:13
smoking 22:2
some 8:24 9:9 14:16
16:9 17:17 18:6,23
19:5,18 23:2,8 29:20
31:12,14 34:8,19,21
35:16 36:12,22 37:8
39:24 44:9
someone 19:12
something 16:6 18:24
Sometimes 8:17
sooner 35:21
sorry 22:19 41:10
sounds 11:8
speak 17:11 18:17,19
19:3 38:18,25 39:5,7
39:14,17,21
speaking 42:22
special 32:7 33:24
specialized 23:2
specific 12:5
speculative 39:11
spent 21:25
split 15:18
spoke 18:21
Spota 1:8 29:8 43:20

43:21,24 44:5
Spring 32:11,12,20,24
32:25 33:8,9 44:11
stages 23:18
standard 45:5
start 13:2
started 13:4 14:3 15:20
32:9,21 33:7
Starting 9:24
state 1:2,24 4:5,9,12
22:22 47:6
status 28:9
step 30:4
Stephen 14:18
still 28:10
stips 7:17
STIPULATED 3:2
stop 43:6,13,15
Strebel 17:15 34:10,10
34:15 35:15
street 26:24
strike 3:7,10
subdivision 13:12
subject 5:25 8:2 25:16
38:19 45:7
subpoena 33:15
subpoenaed 31:14 33:3
33:17
subpoenas 30:24 33:19
34:24
Subscribed 45:21
subsequent 44:2
subsequently 7:3 19:8
substandard 18:2,10
24:14
Suffolk 1:3,8,8,12 2:9
6:4 13:22
summarily 28:17
Summer 6:9 32:13
33:10
superintendent 34:11
supervise 23:3
supervising 34:23 35:3
35:5
supervisor 15:13
supposed 15:6
SUPREME 1:2
sure 10:8 12:2 21:22
26:20 29:14 32:19
33:21,22 44:6
switch 41:2
sworn 3:14 4:4 45:21
47:9
systematical 24:17

T
T 2:12 4:2,2,2 47:3,3
take 6:24 20:24 27:8

29:18 32:5
taken 1:22 3:18 25:15 33:12
taking 15:9
talk 18:25 25:6 43:4
talked 18:22
talking 36:16 39:22 41:14 43:4,13,16
tape 36:6
tapes 36:19 43:23 44:4
target 17:12,24,25 34:15
targets 15:21
task 18:5
tell 25:25 34:3
tenure 12:3
term 32:6 33:22,25 34:2
terms 23:13 24:2
testified 4:6
testify 26:25
testifying 3:25
testimony 3:8,10 27:5 28:2 47:8,11
Thank 45:11
their 27:20 30:7,8
themselves 18:7
thing 12:7 15:19 43:5
things 22:21 24:11
think 8:13,14 18:11,23 21:4,21 22:19 24:2 25:9,19 31:13 35:18 35:20,22 36:22 37:2 37:20 39:24 43:21
THOMAS 1:8
thought 17:22 37:7
three 33:13
through 17:15 18:3,7 22:21 25:12 34:12
time 1:21 4:25 10:22 14:4 15:22 16:3 17:14 19:18 21:25 28:4 29:11,19,21 30:14 31:10,11 34:4 34:8,20,25 39:24 42:17 44:6,9
timing 33:6 34:7
Tineri 36:12
today 15:15 16:16,20
told 20:16 37:22 39:8 39:14,17 40:8,9 43:13
Tom 1:10 29:8
Touro 5:16
town 14:19 15:21 17:21 24:10 25:19
track 22:16 23:18
trail 36:8

training 44:12
transcript 3:17 47:10
trial 1:19 3:9,13 8:25 9:9
true 8:15 35:10 47:10
truthful 27:25
try 5:5 39:21 43:2
trying 34:3
two 11:4 12:25 13:25 21:21 35:20 40:12
type 6:25 24:14
typical 26:23 32:6
Typically 22:22

**U**

U 4:2
ultimately 31:4,18
under 7:7 28:17
understand 26:19
understanding 26:21
understood 5:8
unequivocally 37:23
unreturned 19:15 20:5
unsure 32:3
until 24:8 36:19
unwaivable 42:6
use 23:22 41:18
used 9:5
utilize 35:11

