UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -x

DANIEL WIRSHUP,

                Plaintiff,

      -against-

SUFFOLK COUNTY POLICE DEPARTMENT,
SUFFOLK COUNTY DISTRICT ATTORNEY,
THOMAS J. SPOTA; SUFFOLK COUNTY
DISTRICT ATTORNEY'S OFFICE, ASSISTANT
DISTRICT ATTORNEYS JANE and JOHN DOE
"I" - "S;" ASSISTANT DISTRICT ATTORNEYS
KEVIN WARD, JOHN SCOTT PRUDENTI, and
CHRISTOPHER NICOLINO; DETECTIVES/POLICE
OFFICERS TOM IACOPELLI, ROBERT AMATO,
and RAYMOND FELICE, DETECTIVES/POLICE
OFFICERS JOHN and JANE DOE "I" - "S,"
and THE COUNTY OF SUFFOLK,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -x

          666 Old Country Road
          Garden City, New York

          January 12, 2007
          10:10 a.m.

        EXAMINATION BEFORE TRIAL of ROBERT
AMATO, one of the Defendants in the above-
entitled action, held at the above time and
place, taken before Holly Daloia, a shorthand
reporter and Notary Public of the State of
New York.

RECEIVED
JAN 3 0 2007
BRUCE A. BARKET

COPY

---

2

A P P E A R A N C E S:

LAW OFFICE OF BRUCE BARKET
   Attorneys for Plaintiff
   666 Old Country Road
   Suite 600
   Garden City, New York 11530
BY: BRUCE BARKET, ESQ.

SUFFOLK COUNTY ATTORNEY'S OFFICE
   Attorneys for Defendants
   H. Lee Dennison Building
   100 Veterans Highway
   Hauppauge, New York 11788
BY: RICHARD DUNNE, ESQ.

ALSO PRESENT:

   Daniel Wirshup

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED
by and between the attorneys for the
respective parties herein, that filing,
sealing and certification be and the
same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the
form of the question shall be reserved
to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be signed
and sworn to before any officer authorized
to administer an oath, with the same force
and effect as if signed and sworn to before
the Court.

---

R O B E R T   A M A T O,
the witness herein, having first
been duly sworn by a Notary Public
of the State of New York, was
examined and testified as follows:

EXAMINATION BY

MR. BARKET:

Q.   State your name for the record,
please.

A.   Robert Amato.

Q.   State your address for the record,
please.

A.   200 Center Drive, Riverhead,
New York 11901.

Q.   Good morning.  How are you?

A.   Fine.

Q.   Obviously, we met before.
I'm going to ask you a series of
questions.  If at any point in time the
question isn't clear, just say and I will try
to rephrase it.  If you don't indicate that
the question is unclear, I'm going to assume
you understood it and your answer is meant to
be responsive to that question, okay?

Robert Amato

1     A.   Uh-huh.

2     Q.   Have you ever been deposed before?

3     A.   Yes, I have.

4     Q.   Could you tell me how many times

5  and under which circumstances?

6     A.   Probably less than half a dozen.

7  In civil matters.

8     Q.   What kind of civil matters?

9     A.   One involved a lawsuit against my

10  company when I was in private practice, if

11  you will.

12     Q.   Why don't we list them off and I

13  will go back if I have to ask questions.

14     A.   One involves a lawsuit that I am

15  presently involved in.  A civil matter

16  involving stock purchase.  That's all I can

17  think of.

18     Q.   That's two.

19     A.   I said less than a half a dozen.

20     Q.   Have you ever been to as part of

21  your employment as law enforcement officer?

22     A.   Yes, but never had to give

23  deposition.

24     Q.   When you say a lawsuit while you

---

Robert Amato

1  were in private practice, what was the date

2  of that?

3     A.   Couldn't tell you.  Had to be

4  sometime between 1985 and 1995.

5

6     Q.   I take it those were the years you

7  were employed in the private sector?

8     A.   Uh-huh.

9     Q.   Can you tell me what the plaintiff

10  was?

11     A.   No, I can't.  I don't know.

12     Q.   Were you a named defendant?

13     A.   We pleaded in the lawsuit -- the

14  account was Burger King and it involved a

15  robbery at Burger King at which time our

16  security officer chased down and arrested the

17  subject.  I believe he was suing Burger King

18  for being mishandled or mistreated or

19  something.

20     Q.   The plaintiff was the person who

21  did the robbery or was the plaintiff somebody

22  who was injured in the course of the robber,

23  the customer?

24     A.   The plaintiff was the perpetrator.

25     Q.   When you say "we," were you

1 individually named or a company?
2 A. No, the company.
3 Q. What was the name of the company?
4 A. Search Investigations, Limited.
5 Q. The other lawsuit or the other time
6 you were deposed was a stock purchase you
7 said?
8 A. Yes. Involves a hunting club on
9 the North Fork which I owned a share of stock
10 in and the majority shareholders are trying
11 to sell the place to a developer and the
12 minority shareholders individually and
13 collectively brought lawsuit to stop that
14 sale.
15 Q. Which side of the lawsuit do you
16 fall on?
17 A. I'm in the minority shareholders.
18 Q. When was that deposition, do you
19 recall?
20 A. October.
21 Q. October of 2006?
22 A. Yes.
23 Q. Can you tell me the caption of the
24 lawsuit and the plaintiff and the defendant?

1 A. On that?
2 Q. Yes.
3
4 A. It's a minority shareholder and it
5 involves 37 plaintiffs against the North Fork
6 Preserves, Inc., North Fork Preserves
7 Company, Myron Kaplan and the estate of
8 Robert Krudop.
9 Q. Have you ever testified in court?
10 A. Yes.
11 Q. How many times?
12 A. I wouldn't even casually guess.
13 Hundreds.
14 Q. I take it most of that is in
15 connection with your employment as a law
16 enforcement officer?
17 A. Yes, that's correct.
18 Q. Have you ever been a party of a
19 lawsuit as either a plaintiff or defendant?
20      MR. DUNNE: Other than what
21 he already communicated, right?
22      MR. BARKET: Yes.
23 A. I had been sued as a member of the
24 service several times.
25 Q. I think I know what you mean. Let

1  me see if I can be more explicit about this.
2      You've been named as a defendant in
3  lawsuits as part of your function as a law
4  enforcement officer?
5      A.   Yes.
6      Q.   You said a number of times?
7      A.   Yes.
8      Q.   What is that number?
9      A.   I don't know.
10     Q.   How many is it we don't know?
11     A.   Probably less than a half dozen.
12     Q.   Can you list them for me starting
13 with the most recent working your way back?
14          MR. DUNNE:   Off the record.
15          (Whereupon, a discussion was
16 held off the record.)
17          MR. DUNNE:   Note my
18     objection to the line of
19     questioning.
20          Just preserve it for the
21     record regarding any case which he
22     was a defendant while he was a
23     A.   The only two that come to mind and
24 I say less than --
25

---

1  Suffolk County Police Officer.
2          Go ahead.  Answer the
3      question.
4
5      A.   The only that I recall, and I say
6  less than half a dozen because there may have
7  been one or two that I don't remember.
8          There was a perpetrator that robbed
9  a jewelry store in Babylon Village.  He
10 brought a lawsuit alleging his rights issues
11 and police brutality.  That had to be
12 sometime between 1970 and 1980.  There was a
13 couple of brothers that were doing a string
14 of robberies that were arrested from North
15 Amityville.  They brought a lawsuit of police
16 brutality.
17     Q.   When was that?
18     A.   That was probably middle '70s.
19          There was another fellow robbery
20 perpetrator that made a complaint to the
21 Italian Civil Liberties Union alleging that I
22 called him a name.  I don't remember if that
23 ever wound up in the lawsuit.
24     Q.   What was the name?
25     A.   I don't remember.

1
2    Q.  Who represented you in the course
3  of that investigation?
4    A.  I don't know that there was any
5  representation required.  My name as
6  mentioned because of the amount of money I
7  made and involving a PBA card of mine that
8  wound up in somebody's hands.  No one ever
9  spoke to me from the SIC.
10    Q.  Did you testify before on --
11    A.  No, I did not.
12    Q.  Did you know Tom Iacopelli and
13  Thomas Spota at that time?
14    A.  At the time of the SIC?  Yes.
15    Q.  In what capacity did you know him?
16    A.  At that time he was an ADA,
17  assistant district attorney.
18    Q.  Are you aware of whether or not
19  Mr. Spota had any role in representing
20  individuals before the State Investigation
21  Commission?
22    A.  No, I don't.
23    Q.  Did you ever use Mr. Spota or any
24  of his firms to represent you in any
25  capacity?

---

1
2    Q.  Was he Italian?
3    A.  Yes.  So am I.
4    Q.  I assumed that.
5  Other than those two lawsuits, you
6  don't recall any others at this time?
7    A.  No, I don't.
8    Q.  Have you ever been a party to any
9  litigation beyond civil lawsuits?  Have you
10  ever been charged with a crime?
11    A.  No.
12    Q.  Have you ever been a party to any
13  investigation that you're aware of, a target
14  of any investigation?
15    A.  My name was mentioned in a report
16  issued by the State Investigation --
17          MR. DUNNE:  SIC.
18    A.  -- SIC, during their investigation
19  of a homicide squad relative to the amount of
20  money I made one year.
21    Q.  Actually, I have some familiarity
22  with the report.
23          Were there any accusations against
24  you concerning your interrogation techniques?
25    A.  No.

1
2    A.   No.
3       Q.   Prior to coming to the deposition
4  today, did you have the opportunity to review
5  anything?
6          MR. DUNNE:  My objection
7  ends at that point.  Everything in
8  between the two objections was
9  objected to.
10         MR. BARKET:  Thank you.
11     Q.   (Continuing)  Reviewed any
12  documents or other materials?  Have you taken
13  a look at anything before coming to the
14  deposition to prepare for you being deposed?
15     A.   I reviewed some statements that we
16  took and the purported transcript of the
17  conversations, telephonic and in person.
18     Q.   What statements did you review?
19     A.   Some of the statements that were
20  taken from some of the homeowners on Jennings
21  Avenue and North Ocean Avenue.
22     Q.   Could you be more specific?
23     A.   No.  I don't recall the names.
24     Q.   When did you do the review?
25     A.   About a week ago.

1     Q.   How did you get access to the
2  statements?
3     A.   They are copies in which are in a
4  book that we have.
5          MR. DUNNE:  Right here
6          (indicating).
7     Q.   I gather you have those statements
8  with you?
9     A.   No.
10         MR. DUNNE:  I have them.
11     Q.   When you say "we" have them in a
12  book, who are you referring to?
13     A.   Myself and the other detectives
14  involved in this investigation.
15     Q.   The investigation is over, right?
16  The case is over?
17     A.   Is that a question?
18     Q.   Yes.
19         MR. DUNNE:  Yes, the
20  investigation is over, right.
21         MR. BARKET:  I appreciate
22  your answer.
23     A.   That investigation is over, yes.
24     Q.   When you say other detectives are

Robert Amato 15

1 involved this in this investigation, what are
2 you referring to?
3 A. The investigation that I'm here for
4 now.
5
6 Q. Actually, and I don't want to be
7 overly technical, but words have meanings. I
8 want to see if we can get it right.
9 This is actually a lawsuit where
10 Mr. Wirshup has sued a number of individuals
11 as named defendants. You have been one of
12 them you, right?
13 A. Yes.
14 Q. So there is not any investigation.
15 This is an active lawsuit. Is that what
16 you're referring to?
17 MR. DUNNE: No, that is not
18 what he is referring to.
19 I think what we are doing
20 here is a little bit of a semantic
21 game. He is indicating that the
22 information was obtained during the
23 investigation is the information
24 that he reviewed and still exists.
25 MR. BARKET: What I was

Robert Amato 16

1 asking him is when he said "we" and
2 he said "the other people involved
3 in the investigation." I'm not
4 sure what he meant by that.
5
6 Q. When you said "the other people
7 involved in the investigation" when you said
8 investigation, did you mean the lawsuit
9 Wirshup versus Suffolk County Police
10 Department and all?
11 A. No. I meant the investigation that
12 we conducted under to arrest Mr. Wirshup.
13 Q. Okay. Who were those other people?
14 A. Detective Investigator Tom
15 Iacopelli, Detective Raymond Felice,
16 Detective Charles Bartals.
17 Q. In addition to those statements
18 that you reviewed, have you had access to
19 other documents concerning the prosecution of
20 Mr. Wirshup, say, in last year?
21 A. Have I had access? Yes.
22 Q. How about in the last year?
23 A. Have I had access? Yes.
24 Q. Who are you currently employed by
25 now?

1    A.   Suffolk County District Attorney's
2   Office.
3    Q.   How long have you been employed by
4   the Suffolk DA's office?
5    A.   Since July of 2002.
6    Q.   What is your position?
7    A.   I'm a detective investigator.
8    Q.   Who do you report to?
9    A.   My immediate supervisor is Senior
10   Investigator Peter Tartaglia.
11    Q.   Does he have a supervisor within?
12    A.   That would be Chief Investigator
13   James Burke.
14    Q.   Is this commonly referred to as the
15   DA squad?
16    A.   No.   The DA squad is technically
17   the racket squad.
18    Q.   What's the title or the name of the
19   entity you work for?
20    A.   The entity I work for is the
21   district attorney's office.   There are
22   several units within that of which the racket
23   squad is one of them.   They are referred to
24   as the DA squad.
25

---

1    Q.   What unit are you in?
2    A.   At this time?
3    Q.   Yes.
4    A.   I'm in the major crime unit.
5    Q.   The head of that unit is
6   Mr. Tartaglia?
7    A.   Correct.
8    Q.   The overall supervisor for all the
9   DA investigators is Mr. Burke?
10    A.   Correct.
11    Q.   When did you join this particular
12   unit?
13    A.   The unit I'm in now?   I guess
14   around November, October, no earlier,
15   September.
16    Q.   What year?
17    A.   '06.
18    Q.   What unit were you in before that?
19    A.   Public Integrity.
20    Q.   Who was your immediate supervisor
21   at that time?
22    A.   The supervisor at that time for us
23   was the assistant detective attorney, Chris
24   McPartland, M-C-P-A-R-T-L-A-N-D.
25

1     Q.     Was there a DA investigator in

2

3 charge of the unit or did you report directly

4 to the assistant district attorney?

5     A.     We reported directly to the ADA.

6     Q.     That assistant district attorney

7 had the authority to direct your professional

8 conduct, tell you what to investigate and so

9 forth?

10     A.     Yes.

11     Q.     He was, in all respects, your

12 supervisor or your boss, to be blunt about

13 it?

14     A.     Yes.

15     Q.     How long did you work under his

16 supervision?

17     A.     The Public Integrity Bureau was in

18 existence when -- Public Integrity Unit was

19 in existence when I went into that unit in

20 October of 2003 but it was part of the White

21 Collar Crime Unit. The bureau chief was Ed

22 Heilig. At that time a task force was formed

23 which was co-supervised by ADA McPartland and

24 ADA Jeremy Scileppi, S-C-I-L-E-P-P-I. Then

25 it became it's own bureau, the Government

1 Corruption Bureau, at which time

2

3 Mr. McPartland was named the bureau chief.

4 That was subsequent to this investigation.

5     Q.     Prior to October of '03, what unit

6 were you working in?

7     A.     I worked in the Family Crime

8 Section.

9     Q.     How long did you work there?

10     A.     I guess about six months or so.

11     Q.     Prior to that?

12     A.     The White Collar Unit.

13     Q.     That was supervised by Mr. Heilig?

14     A.     That was Mr. Heilig, yes.

15     Q.     Again, while you were working in

16 the White Collar Unit, I guess, that was six

17 months prior to October of '03, would take us

18 back to April '03?

19     A.     Yes.

20     Q.     How long did you work the White

21 Collar Unit, going back?

22     A.     I started in the White Collar Unit

23 in July '02, probably about six, seven

24 months.

25     Q.     At that time your supervisor in

1 that unit was Mr. Heilig?

2 A. He was a bureau chief.

3 Q. Was there a supervisor --

4 A. Yes. The investigative supervisor

5 was Principal Investigator Pete Calabrese,

6 C-A-L-A-B-R-E-S-E.

7 Q. Is he an attorney?

8 A. No.

9 Q. He was the person who controlled,

10 directed your day-to-day activities?

11 A. Correct.

12 Q. Prior to your employment in July of

13 2002 with the district attorney's office,

14 where did you work?

15 A. An assistant inspector general with

16 New York State Workers' Compensation Fraud

17 Inspector General's Office.

18 Q. How long did you have that job?

19 A. I guess about two years.

20 Q. Prior to that?

21 A. I was with Liberty Mutual/Wausau

22 Insurance Company.

23 Q. What did you do for Liberty?

24 A. I was a senior field investigator.

1

2 Q. How long did you have that job?

3 A. About a year.

4 Q. That takes us back to 1999?

5 A. Something like that.

6 Q. Were you employed at that time?

7 A. Well, I worked for Wausau Insurance

8 as a senior field investigator and they were

9 sold at Workers' Comp. Business to Liberty

10 which is how I wound up in Liberty. In total

11 I was in the private insurance company for

12 two years.

13 Q. How about before that?

14 A. New York State Insurance Frauds

15 Bureau. I was senior investigator.

16 Q. How long did you have that job?

17 A. A little over two years.

18 Q. How about before that?

19 A. Private business.

20 Q. When you say "private business,"

21 what do you mean?

22 A. I was in business for myself; The

23 Search Investigations, Central Alarm and

24 Communications, Executive Security

25 Consultants. All companies I owned and

1   operated.

2        Q.   Are you familiar with an entity

3   entitled Patriot Security?

4        A.   Yes, I am.

5        Q.   What's that?

6        A.   Patriot Security is a guard agency,

7   private investigation agency and an armored

8   car outfit.

9        Q.   What is your involvement with them

10  or what was it?

11       A.   I may have worked a couple of days

12  for Patriot -- It was called Patriot back in

13  the early '70s -- as a store detective.

14       Q.   Do you have any current interest in

15  it?

16       A.   No.

17       Q.   When you say "private business,"

18  and you described search investigations and a

19  few other entities, are those private

20  investigative firms?

21       A.   Yes.

22       Q.   As part of your work with them,

23  were you employed by lawyers at any time?

24       A.   Yes.

1        Q.   Did Mr. Spota or his firm ever

2   employ you?

3        A.   No.

4        Q.   Prior to these private businesses,

5   where were you employed?

6        A.   Suffolk County Police Department.

7        Q.   How long did you work for Suffolk

8   Police Department?

9

10       A.   1964 to 1985.

11       Q.   When you left the Suffolk Police

12  Department, what was your rank?

13       A.   Detective first grade.

14       Q.   What bureau were you in?

15       A.   Homicide.

16       Q.   How long were you in the homicide

17  bureau?

18       A.   I went there in '81.  About four

19  years, a little less.

20       Q.   I want to run through the names, if

21  I can, and I ask you if you worked while in

22  the Suffolk County Police Department with any

23  of these individuals:  Tom Iacopelli?

