COPY



SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF SUFFOLK

- - - - - - - - - - - - - - - - - - - - - - x

DANIEL WORSHIP,

Plaintiff,

-against-

SUFFOLK COUNTY POLICE DEPARTMENT; THOMAS J. SPOTA; SUFFOLK COUNTY DISTRICT ATTORNEY'S OFFICE; ASSISTANT DISTRICT ATTORNEYS JANE AND JOHN DOES "1"-"5," KEVIN WARD, JOHN SCOTT PRUDENTI, and CHRISTOPHER NICOLINO; DETECTIVES/POLICE OFFICERS TOM ICAPELLI, ROBERT AMATO, RAYMOND FELICE, and JOHN AND JANE DOES "1"-"5," and THE COUNTY OF SUFFOLK,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - x

100 Veterans Memorial Highway
Hauppauge, New York

June 5, 2007
11:43 a.m.

**EXAMINATION BEFORE TRIAL** of **CHRISTOPHER NICOLINO**, one of the Defendants in the above-entitled action, held at the above time and place, pursuant to Notice, taken before Eileen Savino, a shorthand reporter and Notary Public within and for the State of New York.





A P P E A R A N C E S:

LAW OFFICES OF BRUCE A. BARKET, P.C.
Attorneys for Plaintiff
666 Old Country Road
Garden City, New York 11530
BY: BRUCE A. BARKET, ESQ.

SUFFOLK COUNTY DEPARTMENT OF LAW
H. Lee Dennison Building
6th floor
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York 11788
BY: RICHARD T. DUNNE, ESQ.
Assistant County Attorney

ALSO PRESENT:

John Scott Prudenti

Daniel Worship

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties:

That all rights provided by the CPLR, including the right to object to all questions except as to form, or to move to strike any testimony at this deposition, are reserved for trial; and that failure to object to any question, or to move to strike any testimony at this deposition shall not be a bar or waiver of the right to make such objection or motion at the trial of this action.

That this deposition may be sworn to by the witness before any notary public; and the failure to do so, or to return the original transcript to counsel for the party on whose behalf it was taken, shall not be deemed a waiver of the rights provided by CPLR Rule 3116, and shall be so controlled..

That the filing and certification of this examination are waived.

That a copy of this examination shall be furnished without charge to the attorney representing the witness testifying herein.





C H R I S T O P H E R   N I C O L I N O,

the witness herein, having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY
MR. BARKET:

Q. State your name for the record, please.

A. Christopher Nicolino.

Q. State your address for the record, please.

A. Building 77, North County Complex, Veterans Memorial Highway, Hauppauge, New York 11788.

Q. Good afternoon.

A. Good afternoon, Mr. Barket.

Q. Have you ever been deposed before?

A. I have.

Q. In what context?

A. The one that sticks out is a slip and fall on my property, some time in the mid 1990s.

Q. Other than that?

A. I don't recall any other times.

Q. Have you ever been a party to a civil lawsuit?

A. That was a lawsuit.

Q. Other than that?

A. Not that I recall.

Q. You are currently an assistant district attorney in Suffolk County?

A. I am.

Q. Are you a member of the Bar of the State of New York?

A. I am.

Q. When did you become a member?

A. 1988.

Q. Where did you graduate law school?

A. University of Bridgeport, Quinnipiac.

Q. What year did you graduate?

A. 1988.

Q. Where did you go to college?

A. American University.

Q. What did you get your degree in?

A. I had an honors from Poly Sci, SGPA degree with an English minor.





Q. When did you graduate from college?

A. '85.

Q. Did you go from high school to college to law school?

A. Yes, I did. The traditional route.

Q. If we go backwards in your career, you are currently an assistant district attorney. What unit are you assigned to?

A. I am the Deputy Bureau Chief of the Economic Crime Unit.

Q. How long have you had that position?

A. At or near the time Mr. Spota assumed office in 2002.

Q. Prior to that, where did you work?

A. Prior to that, I worked in the County Attorney's Office in Suffolk County.

Q. What position did you have there?

A. Principal assistant county attorney.

Q. Did you supervise the entire office or a portion of it?

A. In my apprenticeship or as a county attorney?

Q. No, as a county attorney.

A. No. Principal is the highest ranking line assistant.

Q. I gathered that.

Was there any particular bureaus or sections that you supervised?

A. I didn't supervise anything. You mean, that I worked for? You're asking where I worked in the County Attorney's Office?

Q. No. No. As the principal deputy county attorney, what were your responsibilities?

A. I was a line assistant to represent the county in civil litigation matters in Federal and State Court and administrative proceedings. I handle legal --

Q. As the highest ranking deputy, what were your responsibilities?

A. I was the highest ranking line assistant. There was a deputy chief above me. I'm sorry. There was not a deputy chief in that bureau. There was a bureau chief.

