UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

DANIEL WIRSHUP,

                                    Plaintiff,

        - against -

SUFFOLK COUNTY POLICE DEPARTMENT,
THOMAS J. SPOTA, SUFFOLK COUNTY
DISTRICT ATTORNEY'S OFFICE, ASSISTANT
DISTRICT ATTORNEY'S JANE and JOHN DOES
"1" - "5", KEVIN WARD, JOHN SCOTT
PRUDENTI and CHRISTOPHER NICCOLINO,
DETECTIVES/POLICE OFFICERS, TOM ICAPELLI,
ROBERT AMATO, RAYMOND FELICE and JOHN
and JANE DOES "1" - "5" and
THE COUNTY OF SUFFOLK,

                                    Defendants.
------------------------------------X

                        EXAMINATION BEFORE TRIAL of DANIEL WIRSHUP,
                the Plaintiff herein, taken by the Defendants,
                pursuant to Court Order, held at the above-mentioned
                time and place, before Bethane Mennoma, a Notary
                Public of the State of New York.

                        H. Lee Dennison Building
                        Hauppauge, New York

                        December 18, 2006
                        10:00 a.m.

---

A P P E A R A N C E S :

LAW OFFICES OF BRUCE A. BARKET, P.C.
        Attorney for Plaintiff
        666 Old Country Road - Suite 600
        Garden City, New York 11530
BY:   BRUCE BARKET, ESQ.

CHRISTINE MALAFI, Suffolk County Attorney
        Attorney for Defendants
        H. Lee Dennison Building
        100 Veterans Memorial Highway
        Hauppauge, New York 11788
BY:   RICHARD DUNNE ESQ.

ALSO PRESENT:

        Thomas Icapelli
        Raymond Felice
        Robert Amato

                - oOo -

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and

between the attorneys for the respective parties

hereto, that objections to the form of any question

are reserved for the time of trial.

IT IS FURTHER STIPULATED AND AGREED that

this deposition may be sworn to by any Notary Public,

with the same force and effect as if signed before a

clerk or Judge of the Court.

IT IS FURTHER STIPULATED AND AGREED that the

filing and certification of the original of this

deposition are waived.

---

D A N I E L   W I R S H U P,

        having been first duly sworn by a Notary Public

of the State of New York, was examined and testified

as follows:

EXAMINATION BY

MR. DUNNE:

Q     Please state your name for the record.

A     Daniel Wirshup.

Q     What is your present address?

A     353 Barton Avenue, Patchogue, New York

11727.

Q     Good morning, Mr. Wirshup. My name is

Richard Dunne. I'm here on behalf of the individuals

that you have named in the lawsuit that actually

brings us here today. As I'm sure your counsel has

indicated to you, as part of the process of moving

this lawsuit along, each of the parties are afforded

an opportunity to conduct an examination under oath.

Before I go and start talking about this incident. As

let me go through a couple of preliminary things. So,

you can see, we have a reporter here. So, your

answers have to be verbal; okay?

A     Yes.

Q     If at any point in time I ask you a

D. Wirshup

1
2      question that you don't understand, that's fine. You
3      tell me, and I'll rework the question. The reason
4      that I tell folks that in the beginning is, if you do
5      answer a question, it's going to be assumed that you
6      understood the question. Like I said, there are no
7      tricks here. If you don't understand, you let me
8      know, and I'll rephrase it and rework it; okay?
9      A     Yes.
10     Q     At any point in time, if you want to
11     call a time out and speak to Mr. Barket, let me know,
12     and we'll excuse ourselves, and you can do whatever
13     you need to do with your attorney.
14          I also usually indicate to the folks
15     when they come in, this is essentially your
16     opportunity to tell me what happened here. What I
17     normally do, and I'll remind you again at the end, if
18     you want to make a statement or add something to the
19     record, you can do that. If there is something you
20     think that is important that I have missed or didn't
21     question you about, that you think is important to
22     your claim, I'll give you an opportunity to add that
23     later, if you want. You don't have to. That's up to
24     you.
25          MR. BARKET: We appreciate that. I

D. Wirshup

1      directed him just to answer your questions.
2      Q     In the last 24 hours, have you taken any
3      drugs or alcohol?
4      A     I'm on medication for pain.
5      Q     What medication would that be?
6      A     It's called Norco. It's like a Vicodin.
7      And soma.
8      Q     I'm assuming that's a prescription
9      medication?
10     A     Yes.
11     Q     When you say pain, what pain are you
12     talking about?
13     A     I have chronic pain in my neck and
14     shoulder area from the accident.
15     Q     From a motor vehicle accident --
16     A     Yes.
17     Q     -- or on the job accident?
18     A     Yes. Correct.
19     Q     The pain that you are referring to, does
20     it have anything to do with this case?
21     A     Not at this moment, no.
22     Q     Other than the two medications that you
23     listed to me, is there any other medications that you
24     are on now?

D. Wirshup

2    A    No.
3    Q    Are you under the care of any doctor?
4    A    Yes.
5    Q    It would be in relation to that pain?
6    A    Yes.
7    Q    Are you under the care of any mental
8    health providers; meaning, psychologist or
9    psychiatrist?
10   A    No.
11   Q    Other than the case that brings us here,
12   was there any other point in your life where you were
13   arrested?
14   A    Yes.
15   Q    What would that be?
16   A    I had a DWI in 1982, I believe. I'm not
17   positive of the date.
18   Q    Did that result in some sort of
19   disposition?
20   A    Yes.
21   Q    In other words, you probably plead to a
22   violation?
23   A    Actually, it was my second DWI. I had
24   one in '77.
25   Q    You can approximate. Don't worry about

---

D. Wirshup

1    it. It's a long time ago. Other than those two
2    DWI's and this incident, is there any other time you
3    were arrested?
5    A    Yes.
6    Q    For what?
7    A    There was a disorderly conduct, back in
8    1975, thereabouts.
9    Q    Anything else?
10   A    No.
11   Q    The medication that you are on, that's
12   not going to effect your ability to answer questions
13   today?
14   A    I'm sorry.
15   Q    I thought you said something?
16   MR. BARKST: No.
17   A    I think I'll be fine.
18   Q    In other words, your taking that
19   medicine is not going to interfere with your ability
20   to discuss the incident that's in issue here?
21   A    I'll be fine, yes.
22   Q    Prior to coming in today, did you review
23   anything, prior to coming in to testify today?
24   A    Yes.
25   Q    What did you review?

1  Q    As a result of meeting with your
2  attorney and telling him the facts of the case, did
3  he prepare that document on your behalf?
4  A    If you want to give me time.
5  Q    If you need to, no problem. If you want
6  to be sure, no problem, if you want to review it?
7  MR. BARKET: The short answer is, you
8  don't know what I did.
9  MR. DUNNE: If that's the short answer,
10 take ten minutes. I'll ask you to read that,
11 and then I'll ask you if it's accurate. Take a
12 break.
13 Q    I'm going to ask you if the information
14 in there is true and accurate. This is your chance
15 to tell me what happened. If there is something
16 there that is not correct, this is the time for us to
17 raise that. What I'm going to ask you to do, for the
18 factual portion, because I realize there's a lot of
19 legal stuff in there. When you guys are ready, come
20 and give me a shout.
21 A    (Reading.)
22 (Whereupon, at this time, a break was
23 taken.)
24 Q    Mr. Wirshup, did you have an opportunity

1  A    I reviewed the transcripts of the tapes.
2  Q    Anything else?
3  A    No.
4  MR. DUNNE: Even though this doesn't
5  seem to make sense, I'm going to ask that you
6  mark it as Exhibit L.
7  (The above-mentioned document was marked
8  as Defendant's Exhibit L for identification.)
9  Q    Mr. Wirshup, I ask you to take a look at
10 what I have marked for Defendant's Exhibit L for
11 purposes of our examination today, and ask if you
12 recognize that document?
13 A    (Looking.) I'm not sure. There were
14 documents that I have seen with regard to what -- I
15 can't, right off the bat, tell you if this is a
16 document that I have seen.
17 Q    Let me see if we can do it this way.
18 Did there come a time where you retained Mr. Barket,
19 for purposes of bringing this cause of action?
20 A    Yes.
21 Q    Did there come a point in time when you
22 sat and gave him information regarding what your
23 claim was going to be?
24 A    Yes.

D. Wirshup

1 to review, at least, the factual portion of your

2 complaint?

3

4      A    Yes.

5      Q    As I indicated, I had you do that.  As

6 we sit here today, is the information in there true

7 and accurate?

8      A    I believe so.

9      Q    Do we need to change anything?  That

10 comprises the reason we're sitting here today?

11 That's the basis of your claim?

12      A    To my knowledge, correct.

13      Q    Not to your knowledge.

14           MR. BARKET:  To his knowledge.

15           MR. DUNNE:  To his knowledge is not an

16 answer.

17           MR. BARKET:  You can ask him questions.

18 He answered the question.  If it was not

19 responsive to you --

20      Q    Did you just review the factual portion

21 of that complaint?

22      A    Yes.

23      Q    Is the factual portion of that

24 complaint, based on what you just read, is it true

25 and accurate?

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

D. Wirshup

1

2      A    I believe it to be accurate, yes.

3      Q    You believe it.  Then we'll take time

4 out to go through it again.  It's accurate or not.

5 It's your factual allegations here.

6           MR. BARKET:  He's answered the question.

7 You can ask him another question.  He has read

8 it once.

9      Q    Open it up to the factual portion.

10 We'll go through every freaking paragraph, if we have

11 to.

12           MR. BARKET:  Go ahead.

13      Q    Beginning on page six of your complaint,

14 paragraph nine, is there anything in that paragraph

15 that is not accurate?

16           MR. BARKET:  That you know of.

17           MR. DUNNE:  Don't interrupt him and

18 interject into my questions.

19      Q    Is there anything in that paragraph that

20 is not accurate?

21           MR. BARKET:  It's obviously based on his

22 knowledge.  He can't be answering questions

23 about which he doesn't have personal knowledge.

24           MR. DUNNE:  That's understandable.  It

25 says about factual allegations.

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

1          MR. BARKER: It wasn't drafted and
2     signed by him; it was by me, based on my
3     investigation and his input into it is
4     privileged.
5
6          MR. DUNNE: No, it's not.
7     Q    Is there anything that is not true in
8     paragraph nine?
9     A    Paragraph nine states, "Launched a year
10    long corruption problem." That's what you want me to
11    read?
12    Q    Yes.
13    A    Do I know that's one hundred percent
14    true; it's a year long? I don't know that.
15    Q    Aside from that, that's a fair point.
16    Perhaps you wouldn't be in a position to know that.
17    Q    What about paragraph 10?
18    A    (Reading.) I believe that to be true.
19    I believe the basis of the investigation, yes.
20    Q    Again, only from what your knowledge is.
21    You went through the trial. The other, we'll talk
22    about. What about 11?
23    A    (Reading.) Yes. True.
24    Q    What about 12?
25    A    (Reading.) I believe that to be true.

1     Q    What about 13?
2     A    (Reading.) Yes. True.
3     Q    What about 14?
4     A    (Reading.) Yes.
5     Q    How about 15?
6     A    (Reading.) Yeah, I believe that to be
7     true.
8     Q    How about 16?
9     A    (Reading.) Yes.
10    Q    How about 17?
11    A    (Reading.) I believe that to be true,
12    yes.
13    Q    Fair enough. How about 18?
14    A    (Reading.) I believe that to be true.
15    Q    What about 19?
16    A    (Reading.) Yes.
17    Q    How about 20?
18    A    (Reading.) I believe that to be true,
19    yes.
20    Q    And 21?
21    A    (Reading.) Yes.
22    Q    And 22?
23    A    (Reading.) Yes.
24    Q    Twenty-three?
25    A    (Reading.) Yes.

D. Wirshup

2   A   (Reading.) Yes.

3   Q   How about 24?

4   A   (Reading.) I believe that is true.

5   Q   And 25?

6       (Reading.) Yes, I believe that to be

7   true.

8   Q   And 26?

9   A   (Reading.) Yes, I believe that is true.

10  Q   How about 27?

11  A   (Reading.) Yes.

12  Q   Twenty-eight, next paragraph?

13  A   (Reading.) Yes.

14  Q   You read 28?

15  A   Yes.

16  Q   How about 29?

17  A   (Reading.) Yes.

18  Q   And 30?

19  A   (Reading.) Yes.

20  Q   And 31?

21  A   (Reading.) Yes.

22  Q   And 32?

23  A   (Reading.) True.

24  Q   Thirty-three?

25  A   (Reading.) Yes.

---

D. Wirshup

2   Q   And 34?

3   A   (Reading.) Yes.

4   Q   And 35?

5   A   (Reading.) I believe it to be true.

6   Q   Based on what?

7   A   Well, I'm not sure. It's got dates

8   here. I didn't prepare the document. The dates when

9   he moved, the order to show cause, I'm not positive.

10  Q   Fair enough. Other than that?

11  A   I guess that's why we're here.

12  Q   That's fine. 36?

13  A   (Reading.) Again, I believe that the

14  attorney prepared the document.

15  Q   Thirty-seven?

16  A   I believe that to be correct.

17  Q   Thirty-eight?

18  A   (Reading.) I believe is correct, yes.

19  Q   And 39?

20  A   Again, I believe that to be correct.

21      MR. BARKET:  Can I see the caption,

22  please?

23      MR. DUNNE:  (Handing.)

24  Q   Mr. Wirshup, are you known by any other

25  name, other than Daniel Wirshup?

D. Wirshup

1     A    No.
2     Q    What is your Social Security number and
3 date of birth?
4     A    Social Security number is 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.
5 Date of birth is 9/3/58.
6     Q    The address that you just gave us today,
7 how long have you lived there; can you approximate?
8     A    1979.
9     Q    Do you own that?
10     A    Yes. Well, the bank does.
11     Q    Understood. Who lives there with you?
12     A    My wife and my daughter.
13     Q    Do you have any children?
14     A    Yeah. Two. My son and daughter.
15     Q    Is your son also living at home with
16 you?
17     A    No. He's in Brooklyn. Now my daughter
18 is in college.
19     Q    What do you do for a living, these days?
20     A    I'm on Worker's Compensation.
21     Q    How did that come about?
22     A    I was hit by a car, while we were paving
23 a road in the Village of Patchogue. I was hit by a
24 drunk driver. I had a second surgery on my neck,

D. Wirshup

1 discectomy, C-6 and C-7. I also had rotator cuff
2 surgery on my right shoulder.
3     Q    When did that happen?
4     A    In August of '01.
5     Q    At that time, you were employed as the
6 Highway Superintendent for the Village of Patchogue?
7     A    Correct.
8     Q    You haven't worked since that accident?
9     A    No, I went back to work.
10     Q    Your current status is, you're on
11 Workman's Comp?
12     A    That's correct.
13     Q    From an injury related to what you told
14 me about?
15     A    That's correct.
16     Q    What was your last position, prior to
17 going on Worker's Comp?
18     A    Superintendent of Public Works.
19     Q    When was the last time you actively
20 worked -- is Public Works better? Am I not using the
21 correct term?
22     A    It's Superintendent of Public Works.
23     Q    When was the last time you were actively
24 working in that capacity, prior to your accident?

D. Wirshup

1
2  A    I believe it was July of 2003.
3  Q    Again, you can approximate.
4  A    Right.
5  Q    I'm trying to get a ball park figure.
6  You haven't done any other work, since the accident?
7  A    Correct.
8  Q    You're not supplementing your income by
9  any other means?
10  A    Correct.
11  Q    Fair enough.  Other than the action that
12  brings us here today, have you ever brought any other
13  personal injury actions, yourself; in other words,
14  you were the Plaintiff?
15  A    Against the drunk driver I was, yes.
16  Q    That would be one other time?
17  A    Um.  I'm trying to think here.  There
18  might have been another auto accident.  I'm trying to
19  remember.  No, I think -- I'm pretty sure that was
20  it.
21  Q    Has anyone ever sued you?
22  A    Yeah.  I think in -- when I had got that
23  DWI in '75 or '76, a passenger in my vehicle sued.
24  Q    To the best of your recollection, that
25  thing resolved itself?

