COPY

RECEIVED

JUL 0 5 2007

BRUCE A. BARKET

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -

DANIEL WIRSHUP,

                    Plaintiff,

          -against-

SUFFOLK COUNTY POLICE DEPARTMENT,
SUFFOLK COUNTY DISTRICT ATTORNEY,
THOMAS J. SPOTA; SUFFOLK COUNTY
DISTRICT ATTORNEY'S OFFICE, ASSISTANT
DISTRICT ATTORNEYS JANE and JOHN DOE
"I" - "S;" ASSISTANT DISTRICT ATTORNEYS
KEVIN WARD, JOHN SCOTT PRUDENTI, and
CHRISTOPHER NICOLINO; DETECTIVES/POLICE
OFFICERS TOM IACOPELLI, ROBERT AMATO,
and RAYMOND FELICE, DETECTIVES/POLICE
OFFICERS JOHN and JANE DOE "I" - "S,"
and THE COUNTY OF SUFFOLK,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

                    666 Old Country Road
                    Garden City, New York

                    May 31, 2007
                    11:18 a.m.


          **EXAMINATION BEFORE TRIAL** of **THOMAS

IACOPELLI**, one of the Defendants in the

above-entitled action, held at the above time

and place, taken before Holly Daloia, a

shorthand reporter and Notary Public of the

State of New York.

A P P E A R A N C E S:


LAW OFFICE OF BRUCE BARKET
    Attorneys for Plaintiff
    666 Old Country Road
    Suite 600
    Garden City, New York 11530
BY:  BRUCE BARKET, ESQ.



SUFFOLK COUNTY ATTORNEY'S OFFICE
    Attorneys for Defendants
    H. Lee Dennison Building
    100 Veterans Highway
    Hauppauge, New York 11788
BY:  RICHARD DUNNE, ESQ.



ALSO PRESENT:

  Daniel Wirshup

  Raymond Felice

  Robert Amato

## STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing, sealing and certification be and the same are hereby waived.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question shall be reserved to the time of the trial.

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed and sworn to before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court and that a copy of this examination shall be furnished without charge to the attorney representing the witness testifying herein.

T H O M A S          I A C O P E L L I,

the witness herein, having first

been duly sworn by a Notary Public

of the State of New York, was

examined and testified as follows:

EXAMINATION BY

MR. BARKET:

Q.    Please state your name for the record.

A.    Thomas Iacopelli.

Q.    Have you ever been deposed before?

A.    Possibly, yes.  Many, many years ago.

Q.    In connection with what?

A.    Something to do with someone suing the City of New York.

Q.    Over what?

A.    I'm not sure of the exact grounds of the suit.

Q.    How were you involved?

A.    I believe I was involved in an arrest situation.

Q.    Were you a named defendant in that lawsuit?

1

2      A.    I don't believe I was.

3      Q.    Just a witness?

4      A.    Possibly, yes.

5      Q.    If I ask any question that's not

6 perfectly clear to you, just indicate that

7 and I will try to rephrase it.  If you answer

8 the question, we are all going to assume you

9 understood it.

10     A.    Very good.

11     Q.    Have you been a party to a lawsuit

12 as a plaintiff or a defendant?

13     A.    I don't believe so.

14     Q.    When you say "I don't believe

15 so" --

16     A.    I was never a plaintiff.  I don't

17 know if I was listed as a defendant or a

18 witness of what I just said.

19     Q.    You never sued anybody yourself?

20     A.    No.

21     Q.    Have you ever been sued other than

22 this case?

23     A.    I don't believe so.

24               MR. BARKET:  Plaintiff's

25               Exhibit 3.

(Notice was marked as
Plaintiff's Exhibit 3 for
identification, as of this
date.)

Q.    I would like you to take a look at
what I marked as Plaintiff's Exhibit 3
(handing).

Have you ever seen that document
before?

A.    (Witness examines Plaintiff's
Exhibit 3.)

I have never seen this before.

Q.    How was it that you arrived for
today's deposition; how did you find out
about it?

A.    I was informed by Mr. Dunne.

Q.    Did you bring anything with you
today?

A.    Aside from the transcript that you
produced, no.  That's it.

Q.    Transcript of the conversation
between yourself, Mr. Wirshup and Mr. Amato?

A.    Yes.

Q.    Were you asked to bring anything?

1

2    A.    No.

3    Q.    Did you review anything?

4    A.    Not today.

5    Q.    How about prior to today in

6  preparation for your deposition?

7    A.    Prior to today, yes.

8    Q.    What did you review?

9    A.    Those transcripts.

10    Q.    That's it?

11    A.    That's it.

12    Q.    How are you currently employed?

13    A.    Currently employed as a detective

14  investigator with Suffolk County District

15  Attorney's office.

16    Q.    How long have you been so employed?

17    A.    Approximately five years.

18    Q.    Where are you currently assigned in

19  the DA's office?

20    A.    I'm currently assigned to the

21  Government Correction Bureau.

22    Q.    How long have you been in that

23  bureau?

24    A.    Since inception, which is two years

25  now.

Q.    And before that?

A.    Public Integrity Bureau.

Q.    Same bureau, different name?

A.    It's much larger now, yes.

Q.    How about before the Public
Integrity Unit?

A.    Assigned to the district court in
Central Islip.

Q.    What was your job there?

A.    Serve subpoenas, take statements,
gather evidence.

Q.    What employment did you have before
that?

A.    Retired New York City Policeman.

Q.    When did you start with the Suffolk
DA's office?

A.    July 1, 2002.

Q.    When was Tom Spota elected, do you
remember, initially?

            MR. DUNNE:  November 2001.

Q.    Did you know Mr. Spota before you
were hired?

A.    No.

Q.    How did you get the job out here?

A.    I was called on an interview.  I

went for the interview.  They asked me and I

think that was in -- I don't recall the date

of interview, but by Chief Creighton.

Q.    Do you know anybody who worked for

the Suffolk DA's office prior to working

there yourself?

A.    Yes.

Q.    Who was that?

A.    Detective Investigator Arthur

Scalzo.  I knew the previous chief

investigator Robert Planska.  I knew the

deputy chief investigator, Frank Shields.

                MR. BARKET:  What's so

           funny, Mr. Dunne?

                MR. DUNNE:  Frank was a very

           funny guy.

Q.    Who is the head of the DA squad

now?

A.    He is acting chief investigator,

Inspector James Burke.

Q.    Who is your immediate supervisor?

A.    Sergeant James Shield.

Q.    I'm sorry I'm skipping around.

How long did you work for the City
of New York Police Department?

A.     Twenty-one years.

Q.     Where were your employed before
that?

A.     Worked for Sheraton Hotel chain.

Q.     In law enforcement?

A.     Security.

Q.     Did you have any law enforcement
experience prior to that?

A.     Prior to working for the City of
New York?

Q.     No, the hotel chain.

A.     No, I didn't.

Q.     Where were you last assigned on the
New York City Police Department?

A.     New York Drug Enforcement.

Q.     How long were you with the drug
enforcement task force?

A.     I did two stints there in total.
Approximately eight years.

Q.     Was that your last eight years of
employment?

A.     No.  I was there as a sergeant and

I was there as a lieutenant and I retired

from there a lieutenant.

     Q.    When did you retire from the

New York City Police Department?

     A.    June 30, 2002.

     Q.    Prior to the Drug Task Force, where

were you assigned?

     A.    I did a two-year stint as a

lieutenant in Internal Affairs Bureau.  I

worked on patrol, midtown south precinct.  I

did a year and a half stint in the robbery

squad.  I worked in a training unit.  I was a

sergeant in the training unit.  And rookies

that graduate from the police academy, I

would take them in the street and train them.

I was patrol function.

          I worked in Special Narcotics

Division Special Projects Unit, 17th

Precinct, for a short time.  The 7th Precinct

for a short time.  103rd Precinct for a short

time.

     Q.    What is your educational

background?

     A.    I have a Bachelor's of Science,

1    Criminal Justice.

2         Q.    What year did you receive that and

3    where?

4         A.    John J. College, criminal justice.

5    I graduated December of '79, I believe.

6         Q.    When did you first become involved

7    in an investigation regarding Daniel Wirshup?

8         A.    I was assigned to the Public

9    Integrity Bureau in October of '02. I had a

10   couple of cases. The end of '02, the

11   beginning of '03. I don't have the exact

12   date.

13        Q.    Do you keep any records of that?

14        A.    No.

15        Q.    You don't keep records of

16   investigations you're involved with or when

17   you're assigned to it?

18              MR. DUNNE:  Object to the

19        form of the question.

20              He said he didn't keep a

21        record of when he started. That's

22        a different question you're asking

23        now.

24        Q.    Answer the different question.

25

1

2      A.     Administrative staff opens up the

3    cases for us they hand us a case folder.

4    They do all the administrative paperwork,

5    assigning of numbers.

6      Q.     In what capacity were you assigned?

7      A.     I was assigned as an investigator

8    in the case.

9      Q.     Was anybody else assigned at the

10   same time?

11     A.     Detective Investigator Amato.

12     Q.     Anyone else?

13     A.     Not that I recall.

14     Q.     Who were you reporting to?

15     A.     A the time, the bureau chief,

16   Jeremy Scileppi

17     Q.     In the DA's office?

18     A.     Yes.

19     Q.     Is that the assistant district

20   attorney?

21     A.     He is bureau chief now.

22     Q.     He is an assistant district

23   attorney?

24     A.     Yes, he is.

25     Q.     He was the individual you were

reporting to?

    A.    At that time, immediate supervisor.

    Q.    What were you asked to do?

    A.    We were asked to look into various things in the Incorporated Village of Patchogue, including sidewalks, road work, the theatre, Patchogue Theatre and Performing Arts.

    Q.    Did there come a time you met with Mr. Wirshup?

    A.    Yes, there was.

    Q.    When was the first time?

    A.    The first time I actually met with him and spoke with him was that per chance meeting at the 7-Eleven.

    Q.    Were you at any meetings at the DA's office when he appeared with his attorney before that?

    A.    No, I was not.

    Q.    Were you aware of any meetings that he had with the DA's office prior to your meeting him at the 7-Eleven?

    A.    I'm not sure if I was aware of it. I know subsequent there was a meeting but I

might not have been aware of it at the time I
met him at the 7-Eleven.

Q.    As part of your employment with the
Suffolk County District Attorney's office,
were you given any training?

A.    No.

Q.    You ended on June 30th and started
on July 2nd, you said?

A.    July 1st.

Q.    So?

A.    Did I get any training?

Q.    Yes.

A.    No.

Q.    Was there any --

A.    With the Suffolk County District
Attorney's Office?

Q.    Yes.

A.    No.

Q.    Did they give you any codes or
rules or anything to follow?

A.    No.  Like a manual, a procedure
manual, no.

Q.    This will sound flip.  I don't
intend it to be flip.

1          Do I understand that you, on

2     June 30th, you woke up, went to work in

3     New York City, gave them your badge and ID

4     and July 1st you woke up and went to Suffolk

5     and they gave you another badge and ID,

6     basically what happened?

7          A.    Basically that's what happened.

8          Q.    The Suffolk County District

9     Attorney's Office -- let me back up.

10          In New York City, you went to an

11    academy, right?

12          A.    That's correct.

13          Q.    I take it at each stage of

14    promotion you were given tests?

15          A.    That's correct.

16          Q.    The patrol manuals and procedures

17    in place?

18          A.    That's correct.

19          Q.    In the Suffolk County District

20    Attorney's Office, you're a detective

21    investigator but you're a law enforcement

22    officer?

23          A.    That is correct.

24          Q.    You have the power to make arrests?

25

A.    Yes.

Q.    You carry a badge and a gun?

A.    Yes.

Q.    But instead of being employed from or by a traditional police department, you're employed by the district attorney's office?

A.    That's correct.

Q.    You're saying there is not any manual procedures that were given?

A.    When I became employed by Suffolk County District Attorney's Office, I did not receive any formal training by the Suffolk County District Attorney's office.

Q.    Were you given any manuals or procedures that the district attorney's office in Suffolk expected you to follow?

A.    No.

Q.    Do any exist?

A.    I don't know.

Q.    Getting to the 7-Eleven, you said the meeting that occurred there you had with Mr. Wirshup, you described it as a happenstance or a chance, I forgot the phrase.

1

2          A.     I believe I said a chance meeting.

3          Q.     When did this chance meeting take

4     place?

5          A.     I don't have the exact date, but I

6     believe it was February of 2003, I believe.

7          Q.     February 6th of '03?

8          A.     If that's what it says, then I

9     agree to that.

10         Q.     That being the transcript of --

11         A.     Yes.  That's what I'm looking at.

12    A copy of that transcript.

13         Q.     Actually, the transcript -- this

14    is -- you never heard a tape of this

15    particular meeting, have you?

16         A.     You supplied this transcript to us.

17    This is a copy of what you supplied to us.

18    It says on my copy of the transcript, "This

19    conversation was not recorded."

20         Q.     It is some account of what was

21    said.

22                Have you read it over?

23         A.     I have read it over.

24         Q.     Is it accurate?

25         A.     There are some inaccuracies but, I

1 guess, as a whole, it's accurate.

2  Q.   Whoever prepared it wasn't as good

4 as our reporter?

5  A.   I guess not.

6  Q.   But wasn't terrible?

7       MR. DUNNE:   Whatever that

8       means.

9       Objection to form.

10  Q.   Did you have any notes or records

11 of the meeting?

12  A.   No, I do not.

13  Q.   Did you make any at the time?

14  A.   No, I did not.

15  Q.   How did you recognize Mr. Wirshup?

16  A.   As I stated before, we were

17 assigned to look into the goings on,

18 Patchogue Village Theatre, cement work, road

19 work in the Incorporate Village of Patchogue.

20 In the course of that, we would deliver

21 subpoenas to Village Hall.

