COUNTY COURT, SUFFOLK COUNTY
STATE OF NEW YORK

-------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK,

-vs-

PATRICIA STREBEL, STEPHEN MILVID and
DEBUT CONCRETE CONSTRUCTION, INC.,

Defendants

-------------------------------------------------------------------X

Verdict as to Defendants:
Stephen Milvid and Debut
Concrete Construction, Inc.

BY: GARY J. WEBER, J.C.C.

DATED: May 28, 2004

CASE NO. 1255B-2003
1255C-2003

HON. THOMAS J. SPOTA, ESQ.
DISTRICT ATTORNEY
BY: JOHN S. PRUDENTI, CHRISTOPHER
NICOLINO, and KEVIN WARD, ESQS.
Criminal Court Building
Center Drive
Riverhead, New York 11901

PAUL GIANELLI, ESQ.
Attorney For Defendants
Milvid and Debut Concrete
Construction, Inc.
Reynolds, Coronia, Gianelli & Hagney
200 Motor Parkway, P.O. Box 11177
Hauppauge, New York 11788-0945

## THE CONTENTIONS AT TRIAL

### The Defendants

Patricia Strebel, was a Brookhaven Town councilwoman from 1992 to 2000, was later
appointed as Superintendent of Highways on December 27, 2000, and was thereafter
elected to a two year term of office as the Brookhaven Town Superintendent of Highways
in the general election in November of 2001.

Stephen H. Milvid is the President of Debut Concrete Construction, Inc., hereinafter
referred to as "Debut." Debut was awarded the sidewalk and curbing contract for the
Town of Brookhaven in the year 2001.

### Background

As was made clear by the testimony of numerous witnesses, the instant prosecution was
largely an outgrowth of what began as an investigation of Milvid and Debut in connection
with allegations that Milvid and his corporation, Debut, had been systematically paying
less than the required "prevailing wage" to workers engaged by Debut for work on pubic
projects, most notably in the Town of Brookhaven.

Paradoxically, the manner in which the investigation branched off from Milvid and Debut so as to implicate Strebel and Wirshup, the two public officials charged in this indictment, is at the same time one of the District Attorney's greatest strengths in the case as it is at the same time a weakness.

As will be explored more fully herein, and despite defense claims to the contrary, the investigation which resulted in this subject indictment, at least in so far as it applied to the subject public officials, Strebel and Wirshup was clearly not initiated by the District Attorney, or anyone else, for purposes of political gain. It is clear that the prosecution of this case was not a political witch hunt as has been argued from time to time. It is apparent that the District Attorney's efforts in these regards were in the main directed toward verifying and supplementing information provided by Kroll Associates, a security contractor hired by Brookhaven Town and, in so far as the Village of Patchogue was concerned, by Vollmuth and Brush, an engineering firm.

The impetus for the pursuit of the matter was the result of contacts and information encountered and gathered by the District Attorney in connection with the original investigation relative to Milvid, Debut and the prevailing wage issue.

This circumstance, while a powerful antidote to the criticisms repeatedly raised by the defense, particularly by Mr. Keahon on behalf of Strebel, to the effect that this criminal proceeding was brought against his client because of the agenda of her political enemies and their allies; also serves to cloud certain of the issues and has turned out to be the root cause of certain failures of proof which occurred at times during the course of the trial.

The subject indictment actually is an amalgamation of several different topics encompassing various conduct by each of the defendants, not always acting together, but with Milvid as the common denominator either directly or indirectly with respect to each.

### The Public Works Contract

The Contract awarded to Debut was a unit price contract. It did not contemplate the performance of specific work at an identified location within the town, but rather was an agreement to install new sidewalks, curbs, and aprons at locations later identified by the Superintendent of Highways. *See People's Exhibit 7 the sidewalk and curbing contract.* The work completed would then be billed to the Town of Brookhaven based upon the linear footage of curbing installed and the square footage of concrete sidewalks and aprons that had been poured. The scope of the work to be performed under this contract is in dispute in this case.

The People allege that the defendants, acting in concert, submitted to and accepted on behalf of the Town of Brookhaven vouchers and invoices for work that had never been performed. It is alleged that the invoices submitted for payment inflated the linear measurements of curbing installed and overstated the square footage of concrete sidewalks and aprons poured. It is the People's contention that Strebel's co-defendant submitted bills inflated by more than $50,000 for this work, and that with Strebel's acquiescence, together stole this amount from the Town of Brookhaven. The defendants all acknowledge that they intentionally inflated and overstated the measurements, but contend that this was done as a means to allow for compensation for work that went beyond the requirements of the contract that was, in fact, done by Debut Construction.