**V**

verdict 16:22 17:2
very 5:9 18:7 22:20 24:14
Veterans 1:15 2:11
view 27:25
Village 14:23 16:11 33:4

**W**

wage 18:15 24:15
waived 3:22
waiver 3:12,19
walk 22:21
want 9:25 10:13 20:7,9 25:20,21 26:3 32:20 36:25 39:7 40:9 41:12,20
wanted 17:11 18:17 24:3 36:25 39:21
wants 18:25 39:25 40:22
WARD 1:9
warrant 16:5,6
warrants 27:23
wasn't 26:8 32:25 42:17
wave 25:11

way 15:10 16:9,14 25:5 29:17 33:19 47:15
Weber 16:23
well 5:9 7:13 8:14 14:7 15:16 20:23 28:25 34:17 36:8,9 37:6 40:2
were 4:23 6:11 9:20 10:23 12:6,19,24 13:6,14 14:2,20,24 15:5,6,7,8,20 17:7 18:8,13 19:14,15 20:4,5,15 21:10 24:6 24:10,12 25:13 29:8 29:10,11 30:3,10 31:2,13,15,16 33:16 33:16 34:16 35:6,13 36:15,16,19 37:22 38:17,24 40:4,5,8 41:6,11,11,14 42:12 42:20 43:13 44:4,7 weren't 26:5 41:6
we're 11:4 25:25
while 7:3
wished 24:24 42:10
witness 3:15,25 4:3 17:12,23 26:23,24 45:11 46:5
witnesses 23:13
witness(es) 47:8,12
word 25:12
words 39:6 43:6
work 5:19 6:7 9:25 11:19 12:4,9 14:22 14:24 15:3,12 18:2 18:10,10 24:14 28:21 28:23 30:17 44:16,19
worked 10:2 11:22
working 6:4 10:3,23 11:4,9 12:6 15:16,17 16:12 25:19 28:18 44:25
works 25:5
Worship 1:5 2:18 14:11 15:24 16:4 17:18,22 18:17,19 19:3,19,25 20:11,18 20:23,25 21:6,12,20 23:25 26:12,14,16 27:6 28:4,10 31:18 32:18 34:6 35:24 36:6,17 37:10,16,18 38:17,18,23 39:2,8 39:15,18,21 41:24 42:10,14
Worship's 17:9,18 31:9
would've 20:25 40:12 40:23

written 16:25 23:18

**X**

x 1:4,14 46:3

**Y**

yeah 11:7,16 19:22 31:7 32:22 38:22
year 5:17 10:15 11:3 13:8,15 29:23 44:8
years 7:15 8:12 11:4 12:20,25
York 1:2,16,24 2:5,12 4:5,15 47:6

**0**

02 11:6,8 12:12,14 29:25 34:21 42:13
03 32:10,11,20,24 33:8 33:10 42:13 44:11
04 10:21,21 11:8 32:25
05 10:14

**1**

1 1:1,9,11
10 10:1
10:45 1:17
100 1:15 2:11
11 11:1
11:30 45:15
11530 2:5
11788 2:12
11940 4:15
12 12:1
13 13:1
14 14:1
15 15:1
16 16:1
17 17:1
18 18:1
19 19:1
1980 7:2
1985 5:18,19 6:10
1986 5:13,15 6:10 13:5
1990 12:15
1992 12:21

**2**

2 2:1
20 20:1
2007 1:17 45:22
21 21:1
22 22:1
23 23:1
24 24:1
25 25:1
26 26:1
27 27:1

28 28:1
29 29:1

**3**

3 3:1
30 30:1
31 31:1
3116 3:20
32 32:1
33 4:14 33:1
34 34:1
35 35:1
36 36:1
37 37:1
38 38:1
39 39:1

**4**

4 4:1 46:7
40 40:1
41 41:1
42 42:1
43 43:1
44 44:1
440 8:23 9:7,13
440s 8:22,24
45 45:1
46 46:1
47 47:1

**5**

5 1:9,11,17 5:1

**6**

6 6:1
6th 2:10
6100 2:11
666 2:5

**7**

7 7:1
7-Eleven 35:25

**8**

8 8:1
89 12:14

**9**

9 9:1
90 12:14