24       A.   No.

25       Q.   Raymond Felice?

1   A.  Yes.
2   Q.  Where did you work with Mr. Felice?
3   A.  We never really worked together but
4   we were both detectives around the same time.
5   Q.  How about Thomas Spota?
6   A.  Mr. Spota, I believe, was an ADA
7   when I was in the homicide squad.
8   Q.  When you say he was an assistant
9   district attorney, was he an assistant
10  district attorney that handled murder cases
11  at that time?
12  A.  I believe so, yes.
13  Q.  When you were hired in July of 2002
14  by the Suffolk County District Attorney's
15  Office, was there an interviewing process or
16  application process?
17  A.  Yes.
18  Q.  Who was it, if you know, that
19  made -- I guess Mr. Spota made the ultimate
20  decision to hire you; is that correct?
21  A.  No, I don't know.
22  Q.  Who did you interview with?
23  A.  Robert Keauron and Bob Creighton,
24  K-E-A-U-R-O-N and C-R-E-I-G-H-T-O-N.
25

1   Q.  Mr. Creighton being the former
2   police chief?
3   A.  Police commissioner, yes.  He was
4   the chief investigator.
5   Q.  Who informed you you were employed?
6   A.  Mr. Creighton.
7   Q.  Did you have any contact with
8   Mr. Spota during the interviewing process?
9   A.  No.
10  Q.  What was the date that you were
11  told you where going to be hired?
12  A.  Sometime prior to July 7, 2002 and
13  I don't know.
14  Q.  What training, if any, did you
15  receive from the DA's office before you began
16  your work as an investigator for the Suffolk
17  District Attorney's Office?
18  A.  I don't believe I received any
19  training.
20  Q.  Once you began your employment with
21  Suffolk District Attorney's Office, did you
22  receive any training?
23  A.  I have been to training schools.
24  Q.  Can you describe those, please?
25

```
 2  Whatever is easier for you. You can start
 3  with the most recent work and work your
 4  back or you can start in July and work your
 5  way forward.
 6       A.  I received training in taking
 7  buccal swabs back when I was in the family
 8  crime unit during that period of time. I
 9  received training in the responsibilities of
10  carrying a weapon on an air craft. That was
11  while I was with White Collar Crime.
12       Q.  Do you mean commercial aircraft?
13       A.  Yes, FAA regulations. I received
14  training in identification theft and credit
15  card fraud while I was in Public Integrity
16  Unit. I also attended a course that they
17  sent me to regarding interview and
18  interrogation while I was with Public
19  Integrity. That was last year and I received
20  firearm training every year.
21       Q.  Do you carry a firearm as part of
22  your duties as detective investigator?
23       A.  Yes. We are sworn police officers.
24       Q.  So whenever you are working you
25  carry a gun?
```

```
 1       A.  Yes.
 2       Q.  I take it that you don't wear a
 3  uniform at all?
 4       A.  No.
 5       Q.  Do you have a badge?
 6       A.  Yes.
 7       Q.  I want to talk to you a little bit
 8  about the interview and interrogation
 9  training. When did that happen?
10       A.  About a year ago.
11       Q.  So sometime in the calender year of
12  2006?
13       A.  No, calendar year 2005. Near the
14  end of the year.
15       Q.  Where was that training?
16       A.  Atlantic City, New Jersey.
17       Q.  Did you have to go to school? How
18  long was it?
19       A.  A week.
20       Q.  Where there classes daily?
21       A.  Yes.
22       Q.  How long?
23       A.  Eight hours a day.
24       Q.  So it would be fair to say it was
```

1  40 hours of training?
2      A.    Yes.
3      Q.    The training, describe the nature
4  of the training for me.
5      A.    The training was -- actually, the
6  name of the company that gave it escapes me
7  for the moment but it was the very big
8  polygraph company.  The training was actually
9  a revamped version of polygraph interrogation
10 and interviewing techniques.  I know that
11 because I'm a certified polygraph examiner.
12     Q.    If these alternatives are not
13 right, in other words, if it is not either
14 one of these, feel free to say something
15 else.  But was the training primarily how to
16 interrogate somebody and use a polygraph as
17 part of the techniques in the interrogation
18 or was it how to conduct a polygraph exam?
19     A.    No.  It had nothing to do with
20 polygraph which is why I say it was revamped
21 to use as interrogation.  A lot of techniques
22 that are used in interviews and
23 interrogations are the same kind of
24 techniques that polygraph examiners use

1  during their interview and interrogation
2  prior to and during the administration of the
3  test and formulate the questions.
4      Q.    Was the interview or interrogation
5  seminar aimed at witnesses or targets?
6      A.    Both.
7      Q.    Buy targets I mean people you
8  suspect being involved in a crime, whether
9  they are arrested defendants or somebody you
10 think committed the crime and targets?
11     A.    Yes, that's correct.
12     Q.    At any point, say, in the last ten
13 years, have you taken a seminar, been given
14 any training on an individual's rights to an
15 attorney?
16     A.    No.
17     Q.    Have you been given any training at
18 all in the last ten years or attended any
19 seminars involving techniques for obtaining
20 statements from less than cooperative
21 individuals?
22            MR. DUNNE:  I object to
23     form.
24            I don't know what less than

1  cooperative means, but answer as
2  best you can.
3          THE WITNESS:  Can you repeat
4  the question?
5          MR. BARKET:  Can you read it
6  back?
7          (Whereupon, the requested
8  portion was read by the reporter.)
9      Q.    And actually what's most important
10  if you understand less cooperative.  If you
11  don't understand it, then tell me.
12          MR. DUNNE:  It's not a
13  matter of understanding.  It's
14  almost a subjective term.  I don't
15  know what that means.  You can have
16  a different idea than he can and
17  that was the basis of my objection.
18  That's why I indicated answer as
19  best you can.
20      Q.    Do you understand the question?
21      A.    Yes, I understand where you're
22  going.
23      Q.    Let me just ask a few more and
24  maybe we can flush out what we both mean

---

1  about it.
2          There are instances where you
3  interview witnesses and the witnesses are
4  either victims of a crime or a witness to a
5  crime and they are perfectly willing to speak
6  to the police; is that fair?
7      A.    Yes.
8      Q.    They feel it's either their
9  responsibility, duty or because they are,
10  themselves, a victim, they actually want to
11  speak to you; is that right?
12      A.    Yes.
13      Q.    There are other times -- and we'll
14  kind of swing the other end of the
15  spectrum -- individuals or defendants and
16  that have either committed a crime or have
17  been accused of committing a crime and don't
18  want to speak to you initially; is that fair?
19      A.    Correct.
20      Q.    Within that spectrum there are
21  individuals that would fall in various points
22  along the line who may be somebody who is a
23  witness but for either reasons of fear or
24  uneasiness or just a general distrust in the

1 police may not want to speak to you; is that
2 fair?
3 A. Yes.
4 Q. Maybe there are times that someone
5 is a target of an investigation but not a
6 named defendant yet and they also may be
7 reluctant initially to speak with you; is
8 that fair?
9 A. Yes.
10 Q. So in looking at that, were you at
11 any seminars or training and dealing with
12 individuals who did not initially want to
13 speak to you either because out of fear or
14 retribution of criminals or out of
15 self-interest they were afraid to talk to the
16 police?
17 A. Yes, I have.
18 Q. Could you describe that?
19 A. Well. That one seminar I went to
20 which was given in 2005 and broached that
21 subject, there was training I received when
22 with I was with the inspector general's
23 office with fraud investigation. That
24 subject was discussed. And training I

1 received when I was with the insurance
2 department in New York State Insurance Fraud
3 Bureau, that covered that subject also.
4 Q. Did this training include the
5 interrogation or interview of defendants,
6 people who you believe had committed a crime
7 or who had actually been charged with a
8 crime?
9
10 A. Yes.
11 Q. Is there any distinction between
12 those two, in your mind?
13 A. Between defendants and people being
14 accused?
15 Q. No. Somebody you believe committed
16 a crime and somebody who has been charged
17 with committing a crime.
18 A. I don't understand the question.
19 Q. You understand there comes a point
20 in time when somebody is formally charged
21 with a crime they are presented in court
22 either to a felon complaint or to a superior
23 court on an indictment.
24 You're familiar with that process?
25 A. Yes.

1  Q.    Prior to the person being brought
2  in to court and having to answer to either a
3  felony complaint or an indictment, the person
4  is arrested ordinarily; is that right?
5
6  A.    Yes.
7  Q.    I guess prior to the arrest
8  somebody in law enforcement forms the opinion
9  that that person committed the crime; is that
10  fair?
11  A.    Yes.
12  Q.    I guess I'm asking if you see a
13  distinction in your mind between somebody who
14  has gone through the process of being charged
15  as opposed to somebody who has yet to be
16  formally charged.
17  A.    It would depend on whether or not I
18  thought they had committed that crime.
19  Q.    What do you mean by that?
20  A.    If I believe that person committed
21  a crime, then I would draw no distinction
22  between that person and his state of being
23  interrogated by me and the state in which he
24  would be presented to the court.
25  Q.    Could you talk about -- I want to

1  go through this, if I can, the interrogation
2  techniques of individuals that are either
3  targets of your investigation or people you
4  actually think committed a crime. You said
5  you were given a number of different seminars
6  or training on them --
7  A.    There are way too many scenarios
8  and we don't have time. Every individual is
9  different. Every interrogation is different.
10  Every crime is different. There are too many
11  variables.
12  Q.    I'm sure there are. I'm not asking
13  about those. What I'm asking about is the
14  training you received on interrogating those
15  individuals.
16  A.    The training you receive enables
17  you to recognize the different aspects of
18  each investigation of each suspect of each
19  crime and then determine from there where you
20  need to go, what type of questions you have.
21  It's really a seat of the pants thing until
22  you are sitting with someone and talking to
23  them. You don't know how they are going to
24  react, what they are going to say. So you
25

1  have to formulate each question based on what
2  you are learning from that person as you're
3  sitting there talking to them.
4      Q.  I appreciate that and what I would
5  like to do is not focus so much on what you
6  do during your interrogation but more upon
7  what you were trained to do so we can go into
8  those seminars or training you were given on
9  how to interrogate an individual who is
10 either defendant or somebody you believe
11 committed the crime.
12        Were you given training on how to
13 get those people to talk to you?
14     A.  I don't believe that that's any
15 science that you can define. It's up to the
16 individual. Some guys are great at it. Some
17 guys are okay at it. Some guys are terrible
18 at it. It's a matter of your own personality
19 and what you put into it, how you perceive
20 the crime you're investigating, how you
21 perceive the suspect that you are talking to
22 or the witness you're talking to and how they
23 react to you. You can sit down with somebody
24 for days and not give you the time of day

1  because for some reason you turn them off.
2  These are not things you learn in the
3  classroom. You learn by doing them.
4      Q.  I guess that's true for a lot of
5  endeavors. It depends on how good the person
6  is at doing it.
7      A.  Exactly.
8      Q.  For me I think of golf all the
9  time.
10        What I'm more concerned about is
11 you went to these seminars. These seminars
12 focus on interrogating a defendant, yes?
13     A.  Some of them, yes.
14     Q.  Those are the ones we are talking
15 about now. They teach you things, I assume,
16 right? However long the classes were, you go
17 to school, you go to a class, someone
18 lectures you and presumably they are trying
19 to convey information to you, right?
20     A.  Yes.
21     Q.  That's what I'm focussing on. I'm
22 not focussing on how well you do it or
23 somebody else does it or the spectrum of
24 quality of people that can do it. What I

1  would like to know is what training you
2  received on how to do it.
3       So what information was conveyed to
4  you at these seminars?
5       A.  The information that's conveyed to
6  you or any police officer at these
7  seminars --
8       Q.  Let me interrupt you for a second
9
10  because the language matters a little bit.
11  It's not being conveyed to me.  I want you to
12  be personal about this.  I'm asking you
13  specifically about the information that was
14  conveyed to you.  So if we could just maybe
15  break it down by the training that you
16  received --
17            MR. DUNNE:  Just ask him
18       what the classes were about.  I
19       think that's what you're driving
20       at.
21            MR. BARKET:  Well, I'm
22       driving at a lot but I will try to
23       do this as best I can.
24       Q.  I want to know what was taught at
25  these seminars on this topic.

1            Do you understand that question?
2       A.  I do but I can't give you a table
3  of contents as to what each individual aspect
4  of what these courses were about without
5  having the course outline in front of me, "A,
6  B."  I've been doing this for 41 years and a
7  lot of the experience I have comes from the
8  days when there were no seminars and classes
9  and I picked up a lot by doing it.
10           So a lot of things I have sat in
11  classes about I've already done or already
12  experienced.  I find that a lot of the
13  information that is given to you at these
14  seminars are merely cases, prior
15  interrogation, prior interviews and how the
16  detective or investigator reached his goal
17  and what techniques he used in that
18  particular interrogation involving that
19  particular crime, that particular summit.  So
20  each instance is different.
21           When you say "a course of
22  interrogation techniques," well, that's what
23  it is a course of interrogation techniques.
24  It's not broken down any further than that.

1 How to get a hostile witness to speak to you,
2 how to get someone who doesn't read and write
3 to understand what you're trying to get them
4 to say. It's an overall thing. It's not a
5 specific course. I can't answer that
6 question, basically.
7 Q. You did a fairly good job just
8 then.
9
10 When you say you've been doing this
11 for 41 years, I take it you meant going back
12 to 1964 when you came into the police
13 department?
14 A. Yes.
15 Q. Between 1985 and, say, 2002, did
16 you receive any trainings on changes in the
17 law, what's permitted and not permitted in
18 the course of interrogating suspects?
19 A. I would say yes, in some of those
20 seminars listed for you that I took, that
21 would be past 1975.
22 Q. One of things you mentioned in your
23 answer was "for the detective to reach his
24 goal." What did you mean by that?
25 A. Well, if he was interrogating his

1 witness and wanted to get an account of what
2 the witness saw, that would be his goal.
3 Q. How about if he was interrogating a
4 suspect or a defendant?
5 A. If he was interrogating a defendant
6 you would want to get to a point where the
7 defendant would make admission to him or give
8 a confession.
9 Q. What training have you received
10 with respect to the installation of
11 sidewalks?
12 A. Absolutely none.
13 Q. Do you have any background at all
14 or any training involving pouring of
15 concrete?
16 A. That's a labor I try to stay away
17 from. No, I don't.
18 Q. There are times when working with
19 one's hands is a pleasure for some of us.
20 A. In some instances.
21 Q. So is it fair to say you haven't
22 been given any training in that at all?
23 A. No.
24 Q. How many cases have you been

1 involved with, either as primary investigator
2 or assisting somebody else where the topic
3 that involved, in any way, the pouring of
4 concrete, installation of sidewalks or paving
5 of roadways?
6 A. Other than this matter, I can't
7 think of any.
8
9 Q. What was your first contact with
10 this particular investigation, and that being
11 the investigation that involved Daniel
12 Wirshup?
13 A. In November, October of '03 I was
14 assigned to Public Integrity Unit. That
15 November -- we were given an assignment that
16 November --
17 Q. Let me break it down, a couple of
18 pronouns.
19 A. -- '02.
20 Q. October of '02 and November '02?
21 A. Right.
22 Q. Let me break down a couple of
23 things.
24 A. Detective Investigator Iacopelli

---

1 and myself.
2 Q. When did Detective Investigator
3 Iacopelli begin with the district attorney's
4 office, do you know?
5 A. We started about a week apart.
6 Q. I forget, he was one of the
7 gentlemen you knew from the police
8 department; is that right?
9 A. No, he was not.
10 Q. That was Felice that you knew?
11 A. Yes.
12 Q. Had you met Mr. Iacopelli prior to
13 you coming to work at the DA's office?
14 A. No.
15 Q. Never met?
16 A. No.
17 Q. Prior to July '02?
18 A. No.
19 Q. I think I understand it but you
20 never met prior to July '02; is that correct?
21 A. Correct.
22 Q. Who gave you the assignment?
23 A. It was either Jeremy Scileppi or Ed
24 Heilig, bureau chief.

1

2          Q.    What were your told?

3          A.    We were told, in substance, that

4    there was an investigation being conducted

5    into Patchogue Village involving contracting,

6    in fact, involving Debut Concrete and that we

7    were to hook up with Ray Felice and Charlie

8    Bartels, get briefed by them regarding what

9    they had been doing and start an

10   investigation or take a look around,

11   basically.

12         Q.    What do you mean, "take a look

13   around?"

14         A.    See what they had that we could

15   assist them with or go on our own and do an

16   investigation.

17         Q.    Is this the first investigation as

18   a law enforcement official you had

19   participated in since 1985?

20         A.    No.

21         Q.    Right.   You worked for the State

22   Insurance Company Investigation.   Those were

23   all law enforcement?

24         A.    All law enforcement.

25         Q.    Did you meet with Mr. Felice and

1    clear.  Back up.  Who is "he?"

3    A.   The homeowner.

4    Q.   Who is the homeowner?

5    A.   His name escapes me at the moment.

6    The last name began with a "P." He was a

7    New York City Police Officer.

8    Q.   Leave a blank and see if --

9         MR. DUNNE:  Take a look at

10        this (handing).

11   A.   (Witness peruses document).

12        Pearo.

13        MR. BARKET:  You're looking

14   at a document to refresh your

15   recollection.

16        I ask you to give it to the

17   reporter to have it marked.

18        MR. DUNNE:  Make a copy of

19   it (handing).

20        MR. BARKET:  Mark this as

21   Plaintiff's Exhibit 1.

22        (Copy of handwritten notes

23   was marked as Plaintiff's

24   Exhibit 1 for

25   identification, as of this

---

1    Mr. Bartels?

3    A.   Yes.

4    Q.   What did they tell you?

5    A.   They informed us, in substance,

6    that they had been looking at some wage

7    issues involving Debut Concrete, and that

8    Debut Concrete -- they had been looking into,

9    Town of Brookhaven, and Debut Concrete had

10   also been doing work in Patchogue Village.

11        They had also been investigating a

12   company, LiLi Asphalt, I believe is the name

13   of it. They had obtained information that

14   LiLi had provided a cell phone for personal

15   use to Daniel Wirshup, who was the highway

16   supervisor in Patchogue Village. They were

17   wondering what the connection was between --

18   they were investigating a connection between

19   Wirshup and LiLi and Debut Concrete.

20        They had a homeowner in Patchogue

21   Village who made a complaint concerning the

22   fact that he was bulldozed by Wirshup and

23   Debut Concrete into repairing his sidewalk in

24   front of his house.

25   Q.   Again, the pronouns I want to be

1
2              date.)
3     Q.   With respect to Mr. Pearo, was he a
4  current New York City Police Officer or
5  retired?
6     A.   Current.
7     Q.   According to Mr. Felice --
8     A.   Uh-huh.
9     Q.   -- Mr. Pearo was -- you used the
10  term bulldozed?
11     A.   I think bullied may have been a
12  more appropriate term.
13     Q.   Whatever.
14     A.   Bullied is what I meant to say.
15     Q.   Bulldozed I guess would be no pun
16  intended, right?
17     A.   Yes.
18     Q.   Bullied into using what?
19     A.   Debut Concrete to repair his
20  sidewalks.
21     Q.   Did you, yourself, speak to Mr.
22  Pearo?
23     A.   Eventually I did, yes.
24     Q.   When was that, first of all?
25     A.   I don't recall.

1
2     Q.   What did he tell you?
3     A.   Basically that he came home from
4  work one day and found his front yard
5  cornered off with yellow tape and that he
6  spoke with Daniel Wirshup -- and I believe
7  Dan was with the gentleman who owned Debut
8  Concrete -- and they spoke to him about doing
9  repair work on his sidewalk. He was kind of
10  upset because none of the people around him
11  had to get that work done except for him. He
12  felt that some sidewalks in his neighborhood
13  were in as much disrepair as his were and
14  didn't understand why they were singling him
15  out.
16     Q.   Was his sidewalk in disrepair,
17  according to him?
18     A.   I don't recall. Some of it wasn't
19  even a sidewalk. I think he had a corner
20  lot. I don't know if the whole thing was
21  sidewalk or not. I never saw it so I
22  wouldn't know.
23     Q.   I'm just asking about what he told
24  you.
25     A.   He said that some of the other --

1  if I recall.
2      Q.  The phrase "some of the other
3  sidewalks were in as much disrepair as his,"
4  it indicates that his was in disrepair.
5  Is that what you understood from
6  him?
7      A.  That would be a fair assumption.
8      Q.  Is that what you understood from
9  him?
10     A.  Yes.
11     Q.  He said he met with an individual.
12  Did he know Mr. Wirshup's name at the time
13  when you spoke to him?
14     A.  When I spoke to him, yes.
15     Q.  What did he tell you that
16  Mr. Wirshup said to him?
17     A.  I honestly don't recall.  I would
18  have to review -- I believe we took a
19  statement from him.
20     Q.  Let's back up again.
21  Going back to the initial part of
22  the investigation, after you spoke with
23  Mr. Felice, you said he told one of two
24  things:  One was Mr. Pearo was bullied or

1  bulldozed into using Debut to fix his
2  sidewalks; and two, that there was a cell
3  phone that was given to Mr. Wirshup by LIU?
4      A.  Yes.
5      Q.  Did you take any steps to
6  investigate that?
7      A.  They had already done that and they
8  had, I believe, obtained a printout of phone
9  calls made on the cell phone and the bills
10  attached to it.
11     Q.  How did they do that?
12     A.  I couldn't tell you.
13     Q.  Have you ever obtained cell phone
14  records?
15     A.  By subpoena.
16     Q.  Did you know how they did that?
17     A.  No, I don't.
18     Q.  Have you ever seen a subpoena for
19  Mr. Wirshup for that particular cell phone?
20     A.  No, I haven't.
21     Q.  Was there an active grand jury
22  investigation at the time you entered the
23  investigation?
24     A.  On their end of the investigation,

1  I don't know.
2  Q. You know what I mean by an active
3  grand jury, right?
4
5  A. Yes. There is always an active
6  grand jury but I don't know whether their
7  investigation had been presented to that.
8  Q. Was there an assistant district
9  attorney assigned to this Patchogue matter at
10  that time?
11  A. Chris Nicolino.
12  Q. Could you tell me when you first
13  met Mr. Nicolino?
14  A. I met Chris earlier on. I knew him
15  when I was working in White Collar.
16  Q. So July of '02?
17  A. Yes.
18  Q. Did you know him prior to that?
19  A. No.
20  Q. Did you review the cell phone
21  records?
22  A. Yes.
23  Q. What did you recall about that, if
24  anything?
25  A. The only thing that stands out in

1  my mind is a series of calls, quite a few,
2  made to a particular bar in East Patchogue in
3  the mornings. We thought initially it might
4  be part of book making operation, placing
5  bets. We didn't know what it was. That's
6  the only thing that stands out.
7  Q. What was the bar?
8
9  A. I think it was the Dunton Street
10  Pub or something like that.
11  Q. Was there a bookmaking operation?
12  A. Not that we could ascertain. We
13  believe the calls were made, it seemed like,
14  to a particular barmaid that was working at
15  the same time the calls were made. It may
16  have been a romantic interest.
17  Q. When you say "may have been," do
18  you have any evidence of that?
19  A. No.
20  Q. Just simple speculation?
21  A. Yes.
22  Q. After you looked at the cell phone
23  records, what was the first thing you did in
24  connection with this investigation yourself?
25  A. After looking at the cell phone

```
 1
 2        A.   I don't know of any concrete being
 3   poured in the Dunton Avenue Pub or any
 4   sidewalk work being done there.  So we
 5   assumed they were personal calls.  This is
 6   what we were looking at.  We were not
 7   concerned, basically, that it was a
 8   bookmaking operation or that it was a
 9   romantic interest, were concerned about the
10   cost of the phone to LIU and the fact that
11   Wirshup was making personal calls on the
12   phone which was he given for purposes of
13   business.
14        Q.   How did you come to learn that he
15   was given this for business?
16        A.   From Ray Felice.
17        Q.   When you say the bills were quite
18   high, what does that mean?
19        A.   I don't know but I recall them
20   saying that the bills were high.
21        Q.   What's the next thing you did?
22        A.   We obtained records from Patchogue
23   Village by a subpoena concerning areas
24   because of the Pearo connection, concerning
25   areas of sidewalk work being done in the
```

```
 1   records, we visited the bar a few times to
 2   try to ascertain who was working at the same
 3   time these calls were made and try to
 4   ascertain if there was, in fact, a bookmaking
 5   operation.  We weren't able to determine
 6   anything other than the fact that a lot of
 7   calls were made to that phone in that bar
 8   while that particular barmaid was working.
 9        Q.   I didn't want to know what kind
10   of -- give you the first thing you did unless
11   that was the first thing you did.
12        A.   That was one of the first things we
13   did because the bills were quite high.
14        Q.   You weren't able to determine -- is
15   it fair to say there was no evidence at all
16   that there was a bookmaking operation going
17   on?
18        A.   Yes, that would be fair assumption.
19   There would be concern about the fact that
20   they were obviously personal calls made on
21   the cell phone which was supposedly given to
22   Mr. Wirshup for business use.
23        Q.   What made you say they were
24   personal?
25
```