Q. What bureau did you work in?

A. I worked in both the General





Litigation Bureau and the Torts Bureau.

Q. Did you work with Mr. Dunne at that time?

A. I did not.

Q. Did you know him?

A. I've known Mr. Dunne.

Q. Prior to working at the Suffolk County Attorney's Office, where did you work?

A. The U.S. Attorneys Office for the Eastern District of New York.

Q. How long were you working there?

A. Three years, thereabouts.

Q. Can you tell me the dates that you worked at the DA's office from '02 until the present? When did you work for the County Attorney's Office?

A. Can I do it the other way? It's easier for me to do it the other way.

I started as an attorney in '88 and went to work in the District Attorney's Office. I left there, I think, in '91 and went to work in the U.S. Attorney's Office. I left there in '93, '94, I forget, and went to work in the County Attorney's Office. I

left there in 2002 to go to work for Mr. Spota in the District Attorney's Office. That is my resumé.

Q. In the U.S. Attorney's Office, where did you work?

A. I worked in Garden City in the Long Island Bureau and in Brooklyn in the General Crimes Bureau.

Q. The Long Island Bureau is also general crimes?

A. Well, they didn't call it that. It was the Long Island Bureau. We handled everything. We handled a whole caveat of different crimes. Some of the things that we did were narcotics and guns and things that were outside the realm of general crimes. Counterfeiting. We did counterfeiting as well.

Q. Did you deal with individuals who were cooperating defendants?

A. Yes.

Q. Did you ever move to disqualify an attorney from representing a defendant?

A. I've been involved in cases where





attorneys have been disqualified and shadow counsel has been appointed for cooperating defendants without the knowledge of their defense attorneys.

MR. BARKET: Off the record.

MR. DUNNE: Okay.

(Whereupon, a discussion was held off the record.)

Q. Can you tell us what shadow counsel is?

A. Shadow counsel is a process whereby a defendant in a criminal case who is represented by one attorney has a second attorney appointed to represent him without the knowledge of the first attorney because that attorney has some sort of, and it varies, but some sort of conflict or problem in the honest and fair representation of that criminal defendant necessitating a second attorney to preserve that defendant's rights and enable that defendant to cooperate truthfully.

Q. What would prohibit or prevent the U.S. Attorney's Office from simply

person is because there would be a fear that the attorney would then report back to the other people that he or she had been disqualified, thus, leaving those individuals to conclude that the defendant was cooperating?

A. Yes. It happens with defense attorneys sometimes, believe it or not.

Q. I do believe it.

A. They're all not as honest and forthcoming as you, Mr. Barket.

Q. Well, I don't cooperate people. So there may be a few shadow counsels in my life, and I don't know it.

Did you become aware of a potential conflict between Mr. O'Connell representing Mr. Worship in this case?

A. Yes, I did, and I addressed that with Mr. O'Connell.

Q. In what capacity did you address that? How did you do that?

A. Well, I knew that when Mr. O'Connell brought Mr. Worship in for the proper session that we had some time in -- I





disqualifying the attorney representing the individual in open court?

A. Because then the fact of the cooperation would become known to the other targets, defendants, parties to that criminal action.

Q. So if we can kind of break this down, in the context where shadow counsel is appointed, I take it that your concern was that the attorney representing the potential cooperator had a relationship with some of the other targets?

A. Absolutely. That's one scenario.

Q. What you would hope is that the person would cooperate against these other individuals and obviously couldn't do it with an attorney that knew them or represented the other targeted individuals?

A. Well, shadow counsel only kicks in when the defendant in question indicates a desire to cooperate. You have to get to that point first.

Q. But the reason why you wouldn't simply be able to move to disqualify the

Q. You expressed that to him?

A. I did.

Q. What was his response?

A. He kind of laughed it off. He said, "I don't see it being a problem. I don't think it's going to be a problem." I said, "Well, you know, you're prejudicing your client. He's not going to be able to get any deal that he might otherwise be able to get. It's not fair to him. You really should think twice about this, you know? You do what you want. I can't make you do anything, but you should really think twice about it because it's not fair to the client."

Q. Did this conversation --

A. And I liked Mr. O'Connell. I've known Mr. O'Connell for the better part of 20 years. So I speak very bluntly and frankly to him.

Q. Did the conversation take place in front of Mr. Worship?

A. No. It took place -- it was just he and I out on the front porch, that's the





guess it was some time in the Fall of '02 or whenever it was. I'm not good on the dates, but I made a remark to Pat as an entree into discussing this topic. I said, "What are you doing, carving out a Nick specialty practice in corrupt highway superintendents?" And he kind of laughed at that, and I said, "You know, you've got a problem here. You can't represent her and him at the same time. This is going to end up being a problem for you."