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

---

D. Wirshup

1
2  A    Yes.
3  Q    Has anyone ever asked you to be a
4  witness in their lawsuit?
5  A    I'm trying to think.  I know I did a lot
6  with the village.  There were a lot of cases always
7  pending, trip and fall.  I'm not positive.
8  Q    Let me ask it this way.  Aside from any
9  time that you may have been called to testify in your
10  professional capacity; in a private capacity, either
11  friends or family, has anyone ever asked you to be a
12  party to a lawsuit?
13  A    Not that I recall.
14  Q    There were times in your official
15  capacity you would be asked to come and testify in
16  somebody else's case because of your position?
17  A    Yes.
18  Q    Now, I have been using the term Highway
19  Superintendent.  That's not correct?
20  A    The correct term is the Superintendent
21  of Public Works.
22  Q    Public Works, okay.  Is that an elected
23  position or appointed position?
24  A    It's appointed.  With civil service, you
25  have to pass a test to take it.

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

1    Q   When did you become the Public Works

2    supervisor?

3    A   July of, I think it was, '96.

4    Q   What had you been doing, prior to July

5    of '96?

6

7    A   I was heavy equipment operator and a

8    foreman in heavy construction.

9    Q   Were these private companies?

10   A   Private.

11   Q   Who made the decision to appoint you as

12   the Supervisor of Public Works?

13   A   The mayor and the Village Board.

14   Q   Who was the mayor, at the time?

15   A   Steven Keegan.

16   Q   Prior to July of 1996, when you assumed

17   your official responsibilities, did you know Steven

18   Keegan?

19   A   Yes.

20   Q   How did you know him?

21   A   We had become acquaintances during

22   school board, school district issues that would be

23   done in the village.

24   Q   Of Patchogue?

25   A   In Patchogue; right.

1    Q   Did you do any work on his campaign?

2    A   I believe so.

3

4    Q   Do you know when he was first elected?

5    A   I believe it was March.  I think the

6    elections were in '96.

7    Q   Now, did there come a point in time,

8    once you assumed your responsibility in July of 1996,

9    that you came in contact with a Debut Contracting

10   Company?

11   A   Yes.

12   Q   And do you know who owns that company or

13   who operated it?

14   A   Yes.

15   Q   Who was that?

16   A   Stephen Milvid.

17   Q   Did you know of Debut Contracting or

18   Stephen Milvid, prior to July of 1996?

19   A   No.

20   Q   You can approximate for me when you

21   first came into contact with that individual;

22   meaning, Stephen Milvid and that company?

23   A   It was probably sometime that year; '96.

24   Q   How did it come about that you came into

25   contact with Debut Contracting?

1  
2      A    We can -- as a village, you can purchase  
3  off the county contracts, Suffolk County contracts.  
4  He was a vendor listed for concrete.  
5      Q    Just so I'm clear. In other words,  
6  Debut Contracting was a vendor that had a contract  
7  with the County of Suffolk?  
8      A    Yes.  
9      Q    And in the Village of Patchogue, you  
10  can, if you want, hire off of that county list?  
11      A    Right.  
12      Q    Were there any other persons that would  
13  have met the qualifications to do the work that you  
14  were hiring Debut Contracting for?  
15      A    If I remember correctly, there were two  
16  other vendors on the list I had called -- that  
17  answers your question.  
18      Q    Did you actually make the decision to  
19  use the services of Debut Contracting?  
20      A    Yes.  
21      Q    You indicated there were two other  
22  bidders?  
23      A    There were two other vendors that were  
24  on the Suffolk County list.  
25      Q    Did you contact each of the three  

---

1  vendors?  
2      A    Yes, I did.  
3      Q    What factors went into your decision to  
4  use Debut Contracting?  
5      A    The other two vendors never returned any  
6  of my phone calls.  
7      Q    What types of work was Debut Contracting  
8  doing for the Village of Patchogue?  
9      A    Sidewalk repair, curb repair.  
10      Q    Is that the only work that they did,  
11  sidewalks and curbs?  
12      A    No. They might have done some  
13  foundation work, some brick work.  
14      Q    Foundation work and brick work, in  
15  connection with what?  
16      A    The Village renovated a theatre.  
17  Patchogue Theatre.  
18      Q    How was the decision made to allow them  
19  to do whatever work they may have done on that  
20  theatre?  
21      A    That all went through the Village Board.  
22      Q    Did you make any suggestions to the  
23  Village Board, on behalf of Debut Contracting?  
24      A    I don't understand the question.  
25

1     Q     At any point in time, did anyone on the

2 Village Board ask you for instructions regarding

3 Debut Contracting? In other words, can they do the

4 job, are they fit for this?

5     A     It's possible. I don't recall any

6 conversation. It's possible.

7     Q     Did you have any conversations with

8 the -- is it the Town Board or Village Trustees?

9     A     Village Board.

10     Q     Did you have any conversations with any

11 members of the Village Board, with respect to the

12 work Debut Contracting was going to do with respect

13 to just curbs and sidewalks?

14     A     Well, after -- I'm not sure I

15 understand. They have to approve anything that's

16 done. They sign off on the vouchers and purchase

17 orders.

18     Q     Prior to that process, I'm talking about

19 now. You indicated two other vendors didn't call you

20 back, this vendor called you. Did you pass that

21 information on to the Village Board?

22     A     I don't recall, but I'm sure I did. But

23 I don't recall.

24     Q     Just so I'm clear. The ultimate

---

1

2 decision to use the services of Debut Contracting was

3 made by the Village Board, or did you recommend it to

4 them?

5     A     With regard to the sidewalk issue?

6     Q     Just the sidewalks and the curbs.

7     A     Well -- I'm not sure how to answer that.

8 Like I said, I don't recall specific conversations

9 with any of the board members, with regard to it.

10 But the idea was to get the sidewalks repaired. And

11 this was a vendor we could use off the county

12 contract.

13     Q     You don't recall if you had any specific

14 conversations with any Village Board member or the

15 supervisor himself, regarding Debut Contracting?

16     A     I don't recall any specific

17 conversations at all with regard to that, no.

18     Q     Do you recall any specific conversations

19 with either any of the Village Board members or the

20 mayor, regarding using Debut Contracting, and the

21 theatre you told me he did work on?

22     A     I don't recall any specific

23 conversations, no.

24     Q     Do you know how that came about that

25 Debut Contracting was permitted to do work on that

D. Wirshup

1  theatre? How did that process come about?

2  A  Through the Village Board.

3  Q  Did you make a recommendation to use

4  Debut Contracting for the theatre project?

5  A  I don't recall making a specific

6  recommendation.

7  Q  Do you know when that theatre project

8  began?

9  A  No, I don't know.

10  Q  Can you give me a ball park figure? I'm

11  not going to hold you to exact dates.

12  A  Maybe, 2000. Maybe.

13  Q  It's after the point in time regarding

14  the incident that you were eventually indicted for.

15  Is it before or after?

16  A  The theatre?

17  Q  Yes.

18  A  I don't know. Some of them might have

19  been -- I don't know that. I don't know the answer

20  to that.

21  Q  You think it's sometime in 2000?

22  A  The theatre?

23  Q  In other words, when Debut Contracting

24  was approved to do work on the theatre project.

---

D. Wirshup

1  A  I believe that was around that time,

2  when they started to work on the theatre.

3  Q  In terms of the curbs within the Village

4  of Patchogue, are you familiar with specifications

5  that have to be met, when curbs are either being put

6  in or replaced?

7  A  Yes.

8  Q  What are those specifications?

9  A  As to what?

10  Q  Well, how deep, how wide, things like

11  that?

12  A  I can give you ball park, typical --

13  ball park is what you want. I don't have the

14  document in front of me to say it's got to be this,

15  this and this exactly. If you want a ball park, I

16  can do that.

17  Q  Was part of your responsibilities, in

18  your title, to inspect and ensure that contractors

19  were doing work according to either the county code

20  or village code?

21  A  Yes.

22  Q  Based again on your experience, given

23  your position, you're aware that there were minimal

24  standards, in terms of what had to be done for the

D. Wirshup

```
 1
 2  job to be done properly?
 3       A    Yes.
 4       Q    Some of that would include the depth
 5  For instance, the curb, the depth of the curb?
 6       A    Yes.
 7       Q    Do you have any recollection of
 8  requirements indicating that the depth had to be 18
 9  inches?
10       A    Eighteen inches would be a curb depth,
11  yes.
12       Q    Part of your responsibilities was to
13  ensure whatever work that was done on curbs, that it
14  complied with that requirement?
15       A    Yes.
16       Q    Would that be a pre-condition, to the
17  company doing the curb work, to being paid?
18       A    That they met the requirement?
19       Q    Yes.
20       A    Yes.
21       Q    In other words, they would submit a bill
22  or voucher to you, and you would either have to
23  approve it or not approve it, or at least pass it on,
24  recommending to approve it; correct?
25       A    Correct.
```

---

D. Wirshup

```
 1
 2       Q    Part of the process is that you
 3  recommend it gets paid, is ensuring it was done to
 4  specifications?
 5       A    Yes.
 6       Q    Were there any specifications with
 7  respect to sidewalks?
 8       A    Yes.
 9       Q    In other words, certain minimum
10  standards?
11       A    Yes.
12       Q    With sidewalks, would that have to be a
13  separate concrete pour from a pour to make a curb?
14       A    Well, there's all different situations.
15  So, it's hard to answer that question.
16       Q    Were you familiar with a requirement
17  that when a sidewalk was going to abut a curb, that
18  that had to be poured separately from a curb?
19       A    You're talking about monolithic pour?
20       Q    Yes.
21       A    Well, the county allows monolithic
22  pours.  And we were working under the county
23  contract.  If you're going to pour an apron, aprons
24  are monolithic; meaning, poured in one shot,
25  connected to the curb.  I mean, you can have a grass
```

D. Wirshup

1 buffer in between, where you pour the sidewalk

2 separate than the curb.

3

4 Q   Were you aware of any regulations, both

5 under the county regulations, as well as the Village

6 of Patchogue, where the pours actually, from a

7 sidewalk to the curb, had to be separate?

8 A   Village code had a separate.  They did

9 not allow monolithic pours, yes.  Under the village

10 code, yes.

11   MR. DUNNE:  Now I'm going to ask that

12 these items be marked Exhibits A and B.  And

13 Bruce, as I said, I'm down staff.  I'll make

14 sure you get copies, before we get out of here

15 today.

16   (The above-mentioned documents were

17 marked as Defendant's Exhibits A and B for

18 identification.)

19   Q   Mr. Wirshup, I ask you to take a look at

20 Defendant's Exhibit A and tell me if you recognize

21 that?

22   A   (Reading.)

23   Q   Just take a look at Exhibit A.  Do you

24 recognize what the letter is?

25   A   Yes.

D. Wirshup

1

2 Q   What do you recognize that to be?

3 A   This was a letter that the village clerk

4 would send out to home owners, when their sidewalks

5 were in disrepair.

6 Q   Did you have any input, with respect to

7 the information that is contained in that letter?

8 A   Other than going out and taking the

9 photographs; that would be my input.

10 Q   Who signed off on that letter?

11 A   I believe it's the village clerk, Mary

12 Pontieri.

13 Q   Do you how many of those type of letters

14 went out?  You can give me a ball park?

15 A   I couldn't give exact numbers.  There

16 were quite a few.  I don't know.

17 Q   Talking about ten, 20, maybe 100?

18 MR. BARKET:  What time period?

19 Q   Around '98 and '99.

20 A   I couldn't answer that with anything

21 close or accurate.

22 Q   Fifty, a hundred?

23 A   I can't answer that.  I don't know.  I

24 don't have the answer.

25 Q   Did more than ten go out?

1   150.
2       Q    How long did you hold that position,
3   correct?
4       A    Seven years.
5   Mr. Wirshup?
6       Q    Part of your job is to go out and
7   inspect curbs and sidewalks; correct?
8       A    Yes.
9       Q    And you had to report your findings to
10  some other entity within the Village of Patchogue;
11  correct?
12      A    Yes.
13      Q    That was part of your duties and
14  responsibilities?
15      A    Part of, yes.
16      Q    And the purpose of reporting that was
17  because another wing of the government was going to
18  send a notice to folks that they had to comply with
19  the code?
20      A    Yes.
21      Q    That was done in the normal course of
22  your business; correct?
23      A    Yes.
24      Q    On a weekly basis, how often would that
25  occur, or on a monthly basis?

1       A    You want me to guess?
2       Q    You can qualify it by saying you're
3   taking an educated guess. That's fine.
4       A    In what time frame?
5       Q    During '98 and during '99?
6           MR. BARKET: The question is, are there
7   more than ten for '98 and '99?
8           MR. DUNNE: Yes.
9       A    I would say there was more than ten for
10  that period.
11      Q    Is there more than 50? I'm not going to
12  hold you to an exact. I understand there is a lot of
13  time in between. I'm trying to get a general ball
14  park figure.
15      A    I'm only guessing here. I would say --
16          MR. BARKET: I'm going to tell you not
17  to guess.
18      A    I'll not guess then.
19      Q    Give me a ball park figure. I'm trying
20  to get a general idea whether we're talking about
21  more than 50, more than 100?
22      A    I don't know. I don't know.
23      Q    Is it more than 150?
24      A    If I didn't know about 100, I don't know

D. Wirshup

A     I don't know how to answer that. I

don't know how to answer that question either. I'm

not trying to be evasive. There was a lot of

projects going on within the village.

Q     I'm strictly talking about curbs and

sidewalks.

A     Right. That's what I'm telling you.

There were a lot of projects going on in the village

during that time, during my whole tenure there. And,

you know, for me to try and nail this down, I can't.

Q     On Exhibit A, this is an example of a

letter that would go to a home owner?

A     Yes.

Q     This particular exhibit references a

property at 4 and 6 Gilbert Street. It says, "Please

be informed that the Village of Patchogue, along with

other villages in the State of New York, has not been

able to obtain liability insurance on its streets and

sidewalks. And should an accident occur, the village

would be open to serious liability suits. We must

see to it that adjacent land owners keep their

property in good repair. We trust you will

understand our campaign in keeping sidewalks in

repair, and liability at a minimum."

D. Wirshup

Q     Do you know where the information came

from that the village was unable to obtain liability

insurance on its streets and sidewalks? Where did

that information come from?

A     Mary Pontieri.

Q     Meaning the village clerk?

A     Yes.

Q     Do you know Richard Calame?

A     Doesn't ring a bell, no.

Q     Do you know who the towns insurance

company is?

A     I know they changed insurance while I

was there. I don't know, off the top of my head, no.

Q     Did you ever hear of Wright Risk

Management?

A     Yes.

Q     That was an insurance company for the

Village of Patchogue?

A     I believe they were, or the brokers, or

something along those lines, yeah.

Q     Do you have any idea how the information

indicating to the home owners that they were unable

to obtain liability insurance, where that information

came from?