22       Mr. Wirshup was identified.   I

23 never had a conversation with him but he was

24 identified as Daniel Wirshup.   He was the

25 head of the Highway Department, DPW

1   Department, and someone pointed him out to

2   me.

3       Q.    Was he a target of an investigation

4   on February 6th of 2003?

5       A.    Was he the target of the

6   investigation?

7       Q.    Was he a target?

8       A.    On that date, I believed that

9   Mr. Wirshup was somewhat involved in criminal

10  activity recording the Incorporated Village

11  of Patchogue.

12      Q.    We'll come back to that, I believe,

13  a little later.

14            Where did you fist see him,

15  Mr. Wirshup?

16      A.    The first time I ever saw Daniel

17  Wirshup --

18      Q.    Let me withdraw that and rephrase

19  it.

20            February 6, 2003, where was he,

21  precisely when you first saw him?

22      A.    I saw him inside -- in fact, he was

23  standing in front of me on the line inside

24  the 7-Eleven, which is located on Waverly

Avenue, and I don't remember the cross street

but it's on the corner of Waverly Avenue.

Q.    Why were you at 7-Eleven?

A.    I was getting coffee there.

Q.    Is that near your office?

A.    No, it's not.

Q.    Is it near any office?

A.    The district attorney's office?

Q.    Yes.

A.    No, it's not.

Q.    What were your doing in that town?

A.    We were investigating, like I said

before, certain aspects that were going on in

the Incorporated Village of Patchogue.    It

was a habit of myself and Detective Amato.    I

live Western Suffolk.    Detective Amato lives

in Eastern Suffolk.    It was a habit when we

were going to do work in the Village of

Patchogue, we would meet at the 7-Eleven on

Waverly Avenue, have a cup of coffee, discuss

what we are doing that day and then from that

point on, we would go ahead, do what we had

on our schedule.

Q.    What was your tour of duty?

Thomas Iacopelli

1    A.    I worked 9:00 to 5:00, Monday

2  through Friday.

3    Q.    What time did the meeting

4  of Mr. Wirshup take place?

5    A.    I believe -- according to this

6  transcript it happened at 12:00 p.m. in the

7  afternoon.

8    Q.    Do you have any independent

9  recollection of that?

10   A.    Daytime.  I didn't look at my

11  watch.  I don't know.

12   Q.    What time would you meet with

13  Detective Amato?

14   A.    Aside from this particular case

15  that we were working together, we had other

16  cases assigned to us.  Sometimes earlier,

17  sometimes later, depending on what we were

18  doing that day.

19   Q.    Did you arrive at the 7-Eleven that

20  day in one car or separate cars?

21   A.    Separate cars.

22   Q.    Both district attorney vehicles or

23  your own vehicles?

24   A.    District attorney's vehicle.

25

Q.    When you saw Mr. Wirshup, what did
you initially say to him?

A.    I saw him at the counter. I was
getting coffee. I forget what he was
getting. I was standing behind him. I think
there was some sort of -- he was having a
problem with some sort of payment or
something. According to the transcript it
says, "Are you having trouble with your
credit card, Dan?" I don't have an
independent recollection of saying that but I
initiated the contact with him.

Q.    What did you say to him?

A.    I don't have an independent
recollection of what I said to him.

Q.    Did you ask him at some point to
get into a police vehicle?

A.    I introduced myself to him. I
identified myself.

Q.    How did you identify yourself?

A.    I told him my name and told him
where I worked.

Q.    Did you show him any
identification?

1    A.    I don't know if I showed him my

2  shield or not.  I said I would like to speak

3  with him.  I said my partner is over there.

4  At that time I think Detective Amato was out

5  of the car or he had just gotten out of the

6  car.

7         We walked over to my vehicle.  We

8  introduced ourselves to him.  We asked him if

9  he had a moment for us.  In sum and sum and

10 substance, we asked if he had a moment for

11 us, we would like to speak with him.

12         Mr. Wirshup got in the back seat

13 behind the driver's seat of the vehicle.  I

14 jumped in the driver's seat and Detective

15 Amato was in front passenger seat.  It was my

16 vehicle.

17    Q.    What did you want to talk to him

18 about?

19    A.    We wanted to ask Dan -- we were

20 doing an investigation and we were trying to

21 cultivate Mr. Wirshup as a source of

22 information, possibly a confidential

23 informant.

24    Q.    Were you aware that he was

25

represented by an attorney?

    A.    I was aware at that time he was
represented by an attorney, I believe so.

    Q.    How did that affect your decision
to have a conversation with him that day, if
at all?

    A.    We didn't plan to interrogate
Mr. Wirshup. We didn't plan to ask him
anything about our investigation. We wanted
to meet with Dan. I ran into him at that
thing and I said, you know what, it's a good
opportunity, let's see if we can speak to
him. Let's see if he will get on board with
us.

    Q.    When you say "cultivate him as an
informant," what do you mean by that, what
did you want him to do?

    A.    I wanted him to cooperate with us.
I wanted him to share information with us.

    Q.    About what?

    A.    About the goings on in the
Incorporated Village of Patchogue.

    Q.    When you say "goings on," I take it
to mean criminal wrongdoing?

A.    Yes, that's correct.

Q.    That criminal wrong doing is the subject matter of the investigation you had been assigned to?

A.    We only do criminal cases.

Q.    Right.  But it's that's specific investigation?

A.    Involving the Incorporated Village of Patchogue, yes.

Q.    Let's go through the transcript a little bit if we can.

Do you have a copy of it?

A.    I have it in front of me here.

Q.    Let's start off by asking you what you think some of the inaccuracies are.

A.    I think here it says, "Iacopelli, why don't you wait for me outside?"  I don't recall that.  I think we walked out together.

It says here, "I'm Detective Iacopelli from DA squad.  Step over to the car.  Get in the back seat."  That sounds very forceful.  It wasn't that type of situation, as I said earlier.

Q.    Cultivate?

1

2        A.      Cultivate and get on our team.

3              In my experience dealing with those

4    type of situations, it's let's get together.

5    It's more like, "join our team."  It's much

6    more -- it's not as formal as this.

7        Q.      You were more polite?

8        A.      It was more of a casual

9    conversation.

10       Q.      More friendly?

11       A.      Yes.  Again, a lot of this stuff

12   sounds very forceful.  My recollection of the

13   conversation that happened outside and inside

14   the car was much more informal, friendly.

15             When it gets to -- where it says

16   "Iacopelli," that's a bad spelling of my

17   name.  It says, "Answering his cell phone

18   discussing how they found me at 7-Eleven."

19             Frankly we weren't looking for Dan

20   on that particular day.  Like I said, it was

21   a chance meeting.  We didn't have to go to

22   the DPW office.  The best of my recollection

23   on that particular day was that myself and

24   Detective Amato were going to meet -- as a

25   normal course of business, we were going to

meet at 7-Eleven and discuss what we had and
my belief is we were supposed to meet
Detective Felice at Village Town Hall.  I
don't remember having discussed going to the
DPW office.  That's it.

    Q.   When you say you wanted him to
cooperate with you -- and I want to talk a
little bit about -- you said he was somewhat
involved.

        What did you mean "he was somewhat
involved in criminal activity?"

    A.   We felt there was part of criminal
activity that was occurring there.  We felt
it had to do with the installation of
sidewalks, curbing in the Village of
Patchogue.  Mr. Wirshup was the highway
superintendent or the super for DPW.  Part of
his job was to inspect those types of
construction, the concrete work, curbing work
and sign off on vouchers saying work was done
according to code, that the work was done the
way it was supposed to be done.  Then
obviously the person who was doing the work
would get paid.  We felt Mr. Wirshup was a

low man on the totum pole with respect to

this.

    Q.    What did you believe his criminal

conduct was, what did you think he was doing

that was illegal?

    A.    What I thought he was doing was

that he was okaying work that was

substandard, that was never done, and that

the contractor was getting paid for

substandard work and work that wasn't done.

    Q.    Did you consider the possibility

that whatever errors you discovered were

simply that, errors in Mr. Wirshup's review

of things?

    A.    It happened quite often and some of

the work was obvious. I'm not an expert, not

a mason expert or concrete expert. Even to

my eye it seemed like it was curbing poured

on top of curbing, blue stone. If you're

going to put a new curb in, you remove the

old one and put a new one in.

    Q.    Why do you say that?

    A.    Why do I say that?

    Q.    Yes.

A.    Because I saw it.

Q.    Why would you say that you would remove the old curbing?

A.    Curbing has to be -- according to the code, curbing has to be a full 18 inches: 12 inches below the road surface and 6 inches above the road surface.  If you're putting it on top of the existing blue stone there is nothing below the road surface.  That's against the code.  That's why I say that.

Q.    No exception to the code that you're aware of?

A.    Not that I'm aware of.

Q.    Other than the fact that it happened, quote, "often," is there anything else that indicates that this, whatever errors you say were made in his certification of work was deliberate as opposed to --

A.    Again, some of the curbing is supposed to be two separate pours, curbing and sidewalk.  They were monolithic pours. It was pretty obvious.  It was obvious to me, and I'm not a mason or a concrete guy.

Q.    Did Mr. Mr. Wirshup look at all



these or did his responsibilities include
looking at all the sites individually or did
he have people that worked for him?

    A.    To my knowledge, he was supposed to
inspect all these sites himself and okay the
payment for the work.

    Q.    Did you investigate or discover any
motive on the part of Mr. Wirshup for
engaging in this misconduct, as you put it?

    A.    It was my belief that Dan Wirshup
was not acting alone.  It was my belief that
Dan Wirshup was directed to inspect them and
to okay the substandard work that wasn't
done.

    Q.    What was he getting, if anything,
for okaying work that wasn't done and work
that was substandard?

    A.    My belief was his job, his
employment, that he owed other individuals.

    Q.    He was being threatened with his
job?

    A.    I don't know that for a fact.  That
was my belief.  My understanding is that he
was appointed by the mayor.

Q.    Which mayor?

A.    My belief, Steve Keegan.  We
thought Mayor Pontieri was involved in this,
who was the clerk, and that Dan was the
facilitator of this scheme to do substandard
work and get paid for it.

Q.    When did Mr. Wirshup, to your
knowledge, first start in his position?

A.    I don't have a date for that.  I
don't know.

Q.    When was Mr. Keegan elected mayor?

A.    I don't have the exact date.  I
don't recall.

Q.    Do you have any evidence whatsoever
that Mr. Wirshup received money in exchange
for certifying substandard work or work that
was not?

A.    In addition to his salary, no.

Q.    So your belief was that Mr. Wirshup
was hired specifically to --

A.    I didn't say that.

Q.    He was appointed by Mr. Keegan or
Mayor Keegan, according to you, and at some
point he was told he had to certify this

1    work?

2         A.    I didn't say that either.

3         Q.    Okay.

4         A.    I believe that in Mr. Wirshup's

5    capacity he was the person who was supposed

6    to check on this work and that he approved of

7    this stuff on behalf of Mr. Keegan, possibly

8    at his direction.

9         Q.    Was Mr. Keegan arrested or indicted

10   on this investigation?

11        A.    No, he was not.

12        Q.    Has he ever been?

13        A.    Not to my knowledge.

14        Q.    I guess we all experienced

15   employees who are varying degrees of skill

16   and responsibility at their respective jobs.

17   I take it in the course of your duties as a

18   police officer, you've seen police officers

19   that have done what they are supposed to do

20   and not done what they are supposed to do and

21   done things they shouldn't do, right?

22        A.    That's correct.

23        Q.    You agree with me, I think, that

24   sometimes people don't do things they

shouldn't do for reasons having nothing to do
with criminal intent; is that right?

    A.    That's --

            MR. DUNNE:  I'm going to
object to the form of the question.

            Try to answer that as best
you can.

    A.    I guess that would be a fair
statement.

    Q.    So how do we get from Mr. Wirshup
certifying substandard work and certifying
work that wasn't done as being lazy, sloppy,
stupid, a bad employee, into him being part
of a criminal scheme; where is the nexus
between --

    A.    The nexus is the contractor.

    Q.    What did he get from the
contractor?

    A.    Mr. Wirshup, nothing -- from the
contractor, I don't believe Mr. Wirshup
received anything from the contractor.

    Q.    How is it then that --

    A.    Mr. Keegan.

    Q.    What was Mr. Wirshup's criminal

intent, where was it established, what
evidence is there that there was criminal
intent?

     A.    Criminal intent was it was obvious
that this was sub par work and it was obvious
that he was signing out off on jobs that
never existed.  The work wasn't done.  How do
you sign off on something if there is
supposed to be curbing at a particular
location and there is no new curbing there
but you sign off on it anyway?  How --

     Q.    It makes you, at least, probably
not a good certifier --

                    MR. DUNNE:  Don't answer

               that.

     Q.    How do we go from him being lazy,
not wanting to leave his office and signing
off on the forms that were submitted to him,
going to criminal conspiracy?

     A.    The conspiracy was we felt that
because of Debut Contractors, Steve Melvid's
relationship with Mayor Keegan, and he did
give campaign donations to Keegan, that this
was payback for campaign donations.  You come

1  to my Village, you do substandard or don't do

2  work and you get paid for it.

3      Q.    Keegan said that?

4      A.    I have no knowledge of that.

5      Q.    The idea is Melvid?

6      A.    Steven Melvid.

7      Q.    Melvid was convicted in this,

8  right?

9      A.    That's right.

10      Q.    Ultimately convicted.  Melvid was

11  doing work that what was substandard and not

12  doing it; is that right?

13      A.    That's right.

14      Q.    He was submitting vouchers for work

15  he hadn't done and certifying that he done

16  work to standards that he hadn't actually

17  performed, right?

18      A.    That's correct.

19      Q.    And getting paid for full jobs when

20  either only part of the job was done or no

21  job was done, right?

22      A.    That's correct.

23      Q.    Thus, obviously, he received large

24  amounts of money for basically fraud?

25

1

2          A.    Yes.

3          Q.    What was Mr. Wirshup getting out of

4     this?