Mr. Milvid contends that because it was Ms. Strebel's desire to prove herself worthy of election to the post of Superintendent of Highways after having been appointed that she sought to have sidewalks and curbing replaced on a scale never done before. Under these circumstances, he argues that Debut Construction was impressed into service to perform the root and stump removal that had never been performed by sidewalk and curbing contractors in the past. It is further argued that a reasonable interpretation of the contract, in view of this past practice, permitted Milvid to bill for root and stump removal that had theretofore been done by Town employees in connection with curbing and sidewalk contracts.

The People argue that if such work truly were supplemental to the terms of the contract as interpreted by the industry, then the billing method chosen by Strebel and Milvid of inflating the measurement of sidewalks and curbing in the various payment documents to a quantity greater than actually installed would have been unnecessary. The People argue that a change work order could have been submitted for approval by the Town Board. The defendants counter, however, that to get a single change order requires a month to process and the work would cease for that period at any location where a root or stump interfered with the completion of the job. The defendants contend the billing method used was a matter of expediency, and that it was not the *modus operandi* to commit larceny.

The language of the contract on its face would include the work performed in removing roots and stumps. However, in a civil action attorneys would no doubt argue whether evidence of past practices under such a contract would be admissible as parole evidence so as to affect the interpretation of that contract. This, however, is not a civil action and none of the defendants is an attorney. Thus, the legal question of whether the removal of stumps and roots would be included in the contract or excluded as a matter of law is not controlling.

The question here is whether Stephen Milvid, who is not an attorney, acted together with his co-defendants to steal property from the Town of Brookhaven by billing the Town additionally for work which he in fact knew he was required to perform under the terms of the public works contract. A mistake of fact is a defense to a crime if it negates a culpable mental state. *Penal Law § 15.20(1)(a)*.

Ms. Strebel, almost to the point of obsession, insisted that Milvid was correct in his contentions that Debut was due extra money on account of the extra work claimed by Milvid. Also, it is clear on this record that it was Ms. Strebel who first proposed and initiated the idea to inflate the vouchers concerning the amounts of concrete installed by Debut for the Town of Brookhaven.

Nonetheless, the evidence demonstrates that Ms. Strebel and Milvid were convinced that Milvid / Debut deserved extra compensation for their efforts on the town projects.

Milvid submitted photographs of the extra work occasioned by root and stump removal as some proof that additional work was, in fact, being performed. The fact that the concrete measurements in the bills were inaccurate was never a secret at the highway department.

It is true that long time employees of the Highway Department questioned the <u>method</u> Ms. Strebel chose to allow for payment, these same employees never questioned her belief, as openly professed to them, that Milvid / Debut was entitled to additional compensation for root and stump removal.

This leaves the prosecution's alternative theory advanced at trial which was that even if defendant Milvid / Debut either believed, or was in fact, entitled to bill additionally for the root and stump removal; Milvid / Debut, nonetheless billed for far more additional work than was ever actually performed, thereby stealing from the Town.

The prosecution went to great lengths to amass evidence that in fact far less root and stump removal was performed than claimed. In this regard, however, the District Attorney's Office, at least initially, relied on measurements and information gathered by agents of a private concern, Kroll Associates, in determining the extent of the subject larceny.

However, the figures and measurements provided turned out to be in large part mistaken, unreliable and inaccurate. The difficulties encountered by the prosecution, as demonstrated by the defense on trial included: prosecution claims that Milvid had done no work at a given address, when, in fact, the address examined by Kroll was the wrong address, and another gross calculation error inflating the prosecution's claims beyond all reason. In spite of these trial set backs, the prosecution was able to prove its claim that Milvid / Debut had substantially over billed the Town of Brookhaven. Thus, though the prosecution failed to prove that Milvid / Debut had stolen more than $50,000 to support the

charge of grand larceny in the second degree, it has proved beyond a reasonable doubt that Milvid/Debut are guilty of grand larceny in the third degree.

## Verdict as to Count 1

The prosecution has not proved beyond a reasonable doubt that the defendant Milvid is guilty of grand larceny in the second degree, but has proved the lesser included offense of grand larceny in the third degree, in violation of Penal Law Section 155.35.

Insofar as Milvid effected the commission of the grand larceny through his company, Debut Concrete Construction, Inc. , this corporate defendant is also guilty of grand larceny in the third degree.

## Count 2, Conspiracy to Commit the Grand Larceny Alleged in Count One.

This count is founded not only upon the commission of the Grand Larceny that is alleged in count one, but also an agreement to commit the Grand Larceny. The proof at trial demonstrated that, with respect to the larceny charge, Milvid acted alone and there was no agreement with co-defendant Strebel to commit this crime.

## Verdict as to Count 2

The defendants Milvid and Debut Concrete Construction, Inc. are not guilty of Count 2.

## Count 3, Grand Larceny in the Second Degree: permitting Milvid and Debut to dump in the Town Landfill without paying the dumping fee as included in the sidewalk and curbing contract.