1 Village.
2
3    Q.  But did Mr. Pearo come to speak
4 with anyone from Suffolk DA's office, do you
5 know?
6    A.  I don't know that.
7    Q.  In other words, did they contact
8 him or did he call them?
9    A.  I don't know.
10    Q.  When you say you received by way of
11 subpoena, how was that subpoena delivered, if
12 you know?
13    A.  Personally.
14    Q.  Who personally delivered it?
15    A.  Either Tom Iacopelli or myself, I
16 would assume.
17    Q.  What kind of subpoena was it?
18    A.  I don't recall.
19    Q.  Do you know the difference between
20 a grand jury subpoena and a trial?
21    A.  Yes. It was not a trial subpoena.
22    Q.  So the only thing it would be would
23 be a grand jury subpoena, right?
24    A.  I guess so.
25    Q.  Did you deliver any subpoenas in

1 connection with that investigation?
2    A.  Yes.
3
4    Q.  I know this is a little bit of a
5 tangent. I promise to come back to this.
6 . Let me just talk to you about subpoenas,
7 since we are that topic.
8    Q.  What subpoenas did you deliver?
9    A.  I don't recall.
10    Q.  Were you given any training on how
11 to deliver subpoenas?
12    A.  No.
13    Q.  Were you given any training on the
14 rules in New York for service of a subpoena
15 on an individual?
16    A.  No.
17    Q.  What was your practice? How did
18 you deliver the subpoenas?
19    A.  I delivered the subpoena to the
20 person that I was directed to deliver them
21 to. Obtain a name and identification of the
22 person I delivered to and recorded the time
23 and person I delivered to.
24    Q.  Were there instances where the
25 person complied with the subpoena

1  other sidewalks that were repaired in
2  Patchogue.
3       Let's subpoena the Town and find
4  out what else there is?
5
6    A.   Right.
7    Q.   So you talked about it with the
8  other people involved in the investigation
9  and then you decide to go ahead and get a
10  grand jury subpoena and serve it and get that
11  information?
12    A.   That's correct.
13    Q.   That's kind of what I meant by not
14  merely a process server but you were involved
15  in what you were looking for and what was
16  been being subpoenaed?
17    A.   That's fair to say, yes.
18    Q.   When you were serving subpoenas,
19  were there instances where you gave the
20  subpoena to an individual or a company and
21  you, yourself, received records or whatever
22  it was you were looking for?
23    A.   In this particular matter?
24    Q.   Yes.
25    A.   I have gone back and taken the

1  immediately?
2    A.   I don't know. There may have been.
3    Q.   In other words, the subpoena, if
4  you recall, they would be delivered to the
5  person on one day for them to either appear
6  and testify or appear, testify and produce
7  documents before the grand jury; is that
8
9  right?
10    A.   I guess, yes.
11    Q.   I assume this is part of your
12  investigation.
13       Did you read the subpoenas?
14    A.   Yes.
15    Q.   You weren't simply a process
16  server, were you?
17    A.   In some cases. I do a lot of
18  subpoena work in this job.
19    Q.   Right. But the subpoenas being
20  issued are as a result of decision making
21  within the people doing the investigation; is
22  that fair?
23    A.   Yes.
24    Q.   In other words, the example you
25  gave is that maybe we should look at some

2 items that they supplied us with personally,
3 yes. Had they been supplied to me on the
4 spot, no.
5     Q.   How did that occur? How was that
6 arrangement made?
7     A.   We would drop off a subpoena at
8 Village Hall and they would call us when they
9 had the documents ready to pick up and we
10 would pick them up.
11    Q.   Were all the subpoenas that you
12 were involved in serving served in the
13 Village Hall, were subpoenas served on other
14 individuals or other entities?
15    A.   There with subpoenas served on
16 other individuals to appear before the grand
17 jury to testify and there were subpoenas
18 served to Village Hall for records.
19    Q.   How about records, was there any
20 subpoenas served anywhere besides Village
21 Hall for records?
22    A.   Not that I served.
23    Q.   How was it that the method for
24 compliance with a subpoena was delivery or
25 pickup by you rather than the person actually

2 responding to the grand jury?
3     A.   It was written right on the
4 subpoena.
5     Q.   What do you mean?
6     A.   That the documents requested could
7 be turned over to me, the investigating
8 detective.
9     Q.   Who wrote out the subpoenas, do you
10 know?
11    A.   It was typed by the secretary and
12 probably dictated by one of the ADA's.
13    Q.   The actual drafting of the
14 subpoenas was not something you were
15 personally involved in?
16    A.   No.
17    Q.   That would have been done by the
18 attorneys involved?
19    A.   Right.
20    Q.   Now, getting back to the
21 investigation itself. Were there witness
22 interviews that you were asked to conduct?
23    A.   Yes.
24    Q.   When were you first asked to
25 interview witnesses?

Robert Amato     62

```
 1
 2   A.   Well, I was not really asked to
 3   interview witnesses.  We were told to
 4   investigate the sidewalk situation.  We
 5   obtained sidewalk records, determined who
 6   some of the people were that were sent
 7   letters to have their sidewalks replaced
 8   and/or repaired and we went out and
 9   interviewed those people.  That's the natural
10   order.
11   Q.   Who is "we?"
12   A.   Tom Iacopelli and myself.
13   Q.   Did you do it together or
14   individually?
15   A.   Mostly together.
16   Q.   How many individuals did you
17   interview with him?
18        MR. DUNNE:  In what time
19   period?
20        MR. BARKER:  That fell into
21   this category, the initial part of
22   the investigation.  After he
23   received records back, he went out
24   and spoke to people.
25   Q.   How many?
```

Robert Amato     63

```
 1
 2   A.   We probably talked to twenty or
 3   thirty people.
 4   Q.   Did you take statements from them?
 5   A.   Some of them.
 6   Q.   How many did you take statements
 7   from?
 8   A.   Probably about eight or ten.
 9   Q.   What factors entered into the
10   decision either to obtain a written statement
11   or not?
12   A.   Whether or not the witness felt
13   that they had been bullied into using Debut
14   Concrete as their contractor was a major
15   checkmark as far as whether or not we wanted
16   to get a statement, and any conversation they
17   had with the Village representatives was
18   another benchmark we used.
19   Q.   Let me get a little clearer picture
20   of the number.  You said between 20 and 30 --
21   A.   Maybe more.
22   Q.   So maybe 25 to 35 or more than
23   that?
24   A.   It could have even been more.  We
25   went down the entire street of Jennings
```

```
 1   Avenue and discovered that a lot of people
 2   had sidewalks in a lot worse disrepair than
 3   other people who never received any
 4   notification from the Village.
 5
 6        Q.   That kind of sounds like the person
 7   who gets caught doing 70 in a 55, doesn't it?
 8        A.   Exactly.
 9        Q.   Somebody else passing me going 75
10   is not really an excuse, is it?
11        A.   Exactly.
12        Q.   You can't get everybody, can you?
13             MR. DUNNE:  You're asking
14   the wrong guy.
15             MR. BARKET:  I'm kind of
16   making a joke out of it.
17        Q.   But in all seriousness, code
18   enforcement in a local village is, to some
19   degree, the same in law enforcement.  You do
20   what you can do.
21        There are limits on manpower and
22   hours and resources, fair?
23             MR. DUNNE:  Objection.
24   Absolutely objection.
25        Q.   In the course of your investigation
```

```
 1   you said there were some sidewalks that were
 2   in worse repair than others and those people
 3   didn't receive letters; is that --
 4        A.   That's correct.
 5
 6        Q.   Was there any pattern to people
 7   that didn't receive letter?
 8        A.   No.
 9        Q.   Did they know Mr. Wirshup or know
10   somebody in some way that they were given
11   special treatment?
12        A.   Not in every case.
13        Q.   Did it appear to be a random thing,
14   some people got letters and some people
15   didn't?
16        A.   That appeared to be random, yes.
17        Q.   There was no discernable pattern to
18   that?
19        A.   No.
20        Q.   So that the 30 -- and you
21   interviewed people only who got letters; is
22   that fair?
23        A.   No.  We interviewed, in that
24   particular instance, the entire block.
25        Q.   To see if they had letters or any
```

```
        didn't?
 1   A.  We spoke to everybody on the block.
 2
 3   Q.  All at once?
 4   A.  Not at once.
 5
 6   Q.  Over how long a period of time?
 7   A.  Probably a few weeks.
 8   Q.  So when you went out on day one and
 9   you talked to how many people you talked to
10   then, did you keep a record of who you spoke
11   to and who you had left to speak to?
12   A.  At that time, yes.
13   Q.  Does that record still exist?
14   A.  I don't know.  Possibly.  I don't
15   know.
16   Q.  In the course of your training as a
17   police officer and detective and
18   investigator, are you trained in retention of
19   police reports and notes and things like
20   that?
21   A.  Yes.
22   Q.  If I said to you "Rosario," what
23   would that mean to you?
24   A.  Material matters available to
25   defense.
```

```
        contact?
 1   A.  Exactly.
 2   Q.  So to look at the numbers -- the
 3   floor of the number of people you interviewed
 4   were the people who got letters?
 5   A.  Yes.
 6   Q.  Did you interview everybody who got
 7   a letter?
 8   A.  I believe so.
 9   Q.  Do you keep a record of that?
10   A.  Possibly.
11   Q.  In other words, if you're dealing
12   with thirty or forty people, there must have
13   been -- well, was there some method to
14   determine who you interviewed, who you
15   didn't, what they told you?
16   A.  We tried to keep it to an area
17   without getting too far spread out.  So we
18   concentrated on the Jennings Avenue area.
19   Q.  I gather that from before.  But
20   when you're dealing with several dozen
21   individuals, I'm asking you if there was some
22   method that you and Mr. Iacopelli used to
23   determine who you spoke to and who you
```

1    Q.   You said you testified hundreds of
2 times.  When you're testifying in those
3 instances, before you testify, the individual
4 attorney is given all of your notes and
5 reports concerning the subject matter of your
6 testimony; is that right?
7
8    A.   That's right.
9    Q.   You learned over the course of your
10 duties and responsibilities as a police
11 officer that you're supposed to preserve this
12 material just for this purpose, right?
13    A.   Yes.
14    Q.   So you know that if you're creating
15 reports or taking statements or doing things,
16 you don't destroy those because those are
17 subject to discovery if there is a criminal
18 prosecution?
19    A.   Correct.
20    Q.   You said you took statements from
21 eight to ten people?
22    A.   Probably.  I would say probably at
23 least eight to ten.
24    Q.   At some point we will go through
25 the statements one by one and we will be able

---

1 to determine the exact number, but that's
2 fine for now.
3        All of the people that you
4 interviewed who received letters, would it be
5 fair to say that their reaction to receiving
6 letters was an annoyance, at least?
7
8        MR. DUNNE:  Objection to
9        form.
10       Try to answer that as best
11       you can.
12    A.   I would say annoyance was one.
13    Q.   Common --
14    A.   One of the common threads for each
15 one.
16    Q.   Not terribly complicated to see?
17    A.   No.
18    Q.   A homeowner got a letter from the
19 Town that says you have to spend money on
20 your sidewalk.  That's not a letter that any
21 homeowner wants to receive.
22    A.   Correct.
23    Q.   Most of the homeowners you spoke to
24 were displeased, at the very least, with
25 receiving that kind of letter?

Robert Amato

1  A.    Yes.
2  Q.    A number of these homeowners, I
3  take it, actually went ahead and had his
4  sidewalk repaired; is that fair?
5  A.    Yes.
6  Q.    How many?
7  A.    Everyone we took a statement from
8  and probably one or two others.
9  Q.    Of those people, how many used
10 Debut?
11 A.    All but one, I believe.
12 Q.    The one who didn't, who did that
13 person use?
14 A.    Used another contractor.  I don't
15 know.
16 Q.    Was there any difficulties that
17 person experienced following their repair of
18 the sidewalk with a different contractor?
19 A.    He claimed there was quite a bit of
20 difficulty.
21 Q.    In what way?
22 A.    He had trees on his property, that I
23 think he wanted removed.  There was what
24 appeared to be some kind of backlash for not

---

Robert Amato

1  using Debut.
2  Q.    Who was that individual?
3  A.    Mr. Raffat (phonetic).
4  Q.    When you say "backlash," who was
5  yielding or wielding the lash?
6  A.    That would have been Mr. Wirshup.
7  Q.    In what ways that you recall would
8  the backlash manifest itself?
9  A.    I do recall something about some
10 trees which he had growing out by his curb
11 line, that there was some complaint about it.
12 Also, while he was having the work done there
13 was a complaint about the torn up concrete
14 and how it was being stored on his property
15 and things like that.
16 Q.    Did you investigate those
17 complaints about the backlash?
18 A.    Other than to make notes of them,
19 no, because there was no ticket given or
20 summonses or anything like that.
21 Q.    Were the things complained of or
22 did you investigate whether or not things
23 complained of were actual violations of some
24 ordiance or an ordinance, I should say?

1      What I want to do is ask you a
2 little bit about the relationship between
3 Mr. Wirshup and Debut. From what I gather
4 from what you're saying is that you were
5 looking into whether or not Mr. Wirshup was
6 improperly sending business -- generating
7 bids for Debut, steering business; is that
8
9 what you're saying?
10     A. Yes.
11     Q. Is that right?
12     A. Yes.
13     Q. You didn't think that Mr. Wirshup
14 was doing this, if he was doing it at all was
15 doing it out of the goodness of his heart or
16 some admiration or love he had for Debut?
17     A. No.
18     Q. You thought that if he was doing
19 this he was doing it for some illegal payback
20 to himself; is that right?
21     A. Or he was doing it under orders
22 from someone else.
23     Q. Or orders from somebody else?
24     A. Right.
25     Q. On that end, what did you perceive

---

1     A. No, because they were not existing
2 at the time we spoke to Mr. Raffat and there
3 was no record of him being given a summons or
4 anything.
5     Q. When you say they were nonexistent,
6 do you mean there was no ordinance or the
7 conditions that were complained of were no
8 longer visible?
9     A. Conditions that he complained about
10 were no longer there.
11     Q. Did you take some time to look at
12 the town ordinance to see whether or not
13 there was some code concerning trees or
14 concerning the storage of concrete?
15     A. No.
16     Q. Did anybody?
17     A. I didn't.
18     Q. Did not?
19     A. Did not.
20     Q. Did anybody?
21     A. I don't know.
22     Q. I will come back to the individual
23 when we have all the statements and we go
24 through those in some detail.

1    as his motive?

2        A.    At what time?

3        Q.    At that point in time you began

4    this investigation and you're talking to

5    these people who are telling you they were,

6    in one way or another, asked to or bullied

7    into -- whatever the phrase is -- into using

8    Debut.

9        A.    In the very beginning I actually

10   believed that Mr. Wirship was doing that on

11   orders from higher up.

12       Q.    Who were the orders coming from?

13       A.    The mayor of the village, Steve

14   Keegan.

15       Q.    What lead you to that opinion, why

16   did you hold that opinion?

17       A.    There was always the possibility

18   Mr. Wirship was taking an envelope from Debut

19   Concrete for steering them but I felt

20   personally the likelihood because of the fact

21   that he was given this job by Steve Keegan

22   that he was probably doing what Keegan asked

23   him to do.

24       Q.    I respect the opinion and I respect

1    investigators who form an opinion sometimes

2    based upon -- I don't mean to slight this in

3    any way -- instinct or intuition or

4    experience, but what I want to get at, was

5    that opinion based on -- and I don't say

6    mere, but instinct or intuition or was it

7    based on some facts?

8

9        A.    Early in the investigation there

10   weren't very many facts other than the fact

11   that in our opinion, Dan Wirship was steering

12   Debut customers to Debut Concrete but we

13   didn't know why.

14       Q.    Did your opinion change over the

15   course of the investigation?

16       A.    During the course of the

17   investigation I learned that Dan Wirship's

18   son worked for Debut Concrete.  I guess you

19   could say that could be a quid pro quo,

20   particularly based on what kind of job the

21   kid had, whether it was a no show job or not.

22   I never personally investigated that angle of

23   it.  My opinion remained pretty much the

24   same, that he was being directed by Keegan to

25   do these things.

1    Q.   Remained the same today?

2    A.   Yes.

3    Q.   Did you come -- at any point in

4    time, did you come to believe that

5    Mr. Wirshup committed a violation of any

6    criminal law?

7    A.   Oh, yes.

8    Q.   When did that opinion form?

9    A.   When we discovered invoices that

10   were signed out on by Wirshup approving work

11   done by Debut Concrete that was insufficient

12   and not according to code, and billing for

13   material that was obviously never used and

14   probably for time that was probably never

15   expended.

16   Q.   When did you learn this?

17   A.   As soon as we started getting the

18   copies of the bills submitted by Debut and

19   the sheets that Wirshup signed off on.

20   Q.   When did that occur in terms of

21   time?

22   A.   I don't know.

23   Q.   You said it was in terms of events.

24   Was it before or after --

---

1    A.   It was probably --

2    Q.   Let me ask the question.

3    Was it before or after Mr. Wirshup

4    was arraigned on the indictment?

5    A.   Yes.

6    Q.   Which?

7    A.   Before, well before.

8    Q.   Before or after your first meeting

9    with Mr. Wirshup?

10   A.   It was after.

11   Q.   You started to say -- narrow down

12   the time somewhat and I kind of cut you off.

13   So let me let you finish that.

14   A.   It was definitely before we started

15   taking statements from the witnesses.

16   Q.   What crime did you believe he

17   committed?

18   A.   I believe we could have come up

19   with grand larceny connecting in concert with

20   Debut Concrete.

21   Q.   Did you discuss this opinion with

22   anybody else in the investigation?

23   A.   Yes.

24   Q.   Who?

1    A.  My partner, Tom Iacopelli, and the

2  district attorneys assigned to the case,

3  Chris Nicolino and John Scott Prudenti.

4    Q.  What was Mr. Prudenti's role?

5    A.  After the initial assignment of the

6  investigation and we worked with Nicolino and

7  Bartels and Felice to find out what they had

8  in Brookhaven when we started to get further

9  into Patchogue Village and start to subpoena

10  these records, we started to work with

11  Mr. Prudenti.

12    Q.  In what capacity?

13    A.  He would have been the person to

14  whom we reported.

15    Q.  So Mr. Prudenti, we all know -- let

16  the record reflect he is and was an assistant

17  district attorney?

18    A.  Yes.

19    Q.  Worked for Suffolk County DA's

20  office?

21    A.  Yes.

22    Q.  He was, at some point in the

23  investigation, assigned to supervise this

24  investigation; is that fair?

---

2    Q.  Before I was asking you about some

3  of your supervisors.  You indicated that

4  people you reported directly to were actually

5  assistant district attorneys?

7    A.  Yes.

8    Q.  Was Mr. Prudenti one of those

9  individuals?

10    A.  Yes.

11    Q.  In the course of this particular

12  investigation?

13    A.  Yes.

14    Q.  When did he take on that role?

15    A.  It would be about the time that we

16  started doing these interviews on Jennings

17  Avenue.

18    Q.  Was that before or after your first

19  contact with Mr. Wirshup?