Q. Who's "her"?

A. I'm sorry. "Her" would be Ms. Strebel, whom I was aware that Mr. O'Connell was already representing, and Mr. O'Connell had had a claimed lifelong relationship with her. They had known each other as childhood friends, et cetera.

Q. On the date of the meeting that took place between yourself, Mr. O'Connell, Mr. Worship, Mr. Prudenti, and Detective Amato or Icapelli, you were aware of a potential problem with Mr. O'Connell representing Mr. Worship?

A. Yes.

entrance to my building.

Q. Following that, did you take any steps to have Mr. O'Connell disqualified?

A. There was no reason to at that point, because Mr. Worship had not indicated a willingness to cooperate and it was a waivable conflict at that point, and, in fact, I believe, Judge Weber at some point addressed that to both Ms. Strebel and Mr. Worship prior to beginning our criminal proceedings in County Court.

Q. Short answer is no, you didn't do anything to have him disqualified?

A. Well, there was no reason to up until that -- at that point.

Q. So you didn't do anything?

A. I said no, I said there was no reason to at that point.

Q. You obviously didn't seek to have that shadow counsel appointed?

A. Again, no, because there was no reason to at that point.

Q. Did you become aware of a meeting that took place between Mr. Worship,





Detective Icapelli and Detective Amato at a 7-Eleven in Patchogue?

A. Sometime subsequent to that meeting, I became aware that they had bumped into Mr. Worship at some -- if you're saying it's a 7-Eleven, fine, but at some location somewhere in Patchogue. Yes.

Q. How did you learn of it?

A. I don't recall.

Q. Did you have a discussion with Detective Amato or Detective Icapelli about it?

A. There was an indication, and I'm not sure about what words were used. So I don't want to attribute quotes to them that I'm not sure of, but there was an indication, or at least my impression was that they were indicating to me that Mr. Worship had indicated to them that he may be willing to cooperate.

Q. After you received that information from them, did you take any steps to have Mr. O'Connell disqualified and have another counsel appointed to Mr. Worship?

A. No. Because, again, at that point, there was no reason to do that. Mr. Worship had not been what we call signed up, as you might know from your criminal defense work. You want to bring in the cooperating defendant and actually sign an agreement with him, a cooperation agreement, that details the nature and extent of his cooperation, what benefits he will receive, what benefits the office will receive, et cetera, and he hadn't been signed up yet. So in order to do that and get to the point where we could sign him up, he would have to take a few more steps first.

Q. What steps would he have to take?

A. Well, he would actually have to start showing a willingness to cooperate fully, some acknowledgement of culpability. He would have to try and obtain other representation other than Mr. O'Connell because, as I said, Mr. O'Connell was representing the targets in the grand jury investigation of Ms. Strebel. So he certainly couldn't be in that position to





represent Mr. Worship if he was cooperating, and Ms. Strebel, if she was being prosecuted as a criminal defendant.

Q. What instructions, if any, did you give Detective Amato or Detective Icapelli in this regard?

A. I don't recall.

Q. Did you tell them to stop talking to Mr. Worship?

A. I don't recall what was discussed in that.

I believe you're aware that there was a division of labor in this case because the case developed into multiple targets and multiple jurisdictions throughout the course of the investigation. My focus primarily was Mr. Milvid and then, of course, Ms. Strebel, because that's what flowed out of my part of the investigation. There were other things going on in Patchogue at the time, other investigations. There was Mr. Worship and his conduct in running the Highway Department, but there were also allegations that there was some criminal wrongdoing in

A. Well, no. That's an unfair characterization of my answer. My answer is that's not my role. I would have no reason to tell them yes or no. That's my answer.

Q. When did you become aware that they had met with Mr. Worship?

A. Again, I don't recall when. It was subsequent to that meeting.

Q. Subsequent to?

A. To their chance meeting at what you described as a 7-Eleven.

Q. How long after?

A. I wouldn't even want to guess. I'm not sure. It wasn't the next day. It was some time after that, and I don't know if it was weeks or months.

Q. Was it the year after that?

A. I don't think it was that long, no.

Q. Did you learn at any point in time that Mr. Amato was having phone conversations with Mr. Worship?

A. I learned of that after I learned that they had met Mr. Worship at what you had described as a 7-Eleven when Mr. Tenari came





connection with the rehabilitation of the Patchogue theater, and there were other allegations that the mayor might be involved in that, Mr. Keegan. So he was a potential target of some of these investigations.