1   the sidewalks, aprons and/or curbs?
2   A   I guess if that's the same group, they
3
4   would be our insurance carrier. We would get
5   lawsuits with a trip and fall. So, I guess I would
6   have had contact with them, yeah.
7   Q   That's after you were indicating to me
8   something that would occur after the fact?
9   A   Right.
10  Q   Someone tripped and fell, there would be
11  a lawsuit, and someone from Wright Risk Management
12  would come and talk to you?
13  A   Right.
14  Q   What about before hand, had anyone from
15  Wright Risk Management ever come out to look at the
16  work that was existing, or work that was being done,
17  and make, what you indicated to me, liability
18  recommendations?
19  A   No.  On the facilities that the village
20  owned.  But not on the home owners.  Not in front of
21  a home.
22  Q   At any point in time, did you ever
23  indicate to Ms. Pontieri to place that information in
24  the letter, with respect to an indication here that
25  the village is having a problem getting liability

1   A   I believe it came from the village
2   clerk's office.  I can only -- I'll be speculating.
3   The village clerk's office.
4   Q   Just what you know.
5   A   That's what I know.
6   Q   Did you have any contact with Wright
7   Risk Management, in connection with your duties and
8   responsibilities as the supervisor?
9   A   Yes.  If that is the same group, yeah.
10  Q   In what way would you come in contact
11  with Wright Risk Management?
12  A   They would come and tour the village,
13  with regard to our facilities, our parks.  And I
14  would typically bring them around, and we would have
15  meetings to discuss, you know, what was happening
16  with regard to, let's say, swing sets; they could be
17  a liability, and the padding underneath.
18  Q   They would indicate, the example you
19  gave for swing sets, you need to put more padding
20  here; and they're doing that as the insurance
21  company?
22  A   Right.  They would make recommendations.
23  Q   Did you ever have any such contact with
24  anyone from Wright Risk Management, with respect to

D. Wirshup

1 insurance, because of the conditions of the
2 sidewalks? Did you give her that language?
3     A    No.
4     Q    Did you make any suggestion to her that
5 that language should go into the letter?
6
7     A    No.
8     Q    Did you recall if Richard Calame -- did
9 he testify at your criminal trial?
10     A    I don't recall.
11     Q    Do you remember any individual from
12 Wright Risk Management testifying at your criminal
13 trial, indicating that that information that is
14 contained in Defendant's Exhibit A was simply not
15 true?
16     A    No, I don't remember that.
17     Q    Once a letter such as Defendant's A went
18 out, what were your duties and responsibilities, once
19 home owners were contacted indicating that they had
20 to comply with the code? What would your job be,
21 after these letters went out?
22     A    To go back to see whether, either when
23 they repaired it. Or two, that they didn't repair it
24 and report back to the village clerk.
25     Q    There's an indication in Defendant's A,

---

D. Wirshup

1 indicating that the home owner had two weeks to
2 comply with this. In relation to that two weeks,
3 what were your duties and responsibilities? Who was
4 going to make sure they either complied or didn't
5 comply within two weeks?
6
7     A    I would try to get back and see whether
8 they did or they didn't. That's just one of my
9 duties. I had -- there was a lot of stuff I had to
10 do there a lot.
11     Q    Understood. Did your office ever
12 receive any calls? When such a letter as
13 Defendant's A went out, did you ever receive any
14 feedback from any members of the community?
15     A    From the home owners that got the
16 letter?
17     Q    Yes.
18     A    Yeah, I'm sure I did.
19     Q    Did you get any folks calling up,
20 indicating what is going on here, kind of complaining
21 about it?
22     A    Well they -- yeah. Obviously, they
23 weren't happy they had to repair their sidewalk.
24 Most weren't happy.
25     Q    Now, did you go out and do any follow

1
2  up, when letters such as Defendant's A went out?
3  Meaning, did you go and see if folks were complying
4  with the requirements that were outlined in the
5  letter such as Defendant's A?
6  A   To make the repairs?
7  Q   Yes.
8  A   Like I said, I would try to get back to
9  see whether they had made the repairs.
10 Q   Were there instances where you came
11 across houses in which repairs were not done?
12 A   Yes.
13 Q   What would you do?
14 A   Another letter would be generated.
15 Q   When you say another letter would be
16 generated, I'm going to ask you to look at
17 Defendant's B. Would that be an example of a letter
18 we're talking about?
19 A   (Reading.) Right. Right. It would
20 spell out that you were notified previously, you
21 hadn't done anything and, you know -- as you can see
22 here, this was originally sent out in August. The
23 second letter wasn't sent out until May of the
24 following year.
25 Q   Well, it happens to be for different

1  properties. It's understood. I'm taking that as an
2  example.
3
4  Is Defendant's B an example of the
5  second letter that would go out to a home owner who
6  would not comply with the original letter telling
7  them they had to repair sidewalks and/or curbs?
8  A   Well, these two are different
9  properties. This is not a different property -- I'm
10 sorry.
11 Q   What I'm asking is, is that an example
12 of a letter that would go out for someone who
13 received a letter such as Defendant's A and didn't
14 comply with it?
15 MR. BARKEY: Just to clarify. The
16 letter itself, Exhibit B, says "On August 21st
17 you were notified." And that letter didn't go
18 out until May. He was referring to May.
19 Q   My question is, this is an example of a
20 letter that went out to someone who did not comply
21 with the initial letter, such as the one we looked at
22 in Defendant's A?
23 A   I already answered that. You asked
24 that, and I already answered it.
25 Q   Now, did you go and personally visit

D. Wirshup

1   homes within the Village of Patchogue and have
2   discussions with home owners regarding the state of
3   their curbs and/or sidewalks?
4
5   A    Yes.
6   Q    Milvid and Debut Contracting was the
7   company that was doing work on curbs and sidewalks
8   within the Village of Patchogue; correct?
9   A    Yes.
10  Q    During 1998, were they the only company
11  doing that?
12  A    In the village?
13  Q    Yes.
14  A    I believe so.  Well, working for the
15  village you mean?
16  Q    Right.  That's what I meant.
17  A    Because the home owner could bring their
18  own contractor in.
19  Q    I'm going to get to that.
20  A    I'm not rushing you.
21  Q    I understand that.  When you said before
22  they were the vendor, that's the vendor we're talking
23  about during 1998 into 1999?
24  A    Yes.
25  Q    There would be times when you would do

D. Wirshup

1   follow up to these letters, and that is go to
2   specific homes?
3
4   A    Yes.
5   Q    And you would have to inspect the state
6   of the curbs and inspect the state of the sidewalks?
7   A    Of the sidewalks, right.  Yes.
8   Q    At any point in time, did you ever visit
9   a home owner, with Stephen Milvid, bring him along on
10  your call and go and inspect whether or not the
11  requested work had been done?
12  A    To knock on a door with him?  I don't
13  know that I would have done that.  It's possible he
14  was at a job site there while one of these letters
15  was out there.  Usually I would do it with John Long;
16  he was the highway foreman.  If we were prepping to
17  do a road, him and I do an inspection, knock on doors
18  and follow up, if you haven't fixed it yet.  A lot of
19  these things coincided; the curb work, the road work
20  and then the residents sidewalks.
21  Q    I understand that.  My specific question
22  to you is, did you ever go to a home owner, in a
23  Debut Contracting truck, with Stephen Milvid to
24  discuss the state of either the sidewalks and the
25  curbs?

1　A　It's possible.
2
3　Q　Did you ever indicate to any home
4　owners, upon inspecting the curb or sidewalks, if the
5　job was not done right, that you would be forced to
6　do it; meaning, the Town would have to do it, and
7　then the cost of that would be put onto their tax
8　bills?
9　A　Yes.
10　Q　At any point in time, when you had
11　discussions of that nature, would you recommend to
12　the home owner, in order to get the job done right,
13　you recommended that they use Milvid and Debut
14　Contracting?
15　A　Absolutely not.
16　Q　As we sit here today, you indicated that
17　you never either recommended or steered or directed
18　any home owner, in the Village of Patchogue, to use
19　Stephen Milvid and Debut Contracting to do the work
20　necessary to comply with the code, with respect to
21　sidewalks and curbs?
22　A　I would never direct or steer.  If a
23　home owner asks me -- I'm going to clarify this.  If
24　a home owner asks me who do I use as a contractor, I
25　say, "Go to the yellow pages.  We don't have a

1　contractor."  Who do you use?  Who does the village
2　use?  Or if Debut, our contractor, was working on
3　that road, then they would say, "Well, who is that?"
4　I would say, "That is Debut."  "Can I use them?"
5　"Sure you can use them."
6
7　If you're getting at that I steered or
8　directed people that they had to use Debut,
9　absolutely not.  And I have made it quite clear to
10　the home owners that they could use whoever they
11　wanted to use.
12　Q　If you ever steered any home owners that
13　they had to use Stephen Milvid's company, Debut
14　Contracting, your answer is no?
15　A　That's correct.
16　Q　Did you ever indicate to any home owners
17　that if they did not employ or use the services of
18　Debut Contracting, that you would come back and
19　inspect it, and if it fails, the work would be ripped
20　out?  If it fails to comply with code regulations,
21　the work would be ripped out?
22　A　Absolutely not.
23　Q　Did you ever put any pressure or
24　intimidate home owners, in order for home owners to
25　comply with the subject of Defendant's A; meaning,

1   the letter.   In order for them to comply with that,
2   they had better use Stephen Milvid and Debut
3   Contracting?
4
5       A   No.
6       Q   No force or intimidation or pressure did
7   you ever put on any home owner?
8       A   Never.
9       Q   If a concrete company was going to
10  comply with the village code that prohibited a
11  monolithic pour, how many days would it do a job; in
12  other words, if you were going to replace a sidewalk
13  that abutted a curb?
14      A   Say it again.
15      Q   I'll try to clarify it.   You indicated,
16  earlier, that the village code does not permit
17  monolithic pours; correct?
18      A   That's correct.
19      Q   Meaning, one pour of concrete to do both
20  the sidewalk and the curb?
21      A   Right.
22      Q   And two pours would have to be made; one
23  for the sidewalk and one for the curb?
24      A   Yes.
25      Q   How many days would that take to comply

1   with the two pours, as opposed to a monolithic pour?
2           MR. BARKET:   Objection to form.   You can
3   answer.
4
5       A   I don't think I can answer it.   How much
6   curb are you talking about?   Say 100, 200 feet a day
7   of curbing.   How much are we talking about?
8       Q   Is it fair to say it would be accurate
9   that you would have to have at least two separate
10  days; one day to pour the curb, one day to pour the
11  sidewalks?
12      A   Yes.   Yes.
13      Q   If there was a monolithic pour, that
14  would be done in one day?   In other words, if you
15  were going to do one pour to cover curbs, and pour
16  the curb area and sidewalk area, that could take one
17  day?
18      A   Don't know how much you're talking about
19  pouring.
20          MR. DUNNE:   Let's have this marked
21  Exhibit C.
22          (The above-mentioned document was marked
23  as Defendant's Exhibit C for identification.)
24      Q   Just take a moment to go through what
25  has been marked as Exhibit C for the purposes of our

1  examination today.
2     (Reading.)
3  Q  Mr. Wirshup, did you have a chance to
4  review what has been marked as Exhibit C, for
5  purposes of our examination today?
6  A  Yeah.
7  Q  Do you recognize what those items are?
8  A  Yes.
9  Q  What are they?
10 A  This was a report generated by an
11 engineering company, Vollmuth and Brush.
12 Q  What is the third page of that?
13 A  An invoice from Debut.
14 Q  This is the seventh page; do you
15 recognize what that is?
16 A  Looks like an invoice from Debut.
17 Q  Where does that cover, by the way?
18    Where is the geographic location?
19 A  Jennings Avenue.
20 Q  That's in the Village of Patchogue?
21 A  Yes.
22 Q  What is that invoice for?
23 A  Remove and replace concrete curb at
24 locations below. It gives five addresses, six

1  addresses.
2  Q  What is the amount?
3  A  Total amount was $3,036.06.
4  Q  And the eighth page, what is that item?
5  A  This is a voucher.
6  Q  Is your signature on that?
7  A  Yeah.
8  Q  What is that voucher, in effect, do
9  A  Yes.
10 A  Continues the payment process through
11 the village.
12 Q  Is your signature required on those
13 vouchers?
14 A  Yes.
15 Q  Why is that?
16 A  Because the work pertains to my
17 department.
18 Q  That specific voucher covers a location
19 of Jennings Avenue; is that correct?
20 A  Yeah. That's what it says.
21 Q  So, in the instance of Jennings Avenue,
22 back in 1998, would it be accurate to say that after
23 Debut Contracting did their work, they submitted a
24 bill to your office?
25 A  Yes.

D. Wirshup

Q     And then you reviewed the bill and, as evidence by the voucher, you signed off on it and approved payment for the work done on Jennings Avenue?

A     Yes.

Q     In this particular case, on Jennings Avenue, by way of example, this is $3,036.06; correct?

A     That's what it says, yes.

Q     This voucher is then submitted to the Village Board; correct?

A     Yes.

Q     And the Village Board would then, based on this voucher and you signing off on it, approve payment to Debut Contracting?

A     That would pretty much be the process, yes.

Q     With respect to the curbs, new curbing that were put in, it had to be 18 inches deep; correct?

A     That was a specification. Normal specification didn't always apply to what we were able to do in the field, so...

Q     In instances where there wasn't some

---

D. Wirshup

impediment, when you say couldn't apply to a situation in the field, for instance, a huge rock. Would that be an impediment in going down 18 inches?

A     If there is a huge rock in -- Patchogue is a really old village. There's roads, on top of roads, on top of roads. There is brick roads on top of the village streets. You know, it's a really old town. Numerous items are there, so.

Q     Aside from those instances you had discussed previously in this examination, that the depth of the curb is to be 18 inches, you were aware of that, and that was a specification that your office expects. In the instances that you told me, there was some reason it couldn't be done?

A     Right.

MR. DUNNE: I'll ask that this be marked Defendant's D1 and D2.

(The above-mentioned documents were marked as Defendant's Exhibits D1 and D2 for identification.)

Q     Did you have an opportunity to look at Exhibits D1 and D2?

A     Yes, I see them.

Q     It refers to a location of 123 Jennings

1  Avenue in Patchogue.  Just take a look at the curb
2  work contained.
3       MR. BARKEY:  Is that a question?  The
4  address; I just don't see it.
5       MR. DUNNE:  Right there.  (Indicating.)
6       MR. BARKEY:  I believe you.  But the
7  123, whatever the number is, is blocked out by
8  the post and overhang.
9       Q    Irrespective of that, I'm indicating
10 this was taken at 123 Jennings Avenue.  My point here
11 is, take a look at the curb work done in D1 and D2.
12 In connection with your duties and responsibilities
13 as a supervisor of the Public Works Department, do
14 those works comply with the 18 inch depth
15 requirement?
16      A    I don't know from this, those photos.  I
17 couldn't tell you.
18      Q    Do you see a ruler in D2?
19      A    I see a ruler, yes.
20      Q    From the bottom of the curb to the top,
21 from your observation of that photograph, what is the
22 length?
23      A    Appears to be 11 or 12 inches, on the
24 ruler.

1       Q    Does that comply with the 18 inch
2  requirement?
3       A    Well, I have no idea what was done to
4  this curb before; whether there was a reason that
5  it's 11 or 12 inches.  I don't know.  This is --
6       Q    Do you see anything underneath where the
7  hand is?  Do you see any impediment where they
8  couldn't make an 18 inch pour?
9       A    In this photo, I see a hand and dirt.
10      Q    The hand goes below the bottom of the
11 curb; correct?
12      A    Or at the bottom of the curb.
13      Q    And the curb is not 18 inches in depth,
14 is it?
15      A    Where the ruler is, it's not, no.
16      Q    That would not comply with the 18 inch
17 requirement?
18      A    Well, if this is accurate, and I don't
19 know that it is, it would not.
20      Q    Going back to Defendant's Exhibit C.
21 The voucher covers work that was done on Jennings
22 Avenue, in Exhibit C; correct?
23      A    It says Jennings Avenue, yes.
24      MR. DUNNE:  I'm going to ask this be

1 marked Exhibits E1 and E2.