5                     MR. DUNNE:    Objection to

6                form of the question.

7                     It assumes there was a

8                prerequisite of getting something,

9                but answer the question as best you

10               can.

11                    MR. BARKET:    Withdrawn and I

12               will back up.

13         Q.    Have you investigated financial

14    crimes before?

15         A.    My expertise was in narcotics,

16    robberies.  Especially narcotics cases.  We

17    did do a lot of financial investigations.

18         Q.    Clearly people sell drugs to make

19    money?

20         A.    Yes.

21         Q.    Have you ever had any training or

22    expertise in white color fraud cases?

23         A.    I had some training, yes.

24         Q.    When?

25         A.    In the last years.

1    Q.    Where?

2    A.    New York City Police Department,

3  Suffolk County DA's office.

4    Q.    You did get training in Suffolk

5  DA's office?  I thought you didn't get any.

6    A.    You said hired, did I receive

7  training subsequent to being hired.

8    Q.    Let me go back to that then.

9          Subsequent to being hired, were you

10  given training?

11   A.    Yes.

12   Q.    Where did that take place?

13   A.    It took place in the HIDTA Training

14  Center somewhere in Farmingdale, Long Island.

15   Q.    How long was this -- was it just

16  one?

17   A.    It might have been a two-day

18  course.  It was financial conspiracy and

19  financial training.

20   Q.    Who presented it?

21   A.    HIDTA, High Intensity Drug

22  Trafficking Area.  It's a national

23  organization.

24   Q.    High Intensity?

A.    Drug Trafficking Area, HIDTA.

Q.    That was sometime after 2002 and before today?

A.    That's correct.

Q.    There was a drug word used in the acronym.

A.    High Intensity Drug Trafficking Area.

Q.    So this was another narcotics related --

A.    There was narcotics nexus to this, yes, but they'll do different types of training.

Q.    That was a two-day course?

A.    I believe it was two days.  I'm not certain.

Q.    Any other training subsequent to being hired by the Suffolk DA's office?

A.    I went for an interview in interrogation training course.

Q.    Where was that?

A.    That was held at Atlantic City and was done by --

Q.    How many days was that?

A.    A week long.

Q.    Summer or Winter?

A.    Was nice weather.  Might have been September.

Q.    Was it eight hour classes?

A.    Yes, it was full day.

Q.    Did you go to the classes?

A.    Yes, I did.

Q.    Good for you.

When was that, after or before this investigation?

A.    After.

Q.    Go back to what I started to ask you about.

You understand that, generally speaking, people engage in criminal activity based upon a motive.  They have some personal gain --

MR. DUNNE:  Objection to form.

It requires speculation.  It could or could not.  You're saying a general question.  Ask him a question.

                    MR. BARKET:  Rich, I don't

               want to argue with you.  You can

               object to the form.  He doesn't

               have to answer the question and I

               will rephrase it.

     Q.    Is motive something that you

consider in the course of your experience as

a detective or police officer?

     A.    Yes.

     Q.    What did you perceive to be

Mr. Wirshup's motive in engaging in this

conduct?

     A.    His employment.

     Q.    Can you explain that a bit?

     A.    He was given a job by Steve Keegan.

He was appointed to that position by the

Mayor of Patchogue Village.

     Q.    That job is a legitimate job, isn't

it?

     A.    Yes.

     Q.    How does him being given employment

equal motive to help out Melvid?

     A.    The job was given to Daniel

Wirshup.  He didn't meet -- from what I

understand, he didn't meet the minimum
qualifications for the job.  There was a test
for the job.  He was appointed to the
position.  There was a civil service exam for
the job.  He was -- at the time of employment
when he was first employed, he was just
appointed to this position.  He was just
given a job, I believe.

    Q.    What you're saying that he was
given a job --

    A.    Mayor Keegan.

    Q.    For employment?

    A.    Yes.

    Q.    As a condition of employment he had
to certify substandard or non --

    A.    I didn't say that.

    Q.    How does his employment equal
motive to participate in criminal conduct?

    A.    If he doesn't agree to go along
with Steve Keegan, then he no longer will
have the job.  If he doesn't agree to obey
Steve Keegan, he doesn't have that job.

    Q.    Did you have any evidence that
there was this nexus between him certifying?

A.      That was my belief.

Q.      Is there any evidence?

A.      Hard evidence, no.

Q.      How about any evidence?

A.      There was a connection between
Melvid and Steve Keegan that Melvid gave
campaign donations to Steve Keegan's
campaign.

Q.      You don't have any evidence at all
that there was an explicit condition placed
on Mr. Wirshup's employment that he had to do
this in order to maintain it, do you?

A.      No.

Q.      Is there any evidence that to get
this job he had to agree to do this?

A.      No.

Q.      That was in the course of this,
you're searching for why he would have
certified these jobs, that was your
explanation for it?

A.      That is my thought, yes.

Q.      During the course of the
investigation, was there ever any financial
motive of discovering of Mr. Wirshup?

1

2      A.    Not that I know of.

3      Q.    Going back to the conversation you

4  had on February 6, 2003, have you worked with

5  informants before?

6      A.    Yes.

7      Q.    Confidential informants?

8      A.    Yes.

9      Q.    I guess there are different types

10  of people who become witnesses in criminal

11  cases, yes, different categories?

12      A.    Are you speaking of witnesses or

13  informants?

14      Q.    Both.  A general category if

15  witnesses are called by the prosecution.

16      A.    There are all different types of

17  witnesses and informants.

18      Q.    Let me see if I can break it down

19  to a couple of broad categories.  One is

20  civilian witness who happened to be a witness

21  in a crime and cooperated gets subpoenaed and

22  testifies?

23      A.    That's correct.

24      Q.    Two people, for whatever reason,

25  informants, confidential informants to the

police department either pay -- paid, or

agree, whatever reason, give information to

police department and eventually having to

testify?

    A.    That's correct.

    Q.    Another category, individuals

themselves have some criminal exposure, some

fear of being prosecuted, maybe even are

being prosecuted and in exchange for leniency

and not prosecuted agree to give information

and testify?

    A.    Yes, that's correct.

    Q.    I guess working in the narcotics

field you're fairly familiar with people

becoming confidential witnesses or

confidential informants?

    A.    Yes.

    Q.    It's the kind of bread and butter

of what narcotics enforcement is about, isn't

it?

    A.    Yes.

    Q.    In Mr. Wirshup's case, what

category -- how did you want him to be a

witness?  When you say cultivate him, how

were you going to cultivate him as a witness?

    A.    What I wanted to do or, as I saw it, I wanted him to give us information with respect to Keegan and Melvid's relationship.

    Q.    When you say "cultivate," what were you going to do?

    A.    We felt that Dan was the low man on the totum pole, that Keegan was possibly the top of that totum pole. We wanted to use Dan to get to Keegan.

    Q.    What incentive did you give Dan to do that?

    A.    That's why we tried to cultivate him. That's why we spoke to him nicely. We try to bring him onto our team.

    Q.    What incentive did you give Dan?

    A.    I didn't give any incentive to Dan.

    Q.    In other words, what motivation did you give him?

    A.    That he possibly had criminal exposure.

    Q.    So what you essentially conveyed to him is that he could be prosecuted criminally and that if he cooperated and joined your

team, as you put it, that prosecution may not
take place at all or if it did --

     A.    I don't have the authority to say
that.  I don't believe I ever told that to
Mr. Wirshup.

     Q.    Did you imply that?

     A.    I'm not a mind reader.  We didn't
talk about his criminal exposure.  We didn't
speak specifically about the activities that
he did or did not commit.  We basically tried
to cultivate him.  We believed there was
criminal activity afoot and we needed his
cooperation and we wanted his cooperation.

     Q.    In exchange for that cooperation,
what did you do for him?

     A.    I am not authorized to do anything
for him.

     Q.    What would the district attorney
office do?

     A.    With his attorney he would have to
sit down with the district attorney's office
and come to some sort of decision.

           I am not authorized to do it.  I
don't sit in on those meetings.  That's

usually between the attorneys.

Q. The conversation you had with Mr. Wirshup on of February 6, 2003, I'm going to read you parts of this. This is quoted from Mr. Amato: "Dan, you're in big trouble" --

MR. DUNNE: This is not a quote and the same caveat and objection that I raised at the first deposition, I think it's useful to use it for the purpose of deposition but we are no way indicating that this is an accurate transcript.

MR. BARKET: At some point we will provide our own.

MR. DUNNE: Just so the record is clear, this is his recollection of what took place. You're stating it as if that's a fact. You started your question as if this was a fact. Already clarified.

MR. BARKET: Rich, I don't

                    want to argue with you --

                         MR. DUNNE:  I'm just

                    clarifying the way in which you

                    asked the question.

                         MR. BARKET:  I thought we

                    went over the transcript in the

                    beginning.  Let me ask these

                    questions again.  Maybe I missed

                    something.

          Q.    You said the transcript was

     basically accurate, that there were a few

     things that were not accurate.  You went over

     the transcript and you said it's a little

     less friendly, less polite or a little

     harsher than you recall being and that there

     was something -- you didn't recall the DPW

     office.

               Is that essentially what you

     testified to a few minutes ago?

          A.    What?

          Q.    DPW -- Department of Public Works,

     I'm assuming, office?

          A.    Yes, I did say that right.

          Q.    Other than that, you said the

1
2  transcript was, as far as you recall,
3  basically accurate, yes?
4      A.    Fairly accurate.
5      Q.    I'm going to read from parts of it
6  here and I'm going to ask you questions about
7  it.  Obviously I'm reading from it so I'm
8  going to quote it.  It says "Amato" on the
9  first page.  "Dan, you're in big trouble.
10  There were improper contracts.  Your name was
11  all over these documents.  People were
12  talking and you're being set up as a fall
13  guy, a patsy.  You're going to have your name
14  splashed all over newspapers.  I could or
15  would be fired from my job if I didn't
16  cooperate with them."
17              Do you see that?
18      A.    I see it.  It doesn't make any
19  sense to me.
20      Q.    It does if you --
21                  MR. DUNNE:  No, this is not
22              an actual transcript.
23      Q.    "Dan, you're in big trouble."
24              Do you remember words to that
25  effect being said?

        A.    Again, and I dealt with informants
for many, many years, in this situation we
were not trying to be threatening to Dan.
Like I said before, this is a lot harsher
than my recollection of how the conversation
went.  We want Dan to come up on our side.
We want him to be a team player with us.  In
my experience, threats at this stage of
cultivating a guy, threats don't work that
well.  It's been my experience.  This seems
very threatening.  I don't recall that.
You're asking me -- "Dan, you're in big
trouble."  What was the date on this?

        Q.    February 6th.

        A.    '03.  It's more than four years
ago.  Do I have an independent recollection
of Detective Amato saying, "Dan, your in big
trouble?"  No, I don't.

        Q.    Do you have a recollection of
either you or Detective Amato indicating to
Mr. Wirshup that he was the target of a
criminal investigation and he could, himself,
be arrested and indicted?

        A.     In this particular incident on

1  February 6, 2003, I don't have an independent

2  recollection of that.

3      Q.    Do you have independent

4  recollection of talking to him at all about

5  his lawyer?

6      A.    Where is that, sir?

7      Q.    It would be in your mind.

8  Independent recollection in your mind.

9      A.    I thought you were looking at this

10 transcript.

11     Q.    I may very well have been.

12     A.    During our conversations -- and

13 there were a few conversations with

14 Mr. Wirshup -- we did speak about his

15 attorney, yes.

16     Q.    I'm talking about the one on

17 February 6th, what did you talk about or what

18 was the nature of the conversation about his

19 attorney?

20     A.    In sum and substance, my

21 recollection is that Mr. O'Connell, I believe

22 that's his name, we wanted Dan to cooperate

23 with us and that Mr. O'Connell might be

24 representing other targets of the

investigation and we weren't confident

sitting across the table with Mr. Wirshup

exchanging information with Mr. Wirshup with

Mr. O'Connell present. We felt that there

was a conflict there. We also felt that

Mr. O'Connell would be put into a very

difficult situation if he was present during

those type of conversations.

Q.     You explained that to Mr. Wirshup?

A.     Not certain if it was done at this

conversation but over the course of our

conversations, yes.

Q.     I'm trying to limit it --

         MR. DUNNE:  He answered the

         question.

Q.     I'm trying to limit it, at least at

this point, what was said on February 6, '03.

A.     It was said over the course of

conversations.  I don't know if it was

exactly put that way during this conversation

but I know we did express a concern that

Mr. O'Connell might have had the conflict and

we weren't comfortable sitting across the

table with Daniel Wirshup and Mr. O'Connell

and exchanging information.

Q. On February 6, 2003, the people involved in this investigation, the district attorney's office, were yourself, Mr. Amato and who else?

A. With regard to Patchogue was myself, Detective Amato, Ray Felice, his partner, Charles Bartel. Obviously there were different prosecutors involved.

Q. Who were the prosecutors?

A. John Scott Prudenti. I think Chris Nicolino. That's about it, I think.

Q. Had there been any discussions prior to February 6th between yourself and anyone else involved in the investigation with the DA's office about the propriety of Mr. O'Connell representing Mr. Wirshup?

A. I mean, myself and Detective Amato talk about trying to cultivate Dan as an informant. We knew that there was a relationship that Mr. O'Connell had, a professional as well as social relationship that Mr. O'Connell had with Steve Keegan, the Mayor of Patchogue Village.

Q.    The two of you, yourself and
Mr. Amato, had discussions about the
propriety of Mr. O'Connell representing
Mr. Wirshup in light of his personal,
professional relationship with Keegan?

A.    Myself and Detective Amato were
uncomfortable and we didn't want to sit
across the table and exchange information
with Mr. Wirshup while Mr. O'Connell was
sitting there.

Q.    I understand that.

Did you all talk about it?

MR. DUNNE:  Who is "all"?