Sometime prior to June 11, 2001, at the suggestion of representatives of Kroll Associates, the Town of Brookhaven began a program whereby trucks being used by the Town of Brookhaven which were carrying loads in need of disposal could only use the Brookhaven Town Landfill upon presentation of a "load origin" form at the gate to the landfill.

There was testimony at this trial to the effect that the load origin form was designed to provide control so that only authorized persons or entities bringing materials permitted for disposal at the town landfill could enter and make use of the facility.

The Court has examined a total of 81 such origin of load forms which were dated beginning on June 11, 2001` and the last being dated September 13, 2002 (collectively People's Exhibit 99 in evidence).

The People contend that Strebel, Milvid and Debut arranged to defraud the Town of Brookhaven by use of the load origin forms in order to gain unauthorized entrance to the town landfill so that Milvid and Debut could avoid paying substantial tipping fees for the materials dropped at the dump.

The prosecution also urges that the load forms were in some cases used for detritus that did not originate in connection with the work that Milvid and Debut had done for the Town of Brookhaven.

The People further argue that, in any event, the Town contract with Debut (People's Exhibit 7) clearly stated that the cost of the disposition of any debris attendant to the contracted work was to be the obligation of the contractor.

It appears undisputed that Milvid used the origin of load forms to get materials to be disposed of by Debut into the landfill without charge.

In fact, on each form the name "Stephen H. Milvid" and "Debut Concrete Const." is hand printed where the phrase "name of Town Highway Department Loader Operator" appears. On the spots where a signature is called for the words "Town Highway Department Loader" are scratched out. The name signed in handwriting is "Stephen H. Milvid."

There is ample testimony on the record of these proceedings to the effect that there was a supply of the "origin of load" forms available at the Brookhaven Town Highway Department. Likewise, it is clear that somehow a number of these forms came into the possession of Milvid.

A People's witness, one William Theiss, testified in part as follows concerning the disposal of debris in general and the distribution of the origin of loan forms in particular:

> "A.     I think the DEC was pestering Pat about the way the yards were getting
>         loaded with concrete, leaves and sweepings, road sweepings.
>  Q.     And I'm sorry, concrete, leaves and road sweepings.
>  A.     Yeah. You know, the sand.
>  Q.     And did you ever have a discussion with Mrs. Strebel regarding the removal
>         of the debris at these locations?
>  A.     Well, she just said that we no longer are going to bring the concrete in these
>         yards, anymore. The DEC is starting to start going to shut down the
>         yards..."
> "A.     I'm going to say, some time in May.
>  Q.     And where did this conversation take place?
>  A.     In Pat Strebel's office.

Q. And that was the sum and substance of the conversation regarding the debris in the Coram yard?

A. That it had to be — we can't bring any more concrete in the yards.

Q. And what, if anything, did she tell you that she was going to – did she tell you she was going to give Milvid certain instructions with respect to the debris?

A. At that moment, and like I said earlier, she was going to have Steve do the bid of the contract, that he has to start taking the concrete away on his own.

Q. I want to direct your attention to a development off of Mooney Pond Road. That is one of the developments that Debut Concrete had been performing work in?

A. Yes.

Q. And I want to direct your attention to approximately the first week of May, 2001. Did there come a time that you went to that development at Mooney Pond Road?

A. Yes, because I wanted to see how we were progressing with the sidewalks and the curbing.

Q. And did there come a time that you saw anything there?

A. Yes. When I pulled up there, I saw Steve with his crew. They were ripping out concrete and I noticed a 20-yard roll off by our town sump.

Q. Was this unusual to see a roll-off?

A. We have never had something like this, with a vendor. To put his own roll-off by our yards.

Q. And when you say a "roll-off," commonly like a big dumpster?

A. Yes. Yes.

Q. Did you have a conversation with anybody with respect to that roll-off?

A. When I pulled up, I asked Steve. I said, "I guess Pat's making you live by the contract."

Q. Okay. What, if anything, did Mr. Milvid tell you?

A. He says, "We are going to start loading the roll-off with concrete."

Q. And did you see him loading the roll-off with concrete?

A. His backhoe was loading it, yes.

Q. Were you curious as to where he was going to take this roll-off?

A. I just asked him. I said, "Where are you going to take this?" You know?...
THE WITNESS: He told me that he has it taken care of.

Q. What did you say to him?

A. I just said, you know, "You bring it to the landfill, you have to pay." He says, "I have it taken care of."

Q. What did you say back to him?

A. I just said, you know, "To bring it to the landfill, you either have to pay or you got to get load origin forms."

Q. And what, if anything, did he say, and what did you do?

A. And he just said he has it taken care of. And I said, "Well, let's go see Pat."

Q. And did there come a time that you went and saw Pat?

A. He got in his truck and I went in my truck, and we went back to the office to see Pat.

Q. When you say "Pat", you are talking about –

A. Mrs. Strebel.

Q. – Mrs. Strebel?

A. Yes.

Q. And did you have a conversation with Mrs. Strebel at that time?

A. Yes, I said to Pat, "Where is he going to dump it?" You know, "He said he has it under control. Where is he going to dump the concrete?" She said, "If he has it under control, go down see the secretary and give him two load forms."