20    A.  That was before.

21    Q.  When was your first contact with

22  Mr. Wirshup?

23    A.  I believe it was in February,

24  February 6th.

25    Q.  You read off, I think what was

1  marked as --
2
3          MR. DUNNE: Defendant's
4  Exhibit K at Mr. Wirshup's
5  deposition, going by the dates that
6  were prepared from transcripts that
7  actually the plaintiff prepared.
8  So assuming those dates are
9  correct, that's the reference point
10 referred to.
11     Q.   Am I right that you looked over
12 Defendant's Exhibit K to give me the date of
13 your first contact with Mr Wirshup?
14     A.   Yes.
15     Q.   You're assuming that the date on
16 there, February 2nd, is correct?
17     A.   Yes.
18     Q.   You met him or saw him at a coffee
19 store or 7-Eleven or something?
20     A.   We ran into him at 7-Eleven, yes.
21     Q.   How did you know who he was?
22     A.   We had seen a photograph of him.
23     Q.   Had you met with him before that?
24     A.   No.
25     Q.   Were you at a meeting with him at

1
2  the district attorney's office?
3      A.   No.
4      Q.   Was Mr. Iacopelli?
5      A.   No.
6      Q.   When did Mr. Prudenti -- and
7  sometime after this Mr. Prudenti entered the
8  investigation?
9      A.   Actually around this time, just
10 before we ran into Dan, Mr. Wirshup.
11     Q.   Did you know whether or not
12 Mr. Wirshup was represented by counsel?
13     A.   Yes.
14     Q.   What did you understand?
15     A.   I understood he was represented by
16 Mr. O'Connell.
17     Q.   How did you learn that?
18     A.   I believe that that was information
19 given to us by the team of Prudenti,
20 Nicolino, Felice and Bartels.
21     Q.   Who was in charge of the
22 investigation, was it Prudenti or Nicolino?
23     A.   I don't know.
24     Q.   Did there appear to be any
25 hierarchy between the two of them or did they

1  work as a team?
2      A.  Nicolino was deputy bureau chief.
3  I would assume he would have been.
4      Q.  He actually had a position where he
5  was supervising Mr. Prudenti?
6      A.  I would say.
7      Q.  Would it be fair to say
8  Mr. Nicolino was supervisor and Mr. Prudenti
9  was a hands-on assistant?
10         MR. DUNNE:  Objection to
11     form.
12         If I'm understanding, this
13     is from your perspective.
14     A.  The way I saw it, that would have
15  been the case, yes.
16     Q.  You received direction from each of
17  them, yes?
18     A.  Yes.
19     Q.  I'm talking in the course of this
20  investigation.
21     A.  Yes.
22     Q.  Getting back to the charges.  Were
23  there any other crimes that you believe
24  Mr. Wirshup had committed, besides grand

---

1  larceny?
2      A.  There were some crimes involving
3  his position as a public servant I believe he
4  may have violated.
5      Q.  What are those?
6      A.  Offhand, I don't recall the exact
7  term.
8      Q.  Is there anything that you can look
9  at to refresh your memory?
10     A.  Penal law.
11         MR. DUNNE:  Were you asking
12     him a specific penal law section
13     that he believed he violated?
14         MR. BARKET:  He can describe
15     it any way he wants.
16     A.  I believe he violated public trust
17  in his position by doing the act.
18     Q.  Well, violating public trust is --
19     A.  My term.
20     Q.  Right.  I'm not sure that is always
21  a crime.
22     What crimes did you believe he --
23     A.  Offhand, I would have to look.
24         MR. BARKET:  Let's leave a

1
2 blank spot there and you can feel
3 free to look that up and put in an
4 answer at a later point in time.
5 (INSERT):
6      Q.   You said that his son worked for --
7 Mr. Wirshup's son worked for Debut for some
8 period of time; is that right?
9      A.   That's what we were told, yes.
10      Q.   Did you investigate that?
11      A.   No.
12      Q.   Did anyone investigate it?
13      A.   I didn't.
14      Q.   Did anyone else?
15      A.   I would have to answer I assume the
16 people that advised us of the information
17 investigated it.
18      Q.   Who advised you?
19      A.   Charlie Bartels and Ray Felice.
20      Q.   Do you know what the results of
21 that investigation were?
22      A.   I understand that they were able to
23 show that he had employment or at least
24 paychecks coming from Debut Concrete.
25      Q.   Did that, in and of itself,

1 constitute any crime, in your view?
2      A.   That in and of itself, no.
3      Q.   Did they investigate further
4 Mr. Wirshup's son's employment?
5      A.   I can't go into what they did or
6 didn't do.  I don't know.
7      Q.   You actually are permitted.  The
8 whole hearsay thing doesn't apply.
9      A.   But I don't know.
10           MR. DUNNE:  Even if it's
11 hearsay or not.
12           MR. BARKET:  He needs to
13 know it.
14      Q.   I don't want you to guess.  This
15 was an investigation you all were doing
16 together.  I want to know whether or not you
17 knew what was going on there?
18      A.   I believe you asked, I answered.
19 They determined that his son received a
20 paycheck from Debut Concrete.
21      Q.   Did they, to your knowledge,
22 determine whether or not his son worked,
23 actually performed labor?
24      A.   That I don't know.
25

```
 1   Q.   From what period of time did his
 2   son work for Debut?
 3   A.   Couldn't tell you.
 4   Q.   Did you ever interview his son?
 5   A.   No.
 6   Q.   Did anyone?
 7   A.   I didn't.
 8   Q.   I gather that --
 9   A.   And I don't know of anyone who did.
10   Q.   Other than his son's employment,
11   are you aware of anything that Mr. Wirshup
12   received that could be viewed as a reward of
13   payment, consideration for steering business
14   to Debut?
15   A.   Well, he was given a very good job
16   by the Mayor of Patchogue and perhaps, in my
17   view, in return for that he was doing what
18   the mayor asked him to do, which was to steer
19   work to Debut Concrete.
20   Q.   The very job he had you viewed as
21   he was given that job in order to steer work
22   to Debut?
23   A.   That's not what I said.  What I
24   said was he was given a very good job by the
```

```
 1   Mayor of Patchogue and I think that he may
 2   have steered business to Debut because he was
 3   told to do so by the person that gave him the
 4   job.
 5   Q.   Are you aware of the structure of
 6   the Town of Patchogue at that time, the
 7   political structure?
 8   A.   Somewhat, yes.
 9   Q.   The mayor you said was Keegan?
10   A.   Uh-huh.
11   Q.   When was he elected?
12   A.   I don't know.
13   Q.   When was Mr. Wirshup hired?
14   A.   I don't know.
15   Q.   Who hired him?
16   A.   Steve Keegan.
17   Q.   Was it a political appointment or
18   was it a civil service job?
19   A.   It was a civil service job but was
20   a political appointment.
21   Q.   Was there any approval necessary
22   from any other political or entity or
23   individual for the appointment?
24   A.   I don't know.
```

1 Q. I think I asked you, when did he
2 start his employment, Mr. Wirshup?
3 A. I don't know.
4 Q. You don't know when Mr. Keegan was
5 elected?
6 
7 A. No, I don't know.
8 Q. Was he the mayor in 2002 and 2003?
9 A. No.
10 Q. Who was mayor at that time?
11 A. I don't recall his name.
12 Q. What was the time period for when
13 this steering took place?
14 A. I don't know. I would have to
15 review the statements.
16 Q. Could you give us an estimation?
17 A. No.
18 Q. Was it in this millennium, since
19 2000 on or was it in the 1990s?
20 A. I would say in this millennium,
21 yes.
22 Q. Do you know when Mayor Keegan left
23 office?
24 A. No, I don't. I don't recall the
25 year. I will only be guessing. Maybe '01 or

1 2000, something like that.
2 Q. Other than his very position and
3 his son's job, were there any other facts
4 indicating that Mr. Wirshup received some
5 benefit for steering this work to Debut, if
6 that is, in fact, what he was doing?
7 A. The evidence that we uncovered was
8 that he was approving bills to be paid by the
9 Village of Patchogue to Debut Concrete for
10 work that was not performed.
11 Q. Right. But leaving aside all the
12 issues surrounding the approval of those
13 bills and assuming everything that you said
14 that it was for work not done, that it was
15 improper, whatever, what did Mr. Wirshup get
16 out of it, other than the two things that you
17 listed which are the employment and his son's
18 job, that you know of?
19 A. That I know of, nothing.
20 Q. Did you investigate his own
21 finances, Mr. Worship's finances?
22 A. To a certain degree.
23 Q. Have you done these kinds of
24 investigations before, where there had been

1       bribes or kickbacks or illegal payments made
2       to people?
3     A. Some.
4     Q. When you say "some," in what
5       capacity?
6     A. As a police officer.
7     Q. Back in 1995?
8     A. Yes. And some in private practice.
9
10    Not a lot.
11    Q. When you say you did some
12    investigation of his finances, what did you
13    do?
14    A. We took a look at how he lived and
15    what kind of home he was living in, where he
16    went, and asked questions about him. How he
17    spent his money, that type of thing. We
18    didn't run a credit report or anything like
19    that.
20    Q. What did you find?
21    A. That he had a place Upstate. He
22    had a boat. That was about it.
23    Q. When you say "a place Upstate,"
24    what are you referring to?
25    A. I guess a small cabin. Hunting

1 lodge probably.
2     Q. What was the value of that?
3     A. I don't know.
4     Q. The boat?
5     A. Small boat, fishing boat.
6     Q. Approximate value?
7     A. Couldn't tell you. Never saw it.
8     Q. Anything else?
9     A. No.
10
11    Q. In your view, did this small boat
12    and hunting lodge indicate that he was living
13    beyond his apparent means?
14    A. No.
15    Q. How about his home?
16    A. Modest home.
17    Q. How about how he spent his money?
18    A. Modestly.
19    Q. Is there anything about his
20    lifestyle that indicated that he was
21    receiving -- well, that he was living beyond
22    his means?
23    A. No, not that I could see.
24    MR. BARKET: We'll stop now.
25    I indicated before that I have to

Robert Amato

I N D E X

WITNESS

Robert Amato

EXAMINATION BY

Mr. Barket

PAGE

4

PLAINTIFF'S EXHIBITS

PAGE

1    Copy of handwritten notes    47

INSERTS

DESCRIPTION

PAGE

Other crimes believed to have been
committed by Mr. Wirshup    83

Robert Amato

go to the hospital with my wife

this afternoon. She is having a

procedure, so I need to take a

break.

MR. DUNNE: I certainly

don't object to that. I understand

the circumstances.

-oOo-

(Whereupon, the examination

of Robert Amato was concluded at

11:53 a.m.)

ROBERT AMATO
_____

Subscribed and sworn to
before me this _____ day
of _____, 2007.

NOTARY PUBLIC
_____

# C E R T I F I C A T E

I, HOLLY DALOIA, a Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

HOLLY DALOIA

COPY

Page 95:

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

DANIEL WIRSHUP,

                    Plaintiff,

              -against-

SUFFOLK COUNTY POLICE DEPARTMENT,
SUFFOLK COUNTY DISTRICT ATTORNEY,
THOMAS J. SPOTA; SUFFOLK COUNTY
DISTRICT ATTORNEY'S OFFICE,
ASSISTANT DISTRICT ATTORNEY'S JANE and
JOHN DOE "I" - "S; ASSISTANT DISTRICT
ATTORNEYS KEVIN WARD, JOHN SCOTT PRUDENTI,
and CHRISTOPHER NICASTRO; DETECTIVES/
POLICE OFFICERS TOM IACOPELLI,
ROBERT AMATO, and RAYMOND FELICE,
DETECTIVES/POLICE OFFICERS JOHN and
JANE DOE "I" - "S, and THE COUNTY OF
SUFFOLK,

                    Defendants.

- - - - - - - - - - - - - - - - - - - x

                    666 Old Country Road
                    Garden City, New York

                    January 19, 2007
                    2:21 p.m.

        CONTINUED EXAMINATION BEFORE TRIAL

from JANUARY 12, 2007 of ROBERT AMATO, one of
the Defendants in the above-entitled action,
held at the above time and place, taken
before Holly Daloia, a shorthand reporter and
Notary Public of the State of New York.

ON TIME COURT REPORTING
516-535-3939

Page 96:

A P P E A R A N C E S:

LAW OFFICE OF BRUCE BARKET
        Attorneys for Plaintiff
        666 Old Country Road
        Suite 600
        Garden City, New York 11530
BY:     BRUCE BARKET, ESQ.

SUFFOLK COUNTY ATTORNEY'S OFFICE
        Attorneys for Defendants
        H. Lee Dennison Building
        100 Veterans Highway
        Hauppauge, New York 11788
BY:     RICHARD DUNNE, ESQ.

ALSO PRESENT:

        Daniel Wirshup

        Tom Iacopelli

ON TIME COURT REPORTING
516-535-3939

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED

by and between the attorneys for the

respective parties herein, that filing,

sealing and certification be and the

same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED

that all objections, except as to the

form of the question shall be reserved

to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED

that the within deposition may be signed

and sworn to before any officer authorized

to administer an oath, with the same force

and effect as if signed and sworn to before

the Court and that a copy of this

examination shall be furnished without

charge to the attorney representing the

witness testifying herein.

---

R O B E R T   A M A T O,

the witness herein, having first

been duly sworn by a Notary Public

of the State of New York, was

examined and testified as follows:

EXAMINATION BY

MR. BARKET:

Q. Please state your name for the record.

A. Robert Amato.

Q. Please state your address for the record.

A. 200 Center Drive, Riverhead, New York 11301.

Q. One of the questions I wanted to ask was, did you testify in the Grand Jury?

A. No.

Q. Did you serve Grand Jury subpoenas on witnesses?

A. Yes.

Q. Did you serve Grand Jury subpoenas?

A. Yes.

Q. Did you keep a record of the subpoenas that you served?

1  MR. DUNNE: You mean other
2  than a copy of the subpoena itself?
3  MR. BARKET: Any record.
4  A.  Probably made a notation somewhere,
5  served a particular subpoena.
6  A notation in a calendar in a
7  diary?
8  A.  probably in a note pad.
9  Q.  Did you keep a set of notes
10  concerning this particular investigation?
11  A.  Yes.
12  Q.  What form was that?
13  A.  In a reporter's pad.
14  Q.  A reporter's pad is one of those
15  pads with the very tight metal rings at the
16  top?
17  A.  Correct.
18  Q.  Did you label it, the pad?
19  A.  Yes.
20  Q.  What was the title of it, the name? I
21  don't recall what they were.
22  A.  The pad had several cases in it.
23  Q.  Do you still have that?
24  A.  I believe so.
25

1
2  MR. BARKET: Could I ask
3  that it be produced?
4  MR. DUNNE: Put that in
5  writing and I will take that under
6  advisement.
7  At some point, I assume
8  you're going to serve a demand of
9  some sort. Remember, I mentioned
10  last week that we should have, even
11  if it's an informal letter, just so
12  we can crossmatch what the
13  exchanges are because I did not
14  take material last week.
15  Q.  In addition to the reporter's pad,
16  did you keep any other notes?
17  A.  I don't believe so, no.
18  Q.  Did you fill out any forms for the
19  district attorney's office or the police
20  department?
21  A.  I don't recall making any official
22  report.
23  Q.  So the status of this investigation
24  was kept in a reporter's pad or on a
25  reporter's pad?

2   A.   In my particular instance, yes.

3   Q.   Who maintained possession of that

4   pad during the course of investigation?

5   A.   I did.

6   Q.   Has it been in your exclusive

7   possession since you created it?

8   A.   Yes.

9   Q.   Where did you keep it?

10  A.   In my office.

11  Q.   In the district attorney's office?

12  A.   Yes.

13  Q.   Were you trained on how to -- by

14  the district attorney how to keep records of

15  status of investigations?

16  A.   By the district attorney, no.

17  Q.   Were there any guidelines in place

18  about what reports or notes you should keep

19  by Suffolk District Attorney's Office during

20  the course of this investigation?

21  A.   No.

22  Q.   The record keeping for all

23  investigation was discretionary to the

24  individual investigator?

25  A.   Yes.

2   Q.   You were free to keep notes or not

3   keep notes at your leisure?

4   A.   Yes.

5   Q.   Getting back to where I started

6   with this, the subpoenas, when you say you

7   would have made a notation somewhere, I guess

8   the only place the notation could have been

9   made was in that pad, that's the only report

10  you had?

11  A.   Correct.

12  Q.   How many reporter's pads or

13  notebooks were there for this investigation?

14  A.   I believe just one.

15  Q.   Just one?

16  A.   Yes.

17  Q.   By the way, do we have -- the

18  gentleman sitting to the left of Mr. Dunne,

19  your lawyer is?

20  A.   You're asking me?

21  Q.   Yes.  You're the only person I can

22  ask.

23  A.   Thomas Iacopelli.

24  Q.   He is one of the other named

25  defendants in the lawsuit; is that right?

    A.   Yes.

1
2  A.   Yes.
3  Q.   Did you still work with him?
4  A.   No.
5  Q.   Who has moved on?
6  A.   I have.
7  Q.   What do you do now?
8  A.   I work in the major crime bureau.
9  Q.   But you're still employed by the
10 district attorney's office?
11 A.   Yes.
12 Q.   And so is he?
13 A.   Yes.
14 Q.   But you just don't work in the same
15 unit together?
16 A.   Correct, yes.
17 Q.   Do you share office space? Are you
18 in the same office?
19 A.   No.
20 Q.   The same town?
21 A.   Nope.
22 Q.   Do you still like him?
23 A.   Yes, I do.
24 Q.   The name Renee Sharvelle -- did I
25 say that correctly?

1
2  A.   Yes.
3  Q.   Is that correct?
4  A.   Yes.
5  Q.   What's that name?
6  A.   He is a plumber.
7  Q.   How do you know him?
8  A.   We interviewed Mr. Sharvelle
9  regarding another matter that we were
10 investigating in Patchogue.
11 Q.   Was that matter precluded?
12 A.   Yes.
13 Q.   What was the nature of the
14 investigation?
15      MR. DUNNE: Objection, but
16 go ahead and answer.
17      Preserve the record.
18 A.   My recollection is that it
19 concerned storm drains that were installed
20 somewhere in the Village.
21 Q.   To your knowledge, did
22 Mr. Sharvelle know Mr. Wirshup?
23 A.   I believe so, yes.
24 Q.   Did you ever have a conversation
25 with Mr. Sharvelle about Mr. Wirshup?

1   A.  I would say yes.
2   Q.  What was the nature of those
3  conversations?
4   A.  Just inquire if he knew
5  Mr. Wirshup.
6   Q.  When he said yes, then you said,
7  "that's nice to know," and that was the end
8  of it?
9
10  A.  I don't recall the exact words. I
11  probably would have inquired as his opinion
12  of Mr. Wirshup.
13  Q.  Do you remember what that opinion
14  was?
15  A.  As I recall, he spoke very highly
16  of Mr. Wirshup.
17  Q.  Who was Mr. Sharvelle's lawyer?
18  A.  The only attorney that I am aware
19  of that Mr. Sharvelle had was --
20  Q.  Timothy Maize?
21  A.  Yes.
22  Q.  Timothy Maize, do you know who he
23  is?
24  A.  Yes.
25  Q.  Do you know him personally?

1   A.  Yes.
2   Q.  What do you know about him?
3   A.  He used to be an assistant district
4  attorney.
5   Q.  How do you know him?
6   A.  From his employment and mine.
7   Q.  In other words, his employment at
8  the district attorney's office?
9   A.  Yes.
10  Q.  When did he work there?
11  A.  Probably the early '80s.
12  Q.  You knew him while you were a
13  police officer in Suffolk County?
14  A.  Yes.
15  Q.  So you knew him for about 20 years?
16  A.  I hadn't seen him or talked to him
17  in quite a while. I guess you can say I've
18  known him for 20 years.
19  Q.  I want to ask you about
20  Mr. Wirshup's lawyer. Do you know him?
21  A.  Which one?
22  Q.  No me. The one he had in the
23  criminal case.
24  A.  O'Connell?
25

1  Q.  Yes.
2  A.  Yes.
3  Q.  How did you know him?
4  A.  Never knew him before this case.
5  Q.  Did you meet him during the course
6  of your investigation?
7  A.  No.
8  Q.  Did you ever have any conversations
9  about him with anybody?
10 A.  Yes.
11 Q.  Who?
12 A.  My partner, Detective Iacopelli,
13 Detective Ray Felice, Detective Charlie
14 Vartelis, Chris Nicolino, John Scott
15 Prudenti, Jeremy Scileppi, the Bureau Chief
16 Ed Heilig, and possibly some others, I don't
17 recall.
18 Q.  I want to focus your attention, if
19 I can, to the time period before Mr. Wirshup
20 was indicted. There came a point in time
21 where you met with him or spoke with him
22 outside of a coffee shop or 7-Eleven?
23 A.  Mr. O'Connell?
24 Q.  I'm sorry, Mr. Wirshup.

---

1  A.  Yes.
2  Q.  Do you remember when that was?
3  A.  February '02.
4
5        MR. DUNNE:  Just refresh
6  your recollection (handing).
7        (Witness peruses document).
8  A.  February '03.
9  Q.  You're looking at something
10 previously marked as Defendants' Exhibit K
11 which is a transcript provided -- where did
12 that come from anyway, that transcript?
13 A.  That was something that was put
14 together by Mr. Wirshup.
15 Q.  Right. When was it given to you?
16 A.  Sometime after the tape was
17 delivered to the district attorney's office.
18 Q.  With respect to that particular
19 transcript, not the original photocopy but
20 the actual paper Defendants' K is on, that
21 item itself, do you understand the
22 distinction that I'm drawing?
23 A.  No.
24 Q.  What I'm going to ask about is, I
25 want to know when it is that you viewed this

1    piece of paper.  Not a copy of the
2    transcript, not the original, but the very
3    piece of paper marked as Defendants'
4    Exhibit K.
5         A.   I honestly can't give you a
6    definitive answer on that.
7         Q.   In the course of your preparation
8    for your testimony, I think I asked if you
9    reviewed some documents and I think you said
10   you reviewed some transcripts; is that right?
11        A.   Correct.
12        Q.   Is one of the items you reviewed
13   Defendants' Exhibit K?
14        A.   It may have been or it may have
15   been a transcript that was made up by someone
16   else.  I don't know.  I can't say that it was
17   this particular transcript on this particular
18   paper, no.
19        Q.   In preparing for your deposition or
20   in preparing for Mr. Wirshup's deposition,
21   did you produce anything for your lawyer?
22        In other words, did you give your
23   lawyer a copy of the transcript?
24        A.   I don't know whether he gave it to

1    me or I give it to him.
2         Q.   At some point prior to Mr Wirshup's
3    deposition, you viewed a copy of this
4    transcript?
5         A.   Yes.
6         Q.   Whether it was this document or a
7    copy of it?
8         A.   I don't know.
9         Q.   But either/or, correct?
10        A.   Either/or, yes.
11             MR. DUNNE:  Just before we
12        go further, I don't have any
13        problem referring to this
14        transcript, but this document was
15        prepared by your client.  I'm fully
16        willing to call it a transcript for
17        purposes of our examination.  There
18        are many, many items we will take
19        issue with having compared with the
20        tape, but for our purposes of this
21        examination, this document we can
22        refer to it as a transcript.
23             I'm just saying, just
24        because we are referring to that,

1  we are not adopting this particular
2  interpretation and, in fact, at
3  some point, that in all likelihood
4  will prepare our own.
5       There are a lot of things
6  that are in these documents that
7  are not in the tape.  So the mere
8  use of this in the course of what
9  they may have used in preparation
10 of the deposition, I'm not adopting
11 that this is an accurate
12 transcript, but I have no objection
13 to calling it a transcript for
14 purposes of the examination.
15      In other words, by virtue of
16 just talking about, I'm not
17 ascribing that that's accurate.
18 Yes, they may have reviewed it,
19 which you're going to explore, but
20 the mere fact that they reviewed it
21 does not make it accurate and I
22 want to make that clear.
23 Q.  Take a look at this.  If I turn it
24 upside down there is some printing on the

1
2  bottom.  Do you see that?
3  A.  Uh-hum.
4  Q.  What's the printing at the bottom
5  of that?
6  A.  There's a date, time reference to
7  major crime, a number and a page.
8  Q.  What's the date?
9  A.  July 25, 2006.
10 Q.  And the time?
11 A.  11:43 a.m.
12 Q.  And major crime?
13 A.  Major crime.
14 Q.  Is that the unit you said you're
15 now assigned to?
16 A.  That's correct.
17 Q.  Then there is a number?
18 A.  774, Page 2.
19 Q.  Is there a fax machine on your
20 unit?
21 A.  Yes, there is.
22 Q.  When things are faxed from there,
23 does it print out "major crime" like that?
24 A.  I don't remember whether it prints
25 out when you receive a fax, when you send a

1  fax, I really don't know.
2  Q.   In other words, if you were to take
3  a document and fax it from your unit to
4  someplace else -- let me just back up.
5  You're familiar with fax machines, right?
6  A.   Somewhat. How to work them, yes.
7  Q.   We are not going to ask you to
8  build one but you know when you get a fax
9  typically what happens is at the top and the
10  bottom of the page there is a date and time
11  as the fax comes through, right?
12  A.   Sometimes, I guess on some machines
13  when it comes through you get the date and
14  time from the person that sent it and
15  sometimes, possibly, when you send one out it
16  may put the date and time from your machine
17  on it.   I'm not sure how that works.   I'm not
18  an expert on fax machines.
19  Q.   Does that help at all in
20  determining whether or not this document was
21  faxed from your office?
22  A.   No.
23  Q.   Or to your office in July 2006?
24  A.   No.