And there were other allegations of wrongdoing in and around Patchogue that I tangentially knew about because of my involvement with Mr. Milvid and Ms. Strebel and because of Mr. Worship's involvement with Mr. Milvid. So I knew about some of those things, but I wasn't the day-to-day guy conducting those investigations.

Did you get all that? I know it's kind of convoluted.

Q. Well, my question was, after you learned of the meeting between Detective Icapelli, Detective Amato and Mr. Worship, did you tell Detective Amato and Detective Icapelli to stop talking to Mr. Worship?

A. And I'm indicating to you that that was not my role in the investigation.

Q. So the answer would be no, you didn't tell them that?

in, and I think it was much later after Mr. Worship had been indicted, but I'm not sure. Again, I'm not sure of the dates exactly, but Mr. Tenari came in with some tapes of conversations with the detectives and Mr. Worship that he presented to the district attorney well after all of these events had transpired.

Q. Did you express to Detective Amato or Detective Icapelli your concerns about Mr. O'Connell representing Mr. Worship?

A. Again, I would be guessing. I would say I must have at some point because again, I felt that it was unfair to Mr. Worship to have Mr. O'Connell representing both Ms. Strebel and Mr. Worship. So I assume I said something at some point, but I can't tell you when or what I said.

Q. Did you have discussions with Mr. Prudenti about this?

A. Yes.

Q. When did those discussions take place?





A. Those took place right around the time of our meeting, either before or after that. You know, what does Patrick think he's doing? He should know better. (Witness laughs.)

Q. Did you discuss this problem at all with Mr. Spota?

A. No.

Q. At the time that the tapes were disclosed, did you discuss this with Mr. Spota?

A. I don't know that Mr. Spota and I have ever discussed the tapes or the conversations Mr. Worship had with the detectives.

Q. Did either of the detectives consult you concerning other attorneys who may represent Mr. Worship besides Mr. O'Connell?

A. No, I don't recall that.

Q. Who was assigned to supervise the Daniel Worship aspect of the investigation, if it wasn't you?

A. I don't know if you can say that

there was somebody supervising that. Okay, well, again, it's rather convoluted because of the multiple facets of that investigation. My investigation kind of tailed into what was a government corruption bureau investigation. I do the labor law stuff and prevailing wages and that sort of thing and that's how I became aware of Mr. Milvid. That's what led to Ms. Strebel and that's what subsequently led to Mr. Worship. That bumped into a government corruption investigation, a Government Corruption Bureau investigation that was ongoing regarding Patchogue and its theater and Mr. Worship and some of the things that were going on there with the Highway Department and Mayor Keegan, as I indicated earlier, et cetera.

So who was overseeing the Patchogue investigation? I mean, I had the part of Mr. Worship paying too much for sidewalk and curbing in the Village and allowing Mr. Milvid to overbuild the Village. You know, that was mine because it was a construction and labor thing. I didn't have





the dealer part of it and so, the Government Corruption Bureau.

Q. Who were the investigators reporting to or supposed to report to concerning their contact with Mr. Worship?

A. Well, that --

Q. Let me back up a minute and --

A. Okay, go ahead because I don't know that I can answer that the way you phrased it.

Q. Let me see if I follow some of this.

The District Attorney's office is conducting this investigation into Mr. Milvid and his dealings; is that right?

A. That's correct.

Q. At some point in time, Mr. Worship came on the radar screen, for lack of a better phrase, as a potential target or at least a witness with respect to --

A. Milvid.

Q. -- Mr. Milvid; is that right?

A. Milvid, that's right because --

Q. Then --

A. Let me finish my answer, if I could.

Mr. Worship comes on the radar screen. We know of Mr. Worship's relationship with Mr. Milvid. We already know that. There have been complaints going back a year earlier by members of Mr. Milvid's crew, that they're not getting paid what they should. And as a labor enforcement guy, I'm interested. So we know that Worship's in the mix.

When we do the search warrant at Mr. Milvid's offices, we find Mr. Milvid's rolodex. Mr. Milvid's rolodex, the card with the most information on it is Mr. Worship's, the one with Mr. Worship's name. It's got his cell phone numbers, his mother's number, his home number, his office number. It's got a ton of contact information for Mr. Worship. Ah-hah.

As we're going through some other documents seized from Mr. Milvid, we see the Worship name again. We see that Mr. Worship's son has been employed by





Mr. Milvid. Ah-hah. So now Mr. Worship now is becoming closer to the center of the radar screen. He's moving into my investigation more prominently because of these contacts and connections.