2 (The above-mentioned documents were

3 marked as Defendant's Exhibits E1 and E2 for

4 identification.)

5 

6 Q Let me back track for a minute. I'm

7 going to go to Exhibit D2. Do you see a portion of a

8 sidewalk in Exhibits D1 and D2?

9 A Yes.

10 Q Is that a monolithic pour?

11 A It appears to be, yes.

12 Q At any point in time, in relation to

13 Exhibit C and the voucher that you signed off on, on

14 Jennings Avenue, did you ever go out and inspect the

15 work that Debut Contracting had done?

16 A What's the first part of that question?

17 Q With respect to the voucher contained in

18 Defendant's Exhibit C, that covers work done on

19 Jennings Avenue. Prior to authorizing the payment of

20 that voucher, did you ever go out and inspect the

21 Jennings Avenue work, to ensure that it complied with

22 code requirements?

23 A I believe that I inspected it before

24 signing off on this. I believe I did.

25 Q Let me ask you this. Taking a look at

1 the sidewalk in this photograph, does that comply

2 with code requirements?

3 

4 A With regard to being monolithic?

5 Q Yes.

6 A In the village code, it does not.

7 Q In terms of depth of the curbing, does

8 that comply with the 18 inch requirement, in

9 Defendant's Exhibit 2?

10 A In that photograph, it appears that the

11 curb is 11 inches.

12 Q And the question is: Does that comply

13 with the 18 inch requirement?

14 A You're trying to simplify something it's

15 not that simple. In that photograph, the curb is 11

16 inches; that is not 18 inches.

17 Q Did you inspect that properly, before

18 signing off on the voucher?

19 A I would hope that I did. I believe that

20 I did. So, I would hope that I did.

21 Q Now, can you take a look at what is in

22 Exhibits E1 and E2?

23 A (Looking.)

24 Q I made a reference to that as being 131

25 Jennings Avenue. I'm going to ask you to take a look

1  at Exhibit E1.  The sidewalk and the curbing there,
2  are there two pours there, or is that a monolithic
3  pour.
4  A  Monolithic pour.
5  Q  Does that comply with the town code
6  requirements?
7  A  The village code, no.
8  Q  I'm going to ask you to take a look at
9  Exhibit E2.  Can you tell us the depth of that
10  curbing?
11  A  Where he's got the ruler, the top of the
12  ruler is at 14 inches, in this photograph.
13  Q  It's not 18 inches?
14  A  I don't know.  I'm reading the ruler.
15  Q  Based on your reading the ruler, it's
16  not 18 inches; is that correct?
17  A  Right.  The ruler says 14 inches.
18  Q  Do you know if you conducted an
19  inspection of 131 Jennings Avenue, prior to
20  authorizing the payment of the voucher contained in
21  Defendant's Exhibit C?
22  A  What was the address?
23  Q  131 Jennings Avenue.
24  A  Yes.  Apparently, I did.

1  Q  Apparently you did what?
2  A  Sign off on the voucher.
3  Q  Right.  I'm asking you, did you conduct
4  an inspection?
5  A  I would hope that I did, yes.
6  Q  Do you have any specific recollection of
7  actually doing it?
8  A  Not at this point, no.
9  MR. DUNNE:  I ask that this be marked
10  Exhibits F1 and F2.
11  (The above-mentioned documents were
12  marked as Defendant's Exhibits F1 and F2 for
13  identification.)
14  Q  That's in reference to a 134 Jennings
15  Avenue.
16  A  (Looking.)
17  Q  In reviewing that photograph, does that
18  curb and that sidewalk, is that a monolithic pour or
19  two pours, in that photo?
20  A  Monolithic.
21  Q  Does that comply with code requirements?
22  A  Not in the village.
23  Q  What is the depth of the curbing there?
24  A  I can give you the reading on the top of

D. Wirshup

his ruler, which would be the top of the curb, which

is 15, 16 inches.

Q    Did Debut Contracting submit an invoice

for payment, for work done at 134 Jennings Avenue,

the immediate page before that?

A    (Turning.) Yes.

Q    At any point in time, prior to

authorizing the payment on the invoice contained in

Defendant's Exhibit C, did you inspect the work done

by Debut Contracting at 134 Jennings Avenue?

A    I would hope that I did.

MR. DUNNE: I'm going to ask that this

be marked Exhibit G.

(The above-mentioned document was marked

as Defendant's Exhibit G for identification.)

A    (Looking.)

Q    That's in reference to a 140 Jennings

Avenue. Does the curbing and the sidewalk contained

in Defendant's Exhibit G appear to be a monolithic

pour?

A    Looks monolithic, yes.

Q    That does not comply with the town

requirements, does it?

A    With the village code, no.

---

D. Wirshup

Q    How deep is the curb, in that

photograph?

A    I can't really make out the numbers, if

that's a two foot mark, if that's 24 inches, the red

mark. I don't know. I can't see the numbers.

MR. BARKET: The red mark is 16.

Q    Does 15 inches meet the 18 inch

requirement?

A    Does 15 inches? No.

MR. DUNNE: We'll let the picture speak

for itself.

Q    At any point in time, prior to signing

off on the voucher contained in Defendant's

Exhibit C, did you inspect the premises at 140

Jennings Avenue?

A    I would hope I did. I just want to add

that I also had a foreman there, John Lund. He would

also be eligible to inspect those premises. So, I

would hope that I did or he did. That's with regard

to all of these.

Q    Is 140 Jennings Avenue contained in the

invoice sent to the town by Milvid and Debut

Contracting?

A    Yes.

1    MR. DUNNE:    I ask that this be marked

2  Exhibits H1 and H2.

3            (The above-mentioned documents were

4        marked as Defendant's Exhibits H1 and H2 for

5        identification.)

7  A    (Looking.)

8  Q    That's in reference to 144 Jennings

9  Avenue.  Does the curbing and the sidewalk, in those

10  photographs, appear to be a monolithic pour or two

11  pours?

12  A    I believe it's a monolithic.

13  Q    Would that be in violation of the code?

14  A    Yes.

15  Q    What is the depth of the curb contained

16  in Exhibit H2?

17  A    18 inches.

18  Q    So, that would, in fact, comply with the

19  code?

20  A    If that's the depth of the curb.  The

21  ruler says 18 inches.

22  Q    That would comply?

23  A    Right.

24  Q    At any point in time before authorizing

25  payment to Debut Contracting, did you ever inspect

1  the premises at 144 Jennings Avenue in this case,

2  with respect to the monolithic pour?

3  A    I would hope that I did.  Or like I

4  said, it's possible the foreman inspected it.

6  Q    That curb does not comply with town

7  code; correct?

8  A    The village code, no.  That's correct.

9  Q    Did you ever speak to a Barbara Valencia

10  at 131 Jennings Avenue, regarding the condition of

11  their curbs and sidewalks?

12  A    I don't know.  That name rings a little

13  bit of a bell, but I don't know why it does.

14  Q    At any point in time, did you ever

15  indicate to Barbara Valencia she should use Debut

16  Contracting, in order to make the curbs and sidewalks

17  comply with the code?

18  A    That she should use Debut Contracting?

19  Q    Yes.

20  A    No.

21  Q    Did you ever threaten her?

22  A    No.

23  Q    Ever intimidate her into using Debut

24  Contracting?

25  A    No.

D. Wirshup

Q  Did you ever come into contact with a
Matthew Koch of 140 Jennings Avenue?

A  I know the name. I don't remember
contacting him.

Q  At any point in time, did you ever
suggest to Mr. Koch that he use Debut Contracting?

A  No.

Q  Did you ever threaten or coerce him to
using them, indicate if he didn't, you would rip the
work out and charge it to his tax bill?

A  No.

MR. DUNNE:  Excuse me for one second.

off the record.

(Whereupon, at this time, a break was
taken.)

Q  Did you ever have any contact with an
Edward Detwiler of 134 Jennings Avenue?

A  It's possible.

Q  At any point, did you suggest that
Mr. Deitweiler should use Debut Contracting?

A  No.

Q  Did you ever threaten or coerce him into
using Debut Contracting, indicating if he did not use
that firm, and the work was not done right, you would

---

D. Wirshup

have the work ripped out and it would be assessed on

their tax bill?

A  No.

Q  Did you ever have contact with Richard
Goodman of 123 Jennings Avenue?

A  Possibly.

Q  Any point in time, did you suggest to
him that he hire Debut Contracting for the curb work?

A  No.

Q  Did you ever coerce or threaten him into
using Debut Contracting, indicating to him that if he
used another company that you would rip the work out
and charge it to him?

A  Never.

Q  Did you have any contact with a Mohammad
Rafeat?

A  Possibly.

Q  At any point in time, did you indicate
to him that he should use Debut Contracting?

A  No.

Q  At any point in time, did you ever
indicate or threaten or coerce him into using Debut
Contracting?

A  No.

1 were supposed to have been?

2 A  Yeah. I think they were -- I think they

3 were, like, 7:00 to 4:00, or 8:00 to 4:00; somewhere

4 around there. Normal work day.

5

6 Q  At any point in time, did you have a

7 discussion with Stephen Milvid that if he got your

8 son a no show job, that you would be somewhat lax in

9 your inspection of his work, when he submitted the

10 bills?

11 A  No. I'm insulted by that insinuation.

12 Q  I'm just doing my job. You answered the

13 question as no?

14 A  No.

15 Q  What color was your son's hair? Did

16 your son ever dye his hair?

17 A  Actually, he did.

18 Q  Do you know what color he dyed it?

19 A  I think it was blond highlights or

20 something.

21 Q  Is there any correlation between your

22 son being hired by Debut Contracting and Stephen

23 Milvid submitting vouchers for work that did not

24 comply with the code, by you authorizing payment, in

25 any way?

1 Q  Isn't it a fact that he told you he was

2 not going to use Debut Contracting, no matter what it

3 was you were saying to him?

4 A  I don't recall that conversation.

5 Q  What is your son's name?

6 A  Brian.

7 Q  Did there come a point in time when your

8 son, Brian, went to work for Stephen Milvid and Debut

9 Contracting?

10 A  Yes.

11 Q  When was that?

12 A  The summer of 2000, 2001.

13 Q  What, to your knowledge, was his duties

14 and responsibilities?

15 MR. BARKEY:  Is that 2000 or 2001 or --

16 THE WITNESS:  No.  I think it was 2001.

17 Q  You're ball parking it?

18 A  Yeah.  One summer, there comes a point

19 in time, whenever it was, that he does go to work for

20 Stephen Milvid and Debut Contracting, yes.

21 Q  Do you know what his duties and

22 responsibilities were with Debut Contracting?

23 A  Labor.

24 Q  Do you know what his specific work hours

25

D. Wirshup

    MR. BARKET: Objection to the form. You can answer.

    A   There's no correlation to any of that.

    Q   Does there come a point in time where you learn that Stephen Milvid was actually under indictment from the Suffolk County District Attorney's office?

    A   Yes.

    Q   At that point in time, how long had you known Stephen Milvid, give or take? I understand it's a long time now. You can approximate.

    A   Five years.

    Q   Did you have any discussions with Stephen Milvid regarding the charges he was facing for work that was done in Brookhaven?

    MR. BARKET: At any time?

    MR. DUNNE: Yes.

    MR. BARKET: Ever?

    MR. DUNNE: Ever.

    A   Yes.

    MR. DUNNE: Let me clarify it.

    Q   At the time that you learned of the indictment, did you have a discussion with him?

    A   Yes.

---

D. Wirshup

    Q   What was the nature of the discussion that you had with him?

    A   I was concerned about him.

    Q   Did you know what the substance of the allegations were against him, when you had that discussion with him?

    A   Not sure I know. I think I know the general, but nothing specific.

    Q   That's fair. What, generally, did you know about it?

    A   That there were billing problems within the town.

    Q   At any point in time, after learning that information, did you ever go out and inspect any work that Stephen Milvid had done in the Village of Patchogue?

    A   After having that conversation?

    Q   Yeah. After learning he had been indicted for billing practices in the Town of Brookhaven, did you, after learning that information, ever go out and inspect any work that Debut Contracting did in the Village of Patchogue?

    A   Oh, yeah. Yeah.

    Q   Did you ever inspect any of the homes on

1  Jennings Avenue?
2  A  Possibly.
3  Q  Did you reach any conclusions as to
4  whether or not the work on Jennings Avenue complied
5  with the code requirements?
6  A  As far as the depth of the curb?
7  Q  The depth of the curb and monolithic
8  pours.
9  A  I was aware it was monolithic, at that
10  point, right.
11  Q  Did you ever go back and ever attempt to
12  correct that bill that Stephen Milvid had submitted
13  on behalf of Debut Contracting for work, wherein he
14  represented he had done two pours?
15  MR. BARKET: Objection to form.
16  Q  This is after the indictment.
17  A  No, I never went back and corrected any
18  billing, after his indictment.
19  Q  This was even after inspecting his work?
20  A  When you say after, what are you talking
21  about; any point after?
22  Q  After you learned that he, Stephen
23  Milvid, had been indicted for billing practices in
24  the Town of Brookhaven. After you learned that, in

1  your capacity, did you then go back and review any
2  work that he had done, to ensure that his billing
3  practices were legitimate, within the Village of
4  Patchogue?
5
6  A  Yes.  After his indictment with the Town
7  of Brookhaven, I went and looked at our work, yes.
8  Q  Did you ever adjust or make a
9  recommendation to the Village Board that action
10  should be taken, or that bills should be adjusted,
11  because Stephen Milvid did work that you authorized
12  payment on that did not comply with town or county
13  codes?
14  MR. BARKET: Objection to the form.
15  MR. DUNNE: Understood.
16  A  No, I don't remember making that
17  recommendation.
18  Q  You indicated that, that had nothing to
19  do with the fact that your son was employed by
20  Stephen Milvid?
21  A  My son had nothing to do with any of
22  this.
23  Q  Did you ever do any business dealings
24  with an asphalt company known as LLI?
25  A  Yes.

1    Q    At any point in time, did you accept a
2  cell phone from them?
3
4    A    Yes.
5    Q    That was at their expense? In other
6  words, the company paid for your use of that cell
7  phone?
8    A    I paid for the phone.
9    Q    Were there any instances or months in
10 which you did not pay the phone?
11   A    No. I paid the entire bill.
12   Q    The entire time you were given the phone
13 by LLL Asphalt Company, you're indicating you paid
14 the bill?
15   A    I paid the entire bill, from the time I
16 had the phone.
17         MR. DUNNE: Counselor, I'll leave a
18 space in the record, and I'll request those
19 records. I'll put that formally in writing.
20         MR. BARKET: Okay. Which; record
21 payments or bills.
22         MR. DUNNE: Both.
23 (INSERT):
24   Q    Were there any points in time where you
25 maintained possession of the cell phone provided to

---

1  you by LLL, at times when that company was not doing
2  business within the Village of Patchogue?
3
4    A    It's possible, yeah.
5    Q    Did you ever have any conversations with
6  Stephen Milvid about using that phone?
7    A    It's possible.
8    Q    At any point in time during the criminal
9  trial that you sat through, in relation to this
10 incident, did you ever learn that the cell phone
11 number and your name had been obtained from a rolodex
12 belonging to Stephen Milvid?
13   A    I'm not sure what the question is for
14 me. Do I know that the phone number had been
15 maintained?
16   Q    When you sat, during the course of the
17 criminal trial, at any point in time during that
18 trial, did you learn that the information concerning
19 the phone and the use of that phone was obtained
20 during the course of Stephen Milvid's arrest?
21   A    No, I don't recall that.
22   Q    To your recollection, how much business
23 did LLL Asphalt Company get with the Village of
24 Patchogue? How much work did they do for you guys?
25   A    I don't know. Thousands.