Q.    You and Mr. Amato.

A.    I just said yes, we did.  We
weren't comfortable with the situation.

Q.    Did you express those concerns to
the assistant district attorneys involved in
the case?

A.    I'm not sure.  I don't know.  We
certainly expressed them to Dan Wirshup.

Q.    Getting to the cultivation of
Mr. Wirshup, I understand or I heard you say
several times you wanted to be friendly, and

1    threats weren't appropriate at this stage.

2    How did you exactly try to cultivate him?

3    What did you do?  What did you say?

4         A.    Dan come on our team.  We know

5    there are problems in the Village.  We are

6    investigating the Village.

7              This is off the top of my head.

8    There are no notes on this.  "We feel that

9    you were sort of like a fall guy."  I used --

10   one of my phrases I used is, "You're a small

11   fish in a big pond.  We don't believe that

12   you're the guy that's calling the shots here,

13   but basically you have been used as a patsy."

14   Those type of things.  And that it wasn't his

15   idea to do this but other people's idea to

16   involve him in criminal activity.

17        Q.    I just want to spell out explicitly

18   some of the metaphors or analogies.  You say

19   "a small fish in a big pond."  You mean a big

20   criminal pond, people involved in a variety

21   of criminal activity, right?

22        A.    Yes, that's correct.

23        Q.    A small fish being somebody who is

24   involved in criminal activity but is not --

25

A.    High up on the totum pole.

           MR. DUNNE:   That's another
metaphor, by the way.

Q.    It wasn't his idea to start this
criminal conspiracy; is that what you were
saying?

A.    We posed that to Dan that way, that
we believed he wasn't the guy calling the
shots.

Q.    Did you indicate to him that if he
didn't help you, that things could get rough
for him in any way?

A.    At some point in time, yes, we did
have those conversations.

Q.    How about on February 6th, did you
indicate to him that he could be arrested or
prosecuted or his name might be in the paper?

A.    I'm looking at this transcript.
This is what the transcript says.  Do I have
an independent recollection of that?  No, I
don't.  I don't recall it as being a
threatening conversation with Mr. Wirshup.

Q.    I guess the cultivation -- tell me
if I'm wrong about this.  I understand

cultivation to be kind of a two part or at

least a two part process.

One is you indicate to him as

gently as you can that you believe he is

involved in some criminal activity; is that

right?

A.     That's correct.

Q.     Second, you say if you help us, if

you cooperate, if you do the right thing, the

harm that will come to flow from that

criminal prosecution would be lessened

because you will be doing the right thing.

You will be cooperating with law enforcement.

You will be demonstrating yourself to be an

honest person at this point and time; is that

true?

A.     In sum and substance.

Q.     In sum and substance, cultivation

of an individual that you want to

essentially -- and, again, I use your

metaphor -- switch teams, is that everybody

on that team is going to lose, they're going

to go to jail and get prosecuted.  We are the

good guys.  Come and join us.  Do the right

thing here. Testify truthfully. Help us.
Cooperate, and that will help reduce your
exposure. That's essentially the two
components of this whole cultivation, isn't
it?

     A.    That's correct.

     Q.    There are different ways of saying
that, isn't there?

     A.    Yes, a multitude of ways.

     Q.    There are different ways of saying
that -- multitude of ways. One way would be
very harsh and tell him you are going to go
to prison for a long time and if you don't
cooperate, you're going to be going to jail,
right?

     A.    That's one.

     Q.    That's not something you did with
Mr. Wirshup on February 6th, is it?

     A.    Not what I recall.

     Q.    Another way to do it would be to be
gently put it to him that they have some
criminal exposure?

     A.    That's correct.

     Q.    That's what you did with

*Thomas Iacopelli*

Mr. Wirshup?

    A.    That's correct.

    Q.    You indicated to him that --

    A.    I barely spoke to Mr. Wirshup.

    Q.    You or Detective Amato indicated to Mr. Wirshup there was an obstacle to him joining your team?

    A.    That's correct.

    Q.    That obstacle was the individual he had chosen to have as his attorney, correct?

    A.    That's correct.

    Q.    Did you indicate to him, in sum and substance, either you or Detective Amato, that if he didn't replace his attorney, he would not be able to join your team?

    A.    The indication was we that where we were not comfortable with, as I stated before, sharing information with Mr. Wirshup and his attorney Patrick O'Connell present during those meetings.

    Q.    Did you or Detective Amato communicate to Mr. Wirshup that unless he found a new lawyer, he wouldn't be able to cooperate with you, you wouldn't sit down and

1

2     talk to him with O'Connell as his attorney?

3          A.    On this February 6th, I'm not

4     certain.  I don't know if that is expressed

5     to him on those terms.

6          Q.    Did you express to him concerns of

7     Mr. O'Connell representing him in this

8     context?                                          liw

9          A.    Yes, we did.

10          Q.    Did you ever participate in

11     discussions with any member of the district

12     attorney's office about having Mr. O'Connell

13     formally removed or disqualified from

14     representing Mr. Wirshup?

15          A.    I don't recall that.

16          Q.    The factual basis you believed

17     Mr. O'Connell had a professional/personal

18     relationship with Mr. Keegan was what?

19          A.    Was based on information that was

20     gleaned during the course of the

21     investigation.

22          Q.    Tell us what that is.

23          A.    At one time, Mr. Keegan, I think,

24     appointed Mr. O'Connell to either a Deputy

25     Town Attorney or a part-time Village Justice.

1   They were both -- from my understanding, they

2   were both from Patchogue and had a long

3   standing relationship just from being in the

4   same area.  They had similar friends.

5           Q.    How did you learn this information?

6           A.    It was gleaned during the course of

7   investigation.

8           Q.    Was information conveyed to the

9   assistant district attorneys in this case?

10          A.    It possibly could have been, yes.

11          Q.    Tell me why you thought it was

12  appropriate to have a conversation with

13  Mr. Wirshup without his attorney being

14  present?

15          A.    He wasn't in custody.  We weren't

16  interrogating him.  We didn't ask anything

17  about the crimes we felt he committed.  It

18  wasn't an interrogation.  He was free to

19  leave or not talk to us at any time.

20          Q.    So you thought it was appropriate

21  because he was free to leave?

22          A.    He wasn't in custody.

23          Q.    I'm just repeating to you one at a

24  time.

One, he was free to leave.  Two,
you weren't asking him about his specific
crimes.

A.    It was not an interrogation.  We
weren't asking him about any criminal
behavior.

Q.    In the course of your experiences
as a police officer or detective, have you
learned that individuals who -- just assume
for a second that are involved in criminal
activities do have the opportunity to
cooperate with law enforcement.  Did they
make different decisions, some cooperate,
some don't?

A.    Can you repeat that question?

Q.    You're aware of individuals who
have been involved in criminal activity who
are given a choice as to whether or not they
are going to cooperate with law enforcement?
Some choose to cooperate and some choose to
don't?

A.    Yes.

Q.    The individual, when given that
choice, in your course of experience, the

1
2    individuals are given a choice at different

3    points in the investigation, aren't they?

4           In other words, you can pick

5    somebody up, for example, on a buy and bust.

6    He gets arrested that night and, boom, right

7    away he cooperates and goes back in the

8    street to get his supplier, right?

9           A.    Yes.

10          Q.    Could be that you execute a search

11   warrant, you arrest somebody.  They're in,

12   they're prosecuted.  They have a lawyer and

13   they're indicted but they are going to go out

14   and cooperate anyway, right?

15          A.    Yes.

16          Q.    If you kind of run through the

17   spectrum of an investigation from the first

18   word that some crime has occurred all the way

19   through until -- even right up until the

20   sentence, an individual, anywhere along that

21   line, could, if you want him to and he wants

22   to or she wants to, choose to cooperate; is

23   that right?

24          A.    That's correct.

25          Q.    In the course of your experience as

a police officer, you've seen people make
different decisions all along that spectrum;
isn't that true?

A.    That's correct.

Q.    In the individuals who have
lawyers, has it been your experience these
individuals consult with their lawyers prior
to making a decision to cooperate?

A.    Individuals that are already
represented by counsel?

Q.    Right.

A.    It varies in different situations.
In this particular situation we expressed to
Mr. Wirshup we were not comfortable with his
counsel.  With respect to him becoming an
informant, I don't know what he would do.  I
don't know if he would go to his attorney or
sit back and say, well, you know, maybe I
should get another attorney.  I'm not a mind
reader.  I don't know what his thought
processes was.

Q.    You understand, prior to the
February 6th meeting, someone in
Mr. Wirshup's situation might very well want

1  to consult with a lawyer prior to making a

2  decision to cooperate with you?

3      A.    Throughout our conversations with

4  Mr. Wirshup, we instructed him and we advised

5  him to be represented by counsel, by an

6  attorney, but that we weren't comfortable

7  with him being represented by Mr. O'Connell.

8      Q.    Let me see if I can boil this down

9  to simplest terms.

10          You were perfectly happy to have

11  Mr. Wirshup represented by an attorney and

12  actually wanted him to be represented by an

13  attorney; is that right?

14      A.    That's correct.

15      Q.    You wanted him to cooperate with

16  your office?

17      A.    Yes.

18      Q.    You thought he was involved in some

19  criminal activity but not seriously involved?

20      A.    We thought he was more a

21  facilitator than the actual --

22      Q.    Perpetrator?

23              MR. DUNNE:  Objection.

24      Q.    I don't know.  I'm just completing

25

your sentence.  Complete it yourself.

     A.     We thought he was more the
facilitator than the brains of the
organization.  He wasn't the guy calling the
shots.

     Q.     The purpose of meeting with
Mr. Wirshup or the conversation with
Mr. Wirshup on February 6th wasn't to get him
to incriminate himself, was it?

     A.     No.

     Q.     You didn't want to find out -- get
admissions from him?

     A.     No.

     Q.     It was to get him to get a
different lawyer so that he could cooperate?

     A.     Like I said earlier, it was a
chance meeting.  We had discussions about
developing Dan Wirshup as an informant and
when we did have it on that day, that was the
purpose of bringing him on board with us.

     Q.     The purpose was not to have him
make admissions but to have him find an
attorney that you were comfortable working
with?

A.     Because we wanted him to cooperate

with us.

Q.     Right.  It wasn't to try to get to

speak to him without his lawyer?

A.     No, absolutely not.

Q.     Did you consult with the district

attorney once you saw Mr. Wirshup at the

7-Eleven and decided to have this

conversation with him?  Did you consult with

anybody about the propriety of having a

conversation?

A.     I remember going to the chief

investigator and telling him --

Q.     No, let me rephrase the question.

After you saw him?

A.     Right.

Q.     Before you had the conversation,

you see him in line.  Before you ask him to

get in the car, did you consult with anybody

from the district attorney's office other

than Detective Amato about the propriety of

speaking with him?

A.     No.

Q.     After you had the conversation with

him on February 6th, did you tell anyone from
the district attorney's office, any attorney
with the district's attorney office, that you
had the conversation with him?

A.    I must have, yes.

Q.    Do you remember who?

A.    The attorney could have been John
Prudenti. I do remember having a
conversation with the chief investigator.

Q.    What was that?

A.    Robert Creighton. That was the
first person we notified that we had this
meeting with Dan Wirshup and that we might be
getting -- the office might be getting a
phone call from Pat O'Connell because, at
that time, we weren't sure if Dan Wirshup
wanted to come on board or not.

Q.    What was the reaction of the
attorney that you spoke with after you spoke
with aim?

A.    I don't remember. I'm not
absolutely certain. I'm surmising that we
notified Prudenti.

Q.    Did anyone ever tell you to cease

contact with Mr. Wirshup without his attorney

being present or authorizing it?

    A.    After the initial contact with

Mr. Wirshup?

    Q.    Right.

    A.    At some point and time, yes, but it

wasn't right after.  That wasn't the initial

reaction.  The time thereafter then, I

believe once, I guess, Mr. O'Connell came

forward and we realized Dan Wirshup wasn't

going to cooperate with us and wasn't going

to become an informant.

        I was like, okay, not going to

become an informant.  Don't talk to him.

Stop trying to cultivate him.

    Q.    Through Mr. O'Connell saying he

wasn't going to cooperate?  Did someone tell

you to stop talking to Mr. Wirshup without

Mr. O'Connell's approval?

                MR. DUNNE:  Client.

    Q.    Client?

    A.    I don't recall somebody saying,

"Don't contact Dan."

    Q.    Did you understand that to be

approval for what you were doing then?

    A.    We continued to contact and
Mr. Wirshup actually contacted us.  He took
the initiative to contact us, on occasion.

    Q.    If you continued to speak with
Mr. Wirshup without Mr. O'Connell's knowledge
or approval?

    A.    Hindsight is 20/20.  Obviously
Mr. O'Connell knew.  So Mr. O'Connell knew we
were speaking to him.  I was under the
assumption that he didn't know and we
continued to speak to Dan Wirshup, yes.

    Q.    The prosecutors involved in this
investigation knew you were doing this?

    A.    I believe they did, yes.

    Q.    You took their knowledge and
silence as approval of your conduct?

    A.    I dealt with informants many, many
times over the years.  In my own mind I
didn't think I was doing anything wrong.

    Q.    I'm not asking about your mind.
I'm asking what you understood.

    A.    I thought I was doing the right
thing.  I was trying to cultivate.

Q.    What I'm asking you is the prosecutor's knowledge that you were doing this in silence.  In other words, they didn't object to it.  Did you understand that to be approval for what you were doing?

A.    That would be fair to say.

Q.    They are not shy individuals.  If they felt what you were doing was inappropriate or wrong or didn't want you to do it, they would have told you to stop?

A.    Yes.

MR. DUNNE:  Objection to

form.

You can answer.

A.    Yes.

Q.    Do you have any knowledge or evidence of his criminal intent?

A.    Of his intent?

Q.    Yes.

A.    Physical evidence?

Q.    Verbal?  Anything; physical, testimonial, anything.

A.    No.

Q.    Did you at all participate in the

press releases that were done when

Mr. Wirshup was arrested?