Q. And did you, in fact, give him anything?

A. Yes, I did. I gave him two packages of load origin forms.

Q. At whose direction did you give him these load origin forms?

A. Pat Strebel.

Q. And when you gave these loan origin forms at Mrs. Stebel's direction to Mr. Milvid, was that documented anywhere?

A. Yes. I went down and saw one of our clerks, Joanne Johns."

The Court notes that the testimony of the witness William Theiss is to the effect that although he was instructed by Strebel to give Milvid two origin of load forms he actually gave him "two packages" of the forms.

Moreover, the first origin of load form marked into evidence by the People was dated and accepted at the Brookhaven landfill on June 11, 2001 which would be sometime between 2 - 6 weeks from the date that Theiss testified as to his observations of Milvid working with a roll-off followed by the discussions with Strebel and the release of either "two" or " two packages" of the forms to Milvid.

The court notes that it is highly unlikely that the roll-off which was being filled in May could or would have been left until June 11th to be unloaded.

Generally, the owner of the container would want to keep it working and a container left at a site for any length of time inevitably attracts garbage and neighbor's complaints.

Another People's witness, Wayne Kelly, testified as follows:

"Did Ms. Strebel ask you or tell you anything about these load origin forms and Debut Concrete?

A. Yes. She said that she was looking in the storeroom. I forgot what for. I don't remember what it was. I don't know if it was something to do with Kroll, asking her for something or one of the girls or whatever.

Anyway, back there, stored in that back room were a whole load of load origin forms, made out to Debut, signed by Billy Theiss and she was mad because she said, "That little son-of-a-bitch was giving Debut the loading forms, so he could take the concrete off the road to the concrete site. It was a free pass."

Clearly, Milvid made no secret of his use of the origin of load forms to gain entry and dispose of material at the Brookhaven Town landfill. His name is printed and signed on each of the forms. Moreover, the fact that he was permitted to dump there by use of the forms is a clear indication that the persons in charge of the landfill and its supervision (this would presumably include Kroll Associates) were also of the impression that Milvid and Debut had a right to utilize the facility. In fact, it would appear that Mr. Milvid's use of the facility continued unabated from June 11, 2001 until September 13, 2002, even as the investigation which resulted in these subject charges came to its conclusion.

The defendants have further adduced evidence, through the prosecution's own witnesses, that for decades sidewalk and curbing contractors disposed of refuse from the performance of the sidewalk and curbing contracts in the town landfill. This disposal was most often effected by the town's own workers who provided the removal of that debris that in this case was actually performed by Debut Concrete Construction, Inc.

The defendant Debut Concrete Construction, Inc. through its principal Stephen Milvid did dispose of concrete, roots and stumps at the town landfill. However, far from being a secretive affair, this disposition of the town's broken concrete was done openly, notoriously and under a claim of right.

Once again, while lawyers schooled in the interpretation of contracts might argue the legal abstraction of whether past practices modified the meaning of the contract or that such practices were simply irrelevant because the contract is clear can be debated *ad nauseum* in a civil proceeding. The question presented here is whether the defendants, who are not attorneys, simply acted incorrectly under the terms of the contract or instead acted in intentional derogation of the contract in order to steal property, namely the privilege to dump, from the Town of Brookhaven.

In this case, Strebel and Debut acted openly, without subterfuge, and clearly operated under the belief that the town's own sidewalks could be disposed of in the town's landfill. Town employees at the landfill operated under the same belief, and received the materials.

The People have failed to prove beyond a reasonable doubt that it was the defendant's intention to steal property from the Town of Brookhaven when she authorized the other defendants to dispose of the town's own sidewalk in its landfill.

## Verdict as to Count 3

Accordingly, the defendants Stephen Milvid and Debut Concrete Construction, Inc. are not guilty of grand larceny in the second degree as charged in Count 3 of the indictment.

## Count 4

This count was previously dismissed upon the inspection of the Grand Jury minutes.

## Count 6, Conspiracy to Prevent Public Bidding

The People contend that the Brookhaven Town Highway Department, under the administration of the previous Superintendent of Highways, Harold H. Malkmes, interfered with the reasonable performance of the sidewalks and curbing contract that had been won by ARG, Inc. The People argue that ARG was discouraged from renewing its contract with the Town by the practice of giving that contractor very small jobs at locations remote from each other thus making performance of the contract unprofitable. This may have been true, but there has been no evidence to attribute this alleged conduct to any of the defendants in this indictment, and there is a total failure to even connect such conduct to some unindicted co-conspirator.