---

1  Q.   Do you recognize this span at the
2  bottom of the page for major crime?
3  A.   No, not particularly.
4         MR. DUNNE:   These are my
5  copies (handing).
6         MR. BARKET:   These aren't
7  marked?
8         MR. DUNNE:   I marked the
9  entire packet Exhibit K and I think
10  we indicated and went through and
11  put the dates on all of them.
12  Q.   The first page of 23 -- when we say
13  transcript, actually, on the one marked 2/6
14  of '03, that's actually typed out as if it's
15  a transcript, but did you ever hear of a
16  corresponding tape for that date?
17  A.   No.
18  Q.   As far as you know, no tape exists
19  for that date, correct?
20  A.   As far as I know.
21  Q.   The meeting in February of '03 was
22  not a planned meeting, was it?
23  A.   No, it was not.
24  Q.   Where did that meeting take place?

1  A.  It took place outside of a 7-Eleven
2  store in Patchogue.
3  Q.  What's the address of that 7-Eleven
4  store?
5  A.  Roe Boulevard, and I can't recall
6  the north/south street.
7  Q.  What time did that meeting take
8  place?
9  A.  Probably before noon.
10  Q.  Who were you with at that 7-Eleven
11  that day?
12  A.  It was Detective Iacopelli.
13  Q.  How did you know who Mr. Wirshup
14  was?
15  A.  I believe we had seen a picture of
16  him, a photograph of him.
17  Q.  Where would you have gotten a
18  photograph of him?
19  A.  I don't recall.
20  Q.  So you looked at a photograph at
21  some prior occasion?
22  A.  I believe so.
23  Q.  And committed it to memory?
24  A.  Sort of.
25

---

1  Q.  When you saw Mr. Wirshup you said,
2  "Hello, Mr. Wirshup?"
3  A.  No, I didn't say anything.
4  Q.  Who said what to whom first?
5  A.  I was introduced to Mr. Wirshup by
6  my partner, Tom Iacopelli.
7  Q.  How did Mr. Wirshup learn of your
8  presence, "you" being you or your partner?
9  A.  Mr. Iacopelli.
10  Q.  What did Mr. Iacopelli say to
11  Mr. Wirshup?
12  A.  Don't have a clue.
13  Q.  Did he say -- you don't remember or
14  you didn't hear it?
15  A.  I didn't hear it.
16  Q.  Where were you when this took
17  place?
18  A.  I was sitting in or standing
19  outside of the police car that we had.
20  Q.  How many police cars were there at
21  that time?
22  A.  Two.
23  Q.  Whose?
24  A.  Mine and Tom's.
25

1 Q. And how was it that you ended up
2 there?
3 A. We met there just about on a
4 regular basis when we were working in
5 Patchogue.
6 Q. So that just happened to be a day
7 you met him there, Mr. Iacopelli that is?
8 A. Yes, we always met there.
9 Q. What was your tour of duty that
10 day?
11 A. 9:00 to 5:00.
12 Q. Did you have a regular time that
13 you met him?
14 A. I was working on another case at
15 the time and after I finished up what I was
16 doing further east we would meet up at that
17 7-Eleven.
18 Q. On that day, how did you arrange
19 the meeting?
20 A. Probably via telephone.
21 Q. Is that a cell phone?
22 A. Yes.
23 Q. Is that cell phone issued to you by
24 the county?

1 A. Yes.
2 Q. The records for those cell phone
3 calls, where are they kept?
4 MR. DUNNE: Objection to
5 form.
6 It assumes that they are kept.
7 Answer as best you can.
8 A. I have no idea.
9 Q. Who pays the bills?
10 A. Suffolk County.
11 MR. BARKET: Leave a blank
12 in the transcript there.
13 (INSERT):
14 Q. Did you get back, routinely get
15 back the cell phone bills each month?
16 A. Yes.
17 Q. Then you would review them and
18 submit them?
19 A. Correct.
20 Q. Were they paid by you and then you
21 were reimbursed or were they paid directly by
22 the county?
23 A. Paid by the county.
24 Q. Who did you submit the bills to?
25

1   A. The bills didn't come to me.

2   Q. Who did you submit -- when you

3   received back the calls you made -- what did

4   you receive monthly?

5   A. The bill would be given to us by

6   Mary Smith. We would approve the bill and

7   send it back to Mary Smith.

8   Q. This document, major crime, the

9   first page of Exhibit K which is 2/6/03 has

10  the Number 2 on it, right, the bottom?

11  A. Here you mean (indicating)?

12  Q. Yes.

13  A. Yes, Page 2.

14  Q. Why don't we turn the whole thing

15  upside down.

16      The next page is 3, at least

17  according to this. I think you will agree

18  with me it appears to be a fax printout,

19  right?

20  A. Yes.

21  Q. It looks like it's from or to the

22  major crime unit?

23  A. Yes, that's correct.

24  Q. By the way, what was the status of

1   the investigation on July 25th of 2006?

2   A. Investigation was complete. The

3   trial was over.

4   Q. Trial was over?

5   A. Yes.

6   Q. You weren't working on it any

7   longer?

8   A. No.

9

10  Q. The next document purports to be

11  the transcript again, 2/10/03, right? There

12  is a corresponding tape for this particular

13  conversation, isn't there?

14  A. Well, there is a tape. Whether or

15  not it corresponds to what is written here, I

16  don't know.

17  Q. I'm not asking that. I'm asking if

18  there is a tape for this conversation.

19  A. There is a tape that purports to be

20  for that conversation.

21  Q. You heard that?

22  A. Yes.

23  Q. If you turn it upside down again,

24  you look at it and there is a Page 4 again,

25  right?

1      A.    That's right.

2      Q.    The next page is 5; is that right?

3      A.    Yes.

4      Q.    Next page is 6, right?

5      A.    Yes.

6      Q.    Then we go to, I guess that would

7      describe as a third document, something with

8      a date of 2/24/03?

9      A.    Yes.

10     Q.    Have you heard the tape of what

11     purports to be a conversation that took place

12     on that day?

13     A.    Yes.

14     Q.    If we turn that upside down, that

15     same -- what looks to be a fax is Page 7,

16     right?

17     A.    Yes.

18     Q.    Page 8, right?

19     A.    Yes.

20     Q.    Page 9?

21     A.    Yes.

22     Q.    Page 10?

23     A.    Yes.

24     Q.    Page 11?

1   A.   Yes.
2        Q.   We go to the next document or
3   next -- looks like stapled 2/24/03, right?
4        A.   Yes.
5        Q.   Turn it upside down.  We have
6   Page 12, Page 13?
7        A.   Yes.
8        Q.   Page 14?
9        A.   Yes.
10       Q.   Page 15?
11       A.   Yes.
12       Q.   And we go to the next document
13  which is March 7th?
14       A.   Correct.
15       Q.   Did you hear a tape of that
16  conversation?
17       A.   Yes, I did.
18       Q.   That is page, in sequence, 16, yes?
19       A.   Yes.
20       Q.   Page 17?
21       A.   Yes.
22       Q.   Next document is dated March 7th of
23  '03?
24       A.   Yes.

1        Q.   At the bottom of that we have
2   Pages 18 and, to move this along, through
3   Page 30, and in sequence; is that correct?
4        A.   Yes, it is.
5        Q.   So it appears -- would you agree
6   with me that it appears that these, what is
7   the totality of Defendants' Exhibit K which
8   includes five different transcripts or what
9   look like transcripts, were faxed to or from
10  the major crime bureau on July 25th of '06;
11  is that right?
12       A.   Yes.
13       Q.   Have you spoken to anybody from the
14  internal affairs unit concerning this
15  particular lawsuit?
16       A.   Not that I recall.
17       Q.   Are you aware whether or not there
18  is an investigation into your conduct in the
19  investigation, arrest and prosecution of
20  Mr. Wirshup by any governmental agency?
21       A.   No, I'm not.
22       Q.   In other words, if you were to
23  engage in misconduct, who would have
24  jurisdiction to investigate your professional

1    misconduct; the police department?

2    A.    No.

3    Q.    The district attorney's office?

4    A.    Yes.

5    Q.    Is there a unit within the district

6

7    attorney's office that reviews your conduct?

8    A.    Not that I'm aware of.

9    Q.    So I guess -- I don't want to be

10    flip, but I suppose it will sound that way --

11    the overseer of your conduct is who, exactly?

12    A.    My immediate supervisor.

13    Q.    You -- the DA squad polices itself?

14        MR. DUNNE:    Again, object to

15    the form of the question.

16        Answer that to the best of

17    your ability.

18    A.    You make it sound like the police

19    department doesn't investigate themselves.

20    It's the same situation.  Yes, we investigate

21    ourselves.  The same as the police department

22    would investigate themselves.

23    Q.    Let's see if it's the same.

24        The police department -- you used

25    to work in one, right?

1    A.    Yes.

2    Q.    -- has a separate internal affairs

3    bureau; is that correct?

4    A.    All police officers employed by the

5    same employer.

6    Q.    Do they have a separate bureau for

7    internal affairs?

8    A.    Yes, they do.

9    Q.    Do they have a bureau or officers

10    or detectives or investigators assigned

11    specifically to investigate allegations of

12    misconduct or criminal behavior by the police

13    department?

14    A.    Yes, we do.

15    Q.    Does the district attorney's

16    office have a similar bureau?

17    A.    Yes, we do.

18    Q.    Who is or was in charge of that

19    bureau in 2003?

20    A.    Bureau chief was Ed Heilig.

21    Q.    I thought Ed Heilig was the bureau

22    chief of the unit that you were working on

23    here?

24    A.    Yes, he is.

25

2  Q.  He does both?

3  A.  I was in what you would refer to as

4  the internal affairs unit.  I was the public

5  corruption unit.

6  Q.  So the public corruption unit

7  included misconduct by members of the

8  district attorney's office for the DA squad?

9  A.  I would assume that would come to

10  our office, yes.

11  Q.  During the course of time you were

12  there, did you investigate anyone in the

13  district attorney's office or anyone in the

14  DA squad?

15  A.  No.  During the time I was there,

16  no.

17  Q.  Since you left there, has anybody

18  from that unit contacted you, spoke to you,

19  talked to you about the investigation of

20  Mr. Wirshup?

21  A.  Yes.

22  Q.  Who was that?

23  A.  Detective Iacopelli.

24  Q.  The gentleman -- the other named

25  defendant here?

---

1  A.  Yes.

2  Q.  When I say "talked to you about

3  it," I don't mean in the course of your

4  investigation of Mr. Wirshup, I mean spoke to

5  you about your conduct or misconduct

6  concerning the investigation of Mr. Wirshup.

7  MR. DUNNE:  Objection to

8  form.

9  Answer as best you can.

10  A.  Detective Iacopelli and I have

11  discussed this case and while it's ongoing at

12  this point, has he contacted me to discuss my

13  conduct, as you put it, no.

14  Q.  I think you said before that, as

15  far as you know, there is no investigation

16  into your conduct by any government agency?

17  A.  Not that I'm aware of.

18  Q.  I asked you before about a

19  conversation about Mr. O'Connor or

20  O'Connell -- I always confuse those two.

21  MR. DUNNE:  O'Connell.

22  A.  E-L-L at the end.

23  Q.  Patrick?

24  A.  Uh-huh.

1       Q.   I want to focus in on whether or
2  not he had conversations about him prior to
3  Mr. Wirshup's indictment.
4       A.   Yes.
5            MR. DUNNE:  He answered.  He
6       said yes.
7            MR. BARKET:  We kind of got
8       off to the left.  I want to come
9       back to that now.
10           MR. DUNNE:  You.
11           MR. BARKET:  Well, he went
12      with me.
13      Q.   What were the nature of those
14 conversations?
15      A.   The nature to the best of my
16 recollection, the nature of those
17 conversations involved O'Connell and who he
18 represented and clients that he represented
19 who were employed by Patchogue Village.
20      Q.   Who did you speak with?  All the
21 people you named?
22      A.   I think you asked and I answered
23 that already.
24      Q.   And that happened before

1       Mr. Wirshup's indictment, yes?
2       A.   Yes.
3       Q.   Obviously, you guys went through a
4  trial together, right?
5       A.   Yes.
6       Q.   I'm assuming during the course of
7  the trial, as nature is, you commented on the
8  other lawyers at times?
9       A.   Right.
10      Q.   Who else did Mr. O'Connell
11 represent?
12      A.   I don't recall if he represented
13 anyone at that point.
14      Q.   Who were you told he represented or
15 what were the discussions -- you just said
16 representing other people in the Town of
17 Patchogue.
18      A.   My take on that was he would
19 represent anyone from Patchogue Village who
20 would have been charged with a crime.
21      Q.   Was he actually representing anyone
22 else in your investigation that you were
23 aware of in February 2003?
24      A.   That I was aware of, no.

Robert Amato                    130

1
2    Q.   Did anyone say to you he was
3    representing anyone else?
4    A.   No.
5    Q.   When you say he would represent
6    anybody in the Town of Patchogue charged with
7    a crime, you need to narrow that down.
8    Q.   You don't mean the citizens.  You
9    mean the employees of the Town?
10   A.   Correct, yes.
11   Q.   What would make you think that any
12   employee in the Town of Patchogue who got
13   arrested at that time period would hire
14   Mr. O'Connell?
15   A.   It was my understanding that that
16   would be who the Village would employ to
17   defend one of their workers.
18   Q.   Was that pursuant to a contract or
19   a matter of practice?  How?
20   A.   It was just my understanding.  I
21   don't know where it came from.
22   Q.   You don't know where your
23   understanding came from?
24   A.   No.
25   Q.   And you don't know what your

---

Robert Amato                    131

2    understanding is based on?
3    A.   My understanding was based on
4    Mr. O'Connell's relationship with Mayor
5    Keegan.
6    Q.   Mr. O'Connell's relationship with
7    Mayor Keegan?
8    A.   It was my understanding that Keegan
9    appointed Mr. O'Connell as possibly temporary
10   town justice and also as temporary village
11   attorney.
12   Q.   You mean temporary or part time?
13   A.   My understanding was temporary.
14   Q.   In other words, for a limited
15   duration?
16   A.   Correct.
17   Q.   That duration included a time
18   period of February '03; right?
19   A.   No, that was not my understanding.
20   That was just my understanding of the
21   relationship between O'Connell and Keegan.
22   Q.   Did you have any discussions with
23   anybody in your agency, the people doing this
24   investigation, concerning the propriety of
25   Mr. O'Connell representing Mr. Wirshup?

1  you earlier.
2  A.  Yes.
3  Q.  Who?
4  A.  All the people that I mentioned to
5  you earlier.
6  Q.  Did anyone express the opinion that
7  it was not appropriate for Mr. O'Connell to
8  represent Mr. Wirshup?
9  A.  Yes.  I believe, if my recollection
10  serves me correct, the attorneys felt there
11  was a conflict.
12  Q.  The attorneys being Mr. Nicolino?
13  A.  Nicolino, Prudenti, and the bureau
14  chief, Heilig.
15  Q.  Did the attorneys express to you
16  the nature of that conflict or, should I say,
17  perceived conflict?
18  A.  Yes, because I believe O'Connell
19  was representing another defendant in one of
20  the investigations.
21  Q.  Who was he representing?
22  A.  It's ongoing.
23  Q.  Who was he representing?
24  A.  I don't recall whether it was
25  Milvid or Strettle, it was one of those two.

1  Q.  Was there a Grand Jury going on at
2  this time -- a panel Grand Jury?
3  A.  There is always a Grand Jury going
4  on.
5
6  Q.  In other words, was this the same
7  time period you served?  I think you said it
8  was, as I recall.
9  Let me rephrase the question.
10  Was this the time period you were
11  serving subpoenas to get the various records
12  from the Town concerning the sidewalk and
13  curb repairs?
14  A.  Yes, I believe so.
15  Q.  You know that there was a Grand
16  Jury not just in panel, generally, but one
17  specifically investigating Mr. Wirshup?
18  A.  I don't know if that particular
19  Grand Jury was investigating Mr. Wirshup or
20  not.  The Grand Jury was involved in the
21  business of Steven Milvid and Debut Concrete.
22  I don't recall if that Grand Jury was
23  investigating Mr. Wirshup.
24  Q.  Well, that was the Grand Jury that
25  issued the subpoenas for the letters that

## Page 134

```
 1   went out to the Town's citizens instructing
 2   them to get --
 3        A.  I don't know if it was or it
 4   wasn't.
 5        Q.  The subpoenas weren't fraudulent,
 6   right, the ones you were serving?
 7        A.  Of course not.
 8        Q.  There was some Grand Jury that
 9   existed that justified the subpoenas you were
10   serving?
11        A.  Yes.
12        Q.  Did you bring any witnesses to the
13   Grand Jury?
14        A.  Yes.
15        Q.  Did I transport any witnesses to
16   the Grand Jury?
17        Q.  Yes.
18        A.  I don't believe so, no.
19        Q.  Did you express to Mr. Wirshup, in
20   sum and substance, that you did not think
21   that he was a significant figure, if you
22   will, in this investigation?
23        A.  I assume that means -- it all
24   depends on what you believe by significant
25   figure.  Can you define that for me?
```

## Page 135

```
 2        Q.  I don't know if I can.  Let me give
 3   you a few examples and see if you understand
 4   what I'm saying.
 5        There are so many phrases you've
 6   heard.  We kind of want the big fish.  We
 7   don't want to hurt them.  We want to use them
 8   to -- excuse me, the small fish, we want to
 9   use them to catch the big fish.  You've heard
10   expressions like that in the course of your
11   law enforcement experience?
12        A.  Yes.
13        Q.  Working your way up the food chain,
14   you've heard that?
15        A.  Yes.
16        Q.  All of these are kind of rough
17   metaphors or maybe analogies for
18   investigating a criminal organization, right?
19        A.  Yes.
20        Q.  The real obvious and maybe heavy
21   handed one is John Gotti.  The head of the
22   Gambino crime family.  You arrest the
23   soldiers, you get them to cooperate.  They
24   get a deal and the person you really want is
25   the John Gotti of the organization?
```

```
 1      form?  Don't answer?
 2            MR. DUNNE:  Yes.
 3            MR. BARKET:  Let me see if I
 4      can rephrase it.
 5      Q.    Did you think Mr. Wirshup was
 6      running a criminal enterprise?
 7      A.    Yes, he was.
 8      Q.    Was he giving others directions
 9      that were working under him and committing
10      crimes for him?
11      A.    It's all semantics.  Was he giving
12      directions at anyone to commit crimes for
13      him, no.
14      Q.    Did you think other people were
15      telling him to commit crimes for them?
16      A.    In my own personal opinion, yes.
17      Q.    Did you say to him that you thought
18      he was a fall guy or a patsy?
19      A.    I may have.
20      Q.    Let's see if we -- and feel free to
21      use what's been marked as Defendants'
22      Exhibit K.  I want you to look at the
23      conversation that is described there from
24      February 6th of 2003.  By the way, just to be
```

```
 1      A.    Yes.
 2      Q.    Did you have an opinion as to where
 3      Mr. Wirshup fell in the hierarchy of criminal
 4      behavior in the Town of Patchogue?
 5            MR. DUNNE:  Over and above
 6      what he testified to last week?
 7            MR. BARKET:  Not over and
 8      above --
 9            MR. DUNNE:  He answered what
10      he believes his role was.  You
11      asked him point-blank.
12            MR. BARKET:  I'm asking a
13      different question point-blank.
14            MR. DUNNE:  No.  You're
15      asking the same question.
16            I object as asked and
17      answered.
18            MR. BARKET:  You're telling
19      him not to answer that question?
20            MR. DUNNE:  As it's worded.
21            MR. BARKET:  Because of the
22      form.
23            MR. DUNNE:  Yes.
24            MR. BARKET:  Objection to
```

1 clear, you did end up having a conversation
2 with Mr. Wirshup that day that you and
3 Mr. Iacopelli met at 7-Eleven; is that right?
4 A. I can't --
5 Q. I'm not asking you authenticate
6 that. I'm asking if you had a conversation
7 with Mr. Wirshup on February 6, 2003 with
8 Mr. Iacopelli?
9 A. Yes.
10 Q. Where did that conversation take
11 place?
12 A. Asked and answered. Outside the
13 7-Eleven store.
14 Q. Outside --
15 A. In Patchogue.
16 Q. Outside of the store or in a car
17 outside the store?
18 A. Outside the store in a car.
19 Q. That's what I was getting at.
20 Whose car?
21 A. Tom's car.
22 Q. Just to say you've been very
23 patient with this and I appreciate it. Most
24 people get annoyed well before now in the

1 course of this but I'm really not trying to
2 annoy you. I just have a bunch of questions
3 I've got to go through and ask, but the way
4 it works is he gets to object. I get to ask.
5 You get to answer.
6 Q. Whose car did you talk in?
7 A. Tom's car.
8 Q. Tom being?
9 A. Tom Iacopelli.
10 Q. Is that a police vehicle?
11 A. Yes, it is.
12 Q. Where were you sitting in the car?
13 A. The passenger seat.
14 Q. Where was Mr. Iacopelli sitting?
15 A. Driver's seat.
16 Q. Where was Mr. Wirshup sitting?
17 A. Back seat.
18 Q. How long did the conversation last
19 for?
20 A. Ten minutes.
21 Q. Did you make any notes concerning
22 the conversation?
23 A. No.
24 Q. Did you take down any phone

1  numbers, beeper numbers, anything?