Then we start looking, as I indicated earlier, at some of the work that was done by Milvid in Patchogue. We start seeing the same sort of patterns of over-billing and the invoices being signed off on, not by Ms. Strebel this time but by Mr. Worship, some of the other problems with the work that was being performed that we looked at, et cetera.

So he is working his way into my investigation. He was already -- and this is an assumption. I don't know this to be true, but I assume he was already part of the other Government Corruption Bureau investigation in Patchogue, but he's now worked his way into my investigation.

Does that make it any clearer?

Q. Then there came a point in time when you went to speak to Mr. Worship; is

that right?

A. Well, before that happens, yes. We're looking at this stuff. I told you. We see the rolodex. We see the son. We start looking at some of the numbers that are on the rolodex, and we find --

Q. Simple question. Did there come a point in time when you went to speak with him; yes, there came a point in time when you went to speak with him; no, there came a point in time that I never went to speak with him?

A. I have to put it in context.

Q. I don't want the context. I just want an answer to that particular question.

A. I can't answer it the way you posed it.

Q. Did there --

A. If you want, I will be happy to explain the context.

Q. Did there come a point in time where you made a decision to try and speak with Mr. Worship as part of your investigation? Yes or no?





A. I can't answer it as a yes or no question.

Q. Did there come a point in time where you asked detectives working in the District Attorney's Office to contact Mr. Worship?

A. No.

Q. How was Mr. Worship contacted to come in to this meeting that took place with Mr. O'Connell and Mr. Prudenti?

A. I don't know. You'd have to ask Mr. Worship.

Q. Well, I'm asking -- your office requested the meeting; is that right?

A. Of Mr. O'Connell.

Q. And Mr. Worship?

A. Of Mr. O'Connell.

Q. I'm sorry?

A. Well, our contact was with Mr. O'Connell.

Q. Right.

A. That's what I'm indicating here. I don't know how --

Q. How did your office --

A. I don't know how Mr. Worship was contacted.

Q. How learn your office learn of Mr. O'Connell's representation of Mr. Worship?

A. I'm not sure. I don't recall. I think at some point Mr. O'Connell advised myself of that, maybe Mr. Heilig, maybe Mr. Prudenti. I'm not sure. I don't recall exactly.

Q. Did you arrange the meeting with Mr. O'Connell and Mr. Worship or did somebody else in your office do it?

A. I believe the details of the meeting were arranged by Mr. Prudenti.

Q. Did you want Mr. Worship to be a cooperating defendant to individuals that you were investigating?

A. I always welcome the help of cooperating defendants to give me an inside picture of criminal conspiracies.

Q. At the meeting, do you recall what was said?

A. I can't recall verbatim the words





that were discussed, but it became very clear -- my recollection is that it became very clear very early that Mr. O'Connell's purpose in attending the meeting was not to try and work out a cooperation agreement with Mr. Worship, but rather was to try and feel us out to see what kind of case and how strong a case we had regarding Mr. Worship and that he was probing along those lines and had no inclination or intention to offer Mr. Worship as a cooperator, and that's what prompted my comment to him outside the office, that it wasn't very fair to Mr. Worship to treat him that way, given the conflict that Mr. O'Connell had.

Q. You know, they say that lawyers make the worst witnesses.

A. I'm sorry. I didn't mean to disappoint you.

Q. You haven't disappointed me. If Mr. Dunne wants to ask you questions and put stuff in context and do things, he's free to do that.

A. No, I understand that.

Q. You understand that you need to answer the questions that I ask.

A. I'm trying to answer them as completely as I can.

Q. You understand that you need to answer just the questions I ask, not to try to put your answers into context.

A. Well, I want to give you a full and complete answer whenever I can.

MR. DUNNE: Mr. Barket, he's been instructed to answer the questions that are asked, but if it's going to create a misapprehension or sometimes, you know, that you can't answer a question yes or no. That's the purpose of cross-examination.

Q. What was said? I don't want to know what your impressions were, not what you thought Mr. O'Connell was trying to do. What was said at the meeting between Mr. O'Connell, Mr. Worship, yourself, and Mr. Prudenti?

A. Again, I don't have a verbatim





recollection of everything that was said.

Q. In sum and substance, what was said?

A. Again, I don't have a verbatim sum and substance recollection. I can remember Mr. Prudenti saying at one point to Mr. O'Connell, "That's not the way it works. We don't show you all our cards." I remember that part playing reference, taking place at some point during the meeting.

I recall, in sum and substance, I don't know if these were the precise words used, Mr. Prudenti telling Mr. O'Connell, "Listen. You have to come forward, and there has to be some recognition that something wrong has been done, and we will try and work with you and try and see what we can do to help your client." And I remember Mr. O'Connell saying, you know, trying to probe, and I don't remember what words he used, but trying to probe to find out exactly what kind of case we had, what kind of evidence we had, what kind of charges we were considering bringing against Mr. Worship and

that was the focus of his comments, and he never touched upon or made any comments regarding actually having Mr. Worship cooperate with the prosecution of this matter.