1      Q    What types of jobs would they do?
2      A    One, they ran an asphalt plant, which we
3  would purchase asphalt from for ourselves.  Also,
4  they would do repair work on asphalt; replace and
5  repair.
6      Q    Once again, did the process of using
7  that asphalt company, iii, did you have to look at a
8  series of qualified vendors, prior to employing them?
9      A    Yeah.  Also, they came off the Suffolk
10 County list.
11     Q    Again, the same process that you
12 explained to me before with Debut Contracting, also
13 applied to iii asphalt?
14     A    As far as how I obtained them, yes.
15     Q    You pulled them off the list and
16 submitted them to the Board?
17     A    Right.
18     Q    And they approved of using this company?
19     A    Right.
20     Q    At any point in time, did you have an
21 opportunity to inspect the curbing work that was done
22 by Debut Contracting on North Ocean Avenue?
23     A    I'm trying to remember a job on
24 North Ocean.  Yeah, I believe there was a job on
25

1  North Ocean.
2      Q    At any point in time, did you authorize
3  payment to Debut Contracting for work that was done
4  on North Ocean Avenue?
5      A    I'm just thinking in my head if that was
6  North Ocean Avenue.  Do you have an address or
7  anything?
8      Q    There was quite a bit of curbing there.
9  At any point in time, did you ever inspect any
10 curbing work that was done on North Ocean Avenue, and
11 take a look at what Debut had done and discover,
12 instead of putting 18 inches of curbing in, there
13 were skim coats over existing granite?
14     A    I don't remember skim coats over
15 existing granite.
16     Q    Do you remember authorizing vouchers in
17 which Stephen Milvid submitted to you, that he
18 indicated he had poured 18 inches of curbing on
19 North Ocean Avenue jobs?
20     A    Off the top of my head, I'm trying to
21 remember houses on North Ocean Avenue.
22     MR. BARKET:  It's not a quiz.  If you
23 don't remember, you don't remember.
24     A    I don't know.
25

D. Wirshup

2    Q   You would agree, putting skim coats,
3 instead of 18 inches of curbing, would not comply
4 with the code?
5    A   I would think so, right.
6    Q   You would agree that would not be an
7 accurate bill, if a company put a skim coat, instead
8 of 18 inches of curb, and billed the town for
9 materials to comply with the 18 inch requirement?
10    A   Right. Yes.
11    Q   Did you ever inspect any curb work on
12 North Ocean Avenue, prior to authorizing the payments
13 to Stephen Milvid and Debut Contracting?
14    A   I'm just not recalling work done on
15 North Ocean. So, I'm having a problem answering
16 that.
17    Q   You don't have a recollection. Do you
18 recall going to North Ocean Avenue and inspecting
19 work that was done by Debut, with respect to curbing,
20 prior to authorizing the payment for that work?
21    A   I don't recall a location on
22 North Ocean.
23    Q   Now going back to a period of time in
24 the late fall of 2002, early winter 2003. I'm
25 talking about a general time period. Does there come

---

D. Wirshup

1 a point in time that you have contact with members of
2 the Suffolk County District Attorney's office?
4    A   Yes.
5    Q   Describe for me the contact, at the
6 earliest time, or the first time, in which you had
7 contact the members of the Suffolk County District
8 Attorney's office?
9    A   The earliest contact I had with them
10 was -- it might have -- January. December, January.
11    Q   You can ball park it, that's fine.
12 Somebody comes to visit you?
13    A   Talking about at the 7-11 or in the
14 village?
15    Q   The very first time. The very first
16 time. Do you recollect the very first time you had
17 contact with members of the Suffolk County District
18 Attorney's office regarding work by Debut
19 Contracting?
20    A   Well, they were -- I knew the detectives
21 were in the village, right.
22    Q   At any point in time, when they were in
23 the village, did they ever come to talk to you?
24    A   Well, they kind of avoided me. So, I
25 can't say for sure that they talked to me about a job

1  within the village.
2  
3       Q    Let me ask it this way.  Does there come
4  a point in time where you retained Patrick O'Connell
5  as an attorney?
6       A    Yes.
7       Q    Is there any correlation between
8  retaining Mr. O'Connell and the contact that you had
9  with members of the Suffolk County District
10 Attorney's office?  Is there any correlation?
11       A    Yeah.  I was handed a subpoena to attend
12 Grand Jury.
13       Q    Prior to getting that subpoena, had you
14 had any conversations with any members of the Suffolk
15 County District Attorney's office, whether it be
16 police or attorneys?
17       A    Prior to the Grand Jury subpoena, I know
18 there was -- I don't know what came first.  But there
19 was a time where, at Village Hall, with regard to the
20 cell phone -- I don't know if that was before or
21 after the subpoena.
22       Q    Does there come a point in time, after
23 you retained Mr. O'Connell, that you and he responded
24 to the District Attorney's office?
25       A    Yes.

1       Q    What was your understanding as to why
2  you were going there?
3       A    Wait a minute.  Let me see when that
4  was.  I guess that was -- I don't know if it was
5  before the indictment or after.
6  
7       Q    I'm talking about a period of time prior
8  to you being indicted.  Do you recall a time you
9  responded to the District Attorney's office with
10 Mr. O'Connell?
11       A    Yeah.  I believe we had a meeting with
12 the District Attorney's office, yes.
13       Q    Do you know what the purpose of that
14 meeting was?
15       A    I think they wanted to talk.  But it
16 wasn't quite clear, during the discussion, what was
17 going on.
18       Q    From your recollection, what took place
19 at that meeting?
20       A    The ADA, I believe, was there, was
21 Mr. Niccolino.  And he, basically, said, "Tell us
22 about the guy."  And I said, "I don't know what
23 you're talking about."  "You know, the guy with the
24 thing.  Tell us about the guy with the thing."  And
25 this is the way --

D. Wirshup

Q  That's what he said?

A  Yes, that's what he said.

Q  Did he ever mention --

A  I didn't know what they were talking about. And I don't know what he was trying to get at. So, I didn't know how to answer his question.

Q  Did they ever mention to you, at that meeting, prior to you being indicted, did they ever mention the name Stephen Milvid to you?

A  I don't remember his name coming up, during that.

Q  What events occurred, when you agreed to go to the District Attorney's office with Mr. O'Connell?

A  What events occurred? I believe that they were looking around the village, at the time. The detectives were looking around the village, at that time. And I was aware they were looking at Milvid's work, or Debut's work. I made that assumption, it had something to do with that.

Q  At any point in time, was it ever indicated to you that you were a potential suspect in regard to the work that Debut Contracting had done in the Village of Patchogue?

---

D. Wirshup

A  Did someone say that to me, specifically? Is that what you're asking?

Q  Yes.

A  I'm trying to remember if anybody said that. I don't recall.

Q  Was it ever indicated to you that you faced a -- potentially, you faced charges, Grand Jury charges, at a point in time prior to you being indicted? Meaning, prior to that meeting with the District Attorney and Mr. O'Connell, did you ever express concern, or did anyone ever indicate to you, before going to the District Attorney's office with Mr. O'Connell, that you could be the subject of a Grand Jury investigation?

A  I don't recall, because there was the incident with the cell phone.

Q  The one we discussed, with respect to LiL Asphalt?

A  Yeah. I noticed that evening I'm in big trouble now. Something to that effect.

Q  Were there ever inquiries indicating there was some concern about you using an asphalt company's phone for private purposes, but yet the asphalt company was paying for it?

1    A    I don't think they got into that depth

2  of it?

3    Q    Did anyone ever express that's why they

4  were making inquiry about the cell phone?

5    A    I think they just confiscated the phone

6  and said, "You're in trouble" --

7    Q    Did anyone ever indicate to you?

8    A    -- and then searched my truck.

9    Q    Did anyone ever indicate to you that

10  when that phone was taken, there was a problem with

11  the Supervisor of Public Works, who decided who gets

12  to do work in the town, to possessing and having a

13  phone for private use that is paid for by one of the

14  vendors that does business in the town?

15    A    The same vendors give out cell phones to

16  all county inspectors for the same purpose he gave me

17  the phone.

18    Q    I understand that. Did anyone express

19  concern, and the reason they were talking to you, and

20  the reason you obtained Mr. O'Connell, because there

21  was some concern about the Supervisor of Public Works

22  taking a phone from a vendor that does business in

23  the town, in which you select using it for private

24  purposes and having it paid for by that vendor?

1

2    MR. BARKET: Objection to form.

3    A    I would assume that was the purpose of

4  them having a problem with me having a cell phone.

5    Q    Does that specific conversation ever

6  come up, when you and Mr. O'Connell go to the

7  District Attorney's office, where you indicated

8  Mr. Niccolino was there?

9    A    No. I don't think we talked about the

10  cell phone there.

11    Q    At any point in time, when you were at

12  the District Attorney's office, in addition -- well,

13  you already indicated you don't recall conversations

14  with the cell. Then was there ever any discussion or

15  conversation, or any indication made to you, that

16  they were also interested in work that you had

17  approved that was done by Debut Contracting?

18    A    Where did this conversation happen?

19    Q    I'm asking you if any such

20  conversations, or anything in that general ball park

21  happened, on the day that you went with Mr. O'Connell

22  to the District Attorney's office?

23    A    I don't think it got that far in the

24  District Attorney's office. It made no sense at all

25  what they were trying to ask or, in fact, there was a

1  question in there.

2  Q   From your recollection, how does that

3  meeting end? What happens?

4  A   Mr. O'Connell says, "I guess we're

5  finished here." We got up to leave, and then I was

6  told by Mr. Niccolino, "I thought we were going to

7  have a trusting relationship." And I said to him, I

8  said, "Mr. Niccolino, if we had a trusting

9  relationship, why didn't you come to me earlier, then

10  follow me around and do all your deeds with

11  investigators here. You mistrust me, before you have

12  a conversation with me." That's how it ended.

13  Q   As you just told me, are you telling me

14  this takes place by police across the table with him,

15  with Mr. O'Connell, in that D.A.'s office?

16  A   That's correct. Talking about the door.

17  Q   Talking about the building across the

18  street?

19  A:   Yes.

20  Q   That happens at that time?

21  A   That's correct.

22  Q   At that time, there are no charges

23  pending against you; correct?

24  A   I got to remember the dates here,

25

1  because I'm not sure what came first here.

2  Q   I don't mean to be confusing. I'm

3  simply talking about that day you and Mr. O'Connell

4  went to do the sit down, and you had the conversation

5  you just relayed to me.

6  A   Right. There were no pending charges.

7  Right. I'm sure. Just in order here.

8  Q   Was it your understanding that the

9  purpose of going to that meeting was to see if some

10  sort of agreement can be reached, and avoid any

11  potential liability down the road?

12  A   I think my attorney wanted to see what

13  was happening. Apparently, I was a target of this

14  investigation. It became clear, that's what was

15  going on here.

16  Q   You certainly were aware of that;

17  correct?

18  A   I felt -- yeah. I felt I was a target

19  of investigation. Absolutely.

20  Q   That's why you retained Mr. O'Connell?

21  A   No. I retained him, because I got a

22  Grand Jury subpoena.

23  Q   And subsequent to that, you went over to

24  the D.A.'s office?

25

1    Q    To your knowledge, were there any other

2 efforts made to get you back into the office again,

3 to speak about Stephen Milvid, Debut Contracting, and

4 your possession of a phone from LILI Asphalt Company?

5    A    You'd have to ask Mr. O'Connell that.  I

6    Q

7 don't know.  Did anybody make a -- I can't remember.

8 Unless I had a conversation with my attorney.  I'm

9 not sure that I did.

10    Q    If you don't remember, you don't

11 remember.  That's fine.

12    I'm going to draw your attention to, I

13 guess it's, February 6, 2003, at a time around

14 noontime.  On that date in time, you had an occasion

15 to go to a 7-11 store?

16    A    Yes.

17    Q    Where was that 7-11 store?

18    A    Waverly Avenue and Roe Boulevard in

19 Patchogue.

20    Q    On that day, were you aware that the

21 Suffolk County District Attorney's office was poking

22 around the Village of Patchogue and was, at least,

23 taking a look at things?

24    A    Yes.

25    Q    If I'm correct, February 6, 2003 would

---

1

2    A    That's correct.

3    Q    What happened with that subpoena, by the

4 way?

5    A    I don't know if it was a real subpoena.

6    Q    Well, you never --

7    A    I handed it over to Mr. O'Connell.

8    Q    Around the same time, at any point, did

9 you ever express any concerns that your motor

10 vehicle, your town car, may have been bugged?  Did

11 you ever express any concerns like that to anybody?

12    A    Probably.

13    Q    Did you ever refuse to take a new

14 village car, because you thought it was going to be

15 bugged, and you didn't want anybody listening in on

16 your conversations?

17    A    No.  There was no new vehicle to take.

18 I don't know what you're talking about.

19    Q    Is that the only contact that you had,

20 that Mr. O'Connell had with the District Attorney's

21 office?  Is that the only visit you made to the

22 District Attorney's office?

23    A    Me?

24    Q    Prior to the indictment.

25    A    Yes.

D. Wirshup

1    be a date after you had that meeting with Mr.

2 O'Connell and yourself and some members of the

3 District Attorney's office?

4

5    A   I believe it was, yes.

6       MR. DUNNE:  Can we mark these as

7 Exhibit K.

8       (The above-mentioned document was marked

9 as Defendant's Exhibit K for identification.)

10   Q   Mr. Wirshup, I'm going to ask you to

11 take a look at this packet that has been marked

12 Exhibit K for today's examination.  Take a moment and

13 go through those items.

14   A   (Looking.)

15   Q   Do you recognize those?

16   A   Yes.

17   Q   What do you recognize them to be?

18   A   Conversation of tapes.

19   Q   They're the transcripts; correct?

20   A   They're the transcripts of the

21 discussions I had.

22   Q   Those were prepared by yourself;

23 correct?

24   A   Yes.

25   Q   Now I'm going to refer to the

D. Wirshup

1 transcripts, for my next line of questions.

2       MR. DUNNE:  I want to indicate, the mere

3 fact that I'm using his transcripts for the

4 purposes of my questioning, I'm not adopting or

5 indicating that they are accurate.  I think at a

6 point down the road, if we ever get to trial,

7 you and I will sit down and listen to what the

8 tapes says.

9       MR. BARKET:  Sure.

10   Q   In fact, you indicated earlier,

11 Mr. Wirshup, to my questions, when I asked you if you

12 had reviewed anything, you indicated that you had

13 reviewed conversations.  These are notes, the items

14 you're talking about?

15   A   Yes.

16   Q   Your copy.  Not these, but your copy of

17 them?

18   A   Yes.

19   Q   Tell me what happens, from your

20 recollection, at around 12:00 on February 6, 2003?

21   A   I was in 7-11 on Waverly Avenue and Roe

22 Boulevard, on line, and I was attempting to pay for

23 something.  My debit card was having trouble with the

24 machine.  A person behind me says, "You having

1                    D. Wirshup

2    trouble, Dan or Mr. Wirshup?" I said, "Yeah. It's a

3    problem with the machine." I looked up, and I didn't

4    recognize the person. I asked, "Where do I know you

5    from?"

6    Q    You did or did not recognize him?

7    A    I did not recognize him.

8    Q    Did you get a response from that

9    question?

10    A    He says, "Yeah. Meet me outside," and

11    shows me a badge and tells me he's a Detective

12    Icapelli, and I should go into the car that's parked

13    next to mine; which was the police car, detectives

14    car.