   A.   Participate to what?

   Q.   Did you give information to the

press?

   A.   Did I?  No.

   Q.   Did you give photographs to the

press?

   A.   I did not, no.

   Q.   Did you alert the press when the

individuals would be arrested?

   A.   No.

   Q.   Did you testify in the Grand Jury

in this case?

   A.   No.

   Q.   Did you issue a subpoena for people

to testify in the Grand Jury?

   A.   Yes.

   Q.   Did you transport witnesses to

testify?

   A.   I don't remember that I did.

          MR. BARKET:  I'm done,

          subject to production of the

          documents that we discussed

earlier.

        MR. DUNNE:  Fine.

        Before we get out today, I want to clarify.

EXAMINATION BY

MR. DUNNE:

    Q.   Detective, let me ask you this... Counsel asked you questions about motive or about direct evidence that you had of Mr. Wirshup's activity at the time of the conversation.

        When, approximately, in relation to February of '03, did that indictment containing charges against Daniel Wirshup get handed up?

    A.   Quite awhile after that.  Quite awhile.  I don't have the date of the indictment.  It was after that meeting.

    Q.   Subsequent to the meetings that counsel had asked you about and that have been the subject of a large portion of the depositions thus far, did you go out to speak to any homeowners?

    A.   Yes, we did.

A.      It confirmed those beliefs.

MR. DUNNE:  I don't have anything further.

-o0o-

(Whereupon, the examination of Thomas Iacopelli was concluded at 12:38 p.m.)

_____

THOMAS IACOPELLI

Subscribed and sworn to
before me this _____ day
of _____, 2007.

_____

NOTARY PUBLIC

1

2   A.   It confirmed those beliefs.

3        MR. DUNNE:  I don't have

4   anything further.

5                -o0o-

6        (Whereupon, the examination

7   of Thomas Iacopelli was concluded

8   at 12:38 p.m.)

9

10

11   _____

12   THOMAS IACOPELLI

13

14

15   Subscribed and sworn to
     before me this _____ day
     of _____, 2007.

16

17

18   _____

19   NOTARY PUBLIC

20

21

22

23

24

25



I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Thomas Iacopelli | Mr. Barket | 4 |
| | Mr. Dunne | 74 |

EXHIBITS

| PLAINTIFF'S | | PAGE |
|---|---|---|
| 3 | Notice | 6 |

C E R T I F I C A T E

I, HOLLY DALOIA, a Notary Public within and for the State of New York, do hereby certify:

That the witness(es) whose testimony is hereinbefore set forth was duly sworn by me, and the foregoing transcript is a true record of the testimony given by such witness(es).

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

_____

HOLLY DALOIA

**A**

able 60:16,24
about 6:16 7:5 8:6
24:19 25:10,21,22
28:9 40:15 43:5
45:20 47:9,10 50:6
52:5,15,17,18,19
54:13,17,20 55:3,13
57:16,25 61:12 62:18
63:3,6 67:18 68:11
68:22 71:22 74:9,10
74:21
above 1:22 30:8
above-entitled 1:22
absolutely 68:6 69:23
academy 11:15 16:12
accommodate 75:17
according 22:6 23:9
28:22 30:5 32:24
account 18:20
accurate 18:24 19:2
48:14 49:12,13 50:3
50:4
acronym 39:7
across 53:3,24 55:9
acting 9:21 31:12
action 1:22 78:14
activities 17:10 63:12
activity 20:11 28:12,14
40:17 47:13 56:17,22
56:25 58:6 63:18
66:20 74:11
actual 50:22 66:22
actually 14:14 18:13
36:17 66:13 71:4
addition 32:19
administer 3:19
administrative 13:2,4
admissions 67:13,23
advised 66:5
Affairs 11:10
affect 25:5
afoot 47:13
after 39:3 40:11,13
68:16,25 69:20 70:4
70:8 74:17,19
afternoon 22:8
again 27:11 30:20 49:9
51:2 58:21
against 1:7 30:11 74:15
ago 4:14 49:20 51:17
agree 18:9 33:24 42:20
42:22 43:16 45:3,11
AGREED 3:5,11,16
ahead 21:23
aim 69:21
alert 73:11
alone 31:12

along 42:20 64:20 65:3
already 48:23 65:10
Amato 1:12 2:18 6:23
13:11 21:16,17 22:14
24:5,16 27:24 48:6
50:8 51:18,21 54:5,8
54:19 55:3,7,15 60:6
60:14,22 68:22
amounts 36:25
analogies 56:19
another 16:6 39:10
45:7 57:3 59:21
65:20
answer 5:7 12:25 34:7
35:15 37:9 41:5
72:15
answered 53:15
Answering 27:17
anybody 5:19 9:6 13:9
68:11,20
anyone 13:12 54:16
69:2,25
anything 6:18,25 7:3
15:21 25:10 30:16
31:16 34:22 47:17
62:17 71:21 72:22,23
76:4
anyway 35:12 64:14
anywhere 64:20
appeared 14:18
appointed 31:25 32:23
41:17 42:4,8 61:24
appropriate 56:2 62:13
62:21
approval 70:20 71:2,8
71:18 72:6
approved 33:7
approximately 7:17
10:22 74:13
area 38:23 39:2,9 62:5
argue 41:3 49:2
around 9:25
arrest 4:23 64:11
arrested 33:10 51:24
57:17 64:6 73:3,12
arrests 16:25
arrive 22:20
arrived 6:14
Arthur 9:11
Arts 14:9
Aside 6:20 22:15
asked 6:25 9:3 14:4,5
24:9,11 49:5 74:9,21
asking 12:23 26:15
51:13 63:3,6 71:22
71:23 72:2
aspects 21:14
assigned 7:18,20 8:8

10:16 11:8 12:9,18
13:6,7,9 19:17 22:17
26:5
assigning 13:5
assistant 1:9,10 13:19
13:22 55:19 62:10
assume 5:8 63:10
assumes 37:7
assuming 49:23
assumption 71:12
Atlantic 39:23
attorney 1:8 3:23 13:20
13:23 14:19 22:23
25:2,4 47:19,21
52:16,20 60:11,15,20
61:2,25 62:14 65:18
65:20 66:7,12,14
67:24 68:8 69:3,4,8
69:20 70:2
attorneys 1:10,10 2:4
2:10 3:6 48:2 55:19
62:10
attorney's 1:9 2:9 7:15
15:5,17 16:10,21
17:7,12,14,16 21:9
22:25 47:22 54:5
61:12 68:21 69:3
authority 47:4
authorized 3:18 47:17
47:24
authorizing 70:3
Avenue 21:2,3,21
aware 14:21,24 15:2
24:25 25:3 30:13,14
63:17
away 64:7
awhile 74:17,18
a.m 1:18

**B**

Bachelor's 11:25
back 16:10 20:13 24:13
26:22 37:12 38:9
40:14 44:3 64:7
65:19
background 11:24
bad 27:16 34:14
badge 16:4,6 17:3
barely 60:5
Barket 2:4,6 4:8 5:24
9:15 37:11 41:2
48:16,25 49:6 73:23
77:6
Bartel 54:9
based 40:18 61:19
basically 16:7,8 36:25
47:11 49:12 50:3
56:14

basis 61:16
became 17:11
become 12:7 44:10
70:13,15
becoming 45:16 65:16
before 1:20,23 3:18,20
4:12 6:10,13 8:2,6,13
8:22 10:5 14:19
19:16 21:14 37:14
39:4 40:11 44:5 51:5
60:19 68:18,19 74:4
76:15
beginning 12:12 49:8
behalf 33:8
behavior 63:7
behind 23:6 24:14
being 17:5 18:10 31:21
34:13,14 35:17 38:8
38:10 39:19 41:22
45:9,10 49:16 50:12
50:25 56:24 57:22
62:4,14 66:8 70:3
belief 28:3 31:11,12,19
31:24 32:3,20 43:2
75:12
beliefs 76:2
believe 4:22 5:2,13,14
5:23 12:6 18:2,6,6
20:13 22:6 25:4 29:4
33:5 34:21 39:16
42:9 47:5 52:22
56:12 58:5 70:10
71:16
believed 20:9 47:12
57:9 61:16
below 30:7,10
best 27:22 34:7 37:9
between 3:6 6:23 34:16
42:25 43:6 48:2
54:15
big 48:6 50:9,23 51:13
51:18 56:12,20,20
bit 26:12 28:9 41:15
blood 78:15
blue 29:20 30:9
board 25:14 67:21
69:18
boil 66:9
boom 64:6
both 22:23 44:14 62:2
62:3
brains 67:4
bread 45:19
break 44:18
bring 6:18,25 46:16
bringing 67:21
broad 44:19
BRUCE 2:4,6

Building 2:10
bureau 7:21,23 8:3,4
11:10 12:10 13:15,21
Burke 9:22
business 27:25
bust 64:5
butter 45:19
buy 64:5

**C**

C 2:2 4:2 78:3,3
call 69:16
called 9:2 44:15
calling 56:13 57:9 67:5
came 70:10
campaign 35:24,25
43:8,9
capacity 13:6 33:6
car 22:21,24:6,7 26:22
27:14 68:20
card 23:11
carry 17:3
cars 22:21,22
case 5:22 13:3,8 22:15
45:23 55:20 62:10
73:15
cases 12:11 13:3 22:17
26:6 37:16,22 44:11
casual 27:8
categories 44:11,19
category 44:14 45:7,24
caveat 48:9
cease 69:25
cell 27:17
cement 19:18
Center 38:15
Central 8:9
certain 21:14 39:17
53:11 61:4 69:23
certainly 55:22
certification 3:8 30:18
certified 43:20
certifier 35:14
certify 32:25 42:16
78:7,13
certifying 32:17 34:12
34:12 36:16 42:25
chain 10:7,14
chance 14:15 17:24
18:2,3 27:21 67:18
charge 3:23
charges 74:15
Charles 54:9
check 33:7
chief 9:5,12,14,21
13:15,21 68:13 69:10
choice 63:19,25 64:2
choose 63:21,21 64:22

chosen 60:11
Chris 54:12
CHRISTOPHER 1:11
City 1:17 2:6 4:17 8:15
10:2,12,17 11:5 16:4
16:11 38:3 39:23
civil 42:5
civilian 44:20
clarified 48:24
clarify 74:5
clarifying 49:4
classes 40:6,8
clear 5:6 48:19
Clearly 37:18
clerk 32:5
Client 70:21,22
code 28:22 30:6,11,12
codes 15:10
coffee 21:5,21 23:5
College 12:5
color 37:22
come 14:10 20:13
35:25 47:23 51:7
56:5 58:11,25 69:18
comfortable 53:24
55:17 60:18 65:15
66:7 67:24
commit 47:11
committed 62:18
communicate 60:23
Complete 67:2
completing 66:25
components 59:5
concern 53:22
concerns 55:18 61:6
concluded 76:7
concrete 28:20 29:18
30:24 75:7
condition 42:15 43:11
conduct 29:5 41:13
42:19 71:18
confident 53:2
confidential 24:23 44:7
44:25 45:16,17
confirmed 76:2
conflict 53:6,23
connection 4:15 43:6
consider 29:12 41:8
conspiracy 35:20,21
38:19 57:6
construction 28:20
consult 65:8 66:2 68:7
68:10,20
contact 23:13 70:2,4,24
71:3,5
contacted 71:4
containing 74:15
context 61:8

continued 71:3,6,13
75:16
contractor 29:10 34:17
34:19,21,22
Contractors 35:22
contracts 50:10
conversation 6:22
18:19 19:23 25:6
27:9,13 44:3 48:3
51:6 52:19 53:12,21
57:23 62:13 67:8
68:10,12,18,25 69:5
69:10 74:12
conversations 52:13,14
53:9,13,20 57:15
66:4
conveyed 46:23 62:9
convicted 36:8,11
cooperate 25:19 28:8
50:16 52:23 58:10
59:3,15 60:25 63:13
63:14,20,21 64:14,22
65:9 66:3,16 67:16
68:2 70:12,18
cooperated 44:21
46:25
cooperates 64:7
cooperating 58:14
cooperation 47:14,14
47:15
copy 3:21 18:12,17,18
26:13
corner 21:3
correct 16:13,16,19,24
17:8 26:2 33:23
36:19,23 39:5 44:23
45:6,13 56:23 58:8
59:7,24 60:3,9,11,12
64:24 65:5 66:15
Correction 7:21
counsel 65:11,16 66:6
74:9,21
counter 23:4
Country 1:16 2:5
County 1:8,8,9,13 2:9
7:14 15:5,16 16:9,20
17:12,14 38:4
couple 12:11 44:19
course 19:20 27:25
33:18 38:19 39:15,21
41:8 43:18,23 53:12
53:19 61:20 62:7
63:8,25 64:25
court 1:2 3:21 8:8
credit 23:11
Creighton 9:5 69:12
crime 44:21 64:18
crimes 37:14 62:18

63:4
criminal 12:2,5 20:10
25:25 26:3,6 28:12
28:13 29:4 34:3,15
34:25 35:3,5,20
40:17 42:19 44:10
45:8 46:21 47:9,13
51:23 56:17,21,22,25
57:6 58:6,12 59:23
63:6,11,18 66:20
72:18
criminally 46:24
cross 21:2
cultivate 24:22 25:16
26:25 27:2 45:25
46:2,6,14 47:12
54:20 56:3 70:16
71:25
cultivating 51:10
cultivation 55:23 57:24
58:2,19 59:5
cup 21:21
curb 29:21
curbing 28:16,20 29:19
29:20 30:4,5,6,20,21
35:10,11
currently 7:12,13,18
7:20
custody 62:16,23