Upon assuming office as the Superintendent of Highways, defendant Strebel did elect to have the sidewalk and curbing contract re-bid; and informed the Brookhaven Town Purchasing Department to make the necessary preparations towards this goal. The contract the Purchasing Department put out to bid requested that bidders provide the unit price they would charge for a variety of types of curbing as well as the unit price they would charge per square footage of sidewalks and driveway aprons installed. The bid specifications provided an estimate of the quantity of each type of curbing that would be installed under the contract together with the estimated square footage of sidewalks and aprons to be installed.

The Town Purchasing Department received and unsealed the bids. The Town Purchasing Department made the determination that Debut Construction was the low bidder and had won the contract. However, an examination of the bid reflects that defendant Milvid, through his company Debut Construction, had submitted what is known as an unbalanced bid. An unbalanced bid with respect to a unit price contract is a bid that includes a unit price well below cost for the performance of part of the contract, and makes up for that reduced unit price by increasing the unit price for the performance of another part of the contract. *See People ex rel. Grannis v. Roberts, 163 N.Y. 70 a civil action against the Comptroller of the State of New York seeking payment for performance of an excavation*

*contract for work on the Erie Canal that had been won by employing an unbalanced bid (1900).*

An unbalanced bid is only effective in both winning the bid and earning a profit for the bidder if the successful bidder is not called upon to perform fully that portion of his bid that he agreed to perform at a below market cost. Thus, it is the quality and reliability of the Town's original estimate of the work that will actually be performed under the contract that assures that the Town will in fact have its public works projects performed for the lowest cost. If the original estimate of the work to be performed bears no relationship to the work that is eventually done, then a strategic bidder may not be the lowest bidder for the lion's share of the work that is ultimately performed under a contract and such a bidder might only be an overall low bidder on a contract that included work the bidder is never called upon to perform.

The New York State Legislature encountered this very issue over one hundred years ago with respect to the construction of the state's canal system and enacted laws requiring the State Commissioner of Transportation to cause detailed plans for all proposed canal work under a public works contract. *See People ex rel. Hilton Bridge Constr. Co. v. Aldridge, 13 A.D. 24 the dissenting opinion chronicles this historic development that occurred in response to unbalanced bids submitted for canal excavation work. (Third Department 1897).*

In this case the defendant, Milvid, through his company Debut, submitted an unbalanced bid in order to win the sidewalk and curbing contract. It is this bidding strategy that forms the lynchpin of this count in the indictment. It is the People's contention that essential to this bidding strategy is an illicit agreement with the Superintendent of Highways that the contractor would not be called upon to perform that portion of the work that would, under the bid, be billed at the artificially low price, or at the very least that the portion of work to be completed at the above market price would outweigh any loss sustained by performing the below cost work.

In this case, the bid accepted by the Purchasing Department as the low bid was forwarded to not only Ms. Strebel, but also to the heads of the Department of Parks and the Department of Housing and Community Development. In the Town of Brookhaven curbing and sidewalks could be installed, not only by the Department of Highways, but also by these two other departments. Accordingly, for the conspiracy proposed by the People to have been successful it would have also required the complicity of these two other departments as well. There has been no such evidence presented.

There is no direct evidence that Ms. Strebel had anything to do with the award of this bid, save the fact that she was one of at least four department heads who approved it; nor was any evidence offered showing that Ms. Strebel ever communicated with Milvid as to the terms and conditions of the contract.

Unbalanced bids continue to this day to be the bane of public works contracts and provide the genesis for many civil suits that challenge an award of a bid, the refusal to award a bid, or seek payment after performance has been completed. *See Diamond Asphalt Corp. v. Sander, 92 N.Y.2d 244 (1998); Green Island Constr. Co. v. County of Chenango, 212 A.D.2d 853 (1995); NAB Constr. Corp. v. Metropolitan Transp. Authority, 180 A.D.2d 436 (1992).* To be certain, the best practice would require that before bid specifications are prepared for public works such as this, the amount of work that is to be performed under each separate specification of the contract should be more accurately estimated. It would similarly be a prudent practice for those involved in accepting a given bid as the lowest to examine such bid to determine whether any one or more unit price proposed is substantially below the market price. In this case this responsibility would have fallen to the three department heads as well as the department of purchasing. The question in this case is not whether Ms. Strebel, and some of her colleagues in the Town of Brookhaven failed to use the best practices, but rather is a question of whether Ms. Strebel acted criminally. The record is devoid of any evidence to support a criminal conviction for bid rigging.

Verdict as to Count 6

Accordingly, the Court finds the defendants Stephen Milvid and Debut Concrete Construction, Inc. not guilty of Count 6.