2  A.   Probably one of us did.  I don't

3  recall which one of us did.

4  Q.   How was it that Mr. Wirshup ended

5  up in the back of Investigator Iacopelli's

6  police vehicle?

7  A.   Tom Iacopelli met him in the store.

8  They came outside.  I believe at the time I

9  was standing outside the police vehicle on

10  the passenger side.  He introduced me to Dan.

11  Dan was invited to sit in the car with us.

12  It was kind of cold out.  We sat in the car.

13  We were drinking our coffee and talking to

14  Mr. Wirshup.

15  Q.   Did you know Mr. Wirshup was

16  represented at that time?

17  A.   Yes.

18  Q.   Who did you understand him to be

19  represented by?

20  A.   O'Connell.

21  Q.   Did that in any way affect your

22  willingness to have a conversation with him?

23  A.   No.

24  Q.   Did you talk to Agent Iacopelli or

---

1  Investigator Iacopelli and say Mr. Wirshup is

2  represented by counsel, we shouldn't be

3  speaking to him?

4  A.   No.

5  Q.   Did you call Mr. O'Connell's office

6  and ask if it was okay if you and

7  Investigator Iacopelli speak with his client

8  in the back of Mr. Iacopelli's car?

9  A.   No, we didn't.

10  Q.   Did either you or Investigator

11  Iacopelli tell Mr. Wirshup, in sum and

12  substance, that you're a small fish in a big

13  pond?

14  A.   That doesn't sound like my line.

15  Q.   Did you indicate to him, in sum and

16  substance, that you wanted him to cooperate

17  with your investigation?

18  A.   Yes.

19  Q.   Did you indicate to him that if he

20  was cooperative with the investigation, that

21  any -- any exposure that he may have could be

22  reduced or he would get a break in return for

23  the cooperation?

24  A.   He was advised that any cooperation

1  he gave us would be considered.
2  Q.  Considered?  Considered to reduce
3  his criminal exposure or time in jail?
4  A.  We don't make that determination.
5  It's up to the assistant district attorney.
6  Q.  When you say "considered,"
7  considered how?  Like, when he passes away
8  how long he spends in purgatory or does he
9  get a merit badge or considered in terms of
10  his criminal exposure, yes?
11  A.  Yes, that would be correct.
12  Q.  So we are not talking about
13  something else, you're saying to him any
14  cooperation you give, it will be taken into
15  account as to what happens in the criminal
16  justice system?
17  MR. DUNNE:  Objection to the
18  form because it's assuming
19  something.
20  He indicated that he doesn't
21  make that decision.  He may very
22  well have indicated that but that
23  information would have been told to
24  him and later presented to the DA.
25

1  The way you are framing the
2  question is as if he was going to
3  make the decision about what type
4  of consideration he would be given.
5  Your question assumed that.  I
6  think his answer to you that, yes,
7  he expressed a sentiment similar to
8  that but that it's not his decision
9  as to what that consideration would
10  be and that's the extent of it.
11  Your last question assumes
12  that he is going to be the one
13  making that determination other.
14  than just relaying the information.
15  Q.  When you said to Mr. Wirship that
16  any cooperation would be considered, did you
17  mean considered in the context of the
18  criminal justice system?
19  A.  Yes.  That's not the wording that I
20  may have used but sum and substance, yes.
21  Q.  The word "considered" was actually
22  one you introduced into our conversation so
23  that's why I was asking about it.
24  A.  I don't know if the word
25

1   "considered" is the word I used that day.
2   It's the word I used today but not
3   necessarily the word I used that day.
4
5        Q.   I'm asking about the word you used
6   that day.
7           MR. DUNNE:  The tape speaks
8   for itself.
9           MR. BARKET:  That actually
10  is not tape, if I recall.
11       A.   There is no tape but I don't
12  recall.
13          MR. DUNNE:  Actually, you're
14  correct.  There is no tape on that
15  day.
16          MR. BARKET:  Get a tape of
17  that remark.
18          MR. DUNNE:  She took it.
19          It's on there.
20       Q.   Did you indicate to him or did
21  Investigator Iacopelli indicate to him that
22  the attorney he currently had, Mr. O'Connell,
23  was a hurdle or an obstacle to him
24  cooperating with your investigation?
25       A.   In sum and substance, yes.

1        Q.   What did you tell him in your own
2   words, in sum and substance, what did you
3   tell him?
4        A.   I told him, in sum and substance,
5   that while O'Connell was a very fine
6   attorney, there were things about the
7   investigation that we were conducting that we
8   would not want O'Connell to know because of
9   the fact that he may be investigating some of
10  the people that we would be talking about.  I
11  explained to Wirshup how this would work
12  would be that we would sit down with him and
13  it would be a give and take.  He would give
14  us information.  We would give him
15  information and there is information we would
16  not want to give him in the presence of
17  Mr. O'Connell.
18       Q.   What was Mr. Wirshup's response to
19  this?
20       A.   Confusion.
21       Q.   What did he say?
22       A.   He didn't understand what I meant
23  by that.
24       Q.   Did you explain it to him again?
25

1    A.    Yes.  I told him that one of the
2  primary problems here was that O'Connell may
3  be representing other targets of this
4  investigation.  I had to be very careful not
5  to tell him what we were investigating.
6    Q.    Did you tell him that too?
7    A.    Yes.
8    Q.    After you explained it to him a
9
10  second time, what did he --
11    A.    He seemed to understand.
12    Q.    What was his reaction after he
13  understood it?
14    A.    He wanted to know about other
15  attorneys.
16    Q.    What did you tell him?
17    A.    Told him we couldn't recommend
18  other attorneys.  I said he would have to
19  find one of his own.
20    Q.    How about the subject of whether or
21  not he was going to cooperate with the
22  investigation?
23    A.    What about it?
24    Q.    Did you ask him whether or not he
25  was willing to cooperate?

1
2    A.    I asked him if he would be willing
3  to meet with us.
4    Q.    What did he say?
5    A.    He said if he could find another
6  attorney, he would.
7    Q.    If he could find another attorney,
8  he would be willing to meet with you?
9    A.    Yes.
10    Q.    So he indicated that he would be
11  willing to cooperate with the investigation?
12    A.    At that point, yes.
13    Q.    Did he make any statements that you
14  would view as admissions?
15    A.    No.
16    Q.    Did he say anything at all during
17  the conversation that indicated to you that
18  he actually had committed some crime?
19    A.    No, wouldn't let him.
20    Q.    Did he say anything to you during
21  the course of that conversation that in any
22  way would have led you to believe or added to
23  your belief, however slightly, that he
24  committed a crime?
25    A.    No.

2  Q. So during the course of that
3  conversation, Mr. Wirshup didn't say anything
4  at all that if you could use it, chose to use
5  it, would be helpful in a criminal
6  prosecution against him?
7  A. No.
8  Q. So that conversation itself, there
9  was nothing he said at all that was
10  incriminating; is that right?
11  A. That's correct.
12  Q. How many times did you meet with
13  Mr. Wirshup at that 7-Eleven?
14  A. I believe twice, including that
15  time.
16  Q. When you left, did you have any
17  conversation with him about how to contact
18  him next?
19  A. Yes.
20  Q. Or have him contact you?
21  A. Yes.
22  Q. What was that?
23  A. I believe that we gave him one of
24  our business cards with our number on it. I
25  believe he gave us his beeper number.

2  Q. At any point during the
3  conversation, did you express to him or
4  direct to him any remarks that indicated you
5  thought he engaged in some criminal activity?
6  A. Yes.
7  Q. What did you tell him?
8  A. In sum and substance, that some of
9  his activities while employed by the Village
10  in his capacity may have been considered
11  criminal in nature.
12  Q. Did you tell him you thought you
13  had proof that he committed a crime?
14  A. No.
15  Q. When you told him that you thought
16  he engaged in criminal activity, what was his
17  reaction?
18  A. No reaction.
19  Q. He didn't, neither in word nor in
20  gesture, he didn't respond?
21  A. No.
22  Q. Can you turn to the next
23  transcript.
24  A. (Witness complies.)
25  Q. On the 24th of February 2003, did

1  you or Detective Iacopelli or you actually
2  page Mr. Wirshup?
3
4  A.  I don't think I did.  I think he
5  called us.
6
7  Q.  He called you unexpectedly?  You
8  didn't think he was going to call or didn't
9  know he was going to call?
10  A.  Yes, correct.
11  Q.  The transcript --
12       MR. DUNNE:  You have the
13  wrong date.  The next conversation
14  is not the 24th.  It's the 10th.
15  You're referring to a later
16  conversation.
17       MR. BARKET:  I thought I
18  asked about the 24th.
19       MR. DUNNE:  I thought you
20  said the next one.
21       MR. BARKET:  I thought I said
22  the 24th.
23  A.  Yes.  I believe at the time we did
24  page him.
25  Q.  Now, you say the 10th.  Let me take

1  a look.  I think I said the next one and then
2  said the 24th.  Let's go back to the 10th.
3       On the 10th, did you have a
4  conversation, February 10, 2003, did you have
5  a conversation with Mr. Wirshup?
6  A.  Yes.
7  Q.  He called you?
8  A.  Yes.
9  Q.  Did you speak to him?
10  A.  Yes, I did.
11  Q.  Are you looking now at what
12  purports to be a transcript, February 10,
13  2003?
14  A.  Yes, I am.
15  Q.  Did you ever compare that
16  transcript to the tape?
17  A.  Yes, I have.
18  Q.  Did you make any notes of that
19  comparison?
20  A.  I made no notes about the
21  comparison because there are some areas that
22  may or may not be what's written here.
23       MR. DUNNE:  In other words,
24  we haven't done that yet.
25

1  Q. What we did I'm not all that
2  concerned about. What I'm concerned about is
3  what Investigator Amato did.
4  A. The tape I listened to is very
5  choppy. I have reason to believe that one of
6  these may have been doctored. It's very hard
7  to understand. I have to listen to the
8  original, which we only got a week ago.
9  MR. DUNNE: Actually, we
10 still don't have.
11 Q. So my question is, when you listen
12 to the tape and compare it to the transcript,
13 did you make any notes of your comparison?
14 A. No. The answer is no, I did not
15 make any notes other than mental notes.
16 Q. When did that take place?
17 A. What, sir?
18 Q. The comparison.
19 A. The first time would be sometime
20 after the tape was delivered to the district
21 attorney's office.
22 Q. How about the most recent time?
23 A. About two weeks ago.
24 Q. January 19th, was that before or

---

1  after Mr. Wirshup's deposition?
2  A. After.
3  Q. I guess before yours?
4  A. Yes.
5  Q. Let's go through this, if I can, a
6  little bit.
7  A. Sure.
8  Q. As we are looking at this, on the
9  first page there is a statement attributed to
10 you that says, "See that's the problem. You
11 know what, Dan, you're not really that bad a
12 guy. You're nothing like we had here, so far
13 as problems go. You really shouldn't have to
14 be implicated with this. There are other
15 people that should be dealing with these
16 problems not you. Um, I think you're kind of
17 like a victim of circumstance and that's
18 probably why one of the reasons why we
19 haven't either scooped you up and collared
20 you, threw you out to the press. That kind
21 of stuff. Do you know what I'm saying?"
22 Did you say that?
23 A. I either said that or something
24 very close to it.

```
 1            you can.
 2       Answer the question as best
 3
 4       A.    May have been, if it's available.
 5       Q.    When you say that's normally what
 6  would happen to him, do you really mean
 7  normally what would happen to Mr. Wirship if
 8  he gets arrested or that's normally what
 9  happens when a person gets arrested or that's
10  normally what happens to a person that you
11  arrest?
12       A.    That would be normally what happens
13  to a person that is arrested in this
14  situation.
15       Q.    Which situation is this?
16       A.    As a public official.
17       Q.    "Threw you out to the press."  Who
18  would the thrower?
19       A.    I don't believe anyone in
20  particular.  The press or the blotter is
21  available to the press and they would be made
22  aware of the arrest.
23       Q.    The sentence reads, "Why we haven't
24  either scooped you up..."  The "we" in that
25  instance is you and the other people in the
```

```
 1       Q.    What did you mean by "scooped you
 2  up?"
 3       A.    Picked him up.  Arrested him.
 4       Q.    Arrested him and charged with a
 5  crime?
 6
 7       A.    Yes.
 8       Q.    "Collared him," what does that
 9  mean?
10       A.    That's a slang word for arrest.
11       Q.    "Threw you out to the press," what
12  did you mean by that?
13       A.    That would be what normally would
14  happen after he gets arrested.  He would
15  be -- his situation would be made known to
16  the media.
17       Q.    When you say that's what normally
18  would happen when he gets arrested,
19  Mr. Wirshup, I think, was arrested for a
20  drunk driving case a number of years ago.  Do
21  you know if that drunk driving arrest may be
22  publicity --
23             MR. DUNNE:  Objection to
24  form.
25             It assumes something.
```

1    district attorney squad; is that right?

2    A.    Yes.

3    Q.    And "collared you," again, the

4    person doing the collaring would have been

5    you?

6    A.    Yes.

7    Q.    And "threw you out to the press,"

8    that would have been you as well, right?

9    A.    Maybe.

10         MR. DUNNE:    No.    Objection.

11         That absolutely assumes

12   something that he did not testify

13   to.    You now twisted his answer.

14   I'm objecting to the form.

15         Don't answer that as it's

16   worded.

17   Q.    "That kind of stuff."

18         What's "that kind of stuff?"

19   A.    That kind of stuff, yes.

20   Q.    What kind of stuff?

21   A.    Yeah, scoop you up, collared you

22   and throw you out to the press.    That kind of

23   stuff.

24   Q.    Following this down.    Wirshup says,

1 "Right," in response to that. At least
2 according to the transcript. And then you
3 say, "Did you talk to your attorney at all?"
4 Do you see that?
5 A. Uh-huh.
6 Q. And it says, "Well, I had to let
7 him know there is, you know, a problem and a
8 problem and it's in my court."
9 Amato: "It's in your hands. Let
10 me give you a piece of advice. Why don't you
11 sit tight a day or so and let me reach out to
12 you. I can get you at your place of
13 business?"
14 Did you say that?
15 A. It sounds like something I did say,
16 yes.
17 Q. When you say, "Why don't you just
18 sit tight," what are you referring to?
19 A. That's a slang statement for why
20 don't you just not do anything for the next
21 day or two.
22 Q. What are you telling him not to do?
23 A. Just kind of relax for the next day
24 or two. Don't do anything.

1 Q. Don't what?
2 A. Don't do anything. Don't go
3 running around trying to get yourself an
4 attorney is probably what I meant.
5 Q. About halfway down the page is
6 another statement attributed to you. Reading
7 the transcript along, let me ask you about
8 this phrase or this paragraph.
9 According to the transcript it
10 says, "No, I wouldn't do anything right now
11 until you see which way it falls. You know,
12 maybe something will break for you in the
13 next day or so. Who knows. Give me a day or
14 so and I will get back to you and I will talk
15 to the ADA that's involved here and tell him,
16 listen, you know, that guy is willing to do
17 the right thing here, okay?"
18 Did you say that?
19 A. Sounds very close to something I
20 would have said.
21 Q. Let's just kind of make sure we
22 understand what you meant here.
23 The ADA that you know is involved
24 here, who is that?

1  A. That would have been Chris Nicolino
2  or John Scott Prudenti or Jeremy Scileppi or
3  Ed Heilig.
4  Q. What did you mean by "the guy?"
5  Who is the guy, that, "The guy is willing?"
6
7  A. The guy refers to Dan Wirship.
8  Q. Mr. Wirship?
9  A. Right.
10  Q. And "do the right thing." What
11  does that refer to?
12  A. That he is willing to come in and
13  speak to us.
14  Q. You mean he is willing to
15  cooperate?
16  A. Yes.
17  Q. When I say "cooperate," I guess I'm
18  kind of using a term of art. He is somebody
19  you believe is involved in some criminal
20  activity, yes?
21  A. Yes.
22  Q. Individuals involved in criminal
23  activity have several choices when they are
24  confronted with the criminal activity or
25  alleged criminal activity by law enforcement,

1  right?
2  A. Sometimes.
3  Q. They also have several choices.
4  Let me go through them. They can plead
5  guilty if they want to and take whatever
6  sentence the Court gives them, yes?
7
8  A. Yes.
9  Q. They can go to trial, yes?
10  A. Yes.
11  Q. And there are times if law
12  enforcement is interested, they can -- the
13  individual can offer information about other
14  people's criminal activity in order to gain
15  for themselves a reduced sentence or reduced
16  charges; is that right?
17  A. Those are all options that the
18  person would have with the district
19  attorney's office.
20  Q. Correct.
21  When you say "do the right thing,"
22  you were referring to Mr. Wirship's
23  willingness or perceived willingness to come
24  in and, one, admit his own culpability; and,
25  two, implicate others?

```
 1   time.
 2   A.   That was my perception at that
 3   time.
 4   Q.   Well, that's what you meant by "do
 5   the right thing," is what I'm asking?
 6   A.   Yes.
 7   Q.   Mr. Wirshup says, "Yeah, but I
 8   should still go in with an attorney, right?"
 9   Your response was "Absolutely."
10   Is that right?
11   A.   Yes, it was.
12   Q.   Then he says, "That's what I'm
13   saying. That's what I don't know. I mean,
14   if you're going to call me in, I need to talk
15   to an attorney."
16   The response that's written here,
17   "I couldn't get that out without having an
18   attorney. Let me talk to the DA and what his
19   pleasure is, okay?"
20   Did you say that?
21   A.   That doesn't sound like something I
22   would say. That particular sentence may
23   be -- that might be what came out on the
24   copy. It doesn't sound like a complete
25   sentence and usually I do talk in complete
```

```
 1   sentences.
 2   Q.   Except for the occasional uh-hum.
 3   A.   Yes.
 4   Q.   "Let me talk to the DA and see what
 5   his pleasure is." That sounds similar to
 6   what was said up here where it says "Let me
 7   talk to the ADA that, you know, is involved
 8   here," right?
 9   A.   Yes.
10   Q.   So that may be that phrase, at
11   least something you would have said, yes?
12   A.   Yes.
13   Q.   Was that true, factually?
14   A.   What is that, sir?
15   Q.   That you wanted to go back and
16   speak to the DA concerning this?
17   A.   Absolutely, yes.
18   Q.   Did you, in fact, go back and speak
19   with them?
20   A.   Yes, we did.
21   Q.   After this conversation -- who did
22   you speak with, if you recall?
23   A.   We probably spoke with either
24   Nicolino or John Scott Prudenti at that time.
25
```

1  did you tell him?
2  A. Basically that it sounded like
3  Wirshup was willing to come in and speak to
4  us but that he was -- and my perception of
5  this conversation was that the reason for
6  "sit tight" and "hang loose" was because he
7  sounded nervous about this, was that we have
8  to find this guy, we can't bring this guy in
9  without an attorney.
10 Q. You started to say "we have to find
11 this guy."
12
13
14
15
16 Q. What did you mean by that?
17 A. We have to find out if this guy can
18 get an attorney.
19 Q. We have to find out if he can get
20 an attorney? He had an attorney?
21 A. Yes, he did have an attorney.
22 Q. So what did you mean you had to
23 find out?
24 A. We obviously were not willing to
25 talk to him with that attorney. I think

1  that's the thread that weaves through all
2  this. We did not want to talk to Dan Wirshup
3  in the presence of O'Connell, as simple as
4  that. We were willing to talk to him if he
5  was willing to talk to us, provided he get
6  another attorney, very simple.
7
8  Q. I'm asking about your conversations
9  with the assistant district attorney and
10 Investigator Iacopelli and I want to know
11 what it was that you said to them. So I take
12 it at that point in time you all -- "you"
13 being you and the investigators and DAs --
14 already knew what your position was. You
15 didn't want to talk to Mr. Wirshup in the
16 presence of Mr. O'Connell, correct?
17 A. That's correct.
18 Q. You didn't repeat your own position
19 to yourself. What did you say to them?
20         MR. DUNNE: He did. He
21         answered that already.
22 Q. Is that what you said?
23 A. That's what I said to him.
24 Q. You said, "we are not going to talk
25 to Wirshup," that was your decision?