Q. Did Mr. O'Connell indicate during the course of that meeting whether or not his client, Mr. Worship, was interested in cooperating with the District Attorney's Office?

A. Well, that's why I started my answer off earlier two questions ago. Yes. The premise that Mr. O'Connell --

Q. Did he indicate, verbally indicate, that his client, Mr. Worship, was interested in cooperating or not?

A. Yes. The premise that Mr. O'Connell came to the meeting and the words spoken initially were, "yes, I want my client to try and cooperate here," but the actions and the subsequent language that he used revealed that that was not his intention.

Q. At the point in time when he left,





did he make an unequivocal statement that his client was not going to cooperate?

A. Great question. You know, I have a vague recollection of there being some sort of, and I don't want to say -- and I don't even want to use the word, adamant, but the meeting ended rather abruptly when it became clear what his intentions were. He got up. I don't know that he foreclosed the possibility of cooperation, but at least in my mind, and I have no way of knowing what anyone else in the room was thinking, but at least in my mind, it was clear that that wasn't his purpose. He wanted to probe. He didn't want to cooperate.

Q. Did you keep --

A. Then we went outside, and I made those comments to him.

Q. Did you keep any notes of the meeting?

A. No, I did not.

Q. In dealing --

A. Just to back up to my last question. I was surprised. I hold

Mr. O'Connell in high esteem, and his conduct that day kind of surprised me. That's why I made those comments.

Q. In dealing with potential cooperating defendants, is it relatively common that one of the problematic issues that arises is a conflict with their current attorney? Their current attorney may have a conflict of interest, in that they have relationships with some of the targets in the investigation. Is that a common occurrence?

MR. DUNNE: I'll object to the form as to I don't know what common means, but answer that from your experience in the best way that you can.

THE WITNESS: Okay.

A. It has been my experience that that happens and, you know, I couldn't give you a percentage. I'm reluctant to say often, but that does happen in the context of criminal investigations of criminal conspiracies, yes.

Q. The decision by the individual whether or not to cooperate, in your





experience, is often a product of their attorney's client relationship; is that right?

A. Well, if you're suggesting that sometimes criminal defendants' judgements are clouded by their counsel regarding the question of cooperation, I agree with you, yes.

Q. The decision by the individual of whether or not to cooperate, like the decision whether or not to plead guilty, whether or not to testify, is one that is ultimately the client's; is that true?

A. That is true, and it should be based on full and complete information and a full and open discourse with their attorney. Something that I believe does not always happen with criminal defense attorneys and their clients.

Q. The attorney who is laboring under a conflict, and the precise conflict that I'm talking about is where they're representing a potential witness and representing the target of the witness, that witness doesn't have the

benefit of an attorney who is able to advise them --

A. Mutually? Objectively?

Q. Okay, mutually and objectively about the benefits and pitfalls of cooperation?

A. In general terms, I believe that that happens more often than I'd like it to happen.

Q. In those contexts, as an Officer of the Court, you are obligated to bring that conflict to a Court and move to have that person disqualified, right?

A. Well, now you're getting into questions of timing. Yes, when it becomes clear that the potential criminal defendant wants to cooperate.

Q. How does a defendant ever get to that point if they are represented by somebody who is not giving them any advice about that relation?

A. Another great question, Mr. Barket. It happens in many, many different ways. The most common way is that the criminal





defendant wishing to cooperate who's being told not to cooperate by his conflicted lawyer will reach out to one of the detectives or agents in the federal system or somebody else who is a front line law enforcement person.

Typically, it doesn't happen, although it has, that they reach out to a prosecutor. That's happened to me. I've had criminal defendants reach out to me directly, but typically, it happens where they reach out to the cop or the agent that they've had the most interaction with, that they know, whose name they know, whose card they might have been given at the time of arrest, or the first time that they were questioned, et cetera. Typically, that's the route, but it happens a lot of different ways.

Sometimes they'll use intermediaries. Sometimes they'll use somebody else that they know who might happen to be a police officer or an agent or a detective and say, "Would you contact Detective Jones and let him know I really

want to cooperate, but I can't do it with my attorney because my attorney's telling me not to cooperate, and it's a problem for me." It can happen a lot of different ways.

Q. Have you seen instances where an attorney enters a case and right away with that attorney, there's an application to have the attorney disqualified for this precise conflict, that they're trying to represent somebody that could be a cooperator against some other people in the case?