15    Q    Do you see him here today?

16    A    Yes.

17    Q    The gentleman in the corner?

18    A    Yes.

19    MR. BARKET:  The record should reflect

20    who he pointed to.

21    MR. DUNNE:  He pointed to who he

22    referred to.

23    MR. BARKET:  Which is who?

24    MR. DUNNE:  Thomas Icapelli.

25    Q    Was anybody else with him, at the time?

---

1                    D. Wirshup

2    A    Detective Amato was in the car.

3    Q    Did you have any other conversations

4    with Mr. Icapelli in the 7-11, prior to exiting 7-11?

5    A    Prior to exiting the 7-11, no. I think

6    that was it. He told me to meet him outside, and

7    showed me his badge. Now we're outside the 7-11.

8    Q    What happens then?

9    A    He tells me he's Detective Amato, and go

10    over to the car there.

11    Q    Did you ask him why?

12    A    Well, I -- yeah. And he says -- oh,

13    yeah -- he says, he tells me to go to the car. I

14    asked him if I'm under arrest. He said, "We want to

15    talk." And then I got into the car.

16    Q    Do you say anything in response to them

17    saying that they want to talk, other than you

18    indicated you asked if you were under arrest;

19    correct?

20    A    Yes.

21    Q    Did you ask him anything else?

22    A    No, I don't believe so.

23    Q    What happens, when you get into the

24    vehicle?

25    A    Detective Amato was in the vehicle, and

1     they tell me to -- the basic gist of it is, they want
2     me to -- they want me to find a new attorney and fire
3     my attorney.
4     Q   Do they indicate to you that they wanted
5     to have a sit down or discuss certain things that
6     were going on in Patchogue; they wanted to discuss it
7     with you?
8
9     A   Yes.
10    Q   And they indicated to you that in order
11    for them to do that, you would have to get rid of
12    Mr. O'Connell as an attorney?
13    A   Yes.
14    Q   Now, we marked a series of transcripts
15    as Exhibit K, that you actually indicated to me that
16    you had prepared. The conversations we're talking
17    about now, on February 6, 2003, there is no tape for
18    those conversations; correct?
19    A   That's correct.
20    Q   At what you're telling me takes place --
21    you're not wearing any body ware?
22    A   That's correct.
23    Q   Did they ever indicate to you why it is
24    that they have a concern with Mr. O'Connell?
25    A   That he might not have my best interest

---

1     for me. That he represents other people. That it's
2     a -- he has a conflict of interest.
3     Q   To your knowledge, at that point, did
4     you know who they were referring to, when he said he
5     was representing other people and that there would be
6     a conflict? Did you have any idea what they were
7     talking about?
8
9     A   No.
10    Q   To your knowledge, you don't know of
11    any, at the time this conversation is occurring, you
12    don't know any official either, in the Village of
13    Patchogue, that have retained him?
14    A   Well, I don't know at what point I know
15    that Pat Strebel. I don't know at what point I knew
16    that. But I knew that Mr. O'Connell was representing
17    her. There was no conflict.
18    Q   You had indicated that you went to
19    retain Mr. O'Connell when you had gotten the
20    subpoena; correct?
21    A   The subpoena for the Grand Jury, yes.
22    Q   That's when you went to contact
23    Mr. O'Connell, in relation to this matter; meaning
24    the matter of the subpoena?
25    A   Right.

1
2     Q     Did you know Mr. O'Connell?
3     A     Yeah, I knew him.  Yes.
4     Q     Do you know if he held any titles, or
5  did he have any relationship with the Village of
6  Patchogue?
7     A     Yeah.  One time he was like an acting
8  Village Justice, or fill-in, when the regular Justice
9  wasn't there.
10    Q     Is that how you met him?
11    A     Yeah.  I met him through the Village,
12  yeah.
13    Q     Do you know if he had any relationship
14  with the Mayor, Steven Keegan?
15    A     I knew they knew each other and were
16  friendly towards each other, yes.
17    Q     You indicated to me earlier that Stephen
18  Milvid and Debut Contracting had been involved in
19  work on the Patchogue Theatre; correct?
20    A     Yes.
21    Q     What was being done to the theatre?
22    A     The theatre was purchased by the
23  Village.  It was pretty much abandoned, and they were
24  going to refurbish it and make it a Performing Arts
25  Center.

1     Q     When you say it was abandoned, what do
2  you mean by that?
3     A     It had been closed for many years.  It
4  used to be a movie theatre.  I think they changed it
5  to a duplex, at one point.  That didn't fly.  The
6  doors had just been shut.  That was that.
7     Q     Approximately, how long do you think the
8  place was shut down for?
9     A     I think at least five years.
10    Q     At any point in time, when the work is
11  being done at the Patchogue Theatre, do you ever
12  learn of an insurance claim that was made to Wright
13  Risk Management, an insurance claim in relationship
14  to the Patchogue Theatre?
15    A     I knew there was a flood.  There was a
16  flood that happened.  Is that what you're
17  referencing?  I don't know.  I don't know.
18    Q     I'm just asking generally.  Did anyone
19  ever discuss with you that there was an insurance
20  claim made by the Village, with respect to the
21  Patchogue Theatre, wherein, in that claim it was
22  represented that the theatre was in pristine
23  condition prior to that flood?
24    A     I didn't handle that portion of it.  I

D. Wirshup

1   knew there was a flood, yes. There was a flood, and
2   there was damage from the flood.
3       Q   Right. Did anyone ever ask you, or did
4   you make any input into an insurance claim that was
5   made in connection with that flood, wherein the
6   Village represented that prior to the flood that
7   building was in pristine condition?
8       A   I don't recall.
9       Q   Did you have any conversations with
10  Mayor Keegan regarding that; that specific claim I'm
11  referring to?
12      A   I don't recall.
13      Q   Did you ever give him any information
14  regarding the condition of the theatre, prior to that
15  claim being made?
16      A   Did I give Mayor Keegan information,
17  with regard to the condition of the theatre?
18      Q   Right. Prior to that insurance claim or
19  prior to that flood.
20      A   I don't recall.
21      Q   Did you have any of your village
22  employees from your department contribute to any work
23  that was being done at the Patchogue Theatre?
24      A   Yes.

D. Wirshup

1       Q   You indicated that Mr. Milvid and Debut
2   Contracting were also doing work in connection with
3   that renovation project?
4       A   Yes.
5       Q   At any point in time -- who signed off
6   on Mr. Milvid's vouchers for work that was being
7   done, in connection with the Patchogue Theatre?
8       A   I think Peter Sarich.
9       Q   At any point in time, did you sign off
10  on any of those bills for any of the concrete work
11  that he was doing?
12      A   There was concrete work on the outside
13  as well, yeah. I signed the outside, the walk areas,
14  yes.
15      Q   Is it accurate to say that when Stephen
16  Milvid and Debut Contracting submitted bills, they
17  would submit bills that would cover the expense of
18  labor and cover the expense of whatever materials he
19  was using?
20      A   I have no idea.
21      Q   Did you ever review the vouchers or
22  bills you signed off on, wherein he was billing the
23  Village, making a representation that he was using
24  his employees, but he was, in fact, using your

1  Q  Do you know if he was double billing?

3  A  No.
4  Q  Did you ever learn of any incidents
5  where he represented that, in fact, he had used and
6  paid his own employees, and billed the town for it,
7  when, in fact, they were your workers?
8  A  No.
9  Q  The work on that theatre was being done
10  around the time you and points prior to, and points
11  subsequent to, when you received that subpoena;
12  correct?
13  A  Very possibly. I mean, it was a big
14  project. You know, I'm sure there were sections
15  still going on.
16  Q  At any point in time, did you ever take
17  an envelope full of money from Stephen Milvid, in
18  return to providing him employees?
19  A  No.
20  Q  That he was going to bill to the
21  Village, even though they were yours?
22  A  Absolutely not.
23  Q  Did you ever take any money from him?
24  A  I never took money from nobody.
25  Q  Did you ever take an envelope from

---

1  employees?

3  A  No. Would I sign off on that? No.
4  Q  Did you ever sign off on a voucher that
5  said that?
6  A  No.
7  Q  When you provide your workers to a
8  project, such as the Patchogue Theatre, you have to
9  account for the hours and for the work that they do;
10  correct?
11  A  We accounted for their whereabouts.
12  Q  They get paid?
13  A  And the hours they were there, sure.
14  Q  Part of your responsibilities are to
15  ensure where your guys are and what they're doing. I
16  got a guy being paid $10 an hour, and does five hours
17  of work at the Patchogue Theatre. That's $50 of your
18  budget being contributed to that project.
19  A  Yes.
20  Q  Do you recall getting any vouchers, or
21  signing off on any vouchers, from Stephen Milvid,
22  where he indicated that part of his expenses were the
23  number of employees he was using to complete the work
24  at the Patchogue Theatre?
25  A  No. Not me, no.

D. Wirshup

Stephen Milvid, while you were on that job site, in front of other workers?

A    Absolutely not.

Q    You took no envelopes from him?

A    Filled with money?

Q    Filled with anything.

A    Possibly.

THE WITNESS:  Can we take a break here?

MR. BARKET:  He's close to being done.

MR. DUNNE:  Not really.

MR. BARKET:  How much longer do you have?

MR. DUNNE:  I don't have a problem taking a break.

MR. BARKET:  I'd rather finish and eat later.

THE WITNESS:  I need 15 minutes.

MR. BARKET:  Sure.

(Whereupon, at this time, a break was taken.)

Q    Mr. Wirshup, did you ever receive any engineers reports, or any reports, on the condition of the Patchogue Theatre, from engineers that were hired to evaluate its condition?

---

D. Wirshup

A    Personally, me?

Q    Yeah.

A    No, I don't think so.

Q    Either personally delivered to you or faxed to you?

A    It's possible. I don't recall though any specific engineers report regarding the theatre.

Q    Now I had asked you before about a claim that was put in by the town. Did you have any personal knowledge of that claim?

A    Well, I knew there was a flood. To that extent, you know, I had that information that the theatre got flooded.

Q    Do you know who signed off on the claim?

A    No.

Q    Do you know if it was Mayor Keegan that signed off on the claim?

A    I don't know.

Q    Did you ever see any documents made in connection with that claim, wherein it was represented that that theatre was in pristine condition prior to the flood?

A    No.

Q    I'm going to pick up back at the 7-11,

1 not go, and he gave them to you instead, because he

3 couldn't make it.

4 A. No.

5 Q. Did you ever use your town vehicle for

6 any private purposes?

7 A. Yes.

8 Q. What would those be?

9 A. Well, I didn't do it as a matter of

10 course. I would stop at a store or something like

11 that.

12 Q. Did you have a boat, at this time?

13 A. I had a boat, yeah.

14 Q. What kind of boat was it?

15 A. It was a 19 foot MFG.

16 Q. Where did you keep it?

17 A. I had a trailer, and I kept it at a boat

18 yard in Swan Creek.

19 Q. Did you ever use your town vehicle to go

20 and use that boat as a pleasure craft?

21 A. I think I used the town vehicle to

22 launch the boat, one time.

23 Q. Do you have a house up in Windham?

24 A. Yes.

25 Q. Did you ever use that vehicle to go on

1 in a minute. Let me go over a few things.

2 Other than your professional

3 relationship with Stephen Milvid, did you have any

4 personal relationship with him?

5 A. We became friendly, yes.

6 Q. Did you ever go out to dinner with him?

7 A. No.

8 Q. Go to any theatre with him?

9 A. No.

10 Q. Ball games?

11 A. No.

12 Q. Vacations?

13 A. No.

14 A. No.

15 Q. Did you socialize with him in any way?

16 A. We have coffee. That would be about it.

17 Maybe a slice of pizza.

18 Q. Did you ever take a trip to

19 Disney World, that Stephen Milvid had paid for?

20 A. No.

21 Q. Did you ever go on the Disney Big Red

22 boat?

23 A. No.

24 Q. Was there a point in time where Stephen

25 Milvid purchased tickets for a boat trip and could

D. Wirshup

ski trips?

A    No.

Q    Did you ever use any town equipment to fix a bridge over a creek that leads to your house?

A    No.

Q    Did Debut Contracting, or Stephen Milvid, ever do any private concrete work for you, on any of the properties you own?

A    Yes. I had him do work for my house on Barton Avenue.

Q    Did you pay him?

A    Yes.

MR. DUNNE: Leave a space in the record. Counsel, I'll make a demand for proof of that payment.

(INSERT):

Q    At the time that you went to the District Attorney's office with Mr. O'Connell, did you have any knowledge as to whether or not he had an attorney/client relationship with Ms. Strebel, the Town Supervisor of Brookhaven?

A    Yeah, I knew of that. I'm just not positive what came first here. I knew he was representing Ms. Strebel.

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

---

D. Wirshup

Q    And eventually there was a second indictment that includes allegations against yourself, Ms. Strebel and Mr. Milvid and, I think, a fourth person?

A    Yes.

Q    Eventually, get Mr. Milvid included in an indictment?

A    Yes.

Q    And that also included Pat Strebel?

A    Yes.

Q    I'm just asking at a point in time when you and Mr. O'Connell were having contact with the District Attorney's office, did you have any information as to whether or not Mr. O'Connell had a relationship with Pat Strebel, a professional relationship?

A    That he was representing her?

Q    Yes.

A    Like I said, I don't know exactly when that happened.

Q    Fair enough. You had indicated to me that there was this initial February 6, 2003 contact that you had with the detective/investigators, that they came to you. They don't want to talk to you, if

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

1   Mr. O'Connell was your attorney?

2   A   Yes.

3   Q   How did that contact end? How does it

4   end? How are things left?

5   A   I believe they wanted to hear from me,

6   whether or not I was getting a new attorney, or what

7   new attorney I picked.

8   Q   What did you do, after you get out of

9   the vehicle; do you contact anybody and tell them

10  that you had this, that you came in contact with

11  these two detective/investigators?

12  A   Yes.

13  Q   Who did you tell?

14  A   My attorney.

15  Q   Does there come a point in time where

16  you contact them; meaning, you call either

17  Detective Amato or Detective Icapelli?

18  A   Yes.

19  Q   Specifically, would that have been

20  Monday, February 10, 2003?

21  A   I believe it was on or about that date.

22  Q   I'm using Defendant's K, which is

23  actually the transcripts that you identified as

24  creating. I'm going by your dates.

25

---

1   Q   You have it in front of you.

2   A   Yes.

3   Q   Let me show it to you. I'm referring to

4   that. (Indicating.)

5   A   Yes.

6   Q   At that time, you made a decision to

7   tape your conversations with these detectives;

8   correct?

9   A   Yes.

10  Q   How did that decision come about?

11  A   Under advice of counsel.

12  Q   Were there any discussions about

13  making additional contact with these guys, and saying

14  you shouldn't be talking to my guys?

15      MR. BARKET:  Objection to any

16  conversations between him and his lawyers.

17      MR. DUNNE:  This is in issue.

18      MR. BARKET:  It's privilege.  Doesn't

19  waive privilege.  It's not something we're going

20  to agree to, at this point.

21      MR. DUNNE:  What I'm going to do is move

22  along and we'll wait for a ruling on that.