D

D 77:3
DA 9:19 26:21
Daloia 1:23 78:5,20
Dan 23:11 24:20 25:11
27:19 31:11,13 32:5
46:8,10,12,17,18
48:6 50:9,23 51:4,7
51:13,18 52:23 54:20
55:22 56:5 57:8
67:19 69:14,17 70:11
70:24 71:13
Daniel 1:5 2:16 12:8
19:24 20:17 41:24
53:25 74:15
date 6:5 9:4 12:13 18:5
20:9 32:10,13 51:14
74:18
day 21:22 22:19,21
25:6 27:20,23 40:7
67:20 76:15
days 39:16,25
Daytime 22:11
DA's 7:19 8:17 9:7
13:17 14:18,22 38:4
38:6 39:19 54:17
dealing 27:3
dealt 51:2 71:19

Debut 35:22 75:7
December 12:6
decided 68:9
decision 25:5 47:23
65:9 66:3
decisions 63:14 65:3
defendant 4:24 5:12,17
2:10
Defendants 1:14,21
2:10
degrees 33:16
deliberate 30:19
deliver 19:20
demonstrating 58:15
Dennison 2:10
department 1:8 10:3
10:17 11:5 17:6
19:25 20:2 38:3 45:2
45:4 49:22
depending 22:18
deposed 4:12
deposition 3:17 6:15
7:6 48:11,13
depositions 74:23
deputy 9:14 61:24
described 17:23 75:6
detective 7:13 9:11
13:11 16:21 21:16,17
22:14 24:5,15 26:20
27:24 28:4 41:19
51:18,21 54:8,19
55:7 60:6,14,22 63:9
68:22 74:8
DETECTIVES/POL...
1:11,12
developing 67:19
different 8:4 12:23,25
39:13 44:9,11,16
54:10 59:8,11 63:14
64:2 65:3,13 67:16
difficult 53:8
direct 74:10
directed 31:13
direction 33:9
discover 31:8
discovered 29:13
discovering 43:25
discuss 21:21 28:2
discussed 28:5 73:25
discussing 27:18
discussions 54:14 55:3
61:11 67:18
disqualified 61:13
district 1:2,3,8,9,10,10
7:14 8:8 13:19,22
15:5,16 16:9,20 17:7
17:12,14,16 21:9
22:23,25 47:19,22
54:4 55:19 61:11

62:10 68:7,21 69:3
district's 69:4
Division 11:19
document 6:9
documents 50:11 73:25
DOE 1:10,13
doing 21:12,22 22:19
24:21 26:3 28:24
29:5,7 36:12,13
58:13 71:2,15,21,24
72:3,6,9
donations 35:24,25
43:8
done 28:21,22,23 29:9
29:11 31:15,17 33:20
33:21,22 34:13 35:8
36:16,16,21,22 39:24
53:11 73:2,23
down 44:18 47:22
60:25 66:9
DPW 19:25 27:22 28:6
28:18 49:17,22
driver's 75:7
drug 10:18,19 11:7
38:22 39:2,6,8
drugs 37:18
duly 4:4 78:9
Dunne 2:12 6:17 8:21
9:16,17 12:19 19:7
34:5 35:15 37:5
40:20 48:8,18 49:3
50:21 53:15 55:14
57:3 66:24 70:21
72:13 74:3,7 76:3
77:7
during 43:23 52:13
53:8,21 60:21 61:20
62:7
duties 33:18
duty 21:25

E

E 2:2,2 4:2 77:3 78:3,3
each 16:14
earlier 22:17 26:24
67:17 74:2
Eastern 1:3 21:18
educational 11:23
effect 3:20 50:25 75:11
eight 10:22,23 40:6
either 33:3 36:21 45:2
51:21 60:14 61:24
elected 8:19 32:12
employed 7:12,13,16
10:5 17:5,7,11 42:7
employee 34:14
employees 33:16
employment 8:13

10:24 15:4 31:20
41:14,22 42:6,13,15
42:18 43:12
end 12:11
ended 15:8
enforcement 10:8,10
10:18,20 16:22 45:20
58:14 63:13,20
engage 40:17
engaging 31:10 41:12
equal 41:23 42:18
errors 29:13,14 30:18
Especially 37:16
ESQ 2:6,12
essentially 46:23 49:17
58:21 59:4
established 35:2
even 29:18 45:9 64:19
eventually 45:4
ever 4:12 5:21 6:9
20:17 33:13 37:21
43:24 47:5 61:10
69:25
everybody 58:22
evidence 8:12 32:15
35:3 42:24 43:3,4,5
43:10,15 72:18,21
74:10
exact 4:19 12:12 18:5
32:13
exactly 53:21 56:3
exam 42:5
examination 1:20 3:22
4:7 74:6 76:6 77:5
examined 4:6
examines 6:11
example 64:5
except 3:12
exception 30:12
exchange 32:16 45:10
47:15 55:9
exchanging 53:4 54:2
execute 64:10
Exhibit 5:25 6:3,7,12
EXHIBITS 77:11
exist 17:19
existed 35:8
existing 30:9
expected 17:17
experience 10:11 27:3
41:8 51:9,11 63:25
64:25 65:7
experienced 33:15
experiences 63:8
expert 29:17,18,18
expertise 37:15,22
explain 41:15
explained 53:10

explanation 43:21
explicit 43:11
explicitly 56:18
exposure 45:8 46:22
47:9 59:4,23
express 53:22 55:18
61:6
expressed 55:22 61:4
65:14
eye 29:19

**F**

F 78:3
facilitator 32:6 66:22
67:4 75:13
fact 20:23 30:15 31:23
48:22,23
factual 61:16
fair 34:9 72:7
fairly 45:15 50:4
fall 50:12 56:10
familiar 45:15
far 50:2 74:23
Farmingdale 38:15
fear 45:9
February 18:6,7 20:5
20:21 44:4 48:4
51:15 52:2,18 53:18
54:3,15 57:16 59:19
61:3 65:24 67:9 69:2
74:14
feel 56:9
Felice 1:12 2:17 28:4
54:8
felt 28:13,14,25 35:21
46:8 53:5,6 62:18
72:9
few 49:12,20 52:14
field 45:15
filing 3:7
financial 37:13,17
38:19,20 43:24
find 6:15 67:12,23
Fine 74:3
fired 50:15
first 4:3 12:7 14:13,14
20:17,22 32:9 42:7
48:11 50:9 64:17
69:13
fish 56:12,20,24 75:13
fist 20:15
five 7:17
flip 15:24,25
flow 58:11
folder 13:3
follow 15:21 17:17
follows 4:6
force 3:19 10:20 11:7

forceful 26:23 27:12
foregoing 78:10
forget 23:5
forgot 17:24
form 3:13 12:20 19:9
34:6 37:6 40:21 41:4
72:14
formal 17:13 27:6
formally 61:13
forms 35:19
forth 78:9
forward 70:11
found 27:18 60:24
four 51:16
Frank 9:14,17
Frankly 27:19
fraud 36:25 37:22
free 62:19,22 63:2
Friday 22:3
friendly 27:10,14 49:15
55:25
friends 62:5
from 6:20 11:3,4,15
17:5 21:22 22:15
26:21 34:11,18,20,22
35:17 41:25 48:6
50:5,7,15 58:11
61:13 62:2,3,4 64:17
67:13 68:21 69:2,16
75:3
front 20:24 24:16
26:14
full 30:6 36:20 40:7
function 11:17
funny 9:16,18
furnished 3:22
further 3:11,16 76:4
78:13

**G**

gain 40:19
Garden 1:17 2:6
gather 8:12
gave 16:4,6 43:7
general 40:24 44:14
generally 40:16
gently 58:5 59:22
gets 27:15 44:21 64:6
getting 17:21 21:5 23:5
23:6 29:10 31:16
36:20 37:3,8 55:23
69:15,15
give 15:20 35:24 45:3
45:11 46:4,12,17,18
46:20 73:5,8
given 16:15 17:10
17:15 38:11 41:16,22
41:24 42:9,11 63:19

63:24 64:2 78:11
glean 75:3
gleaned 61:20 62:7
go 21:23 26:11 27:21
35:17 38:9 40:8,14
42:20 58:24 59:13
64:13 65:18 74:23
goes 64:7
going 5:8 21:14,19
27:24,25 28:5 29:21
34:5 35:20 44:3 46:2
46:7 48:4 50:5,6,8,13
58:23,23 59:13,15,15
63:20 64:13 68:13
70:12,12,14,18
goings 19:17 25:22,24
good 5:10 19:3 25:12
35:14 40:10 58:25
gotten 24:6
Government 7:21
graduate 11:15
graduated 12:6
Grand 73:14,18
grounds 4:19
guess 19:2,5 33:15 34:9
44:9 45:14 57:24
70:10
gun 17:3
guy 9:18 30:24 50:13
51:10 56:10,13 57:9
67:5
guys 58:25

**H**

H 2:10 4:2
habit 21:16,18
half 11:12
Hall 19:21 28:4
hand 13:3
handed 74:16
handing 6:8
happened 16:7,8 22:7
27:13 29:16 30:16
44:20
happenstance 17:24
happy 66:11
Hard 43:4
harm 58:11
harsh 59:13
harsher 49:16 51:5
Hauppauge 2:11
having 4:3 23:7,10 28:5
34:2 45:4 61:12
68:11 69:9
head 9:19 19:25 56:8
heard 18:14 55:24
held 1:22 39:23
help 41:23 57:12 58:9

59:2,3
hereinbefore 78:9
HIDTA 38:14,22 39:2
High 38:22,25 39:8
57:2
highway 2:11 19:25
28:17
him 14:15,15,23 15:3
19:23 20:2,15,22,23
23:3,4,6,13,14,16,17
23:19,22,22,24 24:2
24:4,9,9,12,18 25:6,9
25:11,14,16,18,19,20
28:7 31:4 34:14
35:17,19 40:24 41:22
42:25 45:24,25 46:2
46:4,15,15,16,20,24
47:12,16,18 51:8
52:5 56:3,17 57:11
57:13,17 58:4 59:13
59:22 60:4,7,13 61:2
61:5,6,7 62:17 63:3,6
64:21 65:16 66:5,6,8
66:13,16 67:9,13,15
67:21,22,23 68:2,5
68:10,14,16,19,19,23
69:2,5 70:15,16
71:11
himself 31:6 51:23
67:10
Hindsight 71:9
hired 8:23 32:21 38:7,8
38:10 39:19
Holly 1:23 78:5,20
homeowner 75:5
homeowners 74:24
75:3
honest 58:16
hotel 10:7,14
hour 40:6

**I**

Iacopelli 1:12,21 4:11
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1,17,21 27:1,16
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1

64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1,7,12 77:6
ID 16:4,6
idea 36:6 56:16,16 57:5
identification 6:4 23:25
identified 19:22,24
  23:20
identify 23:21
illegal 29:6
immediate 9:23 14:3
imply 47:7
improper 50:10
inaccuracies 18:25
  26:16
inappropriate 72:10
incentive 46:12,17,18
inception 7:24
inches 30:6,7,7
incident 51:25
include 31:2
including 14:7
Incorporate 19:19
Incorporated 14:6
  20:11 21:15 25:23
  26:9
incriminate 67:10
independent 22:9
  23:12,15 51:17 52:2
  52:4,9 57:21
indicate 5:6 57:11,17
  58:4 60:13
indicated 60:4,6
indicates 30:17
indicating 48:14 51:21
indication 60:17
indicted 33:10 51:24
  64:13
indictment 74:14,19
individual 13:25 58:20
  60:10 63:24 64:20
individually 31:3
individuals 31:20 45:7
  63:10,17 64:2 65:6,8
  65:10 72:8 73:12
informal 27:14
informant 24:24 25:17
  54:21 65:17 67:19
  70:13,15
informants 44:5,7,13
  44:17,25,25 45:17
  51:2 71:19
information 24:23
  25:20 45:3,11 46:4
  53:4 54:2 55:9 60:19
  61:19 62:6,9 73:5
  75:2

informed 6:17
initial 70:4,8
initially 8:20 23:3
initiated 23:13
initiative 71:5
inside 20:23,24 27:13
inspect 28:19 31:6,13
Inspector 9:22
installation 28:15
instead 17:5
instructed 66:5
Integrity 8:3,7 12:10
intend 15:25
Intensity 38:22,25 39:8
intent 34:3 35:2,4,5
  72:18,19
interested 78:16
Internal 11:10
interrogate 25:8
interrogating 62:17
interrogation 39:21
  62:19 63:5
interview 19:2,3,5 39:20
introduced 23:19 24:9
investigate 31:8
investigated 37:13
investigating 21:13
  56:7 75:14
investigation 12:8 20:4
  20:7 24:21 25:10
  26:4,8 33:11 40:12
  43:24 51:23 53:2
  54:4,16 61:21 62:8
  64:3,17 71:15
investigations 12:17
  37:17
investigator 7:14 9:11
  9:13,14,21 13:7,11
  16:22 68:14 69:10
involve 56:17
involved 4:21,22 12:7
  12:17 20:10 28:10,12
  32:4 54:4,10,16
  55:19 56:21,25 58:6
  63:11,18 66:19,20
  71:14
Involving 26:9
Island 38:15
Islip 8:9
issue 73:17

J
J 1:9 12:5
jail 58:24 59:15
James 9:22,24
JANE 1:10,13
Jeremy 13:16
job 8:10,25 28:19

31:19,22 36:21,22
41:16,19,19,24 42:3
42:4,6,9,11,22,23
43:16 50:15
jobs 33:17 35:7 36:20
  43:20
John 1:10,11,13 12:5
  54:12 69:8
join 27:5 58:25 60:16
joined 46:25
joining 60:8
July 8:18 15:9,10 16:5
jumped 24:15
June 11:6 15:8 16:3
jurat 75:17
Jury 73:14,18
just 5:3,6,18 24:6 38:16
  42:7,8 48:18 49:3
  55:16 56:18 62:4,24
  63:10 66:25
justice 12:2,5 61:25