Counts 7 through 22, Falsifying Business Records in the First Degree:<br>invoices submitted by Milvid / Debut to the Town of Brookhaven

and

Counts 23 through 36, Offering a False Instrument for Filing in the First Degree:<br>voucher and purchase order payments submitted by Milvid and Debut to the Town of<br>Brookhaven through defendant Strebel.

Verdict as to Counts 7 through 22

The People have proved the defendants' larcenous intent, and accordingly their intent to defraud the Town of Brookhaven as well as all other elements of Counts 7 through 22.

Accordingly Stephen Milvid and Debut Concrete Construction, Inc. are both guilty of Falsifying Business Records in the First Degree.

## Verdict as to Counts 23 through 36

The prosecution has proved beyond all reasonable doubt that defendants Milvid and Debut, acting in concert with Patricia Strebel, did cause false and inflated purchase orders and vouchers to be submitted to the purchasing department for the Town of Brookhaven, and that Milvid and Debut did so with the intent to defraud. Accordingly as to each of the Counts 23 through 36, the Court finds the defendants Milvid and Debut Concrete Construction, Inc. guilty of the crime of Offering a False Instrument for Filing in the First Degree.

## Counts 41 through 48
### The Alleged Election Law
### Violations by Milvid and Debut

Counts 41 and 42 allege that Milvid and Debut made contributions in excess of the $5,000.00 limit proscribed by Election Law Section 14-116(2) during the calendar year 2001 and 2002 respectively.

The record is clear that the defendant, Milvid, made political contributions in excess of the amount permitted by statute during the years 2001 and 2002.

In fact, having been warned earlier of other, lesser contribution violations by the State Board of Elections, Milvid proceeded to take steps to make contributions on behalf of himself and Debut by means of contributions in the names of others in violation of Section 14-120(1) of the Election Law.

This conduct resulted in Counts 43, 44, 45, 46, 47 and 48 of the indictment, which accuses Milvid of making campaign contributions in the names of A. & J. Antorino Company, Inc. (Counts 43 & 44), Lauren A. Milvid (Counts 45 & 46), Celso Fereira (Count 47) and Maria Ferrierira (Count 48).

The allegations contained in Counts 43 and 44 clearly involve a third party and the defendant Milvid is guilty as to these counts.

On the other hand, contributions made in the name of Milvid's wife and his business partner scarcely could deceive anyone who took the time to look carefully at the appropriate filing.

## Verdict as to Counts 41 through 48

The defendants Milvid and Debut Concrete and Construction, Inc. with respect to Counts 41 through 44 are guilty.

The defendants Milvid and Debut Concrete and Construction, Inc. with respect to Counts 45 through 48 are not guilty.

## Counts 49 and 50

Counts 49 and 50 concern activities by Stephen Milvid, Debut Concrete Corporation, and Daniel Wirshup, hereinafter "Wirshup" in connection with work performed by Debut in the Village of Patchogue between January 1, 1998 and December 6, 2000.

### Count 49
### The Larceny from
### The Village of Patchogue

This count alleges that Milvid and Debut, stole more than $3,000.00 from the Village of Patchogue by overbilling the Village for work performed pursuant to contract.

Wirshup was the appointed Superintendent of Public Works for the period of time in question and, as a part of his duties in that capacity, had the authority to approve work done by Milvid and Debut for payment.

Unlike the situation prevailing with respect to the matters pertaining to the Town of Brookhaven now before the Court, there has been no showing that there was conscious attempt on the part of Wirshup or Milvid to systematically inflate the payment of documents submitted, for any reason, nor is there any showing of any motivation on the part of either defendant to approve any inflated vouchers except for the fact that Wirshup's son was employed, apparently as a summer worker, by Debut and is said to have been paid between $3,000.00 and $4,000.00 for it.

In support of these allegations the District Attorney relies essentially on a series of written reports prepared at the request of the Village of Patchogue by the engineering firm of Vollmuth and Brush pursuant to a resolution of that Board dated June 9, 2003.

The record is devoid of proof as to what, if any, standards Wirshup was supposed to apply in connection with his approval of the disputed payments to Debut.

In any event, as the defense was able to establish on cross examination that not all of the contentions of Vollmuth and Brush as per the witnesses, Kenneth Lindauer and Jeffrey V. Vollmuth, were accurate for the purpose of measuring the amounts of concrete actually installed by Debut.

Moreover, many of the complaints articulated by Vollmuth and Brush with respect to the work of Debut concerned the quality of the work and allegations to the effect that the work

was generally substandard. See Vollmuth & Brush letter to Mayor Edward A. Ihne dated September 8, 2003.

A constant critism found in the Volmuth and Brush reports is the allegation that it was difficult to evaluate all of the jobs done by Debut in Patchogue since no field notes were kept.