A. No. I don't make that decision.

What I said was, or what I was trying to say
was that we needed to find out if Wirshup was
going to get an attorney so we could bring
him, simple.

Q. You told Mr. Wirshup you needed to
speak to the DA, right?

A. Right.

Q. When you went to talk to the DA,
according to you, you said, "We have to wait
and see if he was going to get a lawyer."
That was the extent of your conversation with
the DA?

A. No, we were trying to find out what
we could do about getting him hooked up with
an attorney. Was there a way we can give him
a list, tell him to go through the yellow
pages, what do we do with this situation.

Q. What was the conversation, what was
suggested, who said what to whom?

A. Counsel was to let him decide on
who he waits to get as an attorney.

Q. So the decision was we will do
nothing? We will let him contact us with a

---

new lawyer?

A. Correct.

Q. When is the next contact you had
with Mr. Wirshup after that?

A. I would believe it would have to be
the date of the next conversation which was
on the 24th.

Q. Let's not assume that's correct.
Did you have any conversations with
him between February 10th and February 24th?

A. No.

Q. On February 24th -- by the way, did
you learn at some point during this that
Mr. Wirshup was in the district attorney's
office prior to February 6th?

A. At some point, yes, I did learn
this. I don't know exactly when it was. It
wasn't at the time we first met with him.

Q. What did you learn took place
during that meeting?

A. What I learned is that he had been
into the office with O'Connell and they met
with John Scott Prudenti.

Q. Who else was present for this

1 meeting?
2 A. I don't know.
3 Q. Was Investigator Iacopelli?
4 A. I don't believe so.
5 Q. Were there any investigators?
6 A. I don't know.
7 Q. So going back to the February 6th
8 meeting, it's your understanding that neither
9 Investigator Iacopelli or yourself ever met
10 Mr. Wirshup before?
11 A. That's correct.
12 Q. And that from a photograph, the two
13 of you happen to run into him at 7-Eleven,
14 recognize him, introduce yourselves and have
15 a conversation?
16 A. That's what we do for a living.
17 Q. What is it that you do for a
18 living?
19 A. We recognize people from
20 photographs.
21 Q. And talk to them?
22 A. If it's required, yes.
23 Q. Required and appropriate, of
24 course, right?

2 A. Of course.
3 MR. DUNNE: Appropriate
4 being a subjective term.
5 Q. How about required and permitted,
6 legally permitted?
7 A. In this particular case, yes, it
8 was permitted.
9 Q. What is your perception of how you
10 were permitted to speak to Mr. Wirshup while
11 he was represented by counsel without either
12 the permission of his attorney, his attorney
13 being present?
14 A. We were not talking to him about
15 any particular crime.
16 Q. What were you talking to him about?
17 A. Talking to us about his work and
18 coming in to see us with an attorney.
19 Q. What work?
20 A. What work, his work for the Village
21 of Patchogue.
22 Q. I thought that's what you're
23 investigating?
24 A. That's what we were investigating.
25 That's not what we tell him we were

1 investigating. We didn't tell him anything.
2 We didn't have discussions about any criminal
3 activity other than the fact that we advised
4 Mr. Wirshup that he may have been involved in
5 criminal activity and that he needed to speak
6 to us with an attorney.
7     Q. Your perception is that you were
8 permitted, if you wanted, to speak to
9 Mr. Wirshup on February 6th without the
10 permission of his lawyer or his lawyer being
11 present; is that correct?
12     A. Yes.
13     Q. You thought it was appropriate and
14 you were permitted to talk to him about
15 getting a new lawyer for himself so he can
16 come in and cooperate with the district
17 attorney's office?
18     A. Yes.
19     Q. That was an appropriate
20 conversation from your perspective?
21     A. Yes.
22     Q. In all respects, nothing wrong with
23 it, nothing illegal about it, nothing?
24     A. Nothing.

1     Q. And, actually, if he had made
2 admissions during the course of that meeting,
3 it would have been perfectly appropriate for
4 you to use that those admissions?
5     A. I don't know about that.
6     Q. Why not? What do you mean you
7 don't know about that?
8     A. I don't know about that.
9     Q. In the course -- we went over this
10 at length last time about all your training
11 concerning interrogations and how it works --
12     MR. DUNNE: Is there a
13 question here?
14     MR. BARKET: Yes, there is.
15     Q. Were you trained in all those
16 meetings about when you can get admissions
17 and how they were admitted into court?
18     A. As I said in my answer last time,
19 every situation is different. Every set of
20 circumstances is different. There are no set
21 of rules that apply to every situation. You
22 need to take every situation as it goes.
23     Q. The 7-Eleven, the meeting you had
24 with him at 7-Eleven that, according to you,

```
 1   as I understand it, was coincidental?
 2        A.  Yes, it was.
 3        Q.  Complete happenstance?
 4        A.  Absolutely.
 5        Q.  Getting to the conversation on
 6   February 24, 2003, did you page Mr. Wirshup
 7   on that day?
 8        A.  Yes, I think so.
 9        Q.  Had you spoken with Mr. O'Connell
10   between February 6th and February 24th?
11        A.  No.
12        Q.  Did anyone from your staff speak
13   with him?
14        A.  Not that I'm aware of.
15        Q.  Any of the prosecutors, any other
16   agency that you're aware of?
17        A.  I wouldn't have any knowledge of
18   that.
19        Q.  You may.  You can say you don't
20   know.
21        A.  I don't know.
22        Q.  So not to your knowledge, is what
23   you're saying?
24        A.  Correct.
25
```

```
 1        Q.  Do you know -- here it says about
 2   two-thirds of the way down, it has a
 3   statement.  Let's start halfway down.  "How
 4   did you make out?  Did you get yourself
 5   hooked up with another lawyer?"
 6        Wirshup:  "No, you told me not to
 7   do anything."
 8        Were those two statements made by
 9   you and Mr. Wirshup?
10        A.  It sounds like a statement I would
11   make.
12        Q.  The next statement is, "Oh, okay,
13   because we are ready to convene a Grand Jury
14   here and depending on what you want to do,
15   whether you are going to be a witness or a
16   defendant, you know.  Have you heard anything
17   about any attorney you might want to retain
18   or -- "
19        Did you say that?
20        A.  Yes, I believe I did.
21        Q.  Was that true?
22        A.  Not completely.
23        Q.  Which part was false?
24        A.  Probably about getting ready to
25
```

1  convene a Grand Jury.  I believe one was
2  already convened.
3       Q.   Why did you lie to him?
4       A.   I don't recall.  Might have been to
5  attach some urgency to the situation.
6       Q.   What do you mean, attach urgency?
7       A.   I wanted to get him to come in,
8  come in and speak to us.  I wanted him to get
9  an attorney and come in and sit down with us.
10 That was my goal.  That was our goal.
11      Q.   To that end, you told him that
12 there was about to be a Grand Jury convened
13 when, in fact, one had already been convened
14 and there was no particular urgency to that
15 day?
16      A.   Correct.
17      Q.   There is something here, "Whether
18 you are going to be a witness or a
19 defendant."
20      What did you mean by that?
21      A.   Exactly what I said.  Whether
22 you're going to be a witness or a defendant,
23 you know.  Are you going to come in and talk
24 to us and be a witness or are you not going

1  to come in and talk to us and be a defendant.
2       Q.   That was the choice you were
3  presenting him with at that time?
4       A.   Yes.
5       Q.   Next question, set of statements
6  is, "Well, that's why I was looking for you
7  for some guidance."
8       Q.   Your response was, "I really can't
9
10 go there with you, you know what I'm saying?
11 I can't tell you to use this guy, use that
12 guy, you know.  If you run somebody by me I
13 can tell you whether I know the guy is good
14 or bad but I can't really steer you to an
15 attorney, so to speak.  Do you know what I'm
16 saying?"
17      Did you say that?
18      A.   Sounds like what I said, yes.
19      Q.   Let me see if I can define some of
20 the statements.
21      When you say, "I really can't go
22 there with you, you know what I'm saying?  I
23 really can't tell you to use this guy or that
24 guy," you're telling him, I suppose, fairly
25 explicitly, you can't select a lawyer for

1  him?
2  A. Correct.
3  Q. Then you say, "If you run somebody
4  by me, I can tell you whether I know the guy
5  is good or bad."
6  Q. Do you see that phrase?
7  A. Yes.
8  Q. In other words, you said to him,
9  "If you run somebody by me," in other words,
10 if you give me the name of another lawyer,
11 right; is that what you mean by that?
12 A. Yes.
13 Q. "I can tell you" -- what do you
14 mean "if he is good or bad?"
15 A. I tell you if this guy does
16 criminal work or all he does is closings or a
17 matrimonial attorney. Good or bad for you is
18 what I would have meant.
19 Q. How about good or bad for you?
20 Were you concerned about that at all?
21 A. At that point, no.
22 Q. Well, Mr. O'Connell is, was,
23 continues to be a criminal defense lawyer,
24 yes?

1  A. Correct.
2  Q. What was the problem with
3  Mr. O'Connell?
4           MR. DUNNE: That's been
5  asked and answered.
6  Q. When you say "good or bad," did you
7  really mean that you were going to tell
8  Mr. Wirshup whether or not you thought the
9  attorney he chose was qualified to do the
10 work that you chose him for?
11          MR. DUNNE: Asked and
12 answered.
13 A. Of course not and I answered that
14 question already.
15 Q. Did you mean --
16 A. I answered that question already.
17 Q. I get to ask another one, even if
18 it's similar.
19          MR. DUNNE: Well, we'll see
20 where it goes.
21          MR. BARKET: I do get to
22 ask.
23 Q. By "good or bad," did you mean
24 whether or not the attorney had a similar

1   A.  I meant by good or bad whether or
2   not the attorney was in criminal law or
3   whether he was a guy who did real estate or
4   matrimonial. That's what I mean by that.
5   Q.  So the answer to my question, did
6   you mean had a conflict similar to
7   Mr. O'Connell would be no, that's not what
8   you meant; is that correct?
9   A.  That's correct.
10  Q.  The next page. Can you turn to the
11  next page, the statement attributed to you
12  says, "We won't deal with O'Connell. Not
13  that he is a bad guy, you understand. It's
14  just that he defends other people that are
15  likely to be a target of this investigation
16  and we wouldn't want any word to get back to
17  those people. Do you understand what I'm
18  saying?"
19  A.  That's correct.
20      Did you say that?
21  A.  Sounds like something I said, yes.
22  Q.  That's in response to a question by
23  Mr. Wirshup, "What is it, any other attorney
24  but O'Connell; is that right?"
25  A.  Correct, yes.

1   problem to Mr. O'Connell?
2   A.  I answered that question already.
3   Q.  You get to answer it again.
4       MR. DUNNE:  No.  He answered
5       it.  This is not a repetitive
6       practice.  Feel free to ask him
7       anything you like, Bruce.
8       MR. BARKET:  I'm asking
9       you -- I didn't ask that question
10      specifically.
11  Q.  When you said "good or bad," did
12  you mean --
13  A.  I told you what I meant by good or
14  bad.
15  Q.  Investigator, like I said, you've
16  been very patient, I appreciate it. Let's
17  not argue with each other.
18      When you said "good or bad," did
19  you mean an attorney that either had or did
20  not have a conflict similar to Mr. O'Connell?
21  A.  We are not going to have an
22  argument about it. I already told you what I
23  meant by good or bad.
24  Q.  Answer the question, please.

```
 1   Q.    There, when you're saying, "Not
 2   that he is a bad guy," when you said "bad"
 3   there, did you mean bad that Mr. O'Connell
 4   does real estate closings?
 5        MR. DUNNE:  No.  Objection.
 6        Ask him what he meant by
 7   bad.  Don't put words in his mouth.
 8        MR. BARKET:  I get to phrase
 9   the question.
10        MR. DUNNE:  I'm objecting to
11   the form.
12        MR. BARKET:  I can ask
13   leading or non-leading questions.
14        MR. DUNNE:  I understand
15   that.
16        MR. BARKET:  I'm asking a
17   very specific question.
18   Q.    By "bad," did you mean
19   Mr. O'Connell did real estate closings?
20   A.    No.
21   Q.    Did you mean "bad" that he wasn't
22   experienced in criminal defense?
23   A.    That he wasn't experienced?
24   Q.    Right.
25
```

```
 1   A.    No.
 2   Q.    What did you mean by "bad" used
 3   here in reference to Mr. O'Connell?
 4   A.    I said "not that he is a bad guy."
 5   Q.    What did you mean?
 6   A.    As opposed -- that he is not a bad
 7   guy, he is a decent guy.  He is a good
 8   attorney.
 9   Q.    Friendly?
10   A.    No.  That he is a good attorney.
11   Obviously, Mr. Wirshup understood me.
12   Q.    That may be or may not be?
13   A.    Well, he said, "I hear you."  So
14   obviously --
15   Q.    We are going through this and I
16   need to understand.  At the very least, I
17   need to get you to express the opinions on
18   the record.
19   A.    I can't give you a definition of
20   every word I used.  We would be here forever.
21        MR. DUNNE:  No, we won't be
22   here forever.
23        MR. BARKET:  No, we won't be
24   here forever but we might be here
25
```

1   for longer than we thought.
2       Q.    Mr. Wirshup said, "I hear you."
3   And you say, "If you're going to be talking
4   to us, I don't know, I would hope that he
5   would have your best interest at heart but I
6   don't know, you know."
7               Now, the "he" that you are
8   referring to there is the attorney, right?
9       A.    Yes, correct.
10      Q.    Mr. Wirshup responds, "I hear what
11  you are saying. I don't just want to, you
12  know, retain another lawyer and then I go in
13  there and you say he is not acceptable." The
14  response that's printed here is, "No, no, no,
15  the only reason we have any kind of trouble
16  with Mr. O'Connell because of the fact that
17  he represents other people. I don't care who
18  else you get. You know what I'm saying? It
19  doesn't matter. It's not that O'Connell is a
20  bad guy. The reason is because he is
21  representing other people involved in this
22  thing and, you know, human nature being what
23  it is, I wouldn't want to put him in a
24  position where we might think he is giving

1   information that you tell us about to other
2   people and purely it's not in your best
3   interest, you know what I'm saying?"
4               Did you say that?
5       A.    Close to that.
6       Q.    Just to make sure it's clear what
7   you're saying, at the top here you say, "I
8   don't care who else you get."
9
10              Do you see that?
11      A.    Yes.
12      Q.    In other words -- well, when you
13  say you don't care who else you get, that's
14  pretty obvious. He can get any lawyer he
15  wants, yes?
16      A.    Right.
17      Q.    What you're saying is the only
18  problem with O'Connell is you think he has a
19  conflict, yes?
20      A.    Correct.
21      Q.    That opinion is based in part on
22  your conversations with the prosecutor; is
23  that correct?
24      A.    Yes, it is.
25      Q.    Your own basic, I wouldn't say

1 instincts, but experience as an investigator,
2 correct?
3 
4 A. Yes, it is.
5 Q. You wouldn't want to even,
6 regardless of what the attorneys say, you
7 wouldn't want to sit down with an individual
8 witness or cooperator -- you know what I mean
9 by that, right?
10 A. Yes.
11 Q. Somebody who is potentially a
12 defendant who is giving you information to
13 trade to help himself, right?
14 A. Yes.
15 Q. You wouldn't want to sit down with
16 that person if the person's lawyer was
17 representing the individual you wanted the
18 information about?
19 A. Exactly.
20 Q. Says something here about, "It's
21 not in your best interest," right?
22 A. Yes.
23 Q. Tell us what you meant by that.
24 A. What I meant by that was if your
25 attorney represents a target in this

1 investigation who is giving you orders on
2 things to do and not to do and those orders
3 are of a criminal nature, then really it's
4 not in your best interest to have that
5 attorney sitting there listening to us
6 discuss someone that he represents or is
7 friendly with that you're telling us about.
8 It makes sense to me.
9 
10 Q. It may make sense to almost
11 everybody. Let me see if I can capture your
12 words.
13 You were saying to him it's not in
14 your best interest that the attorney, if he
15 has got another client to protect, he may not
16 be looking out for you so well?
17 A. That's a possibility, yes.
18 Q. That the decisions to cooperate, to
19 plead guilty, to go to trial, that he is
20 going to give you advice about may be
21 affected by his loyalty to other people,
22 correct?
23 A. Yes, that's correct.
24 Q. That he may tell you not to
25 cooperate, not because it's in your best

1 interest to cooperate but because he is
2 looking to protect his other client?
3      A.   That's a possibility, sure.
4      Q.   That's one of the things you're
5 expressing to Mr. Wirshup here?
6      A.   Yes.
7      Q.   Down below here says, "You're not a
8 bad guy.  I can tell you straight out you
9 have done some things that can be construed
10 to be not really kosher.  As a matter of
11 fact, it can be criminal.  Do you know what
12 I'm saying?"
13      A.   Yes.
14      Q.   Did you say that?
15      A.   Yes, I believe I said something
16 close to that.
17      Q.   At that point in time, this is
18 February 24th of 2003, what was the status of
19 your investigation?
20      A.   We had some work that was being
21 done by Debut Concrete on the homes of people
22 that Dan Wirshup visited and had letters sent
23 to them demanding that they replace their
24 sidewalks and that the work was being

1 funneled to Debut Concrete.
2      Q.   Had you done any examinations for
3 the work that was done by Debut Concrete at
4 that point?
5      A.   I don't know.  I would have to
6 refer to something.
7      Q.   What would you have to refer to?
8      A.   Probably whatever notes we had
9 concerning the measurements that we took.
10      Q.   Do we still have those notes
11 someplace?
12      A.   Yes.
13      Q.   We don't have them with us, do you?
14      A.   No.
15           MR. BARKET:   We ask for
16 those notes at some point.
17      Q.   Below that there is something that
18 is inaudible.  At least it's written
19 inaudible here.  "For that in return which
20 you give us some information as to what's
21 going on.  That's really the basic thing.  I
22 don't want you sitting down with us telling
23 us something that is going on and it's liable
24 to get back to other people that you're

1    A. Well, I don't know his complete

2    circle of friends.

3

4    Q. I'm sure you don't. What I'm

5    saying is, when you said, "You know who his

6    good friends are," obviously I'm asking who

7    you were --

8    A. That's what I was referring to.

9    Q. You were referring just to

10    Mr. Keegan?

11    A. Yes.

12    Q. Then you say "no." You say, "Well

13    neither do I. Maybe I can tell you but I

14    won't."

15    What are you saying there?

16    A. I wasn't going to mention Keegan's

17    name to him at that point.

18    Q. And reading this page over, does

19    this all look like something you said, any

20    omissions or insertions?

21    A. That looks pretty close, yes.

22    Maybe a word here and there.

23    Q. There is mention of Paul Gianelli?

24    A. Yes.

25    Q. You say you have no problem with

1    telling us about. That wouldn't be good for

2    you and it certainly ain't going to be good

3    for us."

4

5    Q. Did you say that?

6    A. Yes, pretty close to that.

7    Q. As we are going through the

8    transcript so far, have you seen anything

9    that you don't think you said?

10    A. There are words here and there that

11    may be or may not be what I said. It's hard

12    to pinpoint what exactly but I think

13    everything so far has been pretty close to

14    what I said.

15    Q. About halfway down here we have,

16    "Danny, he has an oath. He is not supposed

17    to have a conflict of interest. You know who

18    his good friends are."

19    Do you see that?

20    A. Yes.

21    Q. Who are you referring to there?

22    A. O'Connell.

23    Q. Who are his good friends?

24    A. Steven Keegan.

25    Q. That's it?

1  that. That's fine with you?
2  A. Yes.
3  Q. Do you know who Paul Gianelli was?
4  A. Yes, I do.
5  Q. The next page, can you just kind of
6  read that over, if you would?
7  A. (Witness complies.)
8  Q. Is that Page 10 of Defendants'
9
10  Exhibit K?
11  A. Page 10, yes.
12  Q. It's what looks to be a fax.
13  A. That's pretty close to the
14  conversation, yes.
15  Q. Then the last page here?
16  A. That's pretty close to the way it
17  was, yes.
18  Q. Go back to the page before that.
19  The last little couple of things here. The
20  last part of this paragraph.
21  MR. DUNNE: The last
22  paragraph.
23  Q. Yes. Where it says "Amato" and
24  starts, "That's what I tried to explain to
25  you." About halfway, maybe a little more, "I

1  have no opinion one way or another. I don't
2  think you're the world's worst dirt bag, if
3  that's what you're thinking. I don't think
4  that at all. I think you're a guy that got
5  caught up in some things, you know, to try to
6  do the right thing, try to expedite things
7  for certain people that you feel you may or
8  may not owe a certain, you know, a certain
9  loyalty to and you might have gotten caught
10  up in something here."
11
12  Did you say that?
13  A. Yes, it sounds pretty much like it.
14  Q. What were you referring to in that
15  instance? What did you mean by that?
16  A. I was alluding to the fact that
17  Keegan was the target of our investigation
18  and we felt -- I felt at that time that he
19  may have been doing the things that he was
20  doing, having these letters sent out,
21  pressuring people to get their sidewalks done
22  at the request of Keegan, who apparently was
23  fairly tight with Milvid from Debut Concrete.
24  Q. Do you still feel that way?
25  A. Yes, I do.