A. At that point in a criminal proceeding, I've not seen that happen, no. You need to develop a record a little further before you can make that application because although there might be an appearance of a conflict, et cetera, you don't have -- the conflict doesn't come to fruition until that criminal defendant says, "Yes, I do want to cooperate with the government. I do want to cooperate with the District Attorney's Office. I do want to take some affirmative step to redeem myself and cooperate and help law enforcement and make amends for the





criminal conduct that has happened."

Q. Did you bring any notes with you today?

A. No.

Q. Were you told to?

A. No.

Q. Were you given a copy of the Notice of Deposition that was served on your attorney?

A. No.

Q. I take it that you kept notes of your investigation?

A. I don't know what you mean by notes of my investigation. Do I have my trial notes? I have a trial notebook. I have a grand jury notebook from the grand jury presentation.

Q. When you were interviewing witnesses and supervising the investigation, do you keep any record of what you do?

A. No. Do you mean like some sort of formal notebook or log on a computer? No.

MR. BARKET: Just give me a minute to speak with Mr. Worship.

MR. DUNNE: Okay.

(Whereupon a short recess was taken at this time.)

Q. Your position in the Fall of '02 and the Spring of '03 was Deputy Bureau Chief for the Economic Crime Bureau?

A. I don't know when I actually got the title. I was functioning in that role. I believe I had that title at that time. I believe I got the title some time in the Spring, Summer of '02, right after Mr. Spota came in, but initially, the first line that was open for me in Mr. Spota's administration was another principal one. So I was functioning as a deputy but working on a principal's line, and then the line became available, and I'm not sure how those things happen.

Q. Was Mr. Prudenti working underneath you?

A. Again, I don't know. I would not characterize it as such. That would be an unfair characterization, underneath. Technically, at some point, I outranked him





because I was a deputy, and he was a principal, but we've known each other for a long time, and I consider him a colleague and not a subordinate.

Q. I'm sure you're very close to him.

At some point, did you outrank him? Did that some point include the Fall of '02 and the Spring of '03?

A. As I said, I believe at that point, I had been promoted to a titled deputy position. So at that point, I was a deputy, and he was principal.

Q. When Mr. Worship's indictment was unsealed and the arrests were made, was there any discussion in your office as to whether or not the press should be contacted?

A. Not that I'm aware of, but just to answer that question completely, the press, in large part, was aware, unfortunately, of this investigation even in the grand jury stage. I don't know if you recall, or if Mr. Worship recalls, but Ms. Strebel had requested, even though she did not have an absolute right to, had requested to testify

before the grand jury, even though she wasn't under arrest --

Q. This is a bit of a long one.

A. Let me just finish. Yes, I know it's involving -- but she requested, and we granted that request, and the next day that she was scheduled to testify, it was on the front page of Newsday.

Now, I know I certainly didn't call up Newsday and give them any of those details, and I am pretty darn certain that nobody in my office did. I assume that it was Ms. Strebel and/or Mr. O'Connell, and I actually confirmed that later on with Mr. O'Connell.

Q. After Mr. Worship's indictment was handed up, was there any discussion whether or not to release that fact to the press in your office?

A. What? The fact that Mr. Worship was indicted?

Q. Right.

A. Indictments are, once they're handed up, are public records.





Q. Right. They can be handed up and filed, or they can be handed up, filed and then a press release is issued.

A. I don't know whether or not there was a press release when that indictment was handed up. I don't recall. I certainly didn't draft one.

Q. Were you involved in any discussions concerning that?

A. Not that I recall, no.

Q. Who handled the press for Mr. Spota at that point, do you know?

A. I believe Mr. Clifford, Robert Clifford, the guy that is still his press officer.

MR. BARKET: Subject to notes and records and files, that's all I have.

THE WITNESS: There was one question that I didn't get to complete my answer. I don't know if you'd allow me to complete my answer; is that all right?

MR. DUNNE: I'll ask him. I

have a few questions.

MR. BARKET: Go ahead.

MR. DUNNE: Just make reference to the question and then complete your answer.

THE WITNESS: Mr. Barket at one point was asking me how Mr. Worship came to our attention and became part of my investigation.

MR. BARKET: I actually just asked you if he did, but go ahead. Explain how.

THE WITNESS: You know, I don't want to leave you with the impression that we go around willy-nilly, arresting and indicting people. One of the other factors besides --

MR. BARKET: It was a foundational question. Did he appear on the radar? When did that occur? I didn't care how.

THE WITNESS: It was very





significant and that's why I wanted to add it.