23  Q   At no time, to your knowledge, did

24  Mr. O'Connell ever then re-contact the District

25  Attorney, after meeting, with respect to that meeting

1 at 7-11?
2
3 A    Say that one more time.
4 Q    To your knowledge, based on the contact
5 that you had with the detectives on February 6, 2003,
6 does Mr. O'Connell ever go back to speak to the
7 detectives, based on what you told him?
8 A  -  To my knowledge, no.
9 Q    Was there a decision that's made,
10 instead of you reaching out and making contact with
11 them, but to tape them?
12       MR. BARKET:    Objection to the question.
13       MR. DUNNE:    You can answer it.
14       MR. BARKET:    No.  Assumes a fact that's
15 not in evidence.
16 Q    You made a decision, you indicated, that
17 perhaps you and your attorney made a decision that
18 you were going to reach out and contact these
19 detectives; correct?
20 A    Well, not reach out.  I was following
21 their directive to get back in touch with them,
22 telling them I got a new attorney.
23 Q    You didn't have to call them back;
24 correct?
25 A    I guess.  I don't know.  I guess I

1 didn't.
2 Q    A decision was made to contact them?
3 A    Nobody forced me to dial a phone.
4 Q    Not only did no one force you to dial a
5 phone at the time you did it, you were going to tape
6 the conversation?
7 A    At the time I did it, I was going to
8 tape the conversation?
9 Q    Yes.
10 A    Yes.
11 Q    And you have a conversation on
12 December 10, 2003; correct?
13 A    Yes.
14 Q    And during the course of that
15 conversation, there's an indication that in order for
16 them to talk to you, they would like to do so, but
17 only if you had an attorney, other than
18 Mr. O'Connell?
19 A    Other than Mr. O'Connell, right.  I
20 believe that's correct.
21 Q    During the course of that conversation,
22 on using your date of February 10, 2003, did either
23 Mr. Amato or Mr. Icapelli ever suggest to you an
24 attorney to use?

D. Wirshup

1 And it indicates that you received a page at

2 3:45 p.m., and that you have a phone conversation

3 around 5:15 p.m. And I'm using the information you

4 provided.

5 A    OK.

6 Q    Again, I'm using this for the purposes

7 of this examination. I don't know that that's the

8 case. Counsel and I will work on that later. For

9 the purposes of this examination, we'll use your

10 information.

11 

12 There comes a point in time you call

13 Detective Amato back; correct?

14 A    Yes.

15 Q    And Detective Amato indicates that we

16 won't deal with Mr. O'Connell -- I'm quoting you from

17 your answer -- "Not that he's a bad guy, you

18 understand. It's just he defends other people that

19 are likely to be a target of this investigation, and

20 we wouldn't want any word to get back to those

21 people. You understand what I'm saying?"

22 Based on your recollection of what you

23 wrote, that's what Detective Amato said to you?

24 A    Yes.

25 Q    And he goes on, later on in the

---

D. Wirshup

1 

2 A    Not at that time.

3 Q    On that date, I'm asking.

4 A    Right.

5 Q    In fact, they indicated to you that,

6 that would be your choice; correct?

7 A    I believe so. You have the transcripts;

8 I don't.

9 Q    My point here is, in this conversation,

10 they're not steering you to a specific attorney;

11 correct?

12 A    No.

13 Q    They're just telling you, if you want to

14 come in and sit down and talk, you need to have an

15 attorney. But they're not going to do that if the

16 attorney is Mr. O'Connell?

17 A    Basically, I believe that was the

18 conversation.

19 Q    Sum and substance; fair?

20 A    Yes.

21 Q    Then there comes a point in time, on

22 February 24, 2003, that you then have a conversation;

23 only this time with Detective Amato.

24 A    Okay.

25 Q    And I'm going to use your Exhibit K.

D. Wirshup

1 conversation, to say, "That the only reason we have
2 any kind of trouble with Mr. O'Connell is because of
3 the fact that he represents other people. It's not
4 that Mr. O'Connell is a bad guy. I wouldn't want to
5 put him in a position where he might think he is
6 giving information that you tell us about to other
7 people."
8
9 I'm reading your transcript. That's
10 your recollection of what Detective Amato told you?
11 A    If that's what it says there, that's
12 what was on the tape.
13 Q    From your recollection of reviewing this
14 information, isn't it a fact that there was never any
15 discussion about your relationship with Stephen
16 Milvid?
17 A    That's correct.
18 Q    They don't go into the specific facts or
19 the reason why it is they want to talk to you.
20 They're just indicating to you the problems with
21 Mr. O'Connell?
22 A    Yes.
23 Q    And isn't it a fact that at that time,
24 on February 24, 2003, according to your transcript,
25 you mentioned the name Paul Gionelli, and Detective

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

111

D. Wirshup

1 conversation, to say, "That the only reason we have
2 any kind of trouble with Mr. O'Connell is because of
3 the fact that he represents other people. It's not
4 that Mr. O'Connell is a bad guy. I wouldn't want to
5 put him in a position where he might think he is
6 giving information that you tell us about to other
7 people."
8
9 I'm reading your transcript. That's
10 your recollection of what Detective Amato told you?
11 A    If that's what it says there, that's
12 what was on the tape.
13 Q    From your recollection of reviewing this
14 information, isn't it a fact that there was never any
15 discussion about your relationship with Stephen
16 Milvid?
17 A    That's correct.
18 Q    They don't go into the specific facts or
19 the reason why it is they want to talk to you.
20 They're just indicating to you the problems with
21 Mr. O'Connell?
22 A    Yes.
23 Q    And isn't it a fact that at that time,
24 on February 24, 2003, according to your transcript,
25 you mentioned the name Paul Gionelli, and Detective

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

1   and Detective Amato's earlier indications to you that
2   the only reason he has a problem with Pat O'Connell
3   is because he represents other potential targets?
4   A   O'Connell did, but Gionelli -- I know he
5   represented Mr. Milvid; right.
6   Q   Did it occurred to you, after what
7   Detective Amato said to you about the problems with
8   Mr. O'Connell, by throwing Mr. Gionelli out there,
9   the same problem might exist?
10  A   I don't know if I thought that through.
11  Q   How did you get the name of
12  Mr. Gionelli?
13  A   He's a known attorney in Suffolk.
14  Q   Why did you select him?
15  A   That was a name that came to me.
16  Q   Also during that conversation with
17  Detective Amato, toward the end of that conversation,
18  he indicates to you that from his view of what he is
19  investigating, he believes that you're a guy that got
20  caught up in some things.  He's pitching to you,
21  you're the small potato.  They're looking to get a
22  bigger potato, and suggesting to you that you
23  shouldn't take the fall for the large guys?
24  A   Yes.

1   Q   Now there comes a point in time again,
2   later on, on February 24, 2003, at 5:28 p.m., going
3   by your transcripts, Defendant's Exhibit K, that you
4   have a conversation with Detective Icapelli; correct?
5   A   Yes.
6   Q   And at that point in time, didn't
7   Detective Icapelli tell you that Detective Amato was
8   unaware there was the same problem with Paul Gionelli
9   that there was with Patrick O'Connell, because he
10  represented Stephen Milvid?
11  A   I don't think he said Stephen Milvid
12  there.  But he has a problem, he said.
13  Q   Along similar lines?
14  A   Yes.
15  Q   Would you take similar lines to be the
16  same problem Mr. O'Connell has; meaning, he may
17  represent other potential targets?
18  A   Right.  Yes.
19  Q   And that during that conversation,
20  Detective Icapelli indicates to you that he checked
21  with the prosecutor, and the prosecutor indicated
22  that the same problem existed with Mr. Gionelli?
23  A   Correct.
24  Q   And that Detective Icapelli suggests

D. Wirshup

giving you a list of people you can't use?

3  A    That I can't use; correct.

4  Q    In fact, Detective Icapelli indicates to

5  you he cannot tell you who to go to?

6  A    But he can tell me who I can't use.

7  Q    Right.

8  A    Lawyers that I can't use.

9  Q    Right. He's telling you lawyers you

10  can't use. But at the same time, he is not telling

11  you or directing you or telling you to go to a

12  specific attorney?

13  A    Correct.

14  Q    In essence, that has to be your choice?

15  A    Is that a question? It's not my choice,

16  if I pick another attorney, and they say, "Well, he's

17  no good either." Then it's not my choice, is it?

18  Q    At this particular time, you had no

19  intention of going back to the District Attorney's

20  office and sitting down and discussing this with him?

21  A    Not correct.

22  Q    While these tapes were made, it was in

23  your mind set to go back and talk to these guys?

24  A    That would be a call my attorney would

25  make in conjunction with me. It wasn't ruled out.

---

D. Wirshup

1  Q    Well, they indicated to you that they

2  felt that they had a potential problem with

3  Mr. O'Connell because he might represent other

4  potential targets.

5  Didn't you see that as an impediment to

6  actually going and talking to these guys?

7  MR. BARKET:  I'm sorry. I'm not sure I

8  follow the question. Are you asking him --

9  MR. DUNNE:  As a follow-up question.

10  MR. BARKET:  Rephrase it then.

11  Q    I asked you a question about whether or

12  not, at the time you made these recorded

13  conversations -- my question to you was, you actually

14  had no intention of talking to those guys. You were

15  just calling him to tape them?

16  MR. BARKET:  That was asked and

17  answered.

18  MR. DUNNE:  Not in the way I asked it.

19  MR. BARKET:  I thought he said --

20  MR. DUNNE:  The question is on the

21  table.

22  A    It wasn't ruled out. That was not ruled

23  out that we wouldn't go back and talk to them. That

24  was never ruled out.

1   question. It's convoluted. It's not an

2   appropriate question. Don't answer that

3   question. Mark it for a ruling. We'll come

4   back with a privilege question. I'm not trying

5   to give you a hard time. I'm just doing my job.

6        Q    Let me ask you this. I'll ask it this

7   way. Didn't you, in fact, call them back, for the

8   sole purpose of getting them on tape, in the hopes

9   they would say something you could use to better your

10  position?

11       A    Can I talk to my attorney a minute?

12       Q    Sure.

13            (Whereupon, a discussion was held off

14  the record.)

15            MR. DUNNE:  Read the question back.

16            (Record read.)

17       A    No.

18       Q    So, you're calling them with the idea of

19  eventually sitting down with them?

20       A    That wasn't -- that's not the only

21  reason that I returned their call.

22       Q    Why did you feel the need to tape them?

23       A    Well, they had me in 7-11, which I

24  didn't tape; the first conversation. I followed up

1        Q    I'm asking you to explain the process.

2   If that is not ruled out, if they are telling you,

3   they can't speak to you and Mr. O'Connell because of

4   other problems. Now, in your mind, do you conclude

5   that the possibility of you talking to them is not

6   ruled out?

7            MR. BARKET:  Objection. It' too

8   convoluted. You asked if he ever ruled out ever

9   going back there. And he said no.

10           MR. DUNNE:  I'm asking what is the basis

11  of the conclusion.

12           MR. BARKET:  Objection.

13           MR. BARKET:  Objection.

14           MR. DUNNE:  He has to answer my

15  questions.

16           MR. BARKET:  Please don't yell.

17           MR. DUNNE:  This is the fourth time you

18  interrupted. You're not supposed to have

19  talking objections either.

20           MR. BARKET:  Don't yell.

21           MR. DUNNE:  There are no talking

22  objections in the Federal practice. You have

23  done it repeatedly.

24           MR. BARKET:  Say it. Just don't yell

25  it. What I'm going to say is I object to the

D. Wirshup

1 with taping them, so that anything I said or they
2 said, there would be an accurate record of it.
3
4 Q    What made you think that there would not
5 be an accurate record of it?
6 A    At that point, I don't think there was a
7 trust going on here. There was no bonding going on
8 here.
9 Q    Well, they indicated to you, didn't
10 they, during the course of those conversations, that
11 you were a pretty decent guy. You were a small
12 potato and will wind up taking the fall for the
13 bigger target?
14 A    They said that.
15 Q    They felt, in their estimation, there
16 would not be a certain degree of trust on their part
17 to indicate to you, one hand has got to feed the
18 other. You're a small potato. You do us a favor,
19 we'll do you a favor?
20 A    I'm put in a position to trust these
21 fellows or my attorney. You have to put your faith
22 somewhere. Somebody is not telling me the truth.
23 Q    Well, I'm not going to go into the
24 conversations you had with Mr. O'Connell, by any
25 stretch of the imagination.

D. Wirshup

1 Now, you again have a conversation. You
2 actually -- there comes a point where you, again,
3 meet with Detective Icapelli and Detective Amato;
4 correct?
5
6 A    Yes.
7 Q    That's at the 7-11 store on Roe
8 Boulevard in Patchogue?
9 A    Yes.
10 Q    You have stated that as March 7, 2003 at
11 11:45 p.m.; right?
12 A    Yes.
13 Q    Again, during the course of that
14 conversation, there is a discussion by Detective
15 Amato talking about who might have a conflict. And
16 he indicates to you that, "We have the right to
17 arrest you, which we really don't want to do at this
18 point." But he tells you that he doesn't have a
19 suggestion for you. Meaning, who you should hire,
20 and the ball's in your court. Go out, get yourself
21 another attorney; right? That's what Detective
22 Amato, from your transcript, is telling you; that he
23 could arrest you, but really doesn't want to do this.
24 The ball is in your court.
25 A    Maybe that section of that.

1     Q     Okay.  Earlier in the conversation -- it

2  goes on.

3     A     Um-hmm.

4     Q     In fact, Detective Amato, later on in

5  that conversation, indicates to you that this is the

6  time, now I'll quote, "We all have to shit or get off

7  the pot, when the Grand Jury convenes."

8           What they're indicating to you is the

9  District Attorney is about to convene a Grand Jury.

10  That you have to make this decision one way or the

11  other?

12     A     Is that the question?

13     Q     Yeah.

14     A     Yes.

15     Q     And Detective Icapelli also states,

16  later on, "And we feel very confident there will be a

17  conflict, and the Judge will see it that way."  And

18. you have to get another attorney, because they still

19  are discussing the fact they would like to talk to

20  you.  But they can't speak to you and Mr. O'Connell;

21  correct?

22     A     Yes.

23     Q     And later on in that conversation,

24  Detective Amato tells you there are only two

1  attorneys you can't use.  Those two, meaning

2  Mr. Gionelli and Mr. O'Connell; the ones we talked

3  about originally and the second guy I said to you

4  originally.  I don't see any reason why not.  Do you

5  recall that?

6

7     A     I don't see any reason why not?

8           MR. DUNNE:  Let me strike that.

9     Q     He indicates to you that -- Detective

10  Amato indicates there are only two attorneys you

11  can't use?

12     A     Okay.

13     Q     Right?  I'm reading your transcript.

14     A     You sit here and stare at me.  You don't

15  say correct or not.

16     Q     Fair enough.  Is that correct?

17     A     Yes.

18.          MR. BARKEY:  What page is that you are

19  reading from?

20           MR. DUNNE:  Five.

21     Q     And, in fact, you go back and say to

22  them, Mr. O'Connell and Mr. Gionelli are no good?"

23  And Detective Icapelli says, "We're not going to talk

24  to either one of them."  That occurs in the last time

25  you meet with them; correct?

D. Wirshup

2  A  I believe so, yes.

3  Q  Later on in the conversation, Detective

4  Amato said to you, "Like I said, the people that we

5  interviewed said that -- we talked about you, said

6  you deserve a shot. And we're really trying very

7  hard to give you a shot."

8     Do you recall him telling you that?

9  A  Yes.

10  Q  Then at page eight in this transcript,

11  during the course of the conversation, you indicate

12  to them that you're having physical problems with

13  your health, and you're being stressed out, and I'm

14  just venting here, but it's, "Fucking bull shit."

15  And Detective Icapelli responds back, "Danny, when

16  the shit hits the fan, you know who it's going to

17  fall on, you know. Well, they put you up as a

18  buffer, Danny. We wish we could open up." And then

19  you indicate to him, "Go after the person you're

20  after, instead of dragging me through this shit." To

21  which Detective Amato responds, "Well, unfortunately,

22  in order to get to this person, there's a couple of

23  people we have to go through to get to these people.