K
Keegan 32:3,12,23,24
  33:8,10 34:24 35:23
  35:24 36:4 41:16
  42:12,21,23 43:7
  46:5,9,11 54:24 55:6
  61:18,23
Keegan's 43:8
keep 12:14,16,21
KEVIN 1:11
kind 45:19 58:2 64:16
knew 9:12,13 54:21
  71:10,10,15
know 5:17 8:22 9:6
  14:25 17:20 22:12
  24:2 25:12 31:23
  32:11 44:2 53:20,22
  55:21 56:5 61:4
  65:17,18,19,21 66:25
  71:12
knowledge 31:5 32:9
  33:14 36:5 71:7,17
  72:3,17

L
L 3:3 4:2,2
large 36:24 74:22
larger 8:5
last 10:16,23 37:25
later 20:14 22:18
law 2:4 10:8,10 16:22
  58:14 63:13,20
lawsuit 4:25 5:11
lawyer 52:6 60:24
  64:12 66:2 67:16
  68:5

lawyers 65:7,8
lazy 34:13 35:17
learn 62:6
learned 63:10
least 35:13 53:17 58:3
leave 35:18 62:20,22
  63:2
Lee 2:10
legitimate 41:19
leniency 45:10
less 49:15,15
lessened 58:12
let 16:10 20:19 38:9
  44:18 49:8 66:9
  68:15 74:8
let's 25:13,14 26:11,15
  27:4
lieutenant 11:2,3,10
light 55:5
like 6:6 15:22 21:13
  24:3,12 27:5,20
  29:19 51:5 56:10
  67:17 70:14
limit 53:14,17
line 20:24 64:21 68:19
listed 5:17
little 20:14 26:12 28:9
  49:14,15
live 21:17
lives 21:17
located 20:25
location 35:11
long 7:16,22 10:2,19
  38:15,16 40:2 59:14
  62:3
longer 42:21
look 6:6 14:5 19:17
  22:11 30:25
looking 18:11 27:19
  31:3 52:10 57:19
lose 58:23
lot 27:11 37:17 51:5
low 29:2 46:8

M
M 4:2
made 30:18
maintain 43:13
make 16:25 19:13
  37:18 50:18 63:14
  65:2 67:23
makes 35:13
making 65:9 66:2
man 29:2 46:8
manual 15:22,23 17:10
manuals 16:17 17:15
many 4:13,13 39:25
  51:3,3 71:19,19

marked 6:2,7
marriage 78:15
mason 29:18 30:24
matter 26:4 78:16
may 1:18 3:17 47:2
  52:12
maybe 45:9 49:9 65:19
mayor 31:25 32:2,4,12
  32:24 35:23 41:18
  42:12 54:25
mean 25:17,25 28:11
  54:19 56:20
means 19:8
meet 21:20 22:13 25:11
  27:24 28:2,3 41:25
  42:2
meeting 14:16,23,25
  17:22 18:2,3,15
  19:11 22:4 27:21
  65:24 67:7,18 69:14
  74:19
meetings 14:17,21
  47:25 60:21 74:22
Melvid 36:6,7,8,11
  41:23 43:7,7
Melvid's 35:22 46:5
member 61:11
met 14:10,14 15:3
metaphor 57:4 58:22
metaphors 56:19
midtown 11:11
might 15:2 38:18 40:4
  52:24 53:23 57:18
  65:25 69:14,15
mind 47:8 52:8,9 65:20
  71:20,22
minimum 42:2
minutes 49:20
misconduct 31:10
missed 49:9
moment 24:10,11
Monday 22:2
money 32:16 36:25
  37:19
monolithic 30:22
more 27:5,6,7,8,10,14
  51:16 66:21 67:3
motivation 46:19
motive 31:9 40:18 41:7
  41:12,23 42:19 43:25
  74:9
much 8:5 27:5,14
multitude 59:10,12
must 69:6
myself 21:16 23:19,20
  27:23 54:8,19 55:7

N

N 2:2 3:3 77:3
name 4:9 8:4 23:22 27:17 50:10,13 52:23 57:18
named 4:24
narcotics 11:18 37:15 37:16 39:10,12 45:14 45:20
national 38:23
nature 52:19
near 21:6,8
needed 47:13
never 5:16,19 6:13 18:14 19:23 29:9 35:8
new 1:3,17,25 2:6,11 4:5,17 8:15 10:3,13 10:17,18 11:5 16:4 16:11 29:21,22 35:11 38:3 60:24 78:6
newspapers 50:14
next 75:16
nexus 34:15,17 39:12 42:25
nice 40:4
nicely 46:15
Nicolino 1:11 54:13
night 64:6
non 42:16
normal 27:25
Notary 1:24 4:4 76:18 78:5
notes 19:10 56:9
nothing 30:10 34:2,20
Notice 6:2 77:13
notified 69:13,24
November 8:21
numbers 13:5

O

O 3:3 4:2,2
oath 3:19
obey 42:22
object 12:19 34:6 41:4 72:5
objection 19:9 37:5 40:20 48:10 66:24 72:13
objections 3:12
obstacle 66:7,10
obvious 29:17 30:23,23 35:5,6
obviously 28:24 36:24 50:7 54:9 71:9
occasion 71:5
occurred 17:22 64:18
occurring 28:14
October 12:10

off 26:15 28:21 35:7,9 35:12,19 56:8
office 1:9 2:4,9 7:15,19 8:17 9:7 13:17 14:18 14:22 15:5,17 16:10 16:21 17:7,12,14,17 21:6,8,9 27:22 28:6 35:18 38:4,6 39:19 47:20,22 49:18,23 54:5,17 61:12 66:17 68:21 69:3,4,15
officer 3:18 16:23 33:19 41:9 63:9 65:2
officers 1:12,13 33:19
often 29:16 30:16
okay 31:6,14 33:4 70:14
okaying 29:8 31:17
old 1:16 2:5 29:22 30:4
once 68:8 70:10
one 1:21 22:21 29:22 29:22 38:17 44:19 52:17 56:11 58:4 59:12,17 61:23 62:24 63:2
only 26:6 36:21
onto 46:16
opens 13:2
opportunity 25:13 63:12
opposed 30:19
order 43:13
organization 38:24 67:5
other 5:21 22:16 30:15 31:20 39:18 46:19 49:25 52:25 56:16 64:4 68:21 72:4
ourselves 24:9
out 6:15 8:25 20:2 24:5 24:6 26:19 35:7 37:3 41:23 56:18 64:13 67:12 74:4,23
outcome 78:16
outside 26:18 27:13
over 4:18 18:22,23 24:4,8 26:21 49:7,13 50:11,14 53:12,19 71:20
owed 31:20
own 22:24 48:17 71:20
O'Connell 52:22,24 53:5,7,23,25 54:18 54:22,24 55:4,10 60:20 61:2,7,12,17 61:24 66:8 69:16 70:10,17 71:10,10
O'Connell's 70:20 71:7

o0o 76:5

P

P 2:2,2 3:3 4:2
page 50:9 75:16 77:5 77:12
paid 28:25 29:10 32:7 36:3,20 45:2
paper 57:18
paperwork 13:4
par 35:6
part 15:4 28:13,18 31:9 34:14 36:21 58:2,3
participate 42:19 61:10 72:25 73:4
particular 18:15 22:15 27:20,23 35:10 51:25 65:14
parties 3:7 78:14
partner 24:4 54:9
parts 48:5 50:5
party 5:11
part-time 61:25
passenger 24:16
Pat 69:16
Patchogue 14:7,8 19:18,19 20:12 21:15 21:20 25:23 26:10 28:17 41:18 54:7,25 62:3
Patrick 60:20
patrol 11:11,17 16:17
patsy 50:13 56:14
pay 45:2
payback 35:25
payment 23:8 31:7
people 31:4 33:25 37:18 40:17 44:10,24 45:15 50:11 54:3 56:21 65:2 73:17
people's 56:16
per 14:15
perceive 41:11
perfectly 5:6 66:11
performed 36:18
Performing 14:8
Perpetrator 66:23
person 28:24 33:6 58:16 69:13
personal 40:18 55:5
phone 27:17 69:16
photographs 73:8
phrase 17:25
phrases 56:11
physical 72:21,22
pick 64:4
place 1:23 16:18 18:4 22:5 38:13,14 47:3

48:20
placed 43:11
plaintiff 1:6 2:4 5:12 5:16
Plaintiff's 5:24 6:3,7,11 77:12
plan 25:8,9
Planska 9:13
player 51:8
Please 4:9
point 21:23 23:17 32:25 48:16 53:18 57:14 58:16 70:7
pointed 20:2
points 64:3
pole 59:2 46:9,10 57:2
police 1:8 10:3,17 11:5 11:15 17:6 23:18 33:19,19 38:3 41:9 45:2,4 63:9 65:2
Policeman 8:15
polite 27:7 49:15
pond 56:12,20,21
Pontieri 32:4
portion 74:22
posed 57:8
position 32:9 41:17 42:5,8
possibility 29:12
possibly 4:13 5:4 24:23 33:8 46:9,21 62:11
poured 29:19
pours 30:21,22
power 16:25
precinct 11:11,20,20 11:21
precisely 20:22
preparation 7:6
prepared 19:3
prerequisite 37:8
present 2:15 53:5,8 60:20 62:15 70:3
presented 38:21
press 73:2,6,9,11
pretty 30:23
previous 9:12
prior 7:5,7 9:7 10:11 10:12 11:7 14:22 54:15 65:8,23 66:2
prison 59:14
probably 35:13
problem 23:8
problems 56:6
procedure 15:22
procedures 16:17 17:10,16
process 58:3
processes 65:22

produced 6:21
production 73:24
professional 54:23 55:6
professional/personal 61:17
Projects 11:19
promotion 16:15
propriety 54:17 55:4 68:11,22
prosecuted 45:9,10,11 46:24 57:18 58:24 64:12
prosecution 44:15 47:2 58:12
prosecutors 54:10,11 71:14
prosecutor's 72:3
provide 48:17
Prudenti 1:11 54:12 69:9,24
Public 1:24 4:4 8:3,6 12:9 49:22 76:18 78:5
purpose 48:12 67:7,21 67:22
put 29:21,22 31:10 47:2 53:7,21 59:22
putting 30:8
p.m 22:7 76:8

Q

qualifications 42:3
question 3:13 5:5,8 12:20,23,25 34:6 37:6,9 40:24,25 41:5 48:22 49:5 53:16 63:16 68:15
questions 49:9 50:6 74:9
quite 29:16 74:17,17
quote 30:16 48:9 50:8
quoted 48:5

R

R 2:2 78:3
raised 48:10
ran 25:11
Ray 54:8
Raymond 1:12 2:17
reaction 69:19 70:9
read 18:22,23 48:5 50:5
reader 47:8 65:21
reading 50:7
realized 70:11
reason 44:24 45:3
reasons 34:2
recall 9:4 13:13 26:19

32:14 49:16,17 50:2
51:12 57:22 59:20
61:15 70:23
receive 12:3 17:13 38:7
received 32:16 34:22
36:24
recognize 19:15
recollection 22:10
23:12,16 27:12,22
48:20 51:6,17,20
52:3,5,9,22 57:21
record 4:10 12:22
48:19 78:11
recorded 18:19
recording 20:11
records 12:14,16 19:10
reduce 59:3
regard 54:7
regarding 12:8
related 39:11 78:14
relation 74:13
relationship 35:23 46:5
54:22,23 55:6 61:18
62:4
releases 73:2
remember 8:20 21:2
28:5 50:24 68:13
69:7,9,22 73:22
remove 29:21 30:4
removed 61:13
repair 75:8
repeat 63:16
repeating 62:24
rephrase 5:7 20:19
41:6 68:15
replace 60:15
reporter 1:24 19:4
reporting 13:14 14:2
represented 25:2,4
65:11 66:6,8,12,13
representing 3:23
52:25 54:18 55:4
61:7,14
requires 40:22
reserved 3:13
respect 29:2 46:5 65:16
75:3
respective 3:7 33:17
responsibilities 31:2
responsibility 33:17
retire 11:4
retired 8:15 11:2
review 7:3,8 29:14
Rich 41:2 48:25
RICHARD 2:12
right 16:12 26:7 33:22
34:3 36:9,10,13,14
36:18,22 49:24 56:22

58:7,10,13,25 59:16
64:6,8,14,19,23
65:12 66:14 68:4,17
70:6,8 71:24
road 1:16 2:5 14:7
19:18 30:7,8,10
robberies 37:16
robbery 11:12
Robert 1:12 2:18 9:13
69:12
role 75:12
rookies 11:14
rough 57:12
rules 15:21
run 64:16