In short, the record in this case with respect to the disputed items indicates that there may well be a valid civil claim by the Village of Patchogue against Debut, but criminal activity in these regards certainly has not been proven beyond a reasonable doubt.

Count 50
The Larceny as Pertains to
Ten or More Homeowners

Wirshup is charged with Acting In Concert with Milvid for the purpose of stealing money from ten or more homeowners.

The prosecution contends that Wirshup in his capacity as Superintendent of Public Works caused Mary Pontiere, the Patchogue Village Clerk to send notices in the mail to certain homeowners to the effect that they (the homeowners) were responsible to repair the sidewalks in front of their homes and that repairs were necessary within forty eight (48) hours.

It appears that Patchogue Village Ordinance #73 contains a requirement to the effect that these homeowners were, in fact, responsible for such repairs.

The District Attorney argues that the subject letters were sent at the direction of Wirshup by Ms. Pontieri to certain homeowners whose homes were located nearby to where Debut was working in order to get extra business for "Debut."

While it may have been true that the letters were sent to the subject homeowners, here again, unlike the situation with regard to the Brookhaven matter, there in no evidence to the effect that any such plan was ever agreed upon as between Wirshup and Milvid.

The homeowners called to testify did not claim that the sidewalks and aprons in front of their homes were in good repair. Their objections centered more on the question of why it was their home that was singled out for enforcement. Even, fair and comprehensive enforcement of the Village Code is essential, but a failure to achieve that goal does not result in criminal sanctions for either the contractor involved or the village official who initiates an action resulting in the employment of the contractor.

Certainly, it is true, to the extent that since Wirshup was a public official working for the Village of Patchogue, to the extent that he may have encouraged any homeowner to hire Debut for any work, he would be subject to criticism and, perhaps, criminal sanctions.

But that is not what is before the Court now.

## Verdict as to Counts 49 and 50

Accordingly, the defendant Milvid and Debut are acquitted of Counts 49 and 50

## Counts 53 through 74

### Scheme to Defraud - and the Alleged
### Labor Law Violations Milvid and Debut

The defendants, Milvid and Debut are charged in Counts Fifty Three (53) through Seventy Four (74) with what amounts to an ongoing course of conduct during the periods March 1, 2001 through November 30, 2001 and March 1, 2002 through November 30, 2002 wherein and whereby they systematically paid less than the prevailing wages and supplements to laborers, workmen or mechanics in their employ.

Counts Fifty Seven (57) through Seventy Four (74) allege the failure to pay certain specific workers the prevailing wage during those applicable time frames.

In this respect the workers concerned are Juan Medina, Lucio Gonzalez, Ruiy Monteiro, Aurilio Santos, Jose Rodrigues, Feliciano San Juan, Luis Garcia, Wilson Garcia and Nicholas Martinez.

In that same order as the names of the above workers are listed Counts Fifty Seven (57) through Seventy Four (74) are applicable with two counts attributable to each individual worker named as above.

The allegations in the indictment in so far as these counts are concerned pertain to a Violation of Section 220.3 of the Labor Law.

This law protects workers who are engaged by their employers in public projects and require their employers as the responsible parties to pay the workers a wage consistent with what is known as the "prevailing wage."

Here, there was testimony from certain workers themselves as well as documentary evidence and the testimony of Mary Pontieri who enjoys the dubious distinction of having worked for the Village of Patchogue during the time that Milvid and Debut dealt with that Village and subsequent employment at Debut's offices at the behest of Milvid for general secretarial purposes, bookkeeping, form preparation and the collection of accounts for Debut.

Ms. Pontieri described the chaotic state of affairs at Debut, ongoing horrendous cash flow problems and procedures implemented by Debut at the direction of Milvid which resulted in the indictment against Milvid and Debut with regard to these subject charges.

Specifically, Ms. Pontieri testified that the Debut operation often backed into required governmental forms and had only seven workers "on the books" and a number of day workers who were paid in cash.

The upshot of all of this, despite counsel's theorizing to the contrary, is that at least four of the workers were not paid the prevailing wage during the times in question in violation of the Labor Law.

<u>Verdict as to Counts 53 through 74</u>

In as much as the findings above made establish that one or more persons were defrauded of the sum of $1,000.00 or more but failed to show by proof beyond a reasonable doubt that ten or more persons were defrauded, the defendants Milvid and Debut are guilty as to Counts 54 and 56 but not guilty as to Counts 53 & 55.

The People have failed to produce proof sufficient to establish the guilt of the defendants beyond a reasonable doubt with respect to Counts 57, 58, 59, 60, 65 66, 67 and 68 and the defendants are not guilty of these counts.

The Court finds that the People have sustained their burden of proof of guilt beyond a reasonable doubt and the defendants Milvid and Debut are guilty with respect to Counts 61 & 62; 63, 64, 69, 70, 71, 72 73 and 74.