1   Q.   Later on, on the 24th, did you page
2   him again?
3   A.   Later on, on the 24th, I don't
4   think so.  It's possible, yes, I must have.
5        MR. DUNNE:  Let's take a
6   break.
7        (Whereupon, a recess was
8   taken at this time.)
9   Q.   Did you call back -- page
10  Mr. Wirshup back on the 24th, second call
11  that day?
12  A.   I paged him to call us back, yes,
13  but I was not there when he called back.
14  Q.   I see this is with Iacopelli,
15  right?
16  A.   Yes.
17  Q.   After you spoke with Mr. Wirshup
18  that day, did you go back and ask the DA
19  office or the prosecutors about Paul
20  Gianelli?
21  A.   Yes, we did.
22  Q.   What was the response?
23  A.   Tom Iacopelli and I asked either
24  Prudenti or Nicolino about Gianelli and they

1   told us that Gianelli was not -- that there
2   were -- would be similar problems with
3   Gianelli in that he was representing one of
4   the other defendants that they were working
5   on at the time.
6   Q.   There came a point in time where
7   you met on March 7th with Mr. Wirshup at the
8   7-Eleven again with Mr. Iacopelli?
9   A.   Right.
10  Q.   This looks like a transcript of
11  that recording.
12       Have you listened to the tape of
13  that conversation?
14  A.   Yes, that's the tape that's very
15  chopped, very fuzzy.  There seems to be
16  pieces on this transcript that --
17       MR. DUNNE:  Which one are
18  you referring to?  What time frame?
19       MR. BARKET:  March 7, 2003
20  at 11:45 p.m.
21       MR. DUNNE:  All right.
22  A.   It wasn't 11:45 p.m.  It must have
23  been 11:45 a.m.  First of all, the time is
24  off.  It was a.m.  It was a rainy day.  Dan

1  was wearing a raincoat.
2  Q.  You have your transcript
3  highlighted.  I'm not sure if you did that.
4       MR. DUNNE:  I did it.
5  
6  Q.  I'm not sure if you did that or
7  somebody else did that.
8  A.  I did not do it.
9  Q.  Look at this.  Can you tell me if
10 you have a kind of memory of what instances
11 or whether there are problems with this
12 transcript, that is?
13 A.  There are chopped off sentences.
14 There are words in here that I don't think
15 were said.  Maybe even complete sentences
16 that I don't think were said.
17 Q.  Can you give me examples?
18 A.  Offhand, I can't.  I would have to
19 listen to the tape and go through each.
20 Q.  Have you participated in
21 non-consensual recording of conversations,
22 not over the telephone but conversations?
23 A.  Yes.
24 Q.  Have you ever noticed any problems
25 in doing that, technical problems?

1  A.  Yes.
2  Q.  Typically, generally speaking,
3  phone conversations that are recorded are
4  usually pretty clear; is that right?
5  A.  Yes.
6  Q.  Conversations in person are
7  typically more difficult to record, right?
8  A.  Depending on the equipment used,
9  right?
10 yes.
11 Q.  And depending on the conditions,
12 right?
13 A.  Yes, right.
14 Q.  Phones, ordinarily, there is a
15 line, the line is good.  There are just two
16 people talking and no outside noise?
17 A.  Usually, yes.
18 Q.  When you're in person, the
19 recorders, if they are sensitive enough to
20 pickup someone speaking a few feet away often
21 will pick up noise from the surrounding area,
22 right?
23 A.  Background noise, yes, that's
24 correct.
25 Q.  If the recorder is secreted on

1 somebody, the recorder itself may be rubbing
2 up against clothing, up against a person's
3 body, things like that, that create
4 interference with the recording; is that
5 right?
6    A. Sometimes, yes.
7    Q. In your experience as an
8 investigator using these devices, is it
9 unusual to have a recording done in person
10 that is problematic in terms of picking up
11 all the sentences, getting an accurate
12 transcript of it and catching what everyone
13 says?
14        MR. DUNNE: I object to the
15 word unusual.
16        I don't know what that
17 means, but answer that question as
18 best you can.
19    A. That's not the usual case, no. I
20 would not say that it's not unusual for that
21 to happen. It can happen. I've seen it
22 happen but with the equipment used today, I
23 would say it very rarely happens.
24
25    Q. I want to talk to you a little

1 more. I'm not going to go through the whole
2 transcript now because we won't be able to
3 get through it now.
4     What I want talk to you a little
5 bit about is at this point, March 7th, have
6 you done the test of the sidewalks?
7
8    A. I don't know without referring to
9 some other documents.
10        MR. BARKET: Do you have the
11 photographs that were taken, by
12 chance?
13        MR. DUNNE: I have it here
14 (handing). These are all in order.
15        MR. BARKET: Those weren't
16 marked? Just photographs?
17        MR. DUNNE: Right.
18        MR. BARKET: Can I mark them
19 or no?
20        MR. DUNNE: Why don't you
21 mark this book. Put a sticker on
22 the outside of the book.
23        MR. BARKET: That's okay.
24 I'll just do photographs.
25    Q. Take a look at the photographs I

1  want to show you that were provided today by
2  your attorney. One of the photographs looks
3  like an individual standing over a curb
4  (handing).
5
6  Do you know who was doing that?
7  A.   (Witness examines photograph.)
8  That's Ray Felice.
9  Q.   Is he an expert in concrete or
10 sidewalk installation?
11       MR. DUNNE:  Objection, but
12 answer as best you can.
13 A.   Not to my knowledge.
14 Q.   Does he have any experience in
15 that?
16 A.   Yes, I believe he does.
17 Q.   What experience is that?
18 A.   I believe he was in the
19 construction business.
20 Q.   What was his employment in March
21 '03?
22 A.   Detective.
23 Q.   With who?
24 A.   Suffolk County Police.
25 Q.   Feel free to thumb through those at

1  your leisure, but not at this instance
2  because I want to keep your attention focused
3  on me.
4
5  Right here we have some dates and
6  times. Do you recognize that handwriting?
7  A.   It's not mine.
8  Q.   Did you recognize it?
9  A.   No.
10 Q.   Does that refresh your memory as to
11 when these pictures were taken?
12 A.   No.
13 Q.   Is there any correlation between
14 those dates and times on the photographs?
15 A.   Maybe.
16 Q.   Not that you're ware of?
17 A.   Not that I'm aware of.
18 Q.   The number of installations you
19 investigated, how many instances were there
20 that you found that the work that was done,
21 in your opinion, was not done to
22 specification?
23 A.   In almost every instance.
24 Q.   In what way was it not done, or did
25 it vary from place to place?

1  A.  It varied from place to place.
2  Q.  How was it that you made these
3
4  determinations?
5  A.  A matter of simple arithmetic.
6  Q.  How was it that you made the
7  determination?
8  A.  If I'm looking at a bill for this
9  particular sidewalk that says 75 feet of
10 concrete curb in and there is only 30 feet,
11 yet Mr. Wirshup sings off on it, then seems
12 to me somebody got beat out of 40 feet of
13 curbing.
14 Q.  Is that criminal?
15 A.  Yes.
16 Q.  What's the crime?
17 A.  Larceny.
18 Q.  What do you mean?
19 A.  Well, in one instance it may be a
20 mistake but if it happens on three or four
21 different streets in 20 or 30 different
22 locations, I think it's a crime, a community
23 crime, in my opinion.
24 Q.  What's a community crime?
25 A.  Larceny.

1  Q.  In your experience as an
2
3  investigator, do you look for motive in
4  individuals committing crimes?
5  A.  Sometimes.
6  Q.  What are the instances that you
7  don't look at motive?
8  A.  Maybe if the defendant is crazy.
9  Q.  Is Mr. Wirshup crazy?
10 A.  I don't think so.
11 Q.  Do you think he had a motive for
12 doing what he did?
13 A.  In my opinion, yes.
14 Q.  What was that?
15 A.  I think he wanted to please his
16 superiors.
17 Q.  Please his superiors, being Mayor
18 Keegan?
19 A.  Correct.
20 Q.  Please them in what way?
21 A.  By doing what they asked him to do,
22 which may have been getting work for Debut
23 Concrete.
24 Q.  So as I understand, there is no
25 indication, is there, that Mr. Wirshup

```
 1  profited from this in someway?
 2      MR. DUNNE:  I object to the
 3  form.
 4      It assumes that that's a
 5  requirement, but go ahead and
 6  answer as best you can.
 7  A.   We were not able to find any -- I'm
 8  sorry, can you repeat the question?
 9      MR. BARKER:  Can you read
10  that back?
11      (Whereupon, the requested
12  portion was read by the reporter.)
13  A.   We were unable to show Mr. Wirshup
14  profited in any way other than possibly
15  keeping his job.
16  Q.   When you say you weren't able to
17  show it, did you try?
18  A.   Yes.
19  Q.   Did you look around for unexplained
20  wealth, cash payments, deposits in his
21  checking account, things like that?
22  A.   Basically.
23  Q.   The answer was, as far as you knew,
24  there were no payments to him?
```

```
 1  A.   That's correct.
 2  Q.   So in terms of an actual financial
 3  profit to himself, the only profit he could
 4  have received was keeping his job?
 5      MR. DUNNE:  I object.
 6      Answer that as best you can.
 7      I'm objecting to the form.
 8      That actually assumes
 9  something that was not said by the
10  witness.
11      I'm objecting to the form.
12  A.   We don't know that he was unable to
13  profit from making those decisions.
14  Q.   Here's the way the whole criminal
15  justice system works, I think that we can all
16  think whatever it is that we can think.  I'm
17  asking about proof.
18      Is there any proof that you can
19  offer that Mr. Wirshup profited in some way?
20      MR. DUNNE:  I object because
21  that assumes that that is necessary
22  as a prerequisite to investigate a
23  crime.  That's not proper.  You're
24  assuming that that's a
```

1  prerequisite. So, therefore, if I
2  can't show he profited, then there
3  must not have been a crime.
4       I object to that. That
5  assumes something that is not the
6  case.
7
8       MR. BARKET: I think you
9  still get to answer the question.
10      MR. DUNNE: I'm objecting to
11 it.
12      Rephrase it. It assumes
13 something that is not correct and
14 I'm not permitting him to answer a
15 question with an incorrect
16 assumption in it.
17 Q.  Is there any proof that Mr. Wirshup
18 profited from signing the forms, approving
19 the payments to Debut Concrete?
20      MR. DUNNE: That question
21 you may answer.
22 A.  No, there was no proof.
23 Q.  At all?
24 A.  No.
25 Q.  So your theory is that he did this

---

1  to please Mr. Keegan?
2  A.  Yes.
3  Q.  Is there any proof of that?
4  A.  Kept his job.
5  Q.  That's it?
6  A.  Yes.
7
8  Q.  When was Mayor Keegan -- what was
9  his term in office, do you know?
10 A.  No, I really don't know the dates
11 on that. He was out of office by the time we
12 did this investigation.
13 Q.  How about when the sidewalks were
14 being installed?
15 A.  He was the mayor.
16 Q.  After he left office, did
17 Mr. Wirshup keep his job?
18 A.  Yes, he did.
19 Q.  Up until?
20 A.  Sometime during our investigation.
21 Q.  During that time -- by the way,
22 Detective Felice did the investigation into
23 the sidewalks; is that right?
24 A.  No.
25 Q.  Who did -- who did the

2    investigation of the actual installation of
3    the sidewalk?
4    A.    What do you mean?
5    Q.    How did you determine -- did you
6    hire a firm, did you do it yourselves? How
7    did you all actually, physically investigate
8    the installation or how the sidewalks were
9    installed and the curb?
10   A.    The initial investigation was done
11   by us and later on the Village hired
12   professionals.
13   Q.    Later on before or after the
14   indictment?
15   A.    You mean when the professionals
16   look at it?
17   Q.    Yes.
18   A.    I think it was after the indictment
19   but I'm not sure.
20   Q.    Who, if you know, testified about
21   the installation of the sidewalks in front of
22   the Grand Jury?
23   A.    I don't know.
24   Q.    Is that photo that depicted
25   somebody holding a ruler, a tape measure, I

---

1    guess, do you recognize that person?
2    A.    Yes.
3    Q.    Is it Detective Felice?
4    A.    That's correct.
5    Q.    I notice it looks kind of dug out
6    around the sidewalk.
7          Did you have to actually take out
8    part of the street and dig down to see where
9    the sidewalks were?
10   A.    Yes, we did.
11         MR. BARKET:  Let's stop.
12         It's 4:30.
13                 -o0o-
14         (Whereupon, the examination
15   of Robert Amato was concluded at
16   4:30 p.m.)
17
18
19         _____
20                 ROBERT AMATO
21
22   Subscribed and sworn to
     before me this ____ day
     of _____, 2007.
23
24   _____
25   NOTARY PUBLIC

## C E R T I F I C A T E

    I, HOLLY DALOIA, a Notary Public

within and for the State of New York, do

hereby certify:

    That the witness(es) whose testimony

is hereinbefore set forth was duly sworn by

me, and the foregoing transcript is a true

record of the testimony-given by such

witness(es).

    I further certify that I am not

related to any of the parties to this action

by blood or marriage, and that I am in no way

interested in the outcome of this matter.

_____
HOLLY DALOIA

ON TIME COURT REPORTING
516-535-3939.

---

## I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Robert Amato | Mr. Barket | 98 |

REQUESTS FOR PRODUCTION

| DESCRIPTION | PAGE |
|---|---|
| Reporter's pad | 100 |
| Notes of measurements | 186 |

INSERTS

| DESCRIPTION | PAGE |
|---|---|
| Where cell phone records are kept | 119 |

ON TIME COURT REPORTING
516-535-3939

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x

DANIEL WIRSHUP,

                     Plaintiff,

       -against-

SUFFOLK COUNTY POLICE DEPARTMENT,
SUFFOLK COUNTY DISTRICT ATTORNEY,
THOMAS J. SPOTA; SUFFOLK COUNTY,
DISTRICT ATTORNEY'S OFFICE, ASSISTANT
DISTRICT ATTORNEYS JANE and JOHN DOE
"I" - "S; ASSISTANT DISTRICT ATTORNEYS
KEVIN WARD, JOHN SCOTT PRUDENTI, and
CHRISTOPHER NICOLINO; DETECTIVES/POLICE
OFFICERS TOM IACOPELLI, ROBERT AMATO,
and RAYMOND FELICE, DETECTIVES/POLICE
OFFICERS JOHN and JANE DOE "I" - "S,"
and THE COUNTY OF SUFFOLK,

                     Defendants.

- - - - - - - - - - - - - - - - - - - x

          666 Old Country Road
          Garden City, New York

          May 31, 2007
          11:10 a.m.

     CONTINUED EXAMINATION BEFORE TRIAL

FROM JANUARY 19, 2007 of ROBERT AMATO, one of
the Defendants in the above-entitled action,
held at the above time and place, taken
before Holly Daloia, a shorthand reporter and
Notary Public of the State of New York.

COPY

RECEIVED
JUL 0 5 2007
BRUCE A. BARKET

---

A P P E A R A N C E S:

LAW OFFICE OF BRUCE BARKET
      Attorneys for Plaintiff
      666 Old Country Road
      Suite 600
      Garden City, New York 11530
BY: BRUCE BARKET, ESQ.

SUFFOLK COUNTY ATTORNEY'S OFFICE
      Attorneys for Defendants
      H. Lee Dennison Building
      100 Veterans Highway
      Hauppauge, New York 11788
BY: RICHARD DUNNE, ESQ.

ALSO PRESENT:

      Daniel Wirshup
      Tom Iacopelli
      Raymond Felice

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED
by and between the attorneys for the
respective parties herein, that filing,
sealing and certification be and the
same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the
form of the question shall be reserved
to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be signed
and sworn to before any officer authorized
to administer an oath, with the same force
and effect as if signed and sworn to before
the Court and that a copy of this
examination shall be furnished without
charge to the attorney representing the
witness testifying herein.

---

(Notice was marked as
Plaintiff's Exhibit 2 for
identification, as of this
date.)

R O B E R T   A M A T O,
the witness herein, having been
previously duly sworn by a Notary
Public of the State of New York,
was examined and testified as
follows:

EXAMINATION BY
MR. BARKET:

Q. Please state your name for the
record.

A. Robert Amato.

Q. Please state your address for the
record.

A. 200 Center Drive, Riverhead,
New York 11901.

Q. Good morning again.

Q. You initially appeared for
deposition on January 12th?

MR. DUNNE: 12th and 19th.

A. I believe so.

1
2          Q.   Initially.  That was adjourned from
3     January 5th, which was the original scheduled
4     date of that, right?
5          A.   I believe so, yes.
6          Q.   I think that was done pursuant to a
7     notice for examination for trial.  Do you
8     recall receiving a document like that?
9               MR. DUNNE:  No, he wouldn't
10              get that.  I simply make the phone
11              calls to these guys.  You and I
12              were playing schedule gymnastics.
13         Q.   Take a look at what I marked as
14    Plaintiff's Exhibit 2 (handing).
15              Did you ever see that document
16    before?
17         A.   (Witness examines Plaintiff's
18    Exhibit 1.)
19              No.
20         Q.   When you were notified to come to
21    the deposition, did your attorney or anyone
22    tell you to bring anything with you?
23         A.   No.
24              MR. DUNNE:  Other than the
25    documents he reviewed and we went

1     over.  Meaning the tape
2     transcripts, the photographs and
3     the statements.  That's what we
4     produced and that's what he
5     reviewed prior to the deposition.
6
7              MR. BARKET:  I'm sorry.
8              MR. DUNNE:  That's by
9     counsel.
10         Q.   My question is for -- is it
11    Detective Amato?
12         A.   Yes, Amato.
13         Q.   Were you told to bring anything to
14    the deposition?
15         A.   No, I wasn't told to bring anything
16    to the deposition.
17         Q.   Were you asked to bring anything to
18    the deposition?
19         A.   Most of the stuff you're talking
20    about is in the file.
21         Q.   It may or may not be.  I'm just
22    curious and asking whether or not you were
23    instructed or asked or requested to bring
24    anything to the deposition.
25         A.   I wasn't instructed to bring

1   anything that we didn't have in the file,
2   which was the transcript of the -- the
3   alleged transcript of the tape.
4        Q.   So no one showed you a copy of a
5   document they marked as Plaintiff's
6   Exhibit 2?
7        A.   No.
8        Q.   Did your office, the district
9   attorney's office, to your knowledge, employ
10  any outside experts in connection to this
11  investigation?
12       A.   There were experts utilized, but I
13  don't know if they were employed by the
14  district attorney's office or the Village of
15  Patchogue.
16       Q.   Who was the experts?
17       A.   I don't know. Couldn't tell you.
18       Q.   They must be written down
19  somewhere, yes?
20       A.   Probably.
21       Q.   Where?
22       A.   I had no dealings with them.
23       Q.   Who would have dealt with the
24  experts?

1        A.   Whoever hired them. Probably the
2   Village.
3        Q.   Their use in the investigations --
4   let me go back to that.
5        The Village did something on their
6   own that I don't care about. What I care
7   about is whether or not the district
8   attorney's office used experts in this
9   investigation. Let's go back to that
10  question and say yes, they did or no, they
11  didn't.
12       A.   I can't honestly answer that
13  question yes or no. I don't know.
14       Q.   So as far as you know, there
15  weren't any experts used by the district
16  attorney's office in connection with this
17  investigation; is that right?
18       A.   That's not what I said. I said I
19  don't know if they used any experts.
20       Q.   But as far as --
21       A.   Not to my knowledge.
22       Q.   I briefly touched upon this last
23  time, I think. You're not in any way an
24  expert at the installation of curbs or

1
2 concrete or anything like that, are you?
3   A.  No, but I can read a ruler.
4   Q.  Okay. Congratulations. I'm happy
5 for you. Not a high bar but I'm glad you
6 cleared it.
7     Is anyone employed with the
8 district attorney's office -- is anyone
9 connected with this investigation hold
10 themselves out as any expert in the areas
11 relevant to this investigation?
12   A.  Not to my knowledge.
13   Q.  Did you review anything before
14 coming to the deposition today?
15   A.  No, I did not.
16     MR. BARKET:  I think we made
17   a couple of requests over the
18   course of January 5th and
19   January 12th, and I'm going to end
20   your deposition now, subject to
21   those things being produced and
22   subject to the other document
23   production request we made being
24   resolved.
25     I don't know if you guys

1
2 drove in the same car.
3   THE WITNESS:  We did.
4   MR. BARKET:  Thank you.
5     -o0o-
6     (Whereupon, the examination
7 of Robert Amato was concluded at
8 11:17 a.m.)
9
10
11
12         ROBERT AMATO
13
14 Subscribed and sworn to
15 before me this _____ day
16 of _____, 2007.
17
18 NOTARY PUBLIC
19
20
21
22
23
24
25

1  
2  
3  
4  
5       C E R T I F I C A T E  
6  
7       I, HOLLY DALOIA, a Notary Public  
8  within and for the State of New York, do  
9  hereby certify:  
10       That the witness(es) whose testimony  
11  is hereinbefore set forth was duly sworn by  
12  me, and the foregoing transcript is a true  
13  record of the testimony given by such  
14  witness(es).  
15       I further certify that I am not  
16  related to any of the parties to this action  
17  by blood or marriage, and that I am in no way  
18  interested in the outcome of this matter.  

                 _____  
                 HOLLY DALOIA

---

           I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Robert Amato | Mr. Barket | 212 |

| PLAINTIFF'S | | |
| EXHIBITS | | PAGE |
| 2 | Notice | 212 |