Besides the kid working, and the rolodex, and the other contacts, and things that we had, and information we had regarding a relationship between Mr. Worship and Mr. Milvid, when we went through the telephone numbers off the rolodex, one of those numbers came back to, that was for Mr. Worship, came back to an asphalt company, L.L.L. or L.L. Industries or something like that and, you know, that's part of the investigation, as you know. We go out, and we subpoena all those records and his phone records, and the other stuff is coming back to Mr. Worship and I think his mom or his sister or something like that, all these other numbers on the rolodex, but one is coming back to this asphalt

company. And further investigation revealed that that asphalt company had done extensive work in and around the Village of Patchogue or the Highway Department. So, again, you know, that certainly moves him closer into the middle of the radar screen now and further into, shall we say, pursuit.

MR. BARKET: I appreciate that, and I'm glad you added it because it made me think of a few questions.

FURTHER EXAMINATION BY

MR. BARKET:

Q. When you started in the District Attorney's Office, did you know that you were going to be starting an Economic Crime Bureau?

A. No.

Q. Did you have discussions with Mr. Spota prior to him taking office that you would be joining the office?

A. Yes.





Q. Did you have discussions about where you would be working?

A. Not specifically, no.

Q. Once you began in the Economic Crime Bureau, did you have any discussions with Mr. Spota about investigators being appointed to assist in your investigations?

A. You mean, did I get to like draft my own investigators? I'm not -- I don't understand the question.

Q. No. Did you have any discussions with him about, "Well, I'm in this bureau. We need detectives or investigators or police officers to work with us?"

A. There were. There were under Mr. Catterson's regime. There were under Mr. Henry's. There were investigators assigned to that bureau. It's an investigative bureau.

Q. Well, do you know when Detective Amato started in that position?

A. Detective Amato was detailed to the Government Corruption Bureau, not the Economic Crime Bureau.

Q. How about Detective Icapelli?

A. He was detailed to the Government Corruption Bureau, not the Economic Crime Bureau.

Q. Did you have any role in their assisting in this investigation? Did you get to select them in any way?

A. No.

Q. They were assigned there by somebody else?

A. They were assigned this investigation by somebody else; is that your question?

Q. Right.

A. Yes.

Q. Who?

A. I don't know.

Q. Do you know what training, if any, they were given?

A. They have extensive training with law enforcement. Detective Amato, I believe, was homicide detective. I think he worked in other positions also. I think he worked as an insurance investigator too for the





Department of Insurance at some point, I believe. I have a vague recollection of that.

There's extensive, extensive investigative training and experience, et cetera. There's also a detectives' procedures manual that I think the PD has. I think it's available to detective investigators working in the Suffolk County District Attorney's Office, but there's extensive training that all of these detective investigators bring with them to the DA's office or else they don't get hired.

Q. How do you know that?

A. Because, I believe, the civil service spec calls for a certain number of years of investigative experience. You can't just graduate high school and go work as a detective investigator for the DA's office. It doesn't happen that way. And, of course, you need your certification from the police conference as a police officer.

Q. So the detective investigator positions with the District Attorney's Office

are not at-will positions? They are civil service positions?

A. I believe so. I believe there is a civil service test and a civil service spec and certain requirements that they have to meet before they can be hired into those positions. I believe there's a whole salary structure set by civil service in the County. I'm not an expert in civil service, but I believe that's the case.

MR. BARKET: That's all I have.

EXAMINATION BY
MR. DUNNE:

Q. I just want to clarify one point for the record.

Would you indicate, did you ever go to the impaneling grand jury judge for the special grand jury with regard to Mr. Worship?

A. No. With regard to Mr. Worship, I did not speak to Justice Henry. With regard to other issues, I did.

Q. Why did you not speak to Judge





Henry regarding Mr. Worship?

A. Because his potential cooperation had not matured to the point where that would be necessary, where we would either have to seek recusal of Mr. O'Connell or an appointment of shadow counsel for Mr. Worship or any of those other measures because we weren't there yet.

Q. Is that a condition precedent to your going to see Judge Henry?

(Continued on next page to accommodate jurat.)

A. Of course, as I explained to Mr. Barket.

MR. DUNNE: I don't have anything further.

Thank you.

MR. BARKET: Thank you.

-o0o-

(Whereupon, the examination of Christopher Nicolino was concluded at 12:33 p.m.)

______________________________

CHRISTOPHER NICOLINO

Subscribed and sworn to
before me this _______ day
of ________________, 2007.

______________________________

NOTARY PUBLIC





I N D E X


| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Christopher Nicolino | | |
| | Mr. Barket | 4 |
| | Mr. Dunne | 51 |

# C E R T I F I C A T E

I, EILEEN SAVINO, a Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

Eileen Savino

EILEEN SAVINO