24  You're one of them. It would be easier if we just

25  bring you in, indict you on what you did, and case

---

D. Wirshup

2  closed. Those guys get off with it. All you did was

3  something you were supposed to do, when you were

4  told. To you understand, that's why we're going

5  further."

6     Do you recall that explanation?

7  A  Yes.

8  Q  In essence, they're telling you that's

9  the reason they want to talk to you; to work out some

10  deal and bypass you, to go some other place; is that

11  your understanding?

12  A  That's what he said.

13  Q  Does this factor into any decision?

14  A  I believe that's another whole --

15     MR. BARKET:  He's asking, is he reading

16  accurately from the transcript?

17  A  I believe he is reading it.

18  Q  At that point in time, did you have any

19  reason to disbelieve that they weren't trying to get

20  you into a cooperation agreement?

21  A  I don't know what I believed, at that

22  point.  I don't know who I believed; them or not.

23  Q  Well you, in fact, didn't go back to the

24  District Attorney's office; correct? You didn't go

25  in and talk to these guys with any attorneys to

1  discuss your relationship with Stephen Milvid and
2  your relationship with any other members of the
3  Village of Patchogue government?
4  A    No, we never had another discussion.
5  Q    Now, at the time that these
6  conversations are taking place, and this specific
7  conversation that we're talking about on March 7,
8  2003, you, in fact, indicate that the Village of
9  Patchogue is paying for your attorney; correct?
10  A    I believe they brought that up, yes.
11  Q    Did any member of the Village of
12  Patchogue ever indicate to you what attorney you
13  should be getting to see about this issue, because
14  we're paying for it?
15  A    No. You're allowed to pick your own
16  attorney with regard to --
17  Q    That's what I'm asking.
18.  A    Right.
19  Q    In other words, there's no correlation
20  to the attorney you choose and the fact that the
21  attorney was saying it, other than they were going to
22  pay for the attorney. But you were free to choose
23  whomever you wanted?
24  A    Which I did.
25

1  Q    Now, in your reviewing -- well, toward
2  the end of the conclusion of that conversation,
3  Detective Icapelli says to you, "You know, we can't
4  steer you to anybody in particular." Do you recall
5  that?
6
7  A    Yes.
8  Q    In essence, they're telling you, we
9  can't pick who the attorney is. You got to pick who
10  the attorney is. If you want to do it, that's fine.
11  It can't be Mr. O'Connell.
12  A    That's how things are left; right?
13  Q    That would be your interpretation.
14  A    What is your interpretation?
15  Q    Well, you're cherry picking pieces out.
16  A    I'm talking the broad stroke. Do you
17  ever go in to talk to them about your relationship,
18  with Mayor Keegan or anybody else downtown, with
19  Mr. Milvid or any other contractor?
20  A    No.
21  Q    In your estimation, why does that not
22  happen? Do you make a decision, conscious decision,
23  not to go and talk to them?
24  A    No.
25  Q    You don't make a conscious decision?

D. Wirshup

```
1        A    To go over to the D.A.'s office and talk
2    to them?
3        Q    You never go and talk to them?
4        A    No.
5        Q    In fact, after March 7, 2003, there is
6    no longer any contact between you and either the
7    detectives or the District Attorney's office;
8    correct?
9        A    That was the last contact I had with the
10   investigators; correct.
11       Q    So, you don't take steps to go in to
12   cooperate with them. You make the decision not to?
13       A    That's a question that you should
14   probably ask my attorney.
15            MR. BARKET:  Meaning, Mr. O'Connell?
16            THE WITNESS:  Mr. O'Connell, right.
17       Q    During the course of these conversations
18   that are contained in the transcripts you prepared,
19   isn't it a fact that, at no time, they never discuss
20   the substance of any potential charges or any
21   potential criminal liability that you may face;
22   correct?
23       A    No, not correct.
24       Q    What did they discuss with you that
```

---

D. Wirshup

```
1    would relate to the substance of criminal charges?
2        A    Well, with regard to it being a felony
3    and a misdemeanor.
4        Q    Those portions were discussed?
5        A    Right.
6        Q    In fact, Detective Amato indicated to
7    you that part of the reason to come in here and
8    cooperate is maybe it's only misdemeanor stuff. But
9    by the letter of the law, when the D.A. looks at it,
10   it could be presented as a felony; correct?
11       A    I believe he said the D.A. wanted to
12   push for a felony. They believe, if anything, it was
13   a misdemeanor.
14       Q    Your interpretation of that is that it
15   is only a misdemeanor?
16       A    Yes.
17       Q    That's your interpretation of the tape?
18       A    Right.
19       Q    Okay. I'm just asking for your
20   interpretation of the tape.
21       A    That's what it says.
22       Q    That conversation happens between you
23   and Detective Amato?
24       A    Yes.
```

2     Q    What I meant by the substance -- I don't
3 know if I was clear -- are any specifics ever
4 discussed?  During any of the conversations that you
5 prepared transcripts for; is there any substance of
6 your relationship with Stephen Milvid?
7     A    No.
8     Q    Is there any substance discussed of your
9 relationship with any other vendors, not doing
10 business with the Village of Brookhaven?
11     A    They said they spoke to other vendors.
12     Q    I'm asking about your specific
13 relationship.
14     A    Could you repeat that?  I'm not sure
15 what you're saying.
16     Q    During the course of the conversations
17 that you have prepared transcripts for, did they ever
18 attempt to discuss with you the substance of your
19 relationship with vendors, other than Stephen Milvid
20 and Debut Contracting?
21     A    Just clarify substance.
22     Q    The fact that you went to talk to
23 vendors, you know, met.so and so, did they tell you
24 that somebody said you took an envelope full of
25 money, or somebody saw you do something here?  Did

1 they discuss anything like that with you?
2     A    Other than they said -- generalizing
3 right now.  Not reading from the transcript -- you
4 did some bad things here and you were put up to it.
5
6     Q    They didn't tell you what those bad
7 things are; correct?
8     A    They don't get into detail, no.
9     Q    They don't ask you to tell them what
10 those bad things are; correct?
11     A    Correct.
12     Q    In fact, at no time did anyone ever take
13 any statements from you regarding your relationship
14 with Stephen Milvid; correct?
15     A    Correct.
16     Q    During the course of your criminal
17 trial, at any point in time, did the District
18 Attorney ever offer to introduce statements that I
19 made during the course of the transcripts that we
20 went through today?
21     Q    Did the District Attorney attempt to
22 produce this?
23     Q    Or introduce any information regarding
24 your relationship with Mr. Milvid that was obtained
25 from these conversations that you taped?

D. Wirshup

2    A    No, I don't believe so.  I don't believe
3  so.
4    Q    Were those tapes played for Judge Weber?
5    A    Not in my presence.
6    Q    Were they entered into evidence, in your
7  criminal trial?
8    A    No.
9    Q    In fact, during the course of your
10  criminal trial, there was no evidence presented
11  against you that consisted of any statements you made
12  to those gentlemen?
13    A    Say it again.
14    Q    During the course of your criminal
15  trial --
16    A    Right.
17    Q    -- isn't it a fact that there was no
18  evidence introduced of any purported statement that
19  you made to them, that would some how implicate you
20  in your relationship with Mr. Milvid?
21    A    I mean, when you're talking about the
22  issue of bringing my son into it, is that part of
23  what you're asking and what is the relationship
24  there?
25    Q    Did any of the information contained in

ACCURATE COURT REPORTING SERVICE, INC.  -  (631) 331-3753

---

D. Wirshup

1  the transcripts you prepared, was any of those
2  presented against you, to attempt to incriminate you
3  during the course of your criminal trial?
4    A    To use the transcripts to incriminate
5  me?
6    Q    Yes.
7    A    No.
8    Q    In connection with the trial of which
9  you were one of a number of Defendant's, Mr. Gionelli
10  represented Stephen Milvid; correct?
11    A    Yes.
12    Q    And Mr. O'Connell represented you;
13  correct?
14    A    Yes.
15    Q    Mr. O'Connell did not represent Pat
16  Strebel; correct?
17    A    I believe he might have been co-counsel.
18  But I don't know that for one hundred percent.  But
19  Bill Keon represented Pat Strebel.
20    MR. DUNNE:  Off the record.
21    (Whereupon, a discussion was held off
22  the record.)
23    Q    Mr. Wirshup, it's accurate that you
24  never gave them a confession of any sort; correct?

ACCURATE COURT REPORTING SERVICE, INC.  -  (631) 331-3753

1  A   Correct.
2  Q   And they never interrogated you;
3      meaning, put you in a room and come at you hard to
4      get information out of you; correct?
5  A   Correct.
6  Q   Let me spend a little time on the
7      damages and wrap this up in pretty short order.
8          What damages, specifically, are you
9      claiming, in connection with this case, other than,
10     of course, the expense of trial? I'm assuming the
11     expense of trial.
12 A   Well, obviously that would be one, yes.
13 Q   What other damages are you seeking? Or
14     how do you want to see this case resolved?
15         MR. BARKET: I'll object to that
16     question.
17 Q   Go ahead.
18.        MR. BARKET: How he would like to see
19     the case resolved?
20 Q   What are we sitting here for? What do
21     you mean --
22         MR. BARKET: Objection.
23         MR. DUNNE: No. That we'll make a call
24     on. This is your lawsuit. Damages is the other

1  portion of this.
2  Q   What damages are you seeking?
3          MR. BARKET: What damages did you
4      suffer?
5  Q   What do you mean? Monetary?
6  A   Any damages. Emotional.
7  A   Emotional, my reputation, cost incurred
8      for this whole mess.
9  Q   Anything else?
10 A   Yeah. My character. I was
11     assassinated.
12 Q   Are you seeking anything else?
13 A   Am I seeking anything else?
14         MR. BARKET: Do you have any other
15     damages, is what he's asking.
16 A   Monetary damages. I have, emotional
17     damages. My character has been assassinated.
18         MR. BARKET: You don't have to repeat
19     yourself.
20 Q   Did you see any mental health provider
21     for what you characterize as emotional damages, from
22     the reputation injury you're claiming? Did you go to
23     any therapists?
24 A   I did, yes.

1
2  Q   Who was that?
3  A   Kathleen Lafemina.
4  Q   What is her address?
5  A   I don't have it.
6  Q   We'll leave a space, and you can fill
7  that in.
8  (INSERT): _____
9  Q   Are you indicating to me you went to go
10  and speak to this -- is she a psychiatrist or
11  psychologist?
12      MR. BARKET: If you don't know, you
13  don't know.
14  A   I don't know.
15  Q   Did you get any prescriptions?
16  A   No.
17  Q   Did she ever give you any prescriptions,
18  as a result of this?
19  A.  No.
20  Q   When was the first time you saw her?
21  You can ball park it.
22  A   I'm trying to -- I don't have a date. I
23  can't even ball park it.
24  Q   In relation to the trial, in relation to
25  that time, was it before or after the trial?

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

---

1
2  A   I think it was immediately after the
3  trial.
4  Q   Do you know how much time elapsed, from
5  the time you were indicted, to the time you were
6  acquitted, after trial?
7  A   When was that process; like four months
8  or something. I'm thinking out loud here. I'm
9  thinking around four months.
10  Q   You think you went to go see her at some
11  point after the trial?
12  A   Yes.
13  Q   How often did you see her?
14  A   Once a week.
15  Q   For how long?
16  A   An hour.
17  Q   How long did that treatment go on?
18  A   I don't know. Six months, give or take.
19  Q   Did you receive any diagnosis from your
20  doctor?
21  A   No.
22  Q   Did they classify you with a mental
23  disorder of some sort, or suffering from any sort of
24  mental infirmity?
25  A   No, not that I'm aware of. I stopped

ACCURATE COURT REPORTING SERVICE, INC. - (631) 331-3753

                    D. Wirshup

    going.

    Q   On her advice or your choice?

    A   My choice.

    Q   What went into that decision?

    A   There's a lot going on.  My wife was

    diagnosed with MS, and I just had to -- you know, it

    wasn't the best reason to stop, but it factored into

    my decision, when she was diagnosed with MS.  I had a

    lot on my plate.

    Q   You didn't go to see this doctor in the

    idea of preparing you for this lawsuit, did you?

    A   No.

    MR. DUNNE:  Bruce, what I'm going to do

    is -- I sent you a document demand, a zillion

    years ago, that requested medical stuff.  I

    guess he's going to have to do an authorization.

    MR. BARKET:  Okay.

    MR. DUNNE:  I would like that.  I think

    that would conclude it, at this time.  What I

    did indicate Mr. Wirshup, the last thing I would

    mention to you is, I told you I would give you

    an opportunity to make a statement, if you

    wanted to add anything to the record.  Do you

    want to do that now?

---

                    D. Wirshup

    MR. BARKET:   By counsel, no.

    MR. DUNNE:  Part of the process is, by

    you telling me information, counsel and I sit

    down and discuss this.

    MR. BARKET:  No.  Mr. Wirshup will

    answer specific questions.  Any narratives, or

    anything like that, no.

    MR. DUNNE:  Any other important

    information you want me to know about your

    claim.

    MR. BARKET:  He'll do that through me.

    He'll answer generally, if you have more

    questions.  I'm directing him not to answer

    that.

    MR. DUNNE:  Get a ruling on that.  You

    can't direct him not to answer.

    MR. BARKET:  If you have any specific

    questions to ask, go ahead.  Ask a general

    question.  If you want to add something to the

    record, he is not going to do that.

    MR. DUNNE:  I ask, is there any

    important, significant information about your

    claim that we haven't discussed?

D. Wirshup

MR. BARKET: He's not going to answer
that question. You can get a ruling. If the
Judge makes him answer, then he'll answer it.

MR. DUNNE: We're going to do that.

That's it. I'm done.

(Time noted 2:35 p.m.)

Daniel Wirshup

Subscribed and sworn to before me
This day of ,2006.

NOTARY PUBLIC

---

I N D E X

EXAMINATION BY                                    PAGE

Mr. Dunne                                           4

INFORMATION AND/OR DOCUMENTS REQUESTED

INFORMATION                                       PAGE

Payments and bills for cell phone                  71

Proof of payment for work done by
Debut Contracting on Plaintiff's
house                                             103

Address of Kathleen Lafemina                      135

QUESTIONS MARKED FOR A RULING

        PAGE      LINE

         116        24
         138        23

(Continued on following page.)

C E R T I F I C A T E

I, BETHANNE MENNONNA, a Notary Public

within and for the State of New York do hereby
certify that the foregoing examination of DANIEL
WIRSHUP was taken before me on the 28th day of
December, 2006.

The said witness was by me duly sworn
before the commencement of their testimony. The said
testimony was taken stenographically by myself and
then transcribed.

The within transcript is a true record of
the said testimony.

I am not connected by blood or marriage
with any of the said parties, nor interested directly
or indirectly in the matter in controversy, nor am I
in the employ of any of the counsel.

IN WITNESS WHEREOF I have hereunto set my
hand this 22nd of January, 2007.

BETHANNE MENNONNA

---

DEFENDANT'S EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
| --- | --- | --- |
| A | Letter, dated 8/26/99 | 31 |
| B | Letter, dated 5/28/99 | 31 |
| C | Letter, dated 1/5/04 | 48 |
| D1 & D2 | Photographs | 52 |
| E1 & E2 | Photographs | 54 |
| F1 & F2 | Photographs | 58 |
| G | Photographs | 59 |
| H1 & H2 | Photographs | 60 |
| K | Transcripts of conversations between Plaintiff and detectives/investigators | 87 |
| L | Summons and Complaint | 9 |

ERRATA SHEET

| PAGE | LINE | CHANGE OR CORRECTION |
|------|------|----------------------|
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |
|      |      |                      |

_____
DANIEL WIRSHUP

Subscribed and sworn to before me
this _____ day of _____, 2007

_____
Notary Public