S

S 1:10,13 2:2 3:3,3 4:2
salary 32:19
same 3:9,19 8:4 13:10
48:9 62:5
saw 20:17,22,23 23:2,4
30:2 46:3 68:8,16
saying 17:9 23:12
28:21 40:23 42:10
51:18 57:7 59:8,11
70:17,23
says 18:8,18 23:10
26:17,20 27:15,17
50:8 57:20
Scalzo 9:12
schedule 21:24
scheme 32:6 34:15
75:13
Science 11:25
Scileppi 13:16
Scott 1:11 54:12
sealing 3:8
search 64:10
searching 43:19
seat 24:13,14,15,16
26:22
second 58:9 63:11
Security 10:9
see 20:15 25:13,14
44:18 50:17,18 66:9
68:19
seemed 29:19
seems 51:11
seen 6:9,13 33:19 65:2
sell 37:18
sense 50:19
sentence 64:20 67:2
separate 22:21,22
30:21
September 40:5
sergeant 9:24 10:25
11:14

seriously 66:20
Serve 8:11
service 42:5
set 50:12 78:9
several 55:25
share 25:20
sharing 60:19
Sheraton 10:7
shield 9:24 24:3
Shields 9:14
short 11:20,21,21
shorthand 1:24
shots 56:13 57:10 67:6
show 23:24
showed 24:2
shy 72:8
side 51:7
sidewalk 30:22 75:7
sidewalks 14:7 28:16
sign 28:21 35:9,12
signed 3:17,20
signing 35:7,18
silence 71:18 72:4
similar 62:5
simplest 66:10
simply 29:14
Since 7:24
sir 52:7
sit 47:22,25 55:8 60:25
65:19
sites 31:3,6
sitting 53:3,24 55:11
situation 4:23 26:24
51:3 53:8 55:17
65:14,25
situations 27:4 65:13
skill 33:16
skipping 9:25
sloppy 34:13
small 56:11,20,24
75:13
social 54:23
some 18:20,25 23:7,8
23:17 26:16 29:16
30:20 32:24 37:23
40:18 45:8,8 47:23
48:16 56:19 57:14
58:6 59:22 63:14,15
63:21,21 64:18 66:19
70:7
somebody 56:24 64:5
64:11 70:23
someone 4:16 20:2
65:24 70:18
something 4:16 23:9
35:9 37:8 41:7 49:10
49:17 59:18
sometime 39:3

sometimes 22:17,18
33:25
somewhat 20:10 28:9
28:11
somewhere 38:15
sorry 9:25
sort 23:7,8 47:23 56:10
sound 15:24
sounds 26:22 27:12
source 24:22
south 11:11
speak 24:3,12 25:13
47:10 52:15 68:5
71:6,13 74:23
speaking 40:17 44:12
68:23 71:11
Special 11:18,19
specific 26:7 63:3
specifically 42:21
47:10
spectrum 64:17 65:3
speculation 40:22
spell 56:18
spelling 27:16
splashed 50:14
spoke 14:15 46:15 60:5
69:20,20
Spota 1:9 8:19,22
squad 9:19 11:13 26:21
staff 13:2
stage 16:14 51:9 56:2
standards 36:17
standing 20:24 23:6
62:4
start 8:16 26:15 32:9
57:5
started 12:22 15:8
40:14 48:22
state 1:25 4:5,9 78:6
stated 19:16 60:18
statement 34:10
statements 8:11
STATES 1:2
stating 48:21
Step 26:21
Steve 32:3 35:22 41:16
42:21,23 43:7,8
54:24
Steven 36:7
stint 11:9,12
stints 10:21
STIPULATED 3:5,11
3:16
stone 29:20 30:9
stop 70:16,19 72:11
street 11:16 21:2 64:8
strong-armed 75:6,9
stuff 27:11 33:8

stupid 34:14
sub 35:6
subject 26:4 73:24
74:22
submitted 35:19
submitting 36:15
subpoena 73:17
subpoenaed 44:21
subpoenas 8:11 19:21
Subscribed 76:14
subsequent 14:25 38:8
38:10 39:18 74:20
substance 24:11 52:21
58:18,19 60:14 75:5
substandard 29:9,11
31:14,18 32:6,17
34:12 36:2,12 42:16
sued 5:19,21
Suffolk 1:8,8,9,13 2:9
7:14 8:16 9:7 15:5,16
16:5,9,20 17:11,13
17:17 21:17,18 38:4
38:5 39:19
suing 4:16
suit 4:20
Suite 2:5
sum 24:10,10 52:21
58:18,19 60:13 75:5
Summer 40:3
super 28:18
superintendent 28:18
supervisor 9:23 14:3
supplied 18:16,17
supplier 64:8
supposed 28:3,23 30:21
31:5 33:6,20,21
35:10
sure 4:19 14:24 55:21
69:17
surface 30:7,8,10
surmising 69:23
switch 58:22
sworn 3:18,20 4:4
76:14 78:9

T

T 3:3,3 4:2 78:3,3
table 53:3,25 55:9
take 6:6 8:11 11:16
16:14 18:3 22:5
25:24 33:18 38:13
47:3
taken 1:23
talk 24:18 28:8 47:9
52:18 54:20 55:13
61:2 62:20 70:15
talking 50:12 52:5,17
70:19

tape 18:14
target 20:4,6,8 51:22
targets 52:25
task 10:20 11:7
team 27:2,5 46:16 47:2 51:8 56:5 58:23 60:8 60:16
teams 58:22
tell 57:24 59:13 61:22 62:12 69:2,25 70:18
telling 68:14
terms 61:5 66:10
terrible 19:6
test 42:3
testified 4:6 49:20
testifies 44:22
testify 45:5,12 59:2 73:14,18,21
testifying 3:24
testimonial 72:23
testimony 78:8,11
tests 16:15
theatre 14:8,8 19:18
their 33:17 65:8 71:17
themselves 45:8
thing 25:12 58:10,13 59:2 71:25
things 14:6 29:15 33:22 33:25 49:13 56:15 57:12
think 9:4 23:6 24:5 26:16,17,19 29:5 33:24 48:11 54:12,13 61:23 71:21
Thomas 1:9,20 4:11 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1,7,12 77:6
thought 29:7 32:4 38:6 43:22 49:6 52:10 62:12,21 65:21 66:19 66:21 67:3 71:24

threatened 31:21
threatening 51:4,12 57:23
threats 51:9,10 56:2
through 22:3 26:11 64:16,19 70:17
Throughout 66:4
time 1:22 3:14 11:20,21 11:22 13:10,15 14:3 14:10,13,14 15:2 19:13 20:17 22:4,13 24:5 25:3 42:6 57:14 58:16 59:14 61:23 62:20,25 69:17 70:7 70:9 74:11
times 55:25 71:20
today 6:19 7:4,5,7 39:4 74:4
today's 6:15
together 22:16 26:19 27:4
told 23:22,22 32:25 47:5 72:11
Tom 1:12 8:19
top 29:20 30:9 46:10 56:8
total 10:21
totum 29:2 46:9,10 57:2
tour 21:25
town 21:12 28:4 61:25
traditional 17:6
Trafficking 38:23 39:2 39:8
train 11:16
training 11:13,14 15:6 15:12 17:13 37:21,23 38:5,8,11,14,20 39:14,18,21
transcript 6:20,22 18:10,12,13,16,18 22:7 23:9 26:11 48:15 49:7,11,14 50:2,22 52:11 57:19 57:20 78:10
transcripts 7:9
transport 73:20
trial 1:20 3:14
tried 46:14 47:11
trouble 23:10 48:7 50:9 50:23 51:14,19
true 58:17 65:4 78:10
truthfully 59:2
try 5:7 34:7 46:16 56:3 68:4
trying 24:21 51:4 53:14 53:17 54:20 70:16 71:25

Twenty-one 10:4
two 7:24 10:21 30:21 39:16 44:24 55:2 58:2,3 59:4 63:2
two-day 38:18 39:15
two-year 11:9
type 26:23 27:4 53:9 56:15
types 28:19 39:13 44:9 44:16

—————
U
—————
U 3:3
Ultimately 36:11
uncomfortable 55:8
under 71:11
understand 16:2 40:16 42:2 55:12,24 57:25 65:23 70:25 72:5
understanding 31:24 62:2
understood 5:9 71:23
unit 8:7 11:13,14,19
UNITED 1:2
unless 60:23
until 64:19,19
use 46:10 48:12 58:21
used 39:6 56:10,11,14
useful 48:12
using 75:7
usually 48:2

—————
V
—————
varies 65:13
variety 56:21
various 14:5
varying 33:16
vehicle 22:25 23:18 24:8,14,17
vehicles 22:23,24
Verbal 72:2
very 5:10 9:17 26:23 27:12 51:12 52:12 53:7 59:13 65:25
Veterans 2:11
Village 14:6 19:18,19 19:21 20:11 21:15,19 25:23 26:9 28:4,16 36:2 41:18 54:25 56:6,7 61:25
vouchers 28:21 36:15

—————
W
—————
wait 26:18
waived 3:9
walked 24:8 26:19
want 24:18 25:18 28:8 41:3 45:24 49:2 51:7

51:8 55:8 56:18
58:20 64:21 65:25
67:12 72:10 74:5
wanted 24:20 25:10,19 25:20 28:7 46:3,4,10 47:14 52:23 55:25 66:13,16 68:2 69:18
wanting 35:18
wants 64:21,22
WARD 1:11
warrant 64:11
wasn't 19:3,6 26:23 29:11 31:14,17 34:13 35:8 56:15 57:5,9 62:16,19,23 67:5,9 68:4 70:8,8,11,12,18
watch 22:12
Waverly 20:25 21:3,21
way 28:23 48:13 49:4 53:21 57:4,8,13 59:12,21 64:18 78:15
ways 59:8,10,11,12
weather 40:4
week 40:2
well 51:11 52:12 54:23 65:19,25
went 9:3 16:3,5,11 39:20 49:7,13 51:7
were 4:21,24 6:25 8:23 10:5,16,19 11:8 13:6 13:14,25 14:4,5,17 14:21 15:6 16:15 17:10,15 19:16 21:4 21:12,13,14,19 22:16 22:18 24:20,21,25 27:7,24,25 28:3 29:13 30:18,22 35:19 38:10 46:2,6 49:12 49:13 50:10,11 51:4 52:10,14 54:5,10,11 55:7 56:10 57:6 60:18 62:2,3 65:15 66:11 67:24 71:2,11 71:15 72:3,6,9 73:2 75:6,14
weren't 27:19 53:2,24 55:17 56:2 62:16 63:3,6 66:7 69:17
Western 21:17
We'll 20:13
whatsoever 32:15
while 55:10
white 37:22
whole 19:2 59:5
Winter 40:3
Wirshup 1:5 2:16 6:23 12:8 14:11 17:23 19:15,22,24 20:10,16

20:18 22:5 23:2
24:13,22 25:9 28:17
28:25 30:25 31:9,11
31:13 32:8,16,20
34:11,20,21 37:3
41:25 43:25 47:6
48:4 51:22 52:15
53:3,4,10,25 54:18
55:5,10,22,24 57:23
59:19 60:2,5,7,19,23
61:14 62:14 65:15
66:5,12 67:8,9,19
68:8 69:14,17 70:2,5
70:11,19 71:4,7,13
73:3 74:15 75:4,10
Wirshup's 20:25 33:5
34:25 41:12 43:12
45:23 65:25 74:11
75:12
withdraw 20:19
Withdrawn 37:11
witness 3:24 4:3 5:3,18
6:11 44:20,20 45:25
46:2 77:5
witnesses 44:10,12,15
44:17 45:16 73:20
witness(es) 78:8,12
woke 16:3,5
word 39:6 64:18
words 46:19 50:24 64:4
72:4
work 10:2 14:7 16:3
19:18,19 21:19 28:20
28:20,21,22,24 29:8
29:11,11,17 30:19
31:7,14,17,17 32:7
32:17,17 33:2,7
34:12,13 35:6,8 36:3
36:12,15,17 51:10
worked 9:6 10:7 11:11
11:13,18 22:2 23:23
31:4 44:4
working 9:7 10:12
22:16 45:14 67:24
Works 49:22
wouldn't 60:24,25
wrong 26:3 57:25
71:21 72:10
wrongdoing 25:25

—————
X
—————
x 1:4,15 77:3

—————
Y
—————
year 11:12 12:3
years 4:13 7:17,24 10:4
10:22,23 37:25 51:3
51:16 71:20

**York** 1:3,17,25 2:6,11
4:5,17 8:15 10:3,13
10:17,18 11:5 16:4
16:11 38:3 78:6

---
### 0
**02** 12:10,11
**03** 12:12 18:7 51:16
53:18 74:14

---
### 1
**1** 1:1 8:18
**1st** 15:10 16:5
**10** 10:1
**100** 2:11
**103rd** 11:21
**11** 11:1
**11:18** 1:18
**11530** 2:6
**11788** 2:11
**12** 12:1 30:7
**12:00** 22:7
**12:38** 76:8
**13** 13:1
**14** 14:1
**15** 15:1
**16** 16:1
**17** 17:1
**17th** 11:19
**18** 18:1 30:6
**19** 19:1

---
### 2
**2** 2:1
**2nd** 15:9
**20** 20:1
**20/20** 71:9
**2001** 8:21
**2002** 8:18 11:6 39:3
**2003** 18:6 20:5,21 44:4
48:4 52:2 54:3
**2007** 1:18 76:15
**21** 21:1
**22** 22:1
**23** 23:1
**24** 24:1
**25** 25:1
**26** 26:1
**27** 27:1
**28** 28:1
**29** 29:1

---
### 3
**3** 3:1 5:25 6:3,7,12
77:13
**30** 11:6 30:1
**30th** 15:8 16:3
**31** 1:18 31:1

---
**32** 32:1
**33** 33:1
**34** 34:1
**35** 35:1
**36** 36:1
**37** 37:1
**38** 38:1
**39** 39:1

---
### 4
**4** 4:1 77:6
**40** 40:1
**41** 41:1
**42** 42:1
**43** 43:1
**44** 44:1
**45** 45:1
**46** 46:1
**47** 47:1
**48** 48:1
**49** 49:1

---
### 5
**5** 5:1
**5:00** 22:2
**50** 50:1
**51** 51:1
**52** 52:1
**53** 53:1
**54** 54:1
**55** 55:1
**56** 56:1
**57** 57:1
**58** 58:1
**59** 59:1

---
### 6
**6** 6:1 20:21 30:7 44:4
48:4 52:2 53:18 54:3
77:13
**6th** 18:7 20:5 51:15
52:18 54:15 57:16
59:19 61:3 65:24
67:9 69:2
**60** 60:1
**600** 2:5
**61** 61:1
**62** 62:1
**63** 63:1
**64** 64:1
**65** 65:1
**66** 66:1
**666** 1:16 2:5
**67** 67:1
**68** 68:1
**69** 69:1

---
### 7

---
**7** 7:1
**7th** 11:20
**7-Eleven** 14:16,23 15:3
17:21 20:25 21:4,20
22:20 27:18 28:2
68:9
**70** 70:1
**71** 71:1
**72** 72:1
**73** 73:1
**74** 74:1 77:7
**75** 75:1
**76** 76:1
**77** 77:1
**78** 78:1
**79** 12:6

---
### 8
**8** 8:1

---
### 9
**9** 9:1
**9:00** 22:2