<u>Counts 75 through 78</u>

<u>Alleged False Offering of
Instruments for Filing, Certified
Payroll to the Town of Smithtown</u>

In order to meet the requirements of the Labor Law those individuals or entities holding public contracts are required to file certified payrolls showing that the workers concerned were paid in accordance with law.

Counts 75 through 78 allege that Milvid, on behalf of Debut offered four separate false certified payrolls to the Town of Smithtown for filing which were fraudulent, in violation of Section 175.35 of the Penal Law.

The proof is clear that these same instruments were filed by Milvid with the Town of Smithtown on behalf of Debut and that all or most of the workers concerned were not paid in accordance with the information therein contained so as to conceal the underpayment of wages from the appropriate Town of Smithtown authorities.

<u>Verdict as to Counts 75 through 78</u>

Accordingly, the defendants Stephen Milvid and Debut Concrete Construction, Inc. Are both guilty of all Counts 75 through 78.

Counts 79 and 80
<u>Falsifying Business Records in the First Degree,</u>
<u>Failure to File Certified Payrolls with the Town of Brookhaven</u>

Counts 79 and 80 of the indictment charge Milvid and Debut with the crime of Falsifying Business Records in the First Degree in violation of Section 175.10 of the Penal Law, during the time periods of March 1, 2001 through November 30, 2001 and March 1, 2002 through November 30, 2002.

It is the District Attorneys position that during these time periods the defendants had a duty to file the certified payrolls in question with the Town of Brookhaven.

By failing to do so, the People argue, these defendants were facilitating another crime, namely, Wilful Failure to Pay Prevailing Wages and Supplements in violation of Section 220.03 of the Labor Law. As a result the People argue that the defendants are guilty of omitting "to make a true entry in the business records of an enterprise in violation of a duty to do so which (they) knew to be imposed upon them by law" Penal Law Section 175.05(3).

As a practical matter, there is obviously a major difference between filing a document which contains false information and simply not filing a government required instrument at all.

There was testimony on trial to the effect that at least some of the responsible officials in the Town of Brookhaven were unaware of the requirement here in question, namely Labor Law Section 220.3( c) , which provides for a penalty if the certified payroll is not filed.

The operative language is:

c. The fiscal officer may require any person or corporation performing such public work to file with the fiscal officer within ten days of receipt of said request, payroll records, sworn to as to their validity and accuracy, requested by the fiscal officer, for said public work or for any public or private work performed by said person or corporation during the same period of time as said public work. In the event said person or corporation fails to provide the requested information within the allotted ten days, the fiscal officer shall, within fifteen days, order the department of jurisdiction to immediately withhold from payment to said person or corporation up to twenty-five percent of the amount, not to exceed one hundred thousand dollars, to be paid to said person or corporation under the terms of the contract pursuant to which said public work is being performed. Said amount withheld shall be immediately released upon receipt by the department of jurisdiction of a notice from the fiscal officer indicating that the request for records had been satisfied.

Perhaps as an outgrowth of the investigation of this case, the appropriate officials of the Town of Brookhaven had a meeting and implemented procedures in order to obtain the necessary certified payrolls.

On the other hand, it appears that during the time period in question, not even the officials of the Town of Brookhaven who would be concerned were aware of the requirement of the Labor Law.

It is argued that Milvid should have known about the requirement to file a certified payroll, as earlier discussed, because he did so in relation to similar work that Debut had done in the Town of Smithtown.

It would seem that the Legislature has set up a procedure applicable to those cases in which the required certified payroll filings are not made. That mechanism consists of the sanctions which can be invoked pursuant to Labor Law Section 220 (3)( c) and involve the withholding of partial payment from the offending party.

In any event, Labor Law Section 220 is the embodiment of a comprehensive legislative scheme clearly meant to regulate in detail and enforce the provisions of the Labor Law which dictate the appropriate wage to be paid workers employed on public contracts. If

the Legislature had meant to make non-filing of the certified payrolls a separate felony offense, it would have said so.

Even under these circumstances, where the defendants seem to have been in violation of the Labor Law on a regular basis, there is no proof on this record as to why the certified payrolls were never filed, nor is it clear that the responsibility to file the same with the Town would fall to these particular defendants under the circumstances.

This is especially true given the fact that, for a time at least, some officials of the Town were unaware of the filing requirements.

### Verdict as to Counts 79 and 80

Accordingly, the defendants Stephen Milvid and Debut Concrete Construction, Inc. are not guilty as to Counts 79 and 80.

The foregoing shall constitute the verdict on the case of People of the State of New York against Stephen Milvid and Debut Concrete Construction, Inc. under Indictment No. 1255-B and C-2003.

GARY J. WEBER

Gary J. Weber, J.